Cevdet Uruk

0537987

PERSON IDENTIFICATION/BOOKING NO.

Santa Barbara County Jail
ADDRESS OR PLACE OF CONFINEMENT

4436 Calle Real, Santa Barbora CA
93110

Note: It is your responsibility to notify the Clerk of Court in writing of any change of address. If represented by an attorney, provide his or her name, address, telephone and facsimile numbers, and e-mail address.



FILED
CLERK, U.S. DISTRICT COURT

FEB - 4 2022

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Cevdet Uruk

FULL NAME (Include name under which you were convicted )

Petitioner,

v.

Bill Brown, Sheriff

NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED PERSON HAVING CUSTODY OF PETITIONER

Respondent.

CASE NUMBER:

CV CV22-824-MWF (SP)

To be supplied by the Clerk of the United States District Court

☐ _____ AMENDED

PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY
28 U.S.C. § 2254

PLACE/COUNTY OF CONVICTION
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT
(List by case number)
CV _____
CV _____

### INSTRUCTIONS - PLEASE READ CAREFULLY

1. To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2. In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge judgments entered by more than one California state court, you must file a separate petition for each court.

3. Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4. Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5. You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. You must also state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

6. You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed in forma pauperis (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

7. When you have completed the form, send the original and two copies to the following address:

    Clerk of the United States District Court for the Central District of California
    United States Courthouse
    ATTN: Intake/Docket Section
    255 East Temple Street, Suite TS-134
    Los Angeles, California 90012

PLEASE COMPLETE THE FOLLOWING *check appropriate numbers*

This petition concerns:
1. ☑ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

## PETITION

1. Venue
   a. Place of detention __Santa Barbara Jail (to serve the consecutive jail term from the to the prison term__
   b. Place of conviction and sentence __Santa Barbara__ (completed the prison sentence) same case(s).

2. Conviction on which the petition is based *(a separate petition must be filed for each conviction being attacked)*:
   a. Nature of offenses involved *(include all counts)*: __Dissuading a Witness¹, Corporal Injury², Assault by Means of Likely GBI³, False Imprisonment⁴ (Felonies), Domestic Violence Contempt of Court⁵, Battery⁶, Probation Violation⁷ (Misdemeanors)__
   b. Penal or other code section or sections: __136.1(b)1¹, 273.5(a)², 245(a)(4)³, 236⁴, 166(c)(1)⁵, 243.e.1⁶__
   c. Case number: __18CR02248 + 1471799__
   d. Date of conviction: __6.27.2019__
   e. Date of sentence: __8.5.2019__
   f. Length of sentence on each count: __2 yrs¹ + 4 yrs² + 1 yr³ + 8 mos⁴ + 1 yr⁵ + 16 yr + 1 yr = 10 yrs 8 mos.__
   g. Plea *(check one)*:
      ☑ Not guilty
      ☐ Guilty
      ☐ Nolo contendere
   h. Kind of trial *(check one)*:
      ☑ Jury
      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction?    ☑ Yes   ☐ No
   If so, give the following information for your appeal *(and attach a copy of the Court of Appeal decision if available)*:
   a. Case number: __B299732__
   b. Grounds raised *(list each)*:
      (1) __Prejudice by the exclusion of inconsistent statements__
      (2) __Unlawful sentence due to inapplicable scheme__

    (3) Sentences for false imprisonment and battery must be stayed (Sec. 654)

    (4) _____

    (5) _____

    (6) _____

  c.  Date of decision: 9.30.2020

  d.  Result: Affirmed with 1 yr reduction (for ground 2)

4.  If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision? ☑ Yes ☐ No

If so, give the following information (and attach copies of the Petition for Review and the Supreme Court ruling if available):

  a.  Case number: S265386

  b.  Grounds raised (list each):

    (1) The inconsistent statements should have been admitted for impeachment

    (2) _____

    (3) _____

    (4) _____

    (5) _____

    (6) _____

  c.  Date of decision: 12.9.2020

  d.  Result: Denied

5.  If you did not appeal:

  a.  State your reasons _____

  b.  Did you seek permission to file a late appeal? ☐ Yes ☐ No

6.  Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction? ☑ Yes ☐ No

If so, give the following information for each such petition (use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available):

  a.  (1) Name of court: Superior Court of Santa Barbara County

    (2) Case number: 20CR06321, 21CR00309

    (3) Date filed (or if mailed, the date the petition was turned over to the prison authorities for mailing): 9.9.20, 1.15.21

(4) Grounds raised (list each): Ineffective assistances of the trial and appellate counsels (IAC)

(a) IAC in vindictive prosecutions and prosecutorial misconducts / confrontation violations

(b) IAC in mental illnesses of my wife and newly discovered evidence of them

(c) IAC in illegal/unjust sentencing including disproportionate sentences

(d) IAC in abuse of discretion, judicial/racial/sexual) bias

(e) IAC in misadvice on potential sentence and consequences of turning

(f) down the plea offer

(5) Date of decision: 11.16.20, 4.27.21

(6) Result: Denied, pending appeal (First one.)
Denied, should have been raised during the appeal (Second one.)

(7) Was an evidentiary hearing held?    ☐ Yes   ☑ No

b. (1) Name of court: Court of Appeal

(2) Case number: B309441, B312326

(3) Date filed (or if mailed, the date the petition was turned over to the prison authorities for mailing): 12.18.20, 5.13.21

(4) Grounds raised (list each):

(a) Same as above

(b) "    "    "

(c) "    "    "

(d) "    "    "

(e) "    "    "

(f)

(5) Date of decision: 12.22.20, 5.20.21

(6) Result: Denied, remittitur was issued  (First one.)
Denied, postcard denial (Second one.)

(7) Was an evidentiary hearing held?    ☐ Yes   ☑ No

c. (1) Name of court: Supreme Court of California

(2) Case number: S269309

(3) Date filed (or if mailed, the date the petition was turned over to the prison authorities for mailing): 6.9.2021

(4) Grounds raised (list each):

(a) Same as above

(b) "    "    "

(c) "    "    "

(d) "    "    "

(e) "    "    "

(f)

5. Date of decision: 9.15.2021

6. Result: Denied

(7) Was an evidentiary hearing held?    ☐ Yes  ☑ No

7. Did you file a petition for certiorari in the United States Supreme Court?    ☐ Yes  ☑ No

If yes, answer the following:

(1) Docket or case number (if you know):

(2) Result:

(3) Date of result (if you know):

(4) Citation to the case (if you know):

8. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the <u>facts</u> supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

CAUTION:    *Exhaustion Requirement*: In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court. This means that, prior to seeking relief from the federal court, you first must present <u>all</u> of your grounds to the California Supreme Court.

The trial & appellate counsels were ineffective in that they failed (IAC)

a. Ground one: IAC to investigate, oppose and raise vindictive prosecutions & prosecutorial misconducts in violations of 6th, 5th & 14th Amnds effective asst of counsel due process equal protection

(1) Supporting FACTS: I was overzealously prosecuted and retaliated for exercising my constitutional rights to free speech (quoting the Bible & WSJ), trials, appeals and complaints against discrimination with 2x/3x sentence (with no visible injury or no new information), mischaracterizations (punching, choking, blood, bloody lip, etc) and witheld exculpatory evidence (of witness' recording).

(2) Did you raise this claim on direct appeal to the California Court of Appeal?    ☐ Yes  ☑ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?    ☐ Yes  ☑ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?    ☑ Yes  ☐ No

See the attached Habeas Petition, Memorandum and Response(s) for all grounds (1-5), plus supplemental petitions, memorandums, authorities.

b. Ground two: IAC to investigate & raise my wife's mental illnesses, newly discovered evidence of it, & violation of the confrontation clause in violation of the 6th Amnd. fair trial

(1) Supporting FACTS: My wife suffers from serious mental illnesses (delusions, paranoia, (schizophrenia), PTSD, MDD etc). She has been hitting/kicking

the children and called the police on her father too. She was the aggressor. She refused to testify. Her false testimonial hearsay statements to 911 & Police were admitted to evidence. Her recanting and inconsistent statements were excluded.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☐ Yes  ☒ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☐ Yes  ☒ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒ Yes  ☐ No

consecutive 8 yr jail sentence for the same case, after prison term

c.  Ground three: IAC to prepare, oppose and raise illegal & unjust sentencing issues including cruel/disproportionate sentences in violations of 6th, 8th Amnds.

(1) Supporting FACTS: I was denied presentence report, continuence, right to speak & authorized probation. The Judge used the same false aggravating factors for the upper and consecutive terms and gave the max 12 yrs despite the DA's request for 7 yrs, by completely ignoring the mitigating and concurrent factors, and my good character (devoted stay at home Dad to 3 little children (3,5,7 yrs), good education & profession)

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☐ Yes  ☒ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☐ Yes  ☒ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒ Yes  ☐ No

(MBA, CFA, CPA, PhD Coursework & Finance Professor/Analyst, calm, respectful, no drug/alcohol, 51 yr old, soft spoken, no criminal background)

d.  Ground four: IAC to investigate, oppose and raise abuse of discretion & judicial/racial/gender/sexual biases in violations of the 6th, 5th & 14th Amnds. impartial jury confrontation clause fair trial, due process, equal protection

(1) Supporting FACTS: The jury forperson said if the charges were not dropped, he must be guilty. One juror said the standards of threating a woman in Turkey are different. Jurors were not my peers. I was deliberately prosecuted by a female DA with Iranian descent and represented by a female PD with Iranian/Armenian descent due to my national origin. I was told to go back to Turkey to abuse women.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☐ Yes  ☒ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?  ☐ Yes  ☒ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?  ☒ Yes  ☐ No

I am a US citizen and I was raised secularly, I respect women.

e.  Ground five: IAC to prepare for the trials and appeals, and give competant advice, defenses, and arguments in violations of the 6th Amnd.

(1) Supporting FACTS: The trial counsels failed to prepare for the trials, investigate any defenses, and give competant advice on the potential sentence and the consequences of turning down the plea offer of no jail/prison term. Appellate counsels failed to raise the ineffective assistances of the trial counsels.

(2) Did you raise this claim on direct appeal to the California Court of Appeal?  ☐ Yes  ☒ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court?   ☐ Yes   ☑ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court?   ☑ Yes   ☐ No

9.  If any of the grounds listed in paragraph 8 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: _____

    _____

    _____

10. Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

    ☐ Yes   ☑ No

    If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

    a.  (1) Name of court: _____

        (2) Case number: _____

        (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

        (4) Grounds raised *(list each)*:

            (a) _____

            (b) _____

            (c) _____

            (d) _____

            (e) _____

            (f) _____

        (5) Date of decision: _____

        (6) Result _____

        _____

        (7) Was an evidentiary hearing held?   ☐ Yes ☐ No

    b.  (1) Name of court: _____

        (2) Case number: _____

        (3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

        (4) Grounds raised *(list each)*:

            (a) _____

            (b) _____

            (c) _____

            (d) _____

            (e) _____

            (f) _____

        (5) Date of decision: _____

(6) Result: _____

(7) Was an evidentiary hearing held?    ☐ Yes ☐ No

11. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction?    ☐ Yes  ☑ No

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: _____

(2) Case number: _____

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: _____

(4) Grounds raised *(list each)*:

(a) _____

(b) _____

(c) _____

(d) _____

(e) _____

(f) _____

12. Are you presently represented by counsel?    ☐ Yes  ☑ No

If so, provide name, address and telephone number: _____

_____

_____

WHEREFORE, petitioner prays that the Court grant petitioner all relief to which he may be entitled in this proceeding.

_____
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on  1/29/22 _____
Date                                                    *Signature of Petitioner*

Cevdet Uruk
_____
Petitioner

Bill Brown, Sheriff
_____
Respondent(s)

**DECLARATION IN SUPPORT**
**OF REQUEST**
**TO PROCEED**
*IN FORMA PAUPERIS*

I, _____Cevdet Uruk_____, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1.  Are you presently employed?  ☐ Yes  ☑ No

    a.  If the answer is yes, state the amount of your salary or wages per month, and give the name and address of your employer. _____

    _____

    b.  If the answer is no, state the date of last employment and the amount of the salary and wages per month which you received. _2016, 200-300/month as a self employed (part time) accountant. I was a full time stay-at-home Dad to 3 little children (2,4,6 yrs)_

2.  Have you received, within the past twelve months, any money from any of the following sources?

    a.  Business, profession or form of self-employment?    ☐ Yes  ☑ No
    b.  Rent payments, interest or dividends?                ☐ Yes  ☑ No
    c.  Pensions, annuities or life insurance payments?      ☐ Yes  ☑ No
    d.  Gifts or inheritances?                               ☐ Yes  ☑ No
    e.  Any other sources?                                   ☐ Yes  ☑ No

    If the answer to any of the above is yes, describe each source of money and state the amount received from each during the past twelve months: _____

    _____

3.  Do you own any cash, or do you have money in a checking or savings account?  *(Include any funds in prison accounts)*
    ☑ Yes  ☐ No   I'll pay the filing fee through someone.

If the answer is yes, state the total value of the items owned: ~~$450~~ $400 in jail account. I belive I don't have any money left on my bank accounts. My wife has the control of my accounts and there is to no contact order. I cannot contact her. I had a couple of thousand dollars.

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property? *(Excluding ordinary household furnishings and clothing)* ☐ Yes ☐ No

If the answer is yes, describe the property and state its approximate value: My wife & I own an affordable condo (w 40 K equity in it) and 3 old cars (2002, 2005, 2007) (worth a couple of thousands) She claims full ownership. I don't know how much I have in my IRAs. I don't know how much I'll have after the divorce.

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support: We have 3 children (4, 6 & 8 yr)

_____

_____

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on ___1/20/2022___       _____
              *Date*                          *Signature of Petitioner*

## CERTIFICATE

I hereby certify that the Petitioner herein has the sum of $_____ on account to his credit at the _____ institution where he is confined. I further certify that Petitioner likewise has the following securities to his credit according to the records of said institution: _____

_____

_____

_____

_____        _____
          *Date*                          *Authorized Officer of Institution/Title of Officer*

426

**Santa Barbara County, CA**                                    12/17/2021 05:13 AM

## Resident Transaction Receipt

**Transaction:** 209624                                    **Officer:** CNC5438

| Resident | | | |
|---|---|---|---|
| **Name:** | URUK, CEVDET | **Housing Unit:** | 400 |
| **CIN:** | 0537987 | **Housing Cell:** | 426 |
| | | **Housing Bunk:** | BNK |

| Transaction | | | |
|---|---|---|---|
| **Date/Time:** | 12/17/2021 5:13:30 AM | | |
| **Accounting Event:** | Deposit Check | **Receipt:** | |
| **Description:** | CDCR KERN VALLEY STATE PRISON / 158-887112 | | |
| **Amount:** | $200.00 | | |
| **Balance:** | $553.19 | | |

| Accounts | |
|---|---|
| **Account** | **Current Balance** |
| Trust | 553.19 |

**Signatures**

_____          _____
Resident                                      Date

_____          _____
Authorized Officer                            Date



RETURN TO INMATE

Santa Barbara County, CA                                    12/17/2021 05:12 AM

# Resident Transaction Receipt

**Transaction:** 209623                                    **Officer:** CNC5438

## Resident

| | | | |
|---|---|---|---|
| **Name:** | URUK, CEVDET | **Housing Unit:** | 400 |
| **CIN:** | 0537987 | **Housing Cell:** | 426 |
| | | **Housing Bunk:** | BNK |

## Transaction

| | | |
|---|---|---|
| **Date/Time:** | 12/17/2021 5:12:10 AM | |
| **Accounting Event:** | Deposit Check | **Receipt:** |
| **Description:** | CALIFORNIA DEPT. OF CORRECTIONS AND REHAB / 198-1133979 | |
| **Amount:** | $353.19 | |
| **Balance:** | $353.19 | |

## Accounts

| Account | Current Balance |
|---|---|
| Trust | 353.19 |

## Signatures

_____          _____
Resident                                          Date

_____          _____
Authorized Officer                                Date

SUPREME COURT

# FILED

SEP 1 5 2021

Jorge Navarrete Clerk

_____
Deputy

S269309

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

---

In re CEVDET URUK on Habeas Corpus.

---

The petition for writ of habeas corpus is denied.

CANTIL-SAKAUYE
_____
*Chief Justice*

IN THE SUPREME COURT
OF THE STATE OF CALIFORNIA

Cevdet Uruk,                    )    No: S269309
Petitioner                      )
                                )    SUPPLEMENTAL MEMORANDUM
                                )
                                )

I respectfully submit the following additional authorities.

1. Ramirez v. Tegels, 963 F.3d 604 (7th Cir. 2020)
(Counsel on direct appeal failed to heed client's "ur[ing]... to
raise a confrontation claim under [recently-issued Supreme Court
decision in] Crawford [v. Washington]; an attorney exercising
reasonable professional judgement would have recognized that
the confrontation claim was clearly stronger than the claims...
[appellate counsel] raised. Morever, Mr. Ramirez's trial
counsel made confrontation objections at trial, and ...
[appellate counsel] could have made strong arguments
that the Wisconsin courts should     grant relief on
the merits of the confrontation claim even assuming the
claim was forfeited"). (Grounds 2 & 4)

2. Stankewitz v. Wong, 698 F.3d 1163 (9th Cir. 2012)
(Counsel failed to investigate and present readily available
mitigation evidence.) (Ground 3)

3. Parker v. Bowersox, 188 F.3d 923 (8th Cir. 1999)
cert. denied, 531 U.S 952 (2000)
(Counsel failed to present testimony of witness who could have
rebutted factual predicate of aggravating circumstances.) (Ground 3)

4. Blake v. Kemp, 758 F.2d 523 (11th Cir)
cert. denied, 474 U.S. 998 (1985)
(Counsel failed to prepare for penalty phase before trial and
then could not obtain continuence of sentencing hearing after
trial ended in conviction) (Ground 3).

1

5) Lafler v. Cooper, 566 U.S. 156 (2012)
(Petitioner was denied effective assistance of counsel in plea bargaining by attorney's misadvising petitioner to reject plea offer based on view of law by counsel that the state conceded was deficient, which resulted in petitioner's rejecting plea, " being convicted at trial, ... [and] receiving] a minimum sentence 3½ times greater than he would have received under the plea) (Ground 5)

6) United States v. Gordon, 156 F.3d 376 (2d Cir. 1998)
(Counsel grossly underestimated maximum sentencing exposure under Sentencing Guidelines if client opted for trial.) (Ground 5)

7) Boria v. Keane, 99 F.3d 492 (2d Cir. 1996)
(Counsel was ineffective in failing to counsel client about wisdom of accepting plea bargain which would have substantially reduced sentence.) (Ground 5)

8) Maxwell v. Roe, 628 F.3d 486 (9th Cir. 2010)
cert. denied, 565 U.S. 1138 (2012).
(Prosecution failed to disclose "multiple pieces of critical impeachment information that could have been used to undermine the credibility of [jailhouse informant]. (Ground 1)

9) Brown v. Smith, 551 F.3d 424 (6th Cir. 2008)
(Counsel was ineffective in failing to investigate and obtain counselling records that could have been used to impeach complainant.). (Ground 2)

10) Winzer v. Hall, 494 F.3d 1192 (9th Cir. 2007)
(trial court violated Confrontation clause by "finding that [alleged victim's] report [to police officer] was [admissable as] a "spontaneous declaration or excited utterance"). (Grounds 2 & 4)

11) Harmon v. Lamar, 640 Fed. Appx (3d Cir. 2016)
(Consecutive sentences for aggravated assault and attempted murder arose out of a single incident and thus ... violate[d] the Double Jeopardy Clause"). (Ground 3).

2

I declare under the penalty of rules of perjury.
Respectfully submitted on July 29, 2021.

Cevdet Uruk, Petitioner

IN THE SUPREME COURT
OF THE STATE OF CALIFORNIA

Cevdet Uruk                     )     No: _____
Petitioner                      )
on Habeas Corpus                )     SUPPLEMENTAL PETITION
                                )     FOR WRIT OF HABEAS CORPUS
                                )
                                )

1) I, Petitioner, Cevdet Uruk, respectfully submit this supplement to my Writ of Habeas Corpus Petition (HP) mailed on 6.9.21.

2) I repeat the same claims/grounds (1-5), facts, authorities, and prayers for (additional discovery, evidentiary hearing, appointment of a counsel, habeas corpus and other relief) in the Initial Habeas Corpus Petition supported by the memorandum, exhibits, and by the response to the Superior Court denial (with the background, additional facts, authorities and exhibits).

3) I add the following exhibits. (Ex 47-54)

4) The HP filed with the Court of Appeal on 5.13.21 was denied on 5.20.21 with a postcard denial in error (Ex 44):

5) The HP states issues that are mostly not on the record, for the deficiencies of both the trial and appellate counsels and the prejudices of those deficiencies, with supporting detailed facts, documents, and authorities for a prima facia case. Also, The Court of Appeal didn't consider my supplemental brief during the direct appeal. (Ex 49)

I declare under the penalty of the rules of perjury. Respectfully submitted on June 14, 2021.

*Cevlulk Cewlulk*

Cevdet Uruk
Petitioner.

Name: Cevdet Uruk

Address: CCI

PO Box 608

Tehachapi CA 93581

HC-001

CDC or ID Number: BK0724

IN THE SUPREME COURT
OF THE STATE OF CALIFORNIA

_____
(Court)

Cevdet Uruk
Petitioner

vs.

B. Cates, (A) Warden
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the superior court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the superior court, you should file it in the county in which you are confined.

---

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the superior court, you only need to file the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal in paper form and you are an attorney, file the original and 4 copies of the petition and, if separately bound, 1 set of any supporting documents (unless the court orders otherwise by local rule or in a specific case). If you are filing this petition in the Court of Appeal electronically and you are an attorney, follow the requirements of the local rules of court for electronically filed documents. If you are filing this petition in the Court of Appeal and you are *not* represented by an attorney, file the original and one set of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, an original and 2 copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

---

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2007). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 6

Form Approved for Optional Use
Judicial Council of California
HC-001 [Rev. September 1, 2018]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.,
Cal. Rules of Court, rule 8.380
www.courts.ca.gov

This petition concerns:

- [✓] A conviction
- [✓] A sentence
- [ ] Jail or prison conditions
- [ ] Other (specify): _____

- [ ] Parole
- [ ] Credits
- [ ] Prison discipline

HC-001

1. Your name: __Cevdet Uruk__

2. Where are you incarcerated? __California Correctional Institution__

3. Why are you in custody? [✓] Criminal conviction   [ ] Civil commitment

*Answer items a through i to the best of your ability.*

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon"):
   Dissuading a Witness, Corporal Injury, Assault by Means of likely GBI, False Imprisonment (Felonies) Domestic Violence Contempt of Court, Battery, Probation Violation (Misdemeanors)

b. Penal or other code sections: 136.1 (b) (1), 273.5 (a), 245 (a) (4), 236, 166. c. 1, 243. e. 1

c. Name and location of sentencing or committing court:
   Superior Court of the State of California
   County of Santa Barbara
   Santa Barbara

d. Case number: 18 CR 02248 + 1471799

e. Date convicted or committed: 6. 27. 2019

f. Date sentenced: 8. 5. 2019

g. Length of sentence: 11 yrs, 8 mos

h. When do you expect to be released? 7. 28. 2023

i. Were you represented by counsel in the trial court? [✓] Yes   [ ] No   *If yes, state the attorney's name and address:*
   Neil Levinson
   1933 Clift Dr.
   Santa Barbara CA 93109

4. What was the LAST plea you entered? *(Check one)*:
   [✓] Not guilty   [ ] Guilty   [ ] Nolo contendere   [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?
   [✓] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

6  GROUNDS FOR RELIEF                                                                         HC-001

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "The trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page 4. For additional grounds, make copies of page 4 and number the additional grounds in order.)*

*See attached*

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts on which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel, you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who did exactly what to violate your rights at what time (when)* or *place (where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

*See attached*

b.  Supporting cases, rules, or other authority *(optional)*:

(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

*See attached*

HC-001

3    Did you appeal from the conviction, sentence, or commitment? ☑ Yes    ☐ No    If yes, give the following information.

a.    Name of court ("Court of Appeal" or "Appellate Division of Superior Court").
_Court of Appeal_

b.    Result: _Affirmed w/ 1 yr reduction_    c.    Date of decision: _9. 30. 2020_

d.    Case number or citation of opinion, if known: _B299732_

e.    Issues raised: (1) _Appellant was prejudiced by the exclusion of Jane Doe's inconsistent statements._
        (2) _The principal term of Appellant's sentence was unlawful, because the court relied on an inapplicable scheme._
        (3) _Appellant's sentence for false imprisonment and battery must be stayed pursuant to Section 654_

f.    Were you represented by counsel on appeal? ☑ Yes    ☐ No    If yes, state the attorney's name and address, if known:
_Robert Hernandez_
_530 E. Los Angeles Ave. # 115 - 207, Moorpark, CA 93021_

9.    Did you seek review in the California Supreme Court? ☑ Yes    ☐ No    If yes, give the following information:

a.    Result: _Denied_    b.    Date of decision: _12. 9. 2020_

c.    Case number or citation of opinion, if known: _S265386_

d.    Issues raised: (1) _Hearsay evidence is admissable to impeach a declarant whose statements have been received into evidence._
        (2) _____
        (3) _____

10.    If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
_Factual bases for the claims rest on the evidence not on the record._

11.    Administrative review:

a.    If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500.) Explain what administrative review you sought or explain why you did not seek such review:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

b.    Did you seek the highest level of administrative review available?    ☐ Yes    ☐ No
*Attach documents that show you have exhausted your administrative remedies.*

HC-001

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?    ☑ Yes  *If yes, continue with number 13.*    ☐ No  *If no, skip to number 15.*

13. a. (1) Name of court: Superior Court of Santa Barbara County

(2) Nature of proceeding (for example, "habeas corpus petition"): Habeas Corpus Petition X 2

(3) Issues raised: (a) Ineffective assistance of trial and appellate counsels
on 1) vindictive prosecution, 2) newly discovered evidence; 3)
(b) Sentencing errors, 4) Judicial/racial bias, 5) misadviru.

(4) Result (attach order or explain why unavailable): Denied  2 X

(5) Date of decision: 11. 16. 2020 , 4. 27. 2021

b. (1) Name of court: Court of Appeal

(2) Nature of proceeding: Habeas Corpus Petition 2X

(3) Issues raised: (a) Same as above

(b) _____

(4) Result (attach order or explain why unavailable): Denied

(5) Date of decision: 12. 22. 2020, 5. 20. 2021

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____
_____
_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

_____
_____
_____

16. Are you presently represented by counsel?  ☐ Yes  ☑ No    *If yes, state the attorney's name and address, if known:*

_____
_____

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes  ☑ No    If yes, explain.

_____
_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____
_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 6. 9. 21

► _____
(SIGNATURE OF PETITIONER)

IN THE COURT OF APPEAL
OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT

Cevdet Uruk                    )    No: _____
Petitioner                     )
on Habeas Corpus               )
                               )    PETITION FOR WRIT OF
                               )    HABEAS CORPUS, AND
                               )    APPEAL OF AND RESPONSE TO
                               )    SUPERIOR COURT DENIAL

BACKGROUND

The initial Habeas Corpus Petition (HP) was filed with the Superior Court on September 8, 2020.

Five claims included ineffective assistance of not only the trial counsels but also the appellate counsels (IAC) regarding: 1) Vindictive prosecution, 2) Newly discovered evidence regarding the complaining witness's mental illness/insanity, 3) Unfair, illegal, disproportionate sentencing. 4) Judical, racial, sex(ual) bias, and 5) Misleading advice and other IACs (including admission of testimonial hearsay and exclusion of inconsistent statements).

The HP included a memorandum and 28 Exhibits, including declarations, police/medical reports, relevant parts of the trial transcripts and the complete sentencing transcript. The entire trial transcript was not included since it is burden(some) not only to me but also to the courts. The reasons for the unavailable jury selection transcripts, police reports and other information were explained in the HP.

The Superior Court denied the HP on November 16, 2020, citing the pending CA Supreme Court Review of the direct appeal.

1

The HP was filed with the Court of Appeal on December 18, 2020 and denied on December 22, 2020, citing that the remittitur was issued on December 11, 2020.

The HP was refiled with the Superior Court on January 15, 2021, including the memorandum and 28 Exhibits. It was denied on April 27, 2021, citing (the) failure to file a sufficient record to permit an adequate review and failure to raise the issues of improper admission of testimonial evidence and IAC in appeal.

The Court doesn't seem to looked (at) reviewed (and) the entire HP and Exhibits. did'nt consider(ed)

## CASE

I was arrested for simple battery misdemeanor charges (for grabbing and slapping my wife (lightly) to protect myself and my children against her attacks and lies.)

My charges were pumped up to Corporal Injury and Assault (felony) charges and my exposure was doubled to 12yrs, (with no new information) due to vindication.

There was no visible injury/bruise/redness or blood (both in 2014 and 2018) (Ex 37, p. 163 (12-28), 164 (1-6), and (Ex 37, ps 209-217).

The complaining witness invoked the fifth and refused to testify (both in 2014 and 2018 cases) (Ex 37, p 186 (4-26).

Her testimonial hearsay statements to 911 and Police were admitted as the sole evidence of violence/abuse (both in 2014 and 2018). (Ex 37, ps 30-31, Exs 40,41,42). There was no ongoing emergency; the statements were about past events; My wife was outside with the children; I was inside the house working; She didn't want the arrest; She didn't want the protective order (Both in 2014 and 2018); She was telling stories calmly; She recanted both.

2

(Ex 37, ps. 145-149, ps. 161-185, ps. 193-194, ps. 209-217)
(Exs 40, 41, 42)

"... [statements] are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (Davis v. Washington (2006) 547, U.S. 813 which contains. Hammon v. Indiana). Also see Ex 36, Criminal Evidence Textbook page on Testimonial Hearsay and Crawford v. Washington (2004) 541, US, 36. [emphasized for claims 2 and 4]

Her recanting/inconsistent statements were excluded.

I was convicted of all but one charge.

Newly discovered evidence revealed that she suffers from a very serious illness (mental). She is delusional, (schizophrenic) and paranoid. (Ex 17, p 383 and HP). She has been hitting and kicking the children and She called the Police on her father too.

The Judge denied continuance of sentencing for a new trial (Ex 17, p 383) He denied me speaking (Ex 17, p 389). He also denied the recommended/authorized probation and sentenced me to the maximum term 12 yrs, despite the DA's request for 7 yrs. (Ex 17).

Our lives are destroyed, 3 little children (1, 3, 5 yrs, with no other family in the US) are deprived of their devoted stay-at-home Dad as the primary caregiver and left under the care of a dangerous paranoiac and strangers.

I turned down the plea offer of 1 felony with no Jail/prison term due to misadvice of the counsel and my incompetance.

3

Defense attorneys must fulfill certain professional standards during the plea bargaining process by informing defendants of formal plea offers made by the prosecutors and by accurately providing advice on the consequences of turning down a plea offer. (Missouri v. Frye (2012), 566, US 134, 182. L. Ed 2d 132. S. ct. 1399) (Lafler v. Cooper (2012), 566, US 156, 182 L. Ed 2d 398, 132 S. ct. 1376).

I had brought the IAC issues to my appellate attorney's attention (Ex 38). He said it needs to be done through habeas corpus petition. He didn't do anything. I asked him to file a supplemental brief on my behalf. The Court of Appeal didn't consider it, citing lack of reference to the record and authorities. (Ex 39). I referred to the record but I didn't have the record in Prison and I didn't know the authorities and the rules.

I add the above summary of facts, authorities and Exhibits (29-42) to the HP and renew/repeat my claims/grounds, facts, authorities, and exhibits (1-28), particularly the IAC regarding the violation of the confrontation clause of the 6th Amendment to the grounds 2 and 4.

I repeat the verification and declare under the penalty of perjury.

Respectfully submitted, on May 10, 2021.

Cevdet Uruk
Petitioner

4

IN THE SUPERIOR COURT

OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA BARBARA

Cevdet Uruk,                          )        No:_____

Petitioner,                           )

On Habeas Corpus,                     )        PETITION FOR WRIT OF

                                      )        HABEAS CORPUS

                                      )

                                      )

                                      )

                                      )

IN THE SUPERIOR COURT OF

THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA BARBARA

Cevdet Uruk,                          ) No._____

Petitioner,                           )

On Habeas Corpus                      ) PETITION FOR WRIT OF

                                      ) HABEAS CORPUS

                                      )

                                      )

PETITION FOR WRIT OF HABEAS CORPUS

   TO THE HONORABLE JUSTICE OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF SANTA BARBARA:

   I, Petitioner, Cevdet Uruk, petition for a writ of habeas corpus and by this verified petition state as follows:

                                      I

   I am unlawfully incarcerated and restrained at California Correctional Institution in Tehachapi, California, by J. W. Sullivan, Warden, pursuant to judgements pronounced by the Santa Barbara County Superior Court, in Case No.18CR02248 and 1471799.

                                      II

   I was charged with Dissuading a Witness, Corporal Injury, Assult by Means of Likely GBI, False Imprisonment (Felonies), and Domestic Violence Contempt of Court, Battery, and Probation

1

violation, and Child Endangerment (Misdemeanors). I pled not guilty.

<div align="center">III</div>

I was convicted of all charges, except Child Endangerment, after a jury trial, and judgements of convictions andsentence to state prison and county jail were imposed on August 5, 2019.

<div align="center">IV</div>

The judgements of convictions are presently on appeal before the Court of Appeal, waiting for oral arguments.

<div align="center">V</div>

My imprisonment is unlawful because:

I was deprived of my rights under the Sixth Amendment to the Constitution of the United States and Article I, Section 15 of the California Constitution to the effective assistances of counsels, and was thereby prejudiced as follows:

Ground 1:

Trial and Appeal Counsels were ineffective in that they failed to investigate, object and raise vindictive prosecutions and/or prosecutorial misconducts that violated my rights to freedom of speech under the First Amendment, due process of law under the Fifth Amendment, and equal protection under the Fourteenth Amendment to the Constitution of the United States, and Article I, Sections 2 and 7 of the California Constitution. Specifically, I was overzealously prosecuted and retaliated with upgraded charges without new evidence that tripled/doubled my maximum sentence exposure, for quoting a Bible verse, "Wives, submit to your husbands." and a Wall Street Journal article,

<div align="right">2</div>

"Women Failed Humanity", and going to trial, appealing and complaining to State and Federal Courts and Agencies for their discrimination, since 2014. As a naturalized American citizen, I was deprived of equal protection. It is reasonably probable that a result more favorable to me would have occurred if counsels had investigated, objected, and raised the vindictive prosecutions and/or prosecutorial misconducts, because there wasn't sufficient evidence for the charges.

The additional facts supporting the above ground for relief are as follows:

In 2018, I was arrested for simple Battery, Damaging Cell Phone (Misdemeanors), and False Imprisonment (Felony), with a maximum sentence exposure of 3-5 years. The prosecution upgraded my charges to current charges, with a maximum sentence exposure of 10 years and 8 months, without any new evidence, actually with less evidence. My maximum sentence exposure was tripled/doubled as a retaliation/vindication for using my above stated rights.

In 2014, I was arrested for Battery(Misdemeanor) and Criminal Threat (Felony). Prosecution dropped the Criminal Threat charge and offered an infraction. I declined.Three-four prosecutors broght the Criminal Threat charge back as a mis-demeanor, without any new evidence, alleging that there was a witness from CPS. There was no witness.

I was given a female Prosecutor with Iranian descent (Arshi), a female Public Defender with Iranian/Armenian descent (Karimian), and a female Judge who was in an unsuccessful legal fight with

3

her exhusband over child support. I am a Turkish-American.

During June 2015 trial, one female prosecutor was shouting, "This is a criminal trial", in front of the jury during recess, after my wife refused to testify.

I learned, in the delivery room at the hospital, that I was acquitted of the Criminal Threat, but found guilty of battery. I was sentenced to 3 year probation.

In the Fall of 2015, I was charged with a probation viola- tion for the allegations of "not being able to complete the Batterer's Threatment Program" and "having a firearm", after I explained the group the rationale behind Second Amendment.

My firearm had already been confiscated by the Police. The Probation Officer hadn't let me record the interview. He lied in court, under oath. I was found guilty of probation violation and sentenced to two months in jail.

I expressed my confidence in the American justice system referring to the movie "Midnight Express" and the prosecutions of Jesus and Aaron Swartz. (See Exhibit 16).

In 2014, detectives prepared a report saying that I admitted threatening to kill my wife. I am not that stupid.

In May 2019, two investigators from DA's office told me that "show is on Cevdet", in front of my residence.

Deputy Munoz's report and testimony mentioned "blood" and "bloody lip". (See Exhibit 17 Reporter's Transcript (RT) p.205).

These were mischaracterizations. There was no blood or bloody lip.

Attorney General's appeal response mentions that I am a cronic abuser and I punched my wife. I am not an abuser and there was no mention of punching from anyone. These are other mischaracterizations.

My wife did not have any visible injury/bruise/red mark. She only had a small mark inside her mouth that was likely caused by the implant on her front teeth. She was stating that she bumped on the wall, in the Probation Report (See Ex 8).

There were 10-20 people from the DA's Office attending to my trial. I had noone.

Prosecutor Chanda told the Jury that "I hope you'll find the Defendant not guilty of all charges! (Yes not guilty). (See Ex 17 RT p.331). She also said that there was a police report regarding the probation violation at the Batterer's Threatment Program. I had nver heard of it before. (See Ex 17 RT p.390).

There was no digital recording of my wife's interview with the DA in March 2019. According to my wife and her Attorney (Morse), there was a recording. Additional discovery and an evidentary hearing are necassary to investigate if some exculpatory evidence, regarding my wife's mental state and motivation, existed in the content, or in other interviews/visits/communication. The DA's Office did not respond my request for information regardingmy wife's visit to DA's Office after my incarceration, and any support provided to my wife and family from their office.

My wifeis/was insane/paranoid.The DA's Office made her condition worse by buying into her delusions/paranoia, knowingly/

5

intentionally                . (See Ex 9 for a Sample Expert
Testimony/Declaration).

     The DAs also knew that my wife was the aggressor in each
incident, from her own admission to the Police and them.

     Graund 2:

     The Trial and Appeal Counsels were ineffective in that
they failed to investigate and raise my wife's mental state/
insanity. The newly discovered/available pieces of evidence
(my wife's own actions and admissions with her therapist's
and Psychiatrist's diagnoses/medicalnote/report (See Ex 7), her
recent call to Police on her father, intimate opinions/declara-
tions by our Pastor and marriage counsellor Sergiy Tarasenko,
and our family friends Turanca & Adnan Orali (See Exs10, 11),
and Expert Psychiatrist opinion (See Ex 9) prove her insanity/
paranoia/delusions/(schizophrenia)/sadomaschism/aggression/
violance beyond reasonable doubt. The sole/main evidence of
abuse/violance allegations were my wife's false/testimonial/
hearsay statements to 911 and Police. She refused to testify
both in 2015 & 2019. I was deprived of my right to confront her
(Crawford violation) under the Sixth Amendment to the Constitu-
tion of the United States and Article I, Section 15 of Califor-
nia Constitution. Appeal counsel failed to raise theconfronta-
tion issue on the direct appeal. It is reasonably probable that
a result more fevorable to me would have accurred if the counsels
had investigated and raised my wife's mental state/insanity and
violation of the confrontation right because the sole/main

6

evidence of abuse/violance was alleging witness's false/hearsay/ testimonial statements to 911 and Police, and I was deprived of my right to confront her.

The additional facts supporting the above ground for relief are as follows:

My wife was not healthy physically and mentally when I met her. She had fainted in the Subway, hospitalized and lost her job. I healed her with healthy diet and exercise.She has called the Police six times in six years. Each time, she was the aggressor, she was pregnant and stressed,after I wanted to seperate, she apologized, she took therapy, she promised to change, she didn't remember anything: (See Ex 21)

1) In February 2013, she said to me "I am gonna get your money and I am not gonna show you the baby". She lied to me and left home. Next day she called to ask for forgiveness. (See Ex 18). She called the domestic violence hotline allegin that her life was in danger, before she left, after I asked for a divorce.

2) In March 2013, she hit me. I asked to seperate. She said "I'll send you to jail". We were seperated for a couple of weeks. A year later, I learned that she went to the Police, crying and alleging that I hit her with a red snapper, and also admitting that she hit me too. (See Exhibit 19).

3) In June 2013, she hit me. I locked her out. She called the Police to come home. (See Ex 20, Police Report).

4) In November 2014, she called the Police crying and alleging that I had been abusing her and threatened to kill her over an argument on peanuts she was hiding, eating and lying

7

about it. She was alergic to peanuts. Since she was breastfeeding the baby was getting alergies too. (See Ex 14, Police Report).

5) On March 9, 2018, my wife called 911 alleging that "My husband hit me. He is threatening to kill me. He tried to choke me last night.", immediately after returning from her therapist (Dowkins). The previous night, she was teaching children to lie. I had offered children a treat if they finished their vegetables. My wife threw the vegetables into trash in my absence and told me that they finished, in front of the children. At the therapist she refused to cooperate, despite her previous agreement. I told her that "This could be ourlast chance." She was the aggressor/ attacker. Instead of changing the baby's diaper, she was fighting with me. She hit me. I hold her hands to stop her. The phone was in the basket where she keeps her things including the phone. In a couple of days, she was crying to everybody and begging me to fight for my family. (See Exs 1, 2, 3).

As soon as I was able to come home, she started saying "Do you want me to call the Police?" I hanged the text message and the letters on the wall to remind her. She took them all down.

In November 2017, she went to early labor, at week 31. She was hospitalized for 5 weeks. Doctors wanted to take the baby out at week 34. I learned from second opinions that the Doctors' main motivation was financial. At week 34, newborn goes to NICU, a very expensive stay, without parents' consent. After week 34, they need parents' consent. My out of pocket costs were zero. We had Medical. I had to fight with the Doctors and my wife to keep the baby in the womb as long as possible. He made it to week

8

36, and left the hospital without NICU stay.

In February 2018, the baby was hospitalized due to respira-
tory infection. Doctors wanted to do another unnecassary and
risky procedure (spinal fluid test). I had to fight with the
Doctor and my wife not to do it. It was the most stressful time
of my life. I was so scared of prematurity risk. I was very
disturbed emotionally.

6) In March 2019, when she was pregnant briefly, she went
to the DA, crying and alleging that she was beaten by me in
Turkey [6 months ago] and I had left her and the children with
a bear and ran away in King's Canyon [2 years ago], after I
wanted to seperate. Then she started blackmailing me to get the
affordable housing condo we live in. Later, she recanted. (See
Ex 5).

She threw an onion bag at my Mother, when she came to help
us with the baby. She wanted to slap my Mother. She was pushing
my Mother in Turkey. My family was going to show her the battery
I saved her. We were with family and friends and traveling all
the time, in different cities including a public resort on the
Mediterenian. At King's Canyon, we ran away all together. I was
carrying my daughter on my shoulder.

7) In January 2020, she called the Police on her father too.
See Ex 10).

I held my wife's hand/arm to protect myself (self defense)
against her uncontrolled attacks. She is taller, heavier, and
younger than I am. I am 5'6", 130 lbs, and 51 years old.

My wife has been loosing control and hitting me and

threatening to call the Police many times, even on the phone. For example, in January 2019, she almost called the Police while we were vacationing in Lake Tahoe, unless I hung up thephone with my sister, just before we were about to leave for home.

In April 2019, she slapped me and told me that "I'll send you to prison and you'll die there.", after I wanted to seperate.

She was crying at the C-Section operation, saying that anasthesia didn't work. I asked the Doctor if they had seen anything like that. He said "No". She was crying when she was giving blood sample. She wanted to runaway from the dentist, too.

My three year old daughter is telling me joyfully that "We'll send you to jail and drink juice...hah hah...."

My six year old is throwing her breakfast into trash and telling me that she finished it.

In the Spring of 2019, our baby had unusual rushes. I took him to three different doctors. They couldn't figure it out the cause. I asked my wife if she was eating/taking anything un-usual. She said "no". Later, I found out that she was taking painkilers and lying to me about it.

We often get food poisining due to my wife's poor hygiene.

My six year old got urinary track infection for the first time, in a week after my incarceration. I give bath to children. I don't trust my wife.

I failed to assess the seriousness of my wife's condition, although I've been looking for help from mental health professio-nals. See Ex 22. I took her to three different therapists. I also attempted to take her to three other therapist/psychiatrist,

10

She has also seen another four different therapists/psychiatrists, two of them were court requested. They all failed me.

My love towards her and my family, and similar marriage problems among my closest friends and the most powerful men (Bezos, Musk, Trump, Buffett, Brin, Ellison are a few of them), were contributing factors to my failure, too. For example, Einstein wrote to his boyhood friend that "...I am the triumhant survivor of the Nazi period and two wives."[1]

At the sentencing on August 5, 2019, my wife made a statement saying that: she is delusional due to childhood traumas, she has chemical imbalance due to sugar addiction, she has had images of danger all her life in every setting including work, she was in post partum depression at the time of the call, after a complicated pregnancy and early labor, her psychiatrist postponed medication due to breasfeeding, among other diagnoses (PTSD, MDD etc) made by her therapist in an attached medical note/report. See Exhibit 7.

I didn't know that delision is paranoia; paranoia is very common; paranoids are not truthful; they are angry/violant/evil people with bad memory for the things against their delusions, and paranoids are too paranoid of being paranoid; and they are reluctant to go to psychiatrist. See Ex 9 for a sample Expert Witness Testimony/Declaration. I took her condition childish since I loved her.

---

1) Smith, Dinitia. 1996. "Dark Side of Einstein Emerges in His Letters", New York Times, 6 November.

She meets all seven criteria in DSM (the manual used by
mental health professionals for diagnoses) for Paranoid Persona-
lity Disorder. Four criteria are sufficient for the diagnosis.[2]
See Ex 23.

Ground 3:

Trial counsel was ineffective in that he failed to prepare
for sentencing, introduce mitigating factors, challenge unsubs-
tantiated aggravating factors, and object the illigal/unjust/
disproportunate/cruel/unusual sentences. Specifically, he was on
vacation for three weeks just before the sentencing; he said he
would postpone sentencing; the Judge denied continuance; he
didn't let me make/finish my statement (allocution); he gave me
the maximum upper terms with unsubstantiated aggravating factors
and ran terms consecutive for the same unsubstantiated reason(s)
used for aggravating factors; I wasn't given or read the pre-
sentence report in advance of sentencing; the appeal counsel
failed to raise the sentencing issues adequately. The sentence
violated the cruel/unusual punishment clauses under the Eight
Amendment to the Constitution of the United States and Article I,
Section 17 of California Constitution. It is reasonably probable
that a result more favorable to me would have occurred if the
trial counsel had prepared for sentencing, challenged the

2) American Psychiatric Association. 1994. Diagnostic and
Statistical Manual of Mental Disorders. 4th ed. Washington D.C.:
American Psychiatric Association.

12

unsubstaintiated aggravating factors, present mitigating factors and witnesses because there were substantial mitigating factors and witnesss, and probation was recommended/authorized.

Iwasn't given or read the presentence report before sentencing. There were mischaracterizations and out of context statements, such as "What do you want me to do your honor?, kill myself, or someone else?" There was no outburst. Those statements were in reference to San Bernardino couple who killed others and themselves, by leaving their baby behind. I was responding to racial injustice, particularly Court's and the Batterer's Threatment Program's extortion to get more money from me, despite the Law's explicit otherwise intent.Mitigating factors were omitted in the report as well. Still, the recommendation was probation. I was eligible. I was low risk. There were mitigating factors.

The Judge (Carrozzo) did not allow me to make/finish my statement/alocution at the sentencing. See Ex 17 RT p.389,2-3. I did not say anything disrespectful or demeaning and there was nothing disrespectful or demeaning in my statement. See Ex 24.

He denied probation based on his false/inappropriate/ unsubstaintiated findings. For example, he said "Today, he continued to further deny responsibility, blame the defendant- blame the witness-the victim, rather, and demean her here openly about- with nonsense, quite frankly." See Ex 17 RT p.394, 14-19.

The DA asked for seven year prison term. The judge gave the maximum upper terms with false/inappropriate/unsubstaintiated aggravating factors, by ignoring the substantial mitigating

factors and running all terms consecutive, by using the same
false/inappropriate/unsubstantiated reason(s). He gave me a total
of 11 years and 8 months.

The Judge had the objectives of:

1) Protecting the society,

2) Punishing the Defendant,

3) Encouraging the Defendant to lead a law-abiding life in
the future and deterring him or her from future offenses,

4) Deterring others from criminal conduct by demonstrating
its consecuences,

5) Preventing the Defendant from committing new crimes by
isolating him or her for the period of incarceration.

See Ex 25.

And he accomplished these goals by:

1) Admitting inadmissable hearsay statements from a non
testifying paranoid/insane/liar alleging witness,

2) Not admitting inconsistent/mental/physical condition
statements of the alleging witness, saying that they are
not relevant,

3) Denying continuence for sentencing (for a new trial),

4) Denying the Defendant to make a statement/allocution,

5) Denying authorized/recommended probation,

6) Completely ignoring the mitigating factors,

7) Making up false/inappropriate/unsubstantiated aggravating
factors,

8) Giving the maximum illigal/cruel/disproportionate
upper term sentences,

14

9) Running them consecutive for the same false/inappropriate/ unsubstantiated reason(s) used for upper terms,

10) Issuing a no-contact order with my wife,

11) Traumatizing the alleged witness and three little children (by being cruel to them and endangering them), and victimizing them,

12) Sending their loving husband and devoted father, and primary caregiver with exceptional education (MBA, CFA, CPA, and PhD coursework), and profession (Finance Professor/ Analyst), exceptional character and ethical standards, and without any criminal background, drug or alchool use at age 50, (See Ex 28).

13) Ruining/destroying my life, my family, my career, and professional designations, (See Ex 12).

14) Ruining three little children's life and future,

15) Sending me among criminals and risking my safety and life,

16) Doing all these by saying that "There is nothing I can do to help her [my wife]. See Ex 17 RT 394,14-19.

The Judge used false/inappropriate/unsubstantiated aggravating factors. (See Ex 25):

1) There was no evidence of serious violance. I was arrested for simple battery. There was no visible injury.

2) My wife was not vulnerable. She was an independent woman with a full time job and and good education (Software Analyst with an MS in Mechanical Engineering),

3) There was no threat or dissuation. I was acquitted of

threat charge and my wife called the Police 6 times in 6 years, with false allegations,

4) There was no planning, sophistication or professionalism. My wife was the aggressor.

5) I didn't take advantage of trust and confidence. My wife did.

6) There was no violance or danger to the society from a stay home Dad,

7) Prior misdemeanor convition was for holding my wife's hands/arms to protect myself. There was no other evidence. The conviction did not qualify for enhancement. The court applied the enhancement mistakenly. The Attorney General agreed that it was a mistake.

8) My probation was court supervised and about to end in three months. It could have been ended earlier,

9)                                            I had finished the Batterer's Threatment Program and 20 hours of community work service. There was no call/incident from 2014 to 2018.

The judge completely ignored the mitigating factors. See Exhibit 26:

1) The alleged victim was the aggressor,

2) She was an admitted liar and she was teaching children to lie,

3) She was paranoid/delusional,

4) She was in  post partum depression,

5) I was emotionally disturbed by the early labor, risk of

16

prematurity, and and aggression/paranoia of my wife,

6) There was no visible injury,

7) I was trying to protect my family/children from my wife's aggression and lies,

8) I was the victim of abuse and violence,

9) I had no prior record (except insignificant wrongful conviction for holding my wife's arms/hands to protect myself),

10) I was so tired of her aggression and paranoia and I was extremely stressed,

11) In 2014, I told the Police voluntarily that I slapped her, after she hit me,

I should have been sentenced to just one term. The rest stay. Wrong/inappropriate/unsubstantiated criteria for consecutive sentences were used:

1) The alleged crime and their objectives were NOT predominantly independent of each other,

2) The alleged crimes did NOT involve seperate violance or threats of violance, or

3) The alleged crimes were NOT committed at different times or seperate places, rather than being committed so close in time and place as to indicate a single period of aberrant behaviour,

The mitigating factors were not considered. The lower terms should have been used.

Misdemeanors should have been sentenced/served concurrently. The maximum exposure was 10 years and 4 months. See Ex 17

RT p.34-35.

The Judge said "I look at variety of factors that may or
may not reflect the kinds of things we talked about settlement.."
See Ex 17 RT p.35.

He also said "...I can still send you to jail even if you
are acquitted, even if your wife does not testify.." See Ex 17
RT p.61.

Ground 4:

The trial and appeal counsels were ineffective that they
failed to investigate, object and raise abuse of discretion and/
or Judicial/Sex/Racial/National/Religious origin discrimination,
and thereby I was prejudiced, in violation of my rights to due
process, impartial jury and equal protection under the Fifth,
Sixth, and Fourteenth Amendments to the Constitution of the
United States, and Article I, Section 7 of the California Cons-
titution. Trial counsel was ineffective in that he failed to
investigate discrimination and object.The appeal counselfailed
to raise the discrimination. It is reasonably probable that a
result more favorable me would have occured if the trial counsels
had investigated and objected to discrimination and the appeal
counsels raised discrimination because my national and religious
origins (Turkish, Muslim) were prejudicial, there was not suffi-
cient evidence for the charges, there was substantial evidence
for the discrimination and I had a good character.

The Judges admitted my wife's statements to 911 and Police
both in 2015 and 2019, against the hearsay rule (Section 1200).
They were false/hearsay/testimonial/inadmissable. The Judges

18

admitted them as an exception (Spontaneous statements under Section 1240). There wasn't any ongoing emergency. They were long. Even the parts excluded in 2015 were admitted to 2019 trial.

My wife has made many statements regarding her mental and physical states (extremely emotional, hormonal changes due to pregnancy, postpartum depression, complicated pregnancy, things in her mind, traumatized Russions by the oppressive regimes/ communism). See Exs 1, 2, 3. These statements should have been introduced and admitted according to Evidence Codes: 1202 (Credibility of hearsay declarant), 1235 (Inconsistent statements), and 1250 & 1251 (Statements of of declarant's then and previously existing mental or physical state.

Judge did not admit my wife's written, inconsistent, recanting statements (letter and email to DA, see Exs 4 and 5), saying that they are not relevant, although he said that they are admissable (See Ex 17 RT p.67, 3-4). Nothing can be more relevant than the alleging witness's recantation, mental and physical state statements and contradictions. Relevant evidence shall not be excluded in any criminal proceeding (Right to Truth in Evidence, California Constitution Section 24).

He denied to postpone sentencing for a new trial with the newly discovered  evidence. He denied objections to at least two jurors for cause. One of them was the Forperson. See Ex 17 RT p.74-75. He said he'll take the discrimination into account during sentencing (See Ex RT 369-370). Then he gave me the maximum/illigal/cruel term with harsh looks and comments.

He did not allow me to finish/make my sentencing statement.

19

He used to be a Prosecutor in the DA's Office.

Judges Dandona, and Hill subjected me to harsh/hateful looks and comments. I asked both of them what I had done to deserve these and I wanted to apologize if I had done anything disrespectful.

Counsel Levinson told the Jury that I am Turkish. He didn't tell them that I am an American.

Judgedid not allow us to show the Jury my wife's photos from 2014 incident that showed no sign of violence.

The expert witness testimony on intimate partner battery was prejudicial, in violation of Section 1107 to prove domestic violence. The testimony was not competant and substensive. It lacked the knowledge of the case, abuse of the system, perjury, mental health issues and cultural differences (Section 1473.5).

The Judge told my wife that "...he is disassociated with what happened. You are a strong woman." See Ex 17 RT p.378.

The Battere's Threatment Program Director told the court thatTurks act like that because of difficult life. He was racial profiling while itching his nose. He had been threatening me to get more money.

Judge Carrozzo was thinking that he could put my wife in jail (against Section 1219), if she refuses to testify.

99% of Turkey is Muslim and it is a reality/perception that Islamic countries treat women differently.

One Juror told the court that he had been to Turkey and the standars of treating a woman there are completely different.

The Jury Forperson told the court that if the prosecution

didn't drop the charges, he must be guilty. I was unable to get the augmented record from my appeal attorney or from the Court. Further discovery or evidentary hearing might be needed if the court deems necassary.

It wasn't a coincidence to be represented by a female public defender with Iranian/Armenian descend and prosecuted by a female prosecutor with Iranian descend.

In 2015, I received an unsigned note in the mailsaying that I should go back to Turkey to abuse women.

My wife is telling me that I am a Middle Eastern Man.

The trial took place in the highs of the "me too movement".

There is no oil Turkey. I come from a poor family and I have been working and going to school since I was 12. I grew up without practicing any religion, as a secular. I attended a college founded by Americans, METU, by passing a nationwide exam in the top 1 percentile.

I have an MBA from Washington University in St. Louis (Ranks in the top ten in WSJ College Rankings). I also completed the coursework towards a PhD at METU. (See Ex 28).

I worked for the Turkish SEC and FedEx as Financial Analyst, and Purdue University and University of Mephis as a visiting Professor/Lecturer. I hold CFA and CPA designations.CFA, Charted Financial Analyst, takes four years to complete and the completion rate is is around 10%. I was going to be a CFO. Your people made me a convicted felon.

I have changed my name, nationality and religion trusting the laws, faiths, and people of America. I left my family,

21

friends, a life time employment and a good life in Turkey to become an American.

My family saved the Armenians when the Turks were killing them.

I respect women too. I have two daughters and two sisters. They are the most precious ones. My Grandma was my best teacher. I supported my first wifefor a PhD, although she was threatening me by saying that "if you don't buy me a computer today, I'll divorce you next week." I submitted to my wife and stayed home so that she can work and be happy, despite everything she has said and done to me.

I am sorry for creating this problem from the beginning and not being able to manage it, and being a toll on public resources. But, this is not my shame.

There are cultural and language differences. Still, we have never had anything like Jerry Springer Show or Mell Gibbson's misdemeanor battery.

Ground 5:

Trial counsel was ineffective in that he failed to prepare for the trial, investigate the self defense, call any witnesses, call any expert witness, introduce alleging witness's mental and physical state statements,give a competant legal advice regarding the potential sentence and consequences of going to trial. He had a financial conflict of interest. Specifically, my plea offer was no jail/prison term and he misled/misadvised me by saying that there is no supporting evidencefor the charges and the Judge is not going to give a lengthy /maximum sentence. He completely rendered a guilty plea on all charges. It is

22

reasonably probable that a result more favoravle to me would have occurred if the trial counsel had given competant advice regarding the potential sentence and consequences of going to trial,prepared for the trial, investigated the self defense, called witnesses, called expert witnesses, introduced my wife's mental and physical state statements because I would have taken the plea offer of no jail/prison time since I was scared of vindication and discrimination; no reasonable person would take the risk of 11 years and 8 months. Also, I held my wife's hands to protect myself (self defense), there were witnesses to attest my innocence and my wife's insanity, including expert witnesess, my wife had made many statements regarding her mental and phy-sical state.

2015 trial counsel failed to introduce my wife's statements regarding her mental and physical state as impeaching evidence.

Both appeal counsels failed to raise the ineffective assist-ance of trial counsels. All these could have resulted a different outcome. See above for details.

The additional facts supporting the above graund for relief are as follows:

Trial counsel didn't investigate my wife's insanity. He didn't introduce her statements regarding her mental and physical state (See Ex 1, 2, 3).

My initial plea offer was 1 Felony (Dissuading a witness) and no jail/prison time.See Ex 17 p.34. There was also an email from my attorney regarding the offer. It needs to be discovered. I was considering the offer, since I was scared of vindictiveness

and racial bias. While I was waiting for a response from my counsel, I found myself at the preliminary hearing. When the Judge asked if it would be possible to settle, he said "not at this point." He told me that there was not sufficient evidence for the charges, you might end up with probabtion violation. I asked him specifically, If the Judge could give mea lengthy/ maximum sentence. He said " no, he is not going to". He told me that there was an offer of 1 year, but it wasn't good. Just before the trial, I asked to settle. The offer was 180 days on electronic monitoring. While discussing the offer, he said "let's go try". Even after the convictions, he told me that I might get 3-4 years if the probation fails.

Also, the Judge told me that if my wife did not testify, he could find me guilty on probation violation. I understood it as the maximum they can give me was 1 year, if the probation was denied.

My counsel didn't prepare for the trial adequately. We spent maybe 1-2 hours together total. He told the Jury that my wife didn't remember if I held her throat or neck, despite my advance reminder that she didn't remember if I held her throat or hand.

He was working on other cases, while the expert witness was testifying.

He didn't tell me about the consequences of going to trial: 95% probability of loosing and no contact order with my wife.

He didn't prepare for the sentencing. He was on vacation, he came back 2-3 days (weekend) before the sentencing. Our Pastor

would have made a statement to help me. He didn't mention any-thing about curz waiver or appeal bond.

He told me that "I have other work to do, leave your wife." when I asked him to object to the maximum/illigal sentence.

He didn't respond to my and my friend's calls emails. He didn't respond to my appeal counsel's calls and emails either.

He didn't provide me with the client file, despite my and my friends' numerous requests, in violation of my legal rights to the file.

He told me that he was not being paid extra for the trial. Later, I learned that he had been paid as long as the litigation. It was not in his best interest to settle the case earlier. He had a financial conflict of interest.

He strongly opposed me testifying.

He mentioned that the Jury made a mistake. He didn't res-pond my questions to determine what the mistake was. Further discovery and an evidentary hearing are needed, if the court deems necassary, for any of the issues.

25

VI

I have not previously presented the grounds set forth in paragraph V to this or any other court, state or federal, in any petition, or application, except insofar as prsented in my direct appeal pending before the Court of Appeal.

VII

I have no plain, speedy, or adequate remedy at law. The issues presented in this habeas corpus petition cannot be fairly considered on direct appeal, because facts necassary to a deter-mination of the issues are outside the record on appeal and canot be obtained by augmentation of the record.

VIII

This petition is being presented in the first instance to this Court, under its original habeas corpus jurisdiction.

IX

I move that this petition be heard and decided independent of the direct appeal, and another counsel being appointed since the grounds include ineffective assistance of trial and appeal counsels, if it becomes necassary.

X

I hereby incorporate by reference the accompanying memoran-dum and the declarations contained in the appendices/exhibits attached hereto. My claims in this petition will be based on the petition, the accompanying memorandum, the attached declarations, and all records, documents, and pleadings on file with this Court and any further material to be developed at any future discovery or hearing that may be ordered.

## XI

I hereby request that this Court take judicial notice of the record and all pleadings. Reproducing the whole record for use in connection with this petition would entail unnecassary expense since this court and counsel for the respondent already have a copy of the record and all pleadings.

WHEREFORE, I respectfully request that this court:

1) Take judicial notice of the record and pleadings in the underlying cases;

2) Order respondent to show cause why I am not entitled to the relief sought;

3) Appoint a new counsel if necassary;

4) Conduct an evidentiary hearing to answer the factual questions necassary to determine the merits of my claims;

5) After full consideration of the issues raised by this petition, grant the petition, vacate the August 5, 2019 judgements of sentencing and June 27, 2019 convictions:(inc 2015);

6) Grant such other and further relief as may seem just under the circumstances.


Date: August 20, 2020                    Respectfully submitted,


                                         Cevdet Uruk, Petitioner

27

VERIFICATION

I, Cevdet Uruk, declare as follows:

I am the petitioner in this action. I have read the fore-going petition for writ of habeas corpus and the facts stated therein are true of my own knowledge, except as to matters that aretherein stated on my own information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Tehachapi, California on August 20, 2020.

Respectfully submitted,

Cevdet Uruk

Petitioner

BK0724

IN THE SUPERIOR COURT OF
THE STATE OF CALIFORNIA
FOR THE COUNTY OF SANTA BARBARA

Cevdet Uruk,                          ) No._____

Petitioner                            )

On Habeas Corpus.                     ) PETITION FOR WRIT OF

                                      ) HABEAS CORPUS

                                      )

                                      )

MEMORANDUM

ARGUMENT

I

HABEAS CORPUS IS A PROPER VEHICLE FOR THE

PRESENTATION OF MY CLAIMS

The claims asserted in this petition are that I was deprived of my constitutional rights to the effective assistances of counsels. These constitutional claims cannot be presented as strongly on appeal as they are herein because their factual bases rest in part on evidence in addition to those contained in the record on appeal. (See In re Hochberg (1970) 2 C3d 870, 875.) Although habeas corpus cannot serve as a second appeal, denial of the right to counsel is a claim cognizable on habeas corpus whether or not it was raised on appeal. Id. Because trial and appeal counsels failed to investigate, object or raise the issues brought in the grounds, evidence necassary to determine the merits of such claims were not developed at trial and there-fore are not mostly parts of the record on appeal.

"[H]abeas corpus is an extraordinary and collateral action that lies to review a claim of denial of substantive constitu-tional rights that may have affected the integrity of the fact finding process...." (In re Reed (1983) 33 C3d 914, 918 n2, over-ruled on other grounds in In re Alva (2004) 33 c4th 254; see also In re Coughlin (1976) 16 C3d 52, 55.) Further, the remedy of habeas corpus 'permits the examination not only of the actual evidence introduced atpetitioner's trial but of any necassary additional evidence bearing upon the infringement of petitioner's

1

constitutional rights." (<u>In re Bell</u> (1942) 19 C2d 488, 501, citations omitted.)

A petition for writ of habeas corpus is the proper remedy to attack collaterally a judgement that has been obtained in violation of fundamental constitutional rights. (<u>People v Adamson</u> (1949) 34 C2d 320, 327.) Ineffective assistance of counsel, in fact, is appropriately brought by way of writ. (<u>People v Mendoza Tello</u> (1997) 15 c4th 264, 266-267.) In cases in which trial counsel's reasons for acts or omissions are not clear from the record on direct appeal, habeas corpus is an appropriate vehicle to raise those issues. <u>People v Ledesma</u> (1987) 43 C3d 171, 217-218.)

For all these reasons, habeas corpus is the proper procedure for resolution of the claims included herein.

II

TRIAL AND/OR APPEAL COUNSELS FAILURES TO INVESTIGATE

THE FOLLOWING CLAIMS DEPRIVED ME OF THE

EFFECTIVE ASSISTANCES OF COUNSELS

A Defendant in a criminal matter is entitled, under the Sixth and Fourteenth Amendments to the United States Constitution and under Article I, §15 of the California Constitution, to the effective assistance of counsel. (<u>Strickland v Washington</u> (1984) 466 US 668, 104 S Ct 2052; <u>People v Pope</u> (1979) 23 C3d 412.) To provide effective assistance, counsel must provide representation equivalent to that which would be provided by a "reasonably competant ... attorney acting as a [a] diligent conscientious advocate." (<u>People v Pope, supra,</u> 23 Cal.3d at p. 423, italics omitted) Reasonableness is measured under "prevail-

2

ing professional norms." (<u>Strickland v Washington, supra.</u>)

To prevail on a claim of ineffective assistance, petitioner must show that his trial attorney's representation fell below prevailing norms, and that he was prejudiced by his failure, <u>i.e.</u>, that it is reasonably probable that the result would have been different but for counsel's error. (<u>Strickland v Washington, supra,</u> 466 US at p. 694; <u>People v Fosselman</u> (1983) 33 C3d 572, 584.) " A reasonable probability is a probability sufficient to undermine confidence in the outcome." (<u>Strickland v Washington, supra,</u> 466 US at p. 694.)

### III

TRIAL AND APPEAL COUNSELS FAILED TO INVESTIGATE AND

RAISE VINDICTIVE PROSECUTION AND/OR

PROSECUTORIAL MISCONDUCTS

A naturalized American citizen or criminal defendant has the constitutional rights to freedom of speech under the First Amendment, due process of law under the Fifth Amendment, and equal protection under the Fourteenth Amendment to the Consti-tution of the United States, and Article I, §§ 2 and 7 of the California Constitution.

The due process clauses of the state and federal constitu-tions prohibit prosecutors from punishing criminal defendants for exercising their constitutional rights. <u>People v Juarado</u> (2006) 38 Cal. 4th 72, 98. The constitutional protection against prosecutorial vindictiveness is based on the fundamental notion that it would be patently unconstitutional to chill the asser-tion of constitutional rights by penalizing those who choose to

3

exercise them. In re Bower (1985) 38 Cal.3d 865, 873. In vindic-
tive prosecution cases it is the Government's attempt or threat
to 'up the ante' by bringing new or more serious charges in
response to the exercise of protected rights that violates the
due process guarantee. United States v Robinson (9th Cir. 1981)
644 F.2d 1270, 1273. A vindictive prosecution claim may be es-
tablsihed by producing direct evidence of the prosecutor's
punitive motivation. In the absence of direct evidence of vin-
dictiveness, a criminal defedant may raise a rebuttable pre-
sumption of vindictiveness by showing that the circumstances
establsih a reasonable likelyhood of vindictiveness. When a
presumption of vindictiveness exists, the burden shifts to the
Government to present objective evidence justifying the prose-
cutor's action. United States v Brown (9th Cir 2017) 875 F.3d
1235, 1240. The California Supreme Court has not determined the
standard of review to be applied to a claim of vindictive prose-
cution. People v Ayala (2000) 23 Cal. 4th 225, 299. The petition-
er had made out a prima facia case of vindictive prosecution
where a second indictment added new charges that "doubled" the
petitioner's potential period of incarceration.

I was overzealously prosecuted and retaliated with upgraded
charges, without new evidence that tripled/doubled my maximum
sentence exposure, for quoting a Bible verse, "Wives, submit to
your husbands." and a Wall Street Journal article, "Women Failed
humanity", and going to trial, appealing and complaining to
State and Federal Courts and Agencies for the
discrimination of the prosecution, since 2014.

4

In 2018, I was basically arrested for simple battery (misdemeanor) with a maximum exposure of 3-5 years. The prosecution upgraded my charges to felonies, with a maximum exposure of 10 years and months.

Prosecutors suppressed evidence favorable to the defendant that might have led to a not guilty verdict. Brady v Maryland (1963) 373 US 83. A credible recantation of testimony by a witness, alerting the state to perjury, can establish a due process violation. Sanders v Sullivan (2d Cir. 1988) 863 F.2d 218.

Prosecution knew or should have known my wife's instability/insanity/paranoia/delusions. Yet, they engaged in numerous misconducts for the sake of winning, such as mischaracterizations. There was no blood, no bloody lip, no punching, no abuse. My wife was the aggressor. Justice is not winning. Berger v United States (1935) 295 US 78, 88, 79 L.Ed 1314, 55 S.Ct 629. Nationwide, more than two thousand people have been identified as a victim of wrongful conviction since 1989. See Exhibit 6 for the psychology and politics of wrongful convictions by an expert witness. Prosecution knew that I was innocent. Still, they prosecuted. Because, I was alone and I was an easy target. Even the ancient Roman Law recognized that if an accused had no supporter/defender, he was entitled to acquittal, on the ground of conspiracy.

I had brought the vindictive prosecution and/or prosecutorial misconduct to my counsels' attention. They failed to investigate and raise. It is probably reasonable that a result more favorable to me would have occured if counsels had investigated, objected and raised the vindictive prosecutions and/or prosecu-torial misconduct.

5

torial misconducts because there wasn't sufficient evidence for
the charges. I was prejudiced.

I take no part in the deeds of darkness. I expose them.

IV

TRIAL AND APPEAL COUNSELS FAILED TO INVESTIGATE AND
RAISE MY WIFE'S INSTABILITY/INSANITY AND VIOLATION OF
CONFRONTATION CLAUSE. NEWLY DISCOVERED EVIDENCE PROVE
THAT MY WIFE WAS/IS INSANE/PARANOID/DELUSIONAL

A defendant in a criminal matter is entitled, under the
Sixth Amendment to the Constitution of the United States and
Article I, § 15 of California Constitution, to confront the
witnesses against him. Davis v Alaska (1974) 415 US 311, 39
L.Ed. 2d 347, 94 S.Ct. 1107. This right is secured for defendants
in State as well as Federal criminal proceedings under Pointer v
Texas (1965) 380 US 400, 85 S. Ct. 1074, 1076, 13 L.Ed 2d 934.
Even if the Sixth Amendment is not solely concerned with testi-
monial hearsay, that is its primary object, and interrogations
by law enforcment officers fall squarely within that class.
Crawford v Washington (2004) 514 US 36, 158 L.Ed 177 124 S.Ct.
1354. Polceman's hearsay statements are inadmissable. Gaines v
Thiet (1988) 846 F2d CA 7 402.

My wife refused to testify both in 2015 and 2019. Her
false/inadmissable/      /testimonial statements to 911 and
Police were admitted both in 2015 and 2019 trials. I was deprived
of my right to confront her. 2019 appeal counsel failed to argue
violation of confrontation clause in direct appeal.

6

A writ of habeas corpus may be prosecuted for false evidence that is substantially material or probative and new evidence that is credible and material. (Title 12, § 1473).

Courts are split on what is new evidence. <u>Kidd v Norman</u> 651 F3d 947 (CA 8 1992). To warrant a writ of habeas corpus based on newly discovered evidence, the new evidence must not merely weaken the prosecution's case; it must create fundamental doubt in the accuracy of the proceedings and point unerringly to innocence or reduced culpability. (<u>In re Cruz</u>, 104 Cal. App. 4th 1339 (Cal. Ct. App. 2003)). Once a habeas corpus petitioner has presented newly discovered evidence that raises doubt about his guilt, he may introduce any evidence not insofar as it assists in establsihing his innocence. (<u>In re Hall</u> (1981) 30 Cal. 3d 408, 179.)

The sole/main evidence for the charges were my wife's false statements/allegations, both in 2014 and 2018. The newly discove- red pieces of evidence prove that my wife was/is insane, paranoid, delusional, possibly schizophrenic, aggressive, sadomaschist, and violent, beyond reasonable doubt. The new pieces of evidence include; her actions and own admissions with her therapist's and Pschiatrist's diagnoses/medical note/report (See Ex 7), her recent call to Police on her father (See Ex 10), intimate opin- ions/declarations by our Pastor and marriage counsellor Sergiy Tarasenko, our family friends Turanca & Adnan Orali (See Ex 10, 11), and expert Psychiatrist opinion (See Ex 9). All these evi- dence are newly discovered/available, after the trial. There were evidence of my wife's instability before the trials. The trial

7

and appeal counsels failed to investigate and raise my wife's insanity/paranoia/delusions.

I was prejudiced. It is reasonably probable that a result more favorable to me would have occured if the counsels had investigated, discovered and raised my wife's insanity/paranoia/delusions and the violation of the confrontation clause because the sole/main evidence of abuse/violence allegations were my wife's false/hearsay/paranoid/delusional statements to 911 and Police, and I was deprived of my right to confront her. There has  never been any visible injury, in 6 calls in 6 years.

V

TRIAL AND APPEAL COUNSELS FAILED TO PREPARE, OBJECT AND RAISE ILLIGAL, UNJUST, DISPROPORTIONATE, CRUEL, AND UNUSUAL SENTENCING (DENIALS OF PRESENTENCE REPORT, CONTINUENCE, PROBATION, ALLOCUTION, AND MITIGATION, AND USE OF THE SAME FALSE/UNSUBSTANTIATED AGGRAVATING FACTORS FOR UPPER TERMS AND CONSECUTIVE SENTENCES) ADEQUATELY

The Eight Amendment to the Constitution of the United States and Article I, § 17 of the California Constitution prohibit cruel and unusual punishments.

Heart of effective assistance is preparation. <u>Richter v Hickman</u> 578 F.3d 944 (CA 2009). Presentence Report was not given or read by defendant. <u>United States v Sustaita</u> 1 F3d 950 (CA 9 1993). Ancient in Law, allocution is both rite and right. It is designed to temper punishment with mercy in appropriate cases, and to ensure that sentencing reflects individualized circum-stances ....we hold that if the trial court fails to afford a defendant either

defendant either the right of allocution .... or its ....
functional equivalent, vacation of the ensuing sentence must
follow automatically. United States  v De Alba Pagan 33 F.3d
125 (CA 1 1994). Section 1203 (b)(3), which requires that elible
defendants be considered for probation and authorizes probation
if circumstances in mitigation are found or justice would be
served. The Judge's duty is similar to the duty to consider the
probation officer's report. Judicial fact finding violates
Apprendi. Wilson v Knowles 638 P3d 1213 (CA 9 2011). Sentencing
facts need to accurate - not speculative. United States v
Bradley 628 F.3d 394 (CA 9 2011). Judge's reliance on false
infromation violated due process. Steward v Ervin, 503 F.3d 488
(CA 6 2007). Disorganized penalty phase, no mitigating evidence
was presented. Bean v Calderon, 163 F.3d 1073 (CA 9 1998).

Section654, subdivision (a) provides that "[a]n act or
omission that is punishable in different ways by different
provisions of law shall be punished under the provision that
provides for the longest potential term of imprisonment, but in
no case shall the act or omission be punished under more than
one provision."

The statue does not prohibit multiple convictions for the
same conduct, only multiple punishments. People v Monarrez
(1998) 66 Cal. App. 4th 710, 713. "In such a case, the proper
procedure is to stay execution of sentence on one of the offenses"
(Ibid).

Section 654 precludes multiple punishments for a single
act or indivisible course of conduct." People v Hester (2000)

9

22 Cal. 4th 290, 294. "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of Section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one object-ive, the defenant may be punished for any of such offenses but not for more than one." People v Correa (2012) 54 Cal. 4th 331, 336. An implicit determination that there was more than one objective is a factual determination that must be sustained on appeal if it is supported by substantial evidence. People v Osband (1996) 13 Cal. 4th 622, 730.

The Court should not use the same reason to impose consec-utive sentence as to impose an upper term of imprisonment. People v Avalos (1984) 37 Cal. 3d 216, 233.

Refusal to consider the personal characteristics of the defendant in imposing sentence would also raise serious consti-tutional questions. The California Supreme Court has held that sentencing decision must take into account "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." In re Rodriguez (1975) 14 Cal. 3d 639, 654, quoting In re Lynch (1972) 8 Cal. 3d 410, 425. In In re Rodriguez, the court released the petitioner from further incarceration because "[It] appears that neither the circumstances of his offense nor his personal characteristics establish a danger to society sufficient to justify such a prolonged period of imprisonment." (id. at 655) (Footnote omitted, emphasis added.) "For the determination of sentences, justice generally requires... that there be taken into account the circumstances of the offense

10

together with the character and propensities of the offender." Pennsylvania v Ashe (1937) 302 US 51, 55 quoted with approval in Gregg v Georgia (1976) 428 US 153, 189.

It is now clear that the sentencing process, as well as the trial itself must satisfy the requirements of the Due Process Clause. Even though the defendant has no subtantive right to a particular sentence within the range authorized by statue, the sentencing is a critical stage of the criminal proceeding at which he is entitled to the effective assistance of counsel .... The defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence .... Gardner v Florida (1977) US 349, 358.

The use of probation officers' report is permissable because the officers are trained investigators. Williams v New York (1949) 337 US 241. Compare sections 1203 and 1204. People v Peterson (1973) 9 Cal. 3d 717, 727, expressly approved the holding of United States v Weston (9th Cir. 1971) 448 F.2d 626 that the due process is offended by sentencing on the basis of unsubstantiated allegations that were denied by the defendant.

Multiple sentences forbidden by Penal Code § 654, proscribing double punishment of a criminal act that constitutes more than one crime. whether consecutive or concurrent, impose excessive punishment beyond the power of the sentencing court and can be corrected by habeas corpus. In re Wright (1967), 65 Cal.2d 650, 56.

Trial counsel did not prepare for the sentencing. He was on vacation for three weeks just before the sentencing. He returned

11

2-3 days (weekend) before sentencing. He said he'll ask for continuance. The Judge denied. He didn't call any character witnesses. He didn't introduce any mitigating factors. Our Pastor would have made a statement to help me. I wasn't given or read the presentence report. The Judge denied the recommended/ authorized probabtion with unsubstantiated reasons. The Judge did not let me make/finish my allocution. The DA asked for 7 years. My plea offer was no jail/prison time. The Judge gave the maximum upper terms with false/unsubstantiated aggravating factors, by completely ignoring the mitigating factors.

I was a 50 year old stay home Dad and primary caregiver to three little children. I had an exceptional education and profession. I had a very good character with the highest possible ethical standards. I had no prior serious conviction. The prior conviction was insignificant. It was a misdemeanor conviction for holding my wife's hands to protect myself. It was a wrongful conviction. My performance on the probation was satisfactory. I had completed the Threatment Program and the community service. It was court supervised. It was about to end in three moths. It could have been ended earlier.I was trying to protect myself and my family against a paranoiac liar. She was the aggressor. There has never been any visible injury. We were emotionally disturbed due tocomplicated pregnancy and early labor.

He used the same false/unsubstantiated reasons used for upper terms,for running the sentences consecutive. The alleged crimes and their objectives were not independent. I was trying to protect myself and my children against paranoiac liar and her

12

aggression.He ruined my life, my family,my profession, my professional designations. He gave me 11 years and 8 months for going to trial. He placed a no contact order with my wife.

I was prejudiced because of the failures of the trial counsel. It is reasonably probable that a result more favorable to me would have occurred if the trial counsel had prepared for sentencing, challenged the unsubstantiated/false aggravating factors, present mitigating factors and character witnesses, and the appeal counsel had argued sentencing issues adequately because there were substantial mitigating factors and witnesess,and the probabtion was recommended/authorized.

I am not insane, not a Muslim, not a terrorist, and not violent. I have become an American for the clean faces of judges, not for the economic benefits.


It is not just to deprive three little children of their father and primary caregiver with wrongful convictions and illigal/cruel sentencing. My wife and I have no family in the US. We are all crying.

13

## VI

### TRIAL AND APPEAL COUNSELS WERE INEFFECTIVE THAT THEY FAILED TO INVESTIGATE, OBJECT AND RAISE ABUSE OF DISCRETION AND/OR JUDICIAL/SEX/RACIAL/NATIONAL/RELIGIOUS ORIGIN BIAS (DISCRIMINATION)

As a naturalized American citizen and as a criminal defendant, I am entitled to the rights to due process, impartial jury, and equal protection under the Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and Article I, § 7 of the California Constitution.

To prove disqualifying bias, a petitioner must offer either direct evidence or "a possible temptation so severe that we might presume an actual, substantial incentive to be biased". Absent a "smoking gun", a petitioner may rely on circumstantial evidence to prove the necassary bias. Franklin v McCaughtry, 398 F.3d 955 (CA 7 2005). Vindictiveness must play no part of resentencing. Somerville v Hunt, 695 F.3d 218 (CA 2 2012). Judge threatened to enhance sentence if the defendant goes to trial. United States v Cruz, 977 F.2d 732 (CA 2 1992). Judge must be both impartial and disinterested. Marshall v Jerrico Inc 446 US 238 64 L.Ed 2d 182, 100 S.Ct 1610 (1980). Abuse of discretion to deny continuance where "substantial prejudice" resulted because attorney had no time to prepare a defense to a complex tax evasion charge. United States v Wirsing, 719 F.2d 859, 864-66 (6th Cir. 1983). The denial of continuance can sometimes be tantamount to the denial of counsel. United States v Rodgers, 755 F.2d, 540 (7th

14

Cir. 1985).

Trial court discretion is not unlimited. The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal princip-les governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown. <u>Westside Community for Independent Living v Oledo</u> (1983) 33 Cal. 3d 348, 355. Although an appellate court's deference to the decision below is high under the abuse of discretion standard, it is not absulate. All exercises of discretion must be guided by legal principles and policies, not arbitrariness or caprice. <u>People v Superior Court (Alvarez)</u> (1997) 4 Cal. 4th 968, 977.

Jurors had heard damaging testimony, while Johnson received a trial, his constitutional guarantee has not been granted if any member of the jury was biased. <u>Johnson v Armontrout</u>, 961 F.2d 748 (CA 8 1992).

My national and religious origins are prejudicial. Even the Jurors were not my peers. I respect them though. I was discri-minated against by the jurors, judges, prosecutors, my wife, and the people.

The judge admitted inadmissable/false/hearsay/testimonial statements to 911 and Police. He didn't admit alleging witness's written, inconsistent, recanting statements, saying that they are not relevant. He denied continuance for sentencing. He said he'll take the discrimination into account, then he gave me the maximum illigal/cruel terms with harsh looks and comments. He didn't allow me to make/finish my allocution.

15

Judge Dandona and JUdge Hill subjected me to harsh/hateful looks and comments.

The Batterer's Threatment Program Director told the court that Turks act like that because of the difficult life. He was racial profiling, while itching his nose. He had been threatening me to get more money.

One juror told the court that he had been to Turkey and the standards of treatting a woman there are completely different.

The Jury Forperson told the court that if the prosecution didn't drop the charges he must be guilty.

It wasn't a coincidence to be represented by a female public defender with Iranian/Armenian descent and prosecuted by a female prosecutor with Iranian descent.

In 2015, I received an unsigned note in the mailthat said I should go back to Turkey to abuse women.

My wife is telling me that I am a Middle Eastern Man.

It is reasonably probable that a result more favorable to me would have occurred if the trial counsels had investigated and objected to discrimination and the appeal counsels raised the discrimination issue because my national origin and religious origin (Turkish, Muslim) were prejudicial, there was not suffi-cient evidence for the charges, there was substantial evidence for thediscrimination and as the probation report stated, I didn't fit the profile described by the law enforcement, I had a very good character. I was/am respectful and soft spoken.

I was incompetant to understand the system. I overtrusted the system and the people.

16

My Grandpa was not an abuser. He had lost his father at age five. He had two oxens and a plow to raise his family. There was peace, love and respect in our home. There was no fight.

I wanted my wife to testify. She didn't want to because she feared that her lies and paranoia/delusions would be revealed.

I am a victim of discrimination, and I was stepped on my head/back/neck. I would want to know why young parents leave their baby behind and kill themselves and others,(for America, justice and humanity). But still, I wouldn't sacrifice innocent Police Officers to criminal drug addicts (at least until they are proven guilty beyond reasonable doubt) and I wouldn't support the looters and terrorists.

In Russia 15-20 Thousand women die each year due to domestic violence. Some goto Turkey to sleep with Turkish men for a dinner.

My wife was not a victim. She had the health, family, job, home (with ocean view, affordable housing though), Santa Barbara, America, a dog, a househusband. She hadn't had any of these

17

before I met her. Her sister does not have any of these. She took all these from me. She also took my freedom. I am the victim. Children are the biggest victim. Now, she is threatening me with placing a no-contact order with my children unless I pay her money.

I don't deny what happened. I admit my mistakes. I don't blame anybody. I am sorry for what happened.

But, let your yes be yes, and your no be no. For whatever is more than these is from the evil one.

There is nothing I can do, if you/your people don't like me and respect me as much as I like and respect you and your people.

The prosecutors alleged that I neded a mental evaluation. I took it and passed it without any issues. If I were insane, I should have been found not guilty by the reason of insanity, though.

I don't mean any disrespect to anybody including my wife, particularly with the words that describe her condition/paranoia. I am not an expert. But, I have been working on her issues for 8 years. I haven't seen any better explanation. Without her coopera-tion, a perfect diagnosis by an expert is impossible. I have never done anything uncontrolled/serious to hurt her.I grabbed her. I slapped her lightly. I did not punch her. I did not try to choke her. I wish I could understand her condition earlier. If I am not mistaken, she is not reachable and she is not curable. I am the only one who can help her and I have to help her for the sake of my children. We don't have any other family. I apologize to every-body including my wife, for my failures, and ask your/her

18

understanding and forgiveness. I was defending myself and my family/children against her aggression/paranoia.

I am always grateful to God, America, and good people.

Cursed is the one who perverts the justice due the stranger, the fatherless, and widow.

VII

TRIAL COUNSEL FAILED TO GIVE COMPETANT LEGAL ADVICE
REGARDING THE POTENTIAL SENTENCE AND CONSEQUENCES OF GOING
TO TRIAL, INVESTIGATE SELF DEFENSE, CALL ANY WITNESSES,
PREPARE FOR THE TRIAL, AND INTRODUCE IMPEACHING EVIDENCE.
HE HAD A FINANCIAL CONFLICT OF INTEREST

Counsel in criminal cases are charged with the responsibility of conducting appropriate investigations, both factual and legal, to determine if matters of defense can be developed. United Sattes v Mooney, 497 F.3d 397, 404 (4th Cir. 2007). Counsel's failure to impeach witnesses with prior inconsistent statements was ineffective assistance. United States v Tucker, 716 F.2d 576, 585-87 (9th Cir. 1983). If a defendant insists on testifying, however irrational that insistance might be from a tactical viewpoint, counsel must accede. United States v Curtis, 742 F.2d 1070, 1076 (7th Cir. 1984). An actual conflict of interest exists "if defense counsel was faced with a choice between advancing his own interests above those of his client". Hall v United Sates 371 F.3d 969, 973 (7th Cir. 2004). Counsel, whose preparation for the trial consisted solely of sixteen hours with defendant, provided ineffective assistance. Rickman v Bell, 131 F.3d 1150 (6th. Cir 1997).

19

Advice that resulted in defendant's rejection of plea offer was
ineffective assistance where evidence against defendant was
strong. Turner v Tennessee, 858 F.2d 1202 (6th Cir. 1988).
Failure of defense counsel to "provide professional guidance to
a defendant regarding his sentence exposure prior to a plea may
constitute deficient assistance." Moss v United States, 323
F.3d 445, 474 (6th Cir. 2003). For bad advice, defendant went
to trial. Julian v Bartley, 495 F.3d 487 (CA 7 2007). Inadequate
time spent consulting with the defendant. White v Godinez, 301
F.3d 796 (CA 7 2002).

Trial counsel misled/misadviced me on the potential sen-
tence and consequences of going to trial. He had a financial
conflict of interest. He didn't call any witnesses during trial
or sentencing. He din't introduce impeaching evidence. He didn't
prepare for the trial and sentencing. He completely rendered a
guilty plea on all charges.

Appeal counsels failed to argue ineffective assistances of
counsels.

Counsel with Armenian descent was nice and she fought for
me after she realized that the allegations were ridiculous and
I have a good character.

I was prejudiced because of the failures of counsels.

It is reasonably probable that a result more favorable to
me would have occurred if the trial counsel had given competent
advice regarding the potential sentence and consequences of going
to trial, investigated self defense, called witnesses, intoroduc-
ed impeaching evidence because I would have taken the plea offer

20

of no jail/prison time since I was scared of vindication and discrimination; no reasonable person would take the risk of 11 years and 8 months. Also, I held my wife's hands to protect myself, there were witnesses to attest my innocence and my wife's insanity.

21

XI

I don't deny my mistakes and I take the full responsibility for my actions. My wife did not call the police when I slapped her lightly to stop her, to protect myself and my family. She has called the Police 6 times in 6 years when I wanted to seperate. I am truly sorry for what happened.

XII

I apologize for any deficiencies in this petition or memorandum. I have limited resources and we are in lockdown. I hope that there would be decent people who would be able to understand my heart, my good intentions, and my candor, in the last castle of humanity.

CONCLUSION

For the forgoing reasons, my present confinement is illigal, and a writ of habeas corpus should issue.

Date: August 20, 2020                    Respectfully submitted,


                                         Cevdet Uruk, Petitioner

WORD-COUNT CERTIFICATE

In accordance with Cal Rules of Ct 8.384(a)(1)-(2) and 8.204(c)(1), I hereby certify that the memorandum in support of the attached petition for writ of habeas corpus contains approximately 4,800 words, as estimated roughly.

Date: August 20, 2020                    Respectfully submitted,

                                         Cevdet Uruk, Petitioner

EXHIBITS

1) My Wife's Text to Me

2) My Wife's Email to DA's Office (Laurdes)

3) My Wife's Email to my Public Defender (Steele)

4) My Wife's Letter to DA (2018)

5) My Wife's Email to DA and my Attorney with Investigator Report (2019)

6) Expert Witness Testimony/Declaration (Blind Justice by Godsey)

7) My Wife's Sentencing Statement with the Medical Report/Note

8) Presentence Report

9) Expert Witness Testimony/Declaration (Understanding Paranoia by Kantor)

10) Declaration of Sergiy Tarasenko, Pastor

11) Declarations of Adnan and Turanca Orali, Family Friends

12) Family Photo

14) Police Report (2014)

15) My Wife's Letter to DA (2015)

16) Aaron Swartz-Wikipedia Page

17) Reporter's Transcript

18) My Wife's Skype Message

19) My Email to my Wife - Situation

20) Police Report (June 2013)

21) Email Exchange Between Me and my Wife - Last Apology

22) My Wife's Therapist Issues

23) Paranoid Personality Disorder - DSM

24) My Sentencing Statement

25) Judge's Aggravating Factors

26) Mitigating Factors                         28) Washington University Transcript

EXHIBITS

1) My Wife's Text to Me

2) My Wife's Email to DA's Office (laurdes)

3) My Wife's Email to my Public Defender (Steele)

Conversation between Me and Natalie Uruk - page 1 of 3

——————— Friday, Mar 16, 2018 ———————

 Natalie Uruk
We need you. I need you. Your never failed me. I failed you. After you're gone I realized what you had been telling me. I went to therapist today to work on the issues you wrote. You are right. You were always right. And it is from my parents. It's the learnt things from parents that didn't let me live in peace. I was fighting with you all the time because of the things in my head. I am so so sorry.

8:32 PM

 Natalie Uruk
You are the best farther for kids. I always knew that that's why I got pregnant in the first place.

8:32 PM

 Natalie Uruk
You are right about everything about me, I am a child.

8:32 PM

Conversation between Me and Natalie Uruk - page 2 of 3

 **Natalie Uruk**
After things get resolved I'll do
everything that is best for you. I
need you, we need you. Please
don't give up. Fight for us. I
need you to fight and hope.
I need you to have enough
hopefor all of us.
                                8:32 PM

 **Natalie Uruk**
I had to tell you this. We are
waiting for you. We are your
family. You are loved and
needed.
                                8:32 PM

 **Natalie Uruk**
You are not alone. Don't give up
on us. I need to know that you
are strong for all of us.
                                8:32 PM

 **Natalie Uruk**
I have trouble breathing
are realization of what is
happening
                                8:32 PM

 **Natalie Uruk**
If I know that you are strong
and fighting, I get sttangth from
you
                                8:32 PM

Conversation between Me and Natalie Uruk - page 3 of 3



**Natalie Uruk**
Please-please fight. I beg you.
We will always be here for you.
We'll be waiting for you always.
I cannot bare a thought of
loosing you. I cannot loose you.
8:40 PM



**Natalie Uruk**
Please-please fight. I beg you.
We will always be here for you.
We'll be waiting for you always.
I cannot bare a thought of
loosing you. I cannot loose you.
8:40 PM

 Gmail

Natalie Uruk <natalie.uruk@gmail.com>

## "No contact" order cancellation
1 message

Natalie Uruk <natalie.uruk@gmail.com>                                      Tue, Mar 20, 2018 at 10:26 AM
To: "Negrete, Lourdes" <lnegret@co.santa-barbara.ca.us>

Hello Lourdes,

Herewith I kindly ask to remove/lift/cancel restraining order for my husband:

- I did not ask for an emergency restraining order on him and expected him to return home after the arrest as I know he is not dangerous

- He is a loving and caring dad. Kids miss him very much. Our 2.5 y.o. crying as she says how she misses daddy, comes to me and says she wants to see daddy, crying while asleep. Older one says that she will be so happy when daddy returns home. Kids miss his hugs, playing with him, him reading to them, taking for walks and parks. He has been cooking for them daily different foods they like.

-Him been out of the house keeps kids under undue stress. Kids have had enough with police coming over to our house and taking away their daddy. Please do not extend their exposure to stress. We need to resume our dinners together at the table, playing and having fun in the evening after dinner all together.

- Almost every morning we'd go out to a park for run/walks. Kids would chase daddy back and forth telling each other "Come and get me/you". They miss having that fun and exercise. We need to resume it.

- I need his help in caring for the kids. We do not have a family here. Our families are across the ocean. He has been helping me to take care of the newborn day and night, he's been in charge of cooking, grocery shopping. Cars need to be fixed, I am driving the last one still working, but its has a list of things to be fixed and it won't run for long. I am still recovering from complicated pregnancy and difficult c-section, my disability has been extended due to that. I need my husband at home, so can help out and my recovery goes faster.

- Him spending money for a place to stay is sinking us dipper in debt. We are low income family barely making our ends meet. He needs to move back, so we can get our spending under control. I am on maternity leave right now and my disability check is the only income we have.

- We RARELY have disagreements as by this time in marriage things have been figured out and we're just too busy taking care of the kids to argue/fight over little unimportant things. He is not violent, not dangerous.

- We were going to get a dog this spring for kids. We are a strong family.

We all miss him and we need him home. He misses his kids greatly and he doesn't deserve this. He IS a loving husband and a farther. Please don't be so hard on us.

Thank you very much for your help.

Kind regards,
Natalie Uruk
805-259-9249

 Gmail

Natalie Uruk <natalie.uruk@gmail.com>

**URUK Case**

1 message

**Natalie Uruk** <natalie.uruk@gmail.com> Sun, Mar 18, 2018 at 3:44 PM
To: Addison Steele <addison.steele.atty@gmail.com>, asteele@publicdefendersb.org

Dear Mr. Steele,

Please-please help us. You are our only hope.
My husband, Cevdet Uruk, cannot go to jail. He'll die there.

We've had a tough winter with me spending half of it at the hospital: first keeping the pregnancy and then with newborn when he got respiratory infection. Cevdet set aside all his work and took care of us day and night. Once back home I had to take all kids and house responsibilities so Cevdet can resume his projects.
I've been doing my best to keep up with the responsibilities despite severe lack of sleep. The whole pregnancy was difficult with lots of pain and bleeding, at one point we even thought I had miscarriage. Once at hospital we were scared of baby ben preterm as that implies potential long term mental and physical health issues, C-section was painful as anesthesia didn't work on me as it should. Recovery has been going difficult, I ended up with post-partum depression and my disability has been extended by my OB. My hormones are all over the place.

On Friday after we return from a therapist, I confronted him for no apparent reason. I kept on talking. I can't remember what we talking about, but I know I didn't stop talking and replied back at whatever he'd tell me, eventually I called the police. I wanted to get my way, wanted to hurt him, wanted to show I have power or smth. Not sure I can even explain to myself.
As I met with the therapist this Friday, I figured that I perceive things in an aggressive, attacking way even if they are not, after that I get in a defensive and fighting mode. I've seen this in many situations at work, with friends and especially my husband but couldn't name it or frame it. And I fight verbally blindly, my head doesn't accept any reasoning, I am very upset and want my way, I feel very insecure and vulnerable. In my husband's case I just wanted to show him that I can punish him, was prideful, my head wasn't working clearly.
I told police a rather dramatic story, as I see now, exaggerating many things, unable to reproduce clear facts rather gave them my speculations and assumptions. As I had mentioned before my mind is automatically tuned to make things look as he is a bad person and I am a victim. I create a crisis and drama in my own head, live up to it and my actions in real life become rather childish, inadequate. This could be learnt from my parents, but also I think it's a common behavior for many people from USSR, as we have a rather traumatic Soviet past that got imprinted in our brains for generations after generations.
I'll be going to the therapist to rewrite my cognitive behavior to address the issue.

For my husband we - his family - is everything to him. He wouldn't do anything to hurt us. He'll give his life for us. Being away form kids now is the worst torture for him imaginable. Not been able to hold and hug his newborn is a terrible pain to him. Cevdet won't survive in jail and we won't survive without him.
He is not guilty, I created this situation with my "fighting" approach to everything. He didn't want to discuss with me anything that day, he wanted to do his work, but I kept approaching him saying different things.
Please-please save him. Only you can do it.When I learnt that YOU will be his Public Defendant, I saw it as a sign that God hasn't forsaken us.
I'll never forgive myself if anything happens to him. He is innocent.
Kids miss him badly Sophia ( 2 y.o.) crying while sleeping, when she is up she is crying and telling me how she misses daddy. They are a world to him, He'll give his life for them, for us.
Elizabeth, the oldest will go to kindergarten this year. He shouldn't miss it.
I won't forgive myself if he won't take there on the 1st day of school, if I still this moment from both of them.
My husband doesn't deserve it.
My maternity leave ends at the end of May and then I return back to work. Cevdet was going to take care of the kids. We cannot afford the daycare.
He has to return home. We need him. He is the greatest dad I had ever met. He takes them places, cooks different and fresh dishes for them every day, changes diapers day and night, reads, playes, comforts, wipes their tears, i can continue this list on and on. He is both a mommy and daddy.
To sum up the above: I was totally out of control, I told police things that are not true. Pregnancy was difficult, I had lot of pain, bleeding, contractions. Delivery - c-section was very difficult and painful, as anesthesia didn't work on me as it should. My hormones are effecting everything, I have a post-partum depression for which my disability has been

extended. Please, I didn't know what I was doing. I needed my husbands' help and support but instead of directly asking for it, I chose to verbally fight and "press all his buttons" so to say. I am very skilled at that.

I'll be working with the therapist to address my "fighting" issues and "childishness". My husband married me despite seen all these issues in me and me health been at a lowest capacity. I was exhausted from a 24/7 sales job and non-stop business trips all over Russia and Europe. He keeps saying that I have a good heart, but I start doubting that if I do have heart after all I've done to him. I destroyed his life, he got records, he is unable to find a job because of this.

After marring me he restored my health with diet and exercise. Finally after a year of trying I got pregnant. It's his support of me eating healthy and exercise I was able to be pregnant 3 times. The beautiful family we have now is his doing, he built everything.

He doesn't deserve all this that I brought on his head. Now after seen this therapist I can see how I brought a crisis after crisis into our home through out our marriage.

He is the most direct, decent, non corrupted, moral, principal man I've ever met. His family is everything to him. Please return him to us. Don't let others hurt him more then I did already with him been separated from his family for over a week. He doesn't deserve it. He is not guilty!

I cannot believe I did all this damage and caused suffering to him. He doesn't deserve it. Please protect him.

Tomorrow, please help me to get Cevdet back home. Let judge cancel the "no contact" order. We need him back badly. Because of him away and the consequences he is about to face I cannot sleep, I have trouble breathing at times, can't eat, I am trying to keep doing things all the time, so that despair doesn't paralyze me. I am horrified and cannot even think that kids might not see daddy for a while. Please help, they cannot have their lives imprinted with daddy been away for a long time. They are innocent and wonderful.

Please, Mr. Steele, if anyone can make a miracle and get my husband back home, it is you.

With gratitude,
Natalie Uruk
805-259-9249

EXHIBITS

4) My Wife's Letter to the DA (2018)

5) My Wife's Email to DA and my Attorney with Investigator Report (2019)

7/28/2018

**Dear Ms. Megan Chanda,**

District Attorney's Office
1112 Santa Barbara St
Santa Barbara, CA 93101

Herewith, I am writing to ask for your justice, compassion and help for my husband (Cevdet Uruk) as well as for myself and our little children (3 and 5 y.o.) and a newborn (6 months).

I apologize to you, People and the Court for the troubles I might have caused. I acted childishly, without knowing/understanding the consequences of my actions.

It has been a difficult year for our family with my complicated pregnancy, 5 weeks hospital stay, premature birth and afterwords complications and hospitalizations with the newborn. Due to constant lack of sleep, I don't remember events clearly. English is my second language and having emotions and myself out of control, unintentionally, I have used inappropriate words and made misleading/false/exaggerated statements. In Russia, a women can call the local police station, so that police officer assigned to their block talks to a husband. It is not a big deal.

There was and there is no violence in our home. It was my outburst from all the tiredness and lack of sleep. During that period I was very irritable, especially at my poor husband literally for everything. I wanted to hurt him to get my way and more attention from him. It's been my long time struggle to learn to control my emotions even in regular life outside of high stressful life changing events. I've had some behavioral and mental issues and have been working on them with professionals. I was the aggressor.

Cevdet is a loving husband and a devoted father. While I go to work he takes care for our 3 little children. I know that he'll give his life for us to protect us from any danger. When we met I wasn't healthy. He healed me and gave me a beautiful family, home and job. He is innocent. He is always honest.

I kindly ask you to drop all the charges and remove all the restraining orders.

It's been incredibly difficult to not to have him around when I come from work been already tired and having to take care of the kids and house on my own. We do not have any relatives in the US. Kids miss going out with as a family.

My husband, myself and our children have suffered tremendously (emotionally, mentally, physically, economically) due to my irresponsible uncontrolled actions.

I kindly ask for your understanding and compassion. It has been an incredibly difficult year for our family and all we'd like to do is to finally get to enjoy been together again and enjoy our newborn together.

Thank you very much for your time, compassion and justice.

With gratitude,


Natalie Uruk
natalieuruk@gmail.com
805.259.9249
1021 Cieneguitas Rd
SB CA 93110

---

**Robert Strong**

**Private Investigator**

224 East Islay Street
Santa Barbara CA 93101
805 698 2012
strongsbpi@yahoo.com
License 13512

Dominique Fletes   Interpreter 805 708 0909

---

May 8, 2019

To:   Neil Levinson
Re:   Cevdet Uruk
Subject: Interview Natalie Uruk        May 29, 1980        805 259 9249        1021 Cieneguitas
Santa Barbara CA 93110

I called Natalie Uruk on May 7, 2019. I identified myself as a Private Investigator hired by Criminal Defense Attorney Neil Levinson to interview potential witnesses in Cevdet Uruk's pending criminal case.  I told her my main reason for calling was to go over the email she sent to Attorney Levinson on May 2, 2019.  This report is a summary of what Natalie told me.

Natalie told me she did in fact send the email to Mr. Levinson.  She said she was very emotional at the time of the incident involving her husband that resulted in him being arrested.  I asked her if she had a clear recollection of the circumstances that led up to Cevdet being arrested.  She told me the "Time is blurred to her because it was a stressful time".  She told me she believes she may have been the aggressor because of her emotional condition on the day of the incident. She told me she had a very difficult labor because her water broke early resulting in her needing to stay in Cottage hospital for five weeks until it was safe to deliver the baby.

Natalie told me she had no idea that the police would arrest her husband.  That was never her intention.  She just needed the police to talk to her and her husband and help solve the argument.

I asked Natalie if she was injured in any way during the argument. She told me she doesn't think she was injured in any way.  She said she does not remember any violence being involved.  She said she "misjudged the argument".  She and her husband are together trying to get though this situation.  I asked her if she felt safe living with her husband. She

told me feels very safe with her husband. She said her husband would not hurt her or the children. She said she is not afraid of her husband. She said, "Cevdet is my equal".

I asked her about her statement that raising the children and making a living as immigrants drained her. She told me she works in Goleta doing software testing. She said they did not have any help from her family at the time however that situation has changed. While she works, Cevdet takes care of the children and handles all of the chores around the house. She said Cevdet takes the kids to the park every day. He is better at changing diapers then she is. They are working on their relationship and have talked to their minister about getting marriage counseling. She has read a lot of material concerning marriage and family.

Natalie said "I don't know the secret to happy marriage". She went on to say that they are trying to have a good marriage and a happy family.

**Neil Levinson**

From:        Natalie Uruk [natalie.uruk@gmail.com]
Sent:        Thursday, May 02, 2019 8:30 AM
To:          ndllaw@cox.net
Subject:     URUK Case

Hello,

I appreciate if you could forward the below email to District Attorney.

Thank you very much for your help. I have realized that I was overreacting to certain events, with my emotional personality. I regret taking your time, as I have trouble recalling exact events, as well as I still don't fully understand the consequences of certain actions. I might be the aggressor. I still don't understand how things work exactly. In Russia, people rather casually call and ask police to talk some sense into their family member or a neighbor, or resolve a family dispute.

My husband and I have been overwhelmed and drained by the work and stress of parenthood responsibilities of raising three little children (1, 3, 5 years old) and making a living as immigrants, without any family and help. That has caused some unpleasant events and misunderstandings. But, there was no real threat or violence. I misjudged and had high emotional reactions.

We will get some help from my parents in taking care of the children, which will give us an opportunity to continue working on our relationship and ourselves through counselling. In case we can not resolve our differences, we have a separation plan prepared.

It is due to my husband, who taught me healthy lifestyle, I was able to improve my health, get pregnant and give birth to three children. Due to his mentoring I was able to get the job and be competitive at my work.

There is no danger or any risk to me or the children. My husband is a responsible devoted father and husband.

I appreciate your help in forgiving us both so that we can work towards fulfilling our parenthood responsibilities.

Kind regards,
Natalie Uruk

EXHIBIT

6) Expert Witness Testimony/Declaration (Blind Justice by Godsey)

Expert Witness Testimony/Declaration

of

MARK GODSEY

Author of the Book:

BLIND JUSTICE[1]

Mark Godsey is a Professor of Law at the University of Cincinati. He was an
award-winning prosecutor in New York City before cofounding the Ohio Innocence
Project and becoming a leading attorney and activist for the wrongfully convicted.

Nationally, more than two thousand people have been identified as victims of
wrongful conviction since 1989.

Three psychological factors combine to cause good people to create this kind of
evil outcome in our criminal justice system: cognitive dissonance, administrative
evil, and dehumanization.

Cognitive dissonance is a psychological phenomenon that can cause us to push
aside or deny information that conflicts with our most deeply held beliefs.

Good people will typically act with goodness when acting alone. When acting alone
our internal moral compass is our only guide and the only thing to which we are beholden.
Problem of cognitive dissonance and denial are magnified exponentially when good
people are part of large bureacracy, like the criminal justice system, that marches
in locksteps according to predetermined policies and procedures. This is called
administrative evil. It is the process that allowed "good" Germans to participate
in the Hlocaust.

Dehumanization "is a psychological process whereby opponents view each other as
less thanhuman and thus not deserving of moral consideration.

_____

1)All text is quoted from the book, without any change.

Godsey, Mark. 2017. Blind Justice. Oakland, CA: University of California Press.

When this dehumanization mentally goes to extremes, it perpetuates things like the "two-ton contest" in which prosecutors in Chicago competed to see who could be the first to indict "four thousands of fless". The contest resulted in prosecutors going after the heaviest defendants they could find.

The fact that most prosecutors in this country are elected, and the public wants prosecutors who are "though on crime" creates a pressure to solve, arrest and convict. Elected judjes experience political pressure as well.

Defendants and defense attorneys, on the other hand operate at a greater disadvantage. The result is a system that is structurally imbalanced in favor of convictions.

Most judges were prosecutors before going on the bench and thusoften have a prosecutorial mentality by nature.

Most prosecutors and most sheriffs are elected. Office politics and desire for internal advancement create a pressure to solve cases and convict.

Police and prosecutors also have budgetary pressure. The budgets depend in part on the number of arrests and convictions.

While the State has unlimited resources, defendants especially if represented by public defenders, who are grossly underpaid and also overloaded, have very limited resources.

Jurors typically think, " The Police, the prosecutors, and these fancy experts know a lot more than me".

The presumption of innocence is a myth.

Humans are susceptible to confirmation bias, "the seeking or interpreting of evidence in ways that arepartial toexisting beliefs, expectations, or hypothesis in hand."

Human memory is fallable, especially under stress. 70% of college students construct detailed, false memories of crimes they didn't commit.

2

Faulty eyewitness identification testimony caused by errors in human intuition/
perception and memory - is the single greatest cause of wrongful convictions.

Our criminal justice system rests on the widespread belief that human intuition
allows us to know when a witness is telling the truth or lying.

The reseacrh shows that the accuracy rate of lie detection is about 57% and
Police are no better than lay subjects.

Tunnel vision accurs when we develop an initial belief, or suspicionbecome wedded
to that belief, and then interpret or even twist all subsequent information we en-
counter in order to confirm it.

It is a prosecutor's job to seek justice, not to win cases.

One judge in Pennsylvania, in what's known as the "kids for cash" scandal, was
recentlyconvicted for taking payoffs from a private prison company for each juvenile
he sentenced.

The number of wrongful convictions should be viewed as an indicative of main
disaster.

3

EXHIBIT S

8) Presentence Report

7) My Wife's Sentencing Statement with the Medical Report/Note

*will call*

*Neil Levinson*

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA
CRIMINAL DIVISION



| PLAINTIFF: THE PEOPLE OF THE STATE OF CALIFORNIA | FOR COURT USE ONLY |
|---|---|
| DEFENDANT: CEVDET URUK AKA: BEN CEVDET URUK | |
| PRESENTENCE REPORT | |

| Department: 12 | Hearing Date: August 5, 2019 | | Action #: 18CR02248 |
|---|---|---|---|
| Defense Attorney: Neil Levinson | District Attorney: Megan Chanda | Probation Officer: Lindsay Whitmeyer | Area Office: Santa Barbara |
| Guilty By: Jury | Date: June 27, 2019 | Judge: Michael Carrozzo | |
| Date of Offense: March 9, 2018 | Arresting Agency: SBSO | | Bail/OR/Custody: Custody |

Days Custody This Case: 46 actual + 46 GT/WT = 92 total (See attached Time in Custody Worksheet)

Address:
1021 Cieneguitas Rd., Santa Barbara, CA. 93110

| Driver's Lic. No./State: F3286546/CA | | CII No.: A31702705 | FBI No.: 355346RE5 | | | |
|---|---|---|---|---|---|---|
| DOB: July 13, 1969 | POB: Kayseri, Turkey | Citizenship: United States | Height: 5'7" | Weight: 140 lbs. | Hair: Black | Eyes: Brown |
| Sex: Male | Race/Ethnic Identity: Other | Physical Identifiers: None | | | | |

Charged With:
Ct. 1: §136.1(b)(1) PC (DISSUADING A WITNESS FROM REPORTING A CRIME), a felony
Ct. 2: §273.5(a) PC (CORPORAL INJURY TO SPOUSE/COHABITANT/FORMER COHABITANT/CHILD'S PARENT), a felony
Ct. 3: §245(a)(4) PC (ASSAULT BY MEANS OF FORCE LIKELY TO PRODUCE GREAT BODILY INJURY), a felony
Ct. 4: §236 PC (FALSE IMPRISONMENT BY VIOLENCE), a felony
Ct. 5: §273a(b) PC (CRUELTY TO CHILD IN CARE OR CUSTODY), a misdemeanor
Ct. 6: §166(c)(1) PC (DOMESTIC VIOLENCE CONTEMPT OF COURT), a misdemeanor
Ct. 7: §243(e)(1) PC (BATTERY), a misdemeanor

Enhancements/Special Allegations Alleged:
§273.5(f)(1) PC (PRIOR CONVICTION FOR DOMESTIC VIOLENCE {SBSC #1471799})

Convicted Of:
Ct. 1: §136.1(b)(1) PC (DISSUADING A WITNESS FROM REPORTING A CRIME), a felony
Ct. 2: §273.5(a) PC (CORPORAL INJURY TO SPOUSE/COHABITANT/FORMER COHABITANT/CHILD'S PARENT), a felony
Ct. 3: §245(a)(4) PC (ASSAULT BY MEANS OF FORCE LIKELY TO PRODUCE GREAT BODILY INJURY), a felony
Ct. 4: §236 PC (FALSE IMPRISONMENT BY VIOLENCE), a felony
Ct. 6: §166(c)(1) PC (DOMESTIC VIOLENCE CONTEMPT OF COURT), a misdemeanor
Ct. 7: §243(e)(1) PC (BATTERY), a misdemeanor

Enhancements/Special Allegations Found True:
§273.5(f)(1) PC (PRIOR CONVICTION FOR DOMESTIC VIOLENCE {SBSC #1471799})

| Co-Defendant(s): None | Disposition: N/A |
|---|---|

Settlement Agreement:
None

PRO-109 (05/2017)                                    CONFIDENTIAL PROBATION REPORT PER PC 1203.05

1    <u>CIRCUMSTANCES OF OFFENSE</u>:

2       <u>Sources of Information</u>:

3       Santa Barbara County Sheriff's Department Report No. 18-3500

4       "The Court is familiar with the circumstances of the offense having already heard testimony during the course of the Jury
5       Trial.  The following summary of the offense is based on the law enforcement report and may not reflect testimony presented at
6       Trial."

7                              On March 9, 2018, at

8 approximately 1018 hours, deputies were dispatched to 1021 Cineguitas

9 Road for a report of a husband who had hit his wife.  Upon arrival,

10 deputies observed the victim, herein referred to as Jane Doe, and her

11 three children in the driveway of the home.  Doe informed deputies she

12 was outside of the home because she was afraid of her husband,

13 defendant Cevdek Uruk, who was inside the residence.

14                          Doe was holding the couple's

15 two-month old son and was visibly upset and crying.  Deputies noticed

16 that she had a bruised and bloody lip.  Doe told deputies she and Uruk

17 had been married for the past six years and had three children, ages

18 two months to four years.  Doe said the two argued frequently and

19 their arguments had turned physical in the past resulting in Uruk

20 being arrested.  Deputies noted a protective order against Uruk issued

21 on June 24, 2015, for three years. (Count 6)  Additionally, Uruk had a

22 semi-automatic firearm registered to him; however, it had been taken

23 away due to a conviction for domestic violence.

24                       Doe said she and Uruk engaged

25 in a verbal argument the day prior when Uruk discovered she had lied

26 to him about how much food their children had eaten during lunch.

27 Uruk strangled Doe with both of his hands and pinned her down against

28 the kitchen counter. (Count 3)  Doe did not contact law enforcement at

- 2 -

1    that time because she believed Uruk would calm down and forget about
2    the incident.  She said their children were present and witnessed the
3    incident. (Count 5)

4              Instead of Uruk forgetting
5    about the incident and moving on, Doe said he became increasingly
6    angry overnight and was constantly following her around the house the
7    next morning.  While the two were upstairs and the children were
8    downstairs, Uruk grabbed Doe by her arms, pinned her against the wall,
9    and prevented her from moving freely for approximately one minute.
10   (Count 7)

11              Doe attempted to get away from
12   Uruk but his grip became tighter and he refused to let go of her.
13   (Count 4)  Doe said she stopped trying to get away from Uruk because
14   she believed if she did not put up a fight, he would let her go.
15   Instead, Uruk became even angrier that Doe would not speak to him, so
16   he hit her in the face twice, causing Doe to suffer a bloody and
17   bruised lip.  (Count 2)

18              As a result of being hit in
19   the face, Doe fell onto the floor.  She then observed Uruk run into
20   their bedroom to retrieve her cellphone because he believed she would
21   call 9-1-1.  When Doe asked Uruk for her phone, he refused to give it
22   to her, and told her to focus on taking care of the children instead.
23   (Count 1)  Due to being in fear of her safety, and for the safety of
24   the children, Doe went to her neighbor's home to use the phone to call
25   9-1-1.

26              Deputies attempted to speak
27   with Uruk; however, he said he had had negative experiences with law
28

1    enforcement and refused to speak with deputies regarding the incident

2    involving Doe.

3                                        Deputies spoke with Doe and

4    Uruk's neighbor, Nathan Miller.  Miller said he was at home when he

5    suddenly heard a knock at the door and saw Doe standing outside.  Doe

6    requested to use his phone.  He did not know who she was calling but

7    assumed it had to do with Uruk as he had heard the two involved in an

8    argument.  Miller told deputies that Uruk is very controlling of Doe

9    and their children, specifying the worst he has ever seen.  Miller

10   said when Doe walked away, the couple's oldest child told him, "Mommy

11   and Daddy fight all the time.  Daddy took Mom's phone."

12                                        Miller further told deputies

13   that he has noticed Doe and Uruk argue a lot in the past,

14   specifically, in front of their children.  Miller also said that Uruk

15   keeps the children in the house all day when Doe goes to work.

16                                        Before transporting Uruk to

17   jail, he was asked to provide the location of Doe's cellphone.  He

18   said he hid it above the refrigerator in the kitchen.  Uruk was later

19   booked on the new charges at the county jail.

20   **CRIMINAL HISTORY:**

21       **Sources of Information:**

22       CII, FBI, NCIC, DMV, Santa Barbara County Superior Court records,
         Santa Barbara County Probation Department records, Santa Barbara
23       County Jail records

24   11/22/14    SBPD/§422 PC (THREATEN CRIME WITH INTENT TO
                 TERRORIZE); §243(e)(1) PC (SPOUSAL BATTERY)
25               Conviction:   6/24/15; §243(e)(1) PC, misd.
                 Court:        SBSC #1471799
26               Disposition:  3 years probation, 8 days jail, fine

27               Description:  According to SBPD report no. 14-83919,
                 on November 22, 2014, officers responded to the
28               defendant and Doe's residence on a report of a

domestic disturbance. Doe told officers that there
was a long history of abuse involving the defendant,
and that she had only called law enforcement one
other time. The couple had been married for
approximately two years, had two children and Doe was
pregnant with the couple's third child.

On November 16, 2014, the defendant found a bag of
peanuts Doe had hidden in a closet. He believed she
was allergic to peanuts and other foods so he
restricted her diet. The defendant yelled at Doe,
grabbed her by the throat, and pushed her against a
wall. He then told her if she had an allergic
reaction to the peanuts, he would kill her. Later,
he threw a pillow at her, took her into the bedroom
and began hitting her through the pillow. Doe yelled
for help and their one-year-old daughter cried.

On November 22, 2014, the defendant grabbed Doe by
either her neck or arms, pushed her against a wall,
and said, "I'm going to kill you if you do this!"
Doe said their baby was crying and she was able to
get away from the defendant, take the baby outside
and call law enforcement. Doe said she is afraid of
the defendant and his threats. The defendant
admitted to officers that he threatened to kill Doe
if she hurt the unborn child from an allergic
reaction. He also admitted to grabbing both of her
arms and making her face him in order to speak with
him. He said he told Doe again he would kill her if
she hurt the baby.

Several of the defendant's emails to Doe were
reviewed and yielded bible passages referring to
submission. In the defendant's email messages to Doe
he inferred that she should submit to him.

**Violation:**       10/14/15; failure to comply with
Probation directives, failure to surrender firearm,
failure to complete treatment
**Amended Violation:**  11/25/15; possession of .40
caliber ammunition, possession of a hunting knife
**Disposition:**     1/8/16; probation reinstated on same
terms and conditions, 60 days jail, mental health
evaluation

**Status:**          11/16/16; probation converted to
unsupervised

**Violation:**       3/13/18; SBSC #18CR02248
**Disposition:**     Pending

DEFENDANT'S STATEMENT:                     The defendant was interviewed

via video conferencing on July 25, 2019. Regarding the instant

1   offenses, he said, "I take responsibility for my actions.  I'm sorry

2   for what happened.  It was a very difficult time."

3                           The defendant explained that a

4   few months prior to the instant offenses, Doe had gone into early

5   labor with the couple's third child.  At that time, they had been

6   given evacuation orders because of the Thomas fire; however, while Doe

7   was in the hospital, the defendant stayed home with the couple's two

8   daughters and did not evacuate.  In early January, their son was born,

9   and the mudslides occurred.  Soon after, their son was diagnosed with

10  a viral infection and had to be re-hospitalized.  The defendant said,

11  "It was overwhelming.  I was so tired.  It was the most difficult,

12  stressful time of my life."

13                          The defendant said, "I am very

14  disciplined. I believe in self-control.  I was trying to teach and

15  raise my children the same way."  The defendant explained that the day

16  prior to the instant offenses, Doe threw the children's lunch

17  vegetables away and lied about doing so.  He said he became very upset

18  at Doe for lying, because "lying is evil."  He further stated, "I

19  didn't choke her.  I didn't cause great bodily injury.  I did not

20  abuse, isolate, or subject her to violence.  There was nothing to rise

21  to corporal injury."  Additionally, he said, "My biggest mistake is I

22  pushed (Doe) to change how I wanted."

23                          The defendant denied ever

24  being physical with his wife "in a harmful way."  Additionally, he

25  said, "I respect women.  I'm not controlling."  He told the

26  undersigned, "I promise not to touch her (Doe)."

27                          The defendant believes he can

28  be successful if placed on probation.  He admitted to having an anger

1    management issue and is willing to participate in an appropriate

2    treatment program.

3    **VICTIM'S STATEMENT**:                    The undersigned met with Doe

4    at the Probation Department on July 24, 2019.  Doe told the

5    undersigned that the defendant is not dangerous and she is not in fear

6    of him.  She also said that the defendant is a good citizen who has

7    never had a traffic ticket.  She explained that he was happy staying

8    home with the children and she described him as being both "mom and

9    dad" to the couple's children while she held a full-time job.

10                                          Doe explained that because of

11   trauma suffered in her childhood, she experiences blackouts when

12   arguing with the defendant and calls law enforcement to report things

13   that are not true.  The victim denied that the defendant physically

14   injured her in this case, and said that she injured her lip by bumping

15   into the wall.

16                                          Additionally, the victim has

17   submitted a written statement which has been read, and considered, and

18   is attached for the Court's consideration.

19   **RESTITUTION INFORMATION**:              According to Doe, she will not

20   be seeking a claim for restitution.  According to Restitution

21   Specialist Julie Rotta, a claim for restitution has not been made with

22   the Victim Compensation and Government Claims Board.

23   **SOCIAL HISTORY**:

24       Unless otherwise noted, all information was provided by the
         defendant and has not been verified.
25

26       **Living Situation**

27       The defendant resides with his wife (Doe) and three children at
         1021 Cieneguitas Road, Santa Barbara, California.

28       Any cohabitants on probation or parole?  (X) None

**Marital History**:                                    (X) Married (Jane Doe)

**Children**:

The defendant has three children with Doe, ages 15 months, four, and six.

**Education**:

The defendant reported attending the Middle East Technical University in Ankara, Turkey and receiving a Bachelor of Science degree in Finance. He then attended Washington University in Saint Louis, Missouri and received a Master's degree in Business Administration. The defendant also reported completing the PHD program at the Middle East Technical University in Ankara, Turkey for Management and Business Administration. He says he holds a Certified Public Accounting certificate which is inactive, and a Certified Financial Analyst certificate which is active.

**Physical Health Concern at Present**:

The defendant reported currently suffering from tinnitus. He is not taking any medication.

**Mental Health History**:

The defendant reported being diagnosed with depression in 2007 or 2008. He refuses to take medication because he does not like medication. Additionally, the defendant said he suffers from claustrophobia.

The defendant denied ever being abused as a child. Although the defendant denied suffering from suicidal ideations, he said, "Sometimes I wish I was dead instead of going through this pain......being separated from my children."

**Substance Abuse History**:

The defendant reported first consuming alcohol at age 17 or 18. He said he last consumed alcohol approximately ten years ago.

The defendant denied ever using an illegal drug.

**Substance Abuse Treatment**:

The defendant reported currently participating in the Sheriff's Treatment Program (STP).

**Military History**:

The defendant reported being in the Turkish military for 30 days at age 31, until he paid $15,000 and was able to exit the military.

**Gang Association**:                                    (X) None

**Employment**:                                                    (X) None

The defendant reported not being employed since 2014.  At that time, he was employed as Chief Investment Officer for one month at Pension Mark.  He said he was fired because of "behavioral issues," and told by management that he was "incompetent."  The defendant told the undersigned he "took it as discrimination."  Since 2014, the defendant has been working as a "free-lance accountant" and has been a stay-at-home dad.

**Financial Status**:

| Assets: | Debts: | Monthly Income: | Monthly Expenses: |
|---------|--------|-----------------|-------------------|
| $285,000* | $6,000** | $4,166 | $3,350*** |

*Home, retirement accounts, vehicles
**Credit card
**Living expenses including mortgage and home owner's association fee

**Ability to Pay For Probation Services**:

The term "ability to pay" is relevant to the cost of the probation investigation and supervision fees [§1203.1b PC], booking fees [§29550(c)(2) GC], restitution payments [§1203.2(a) PC] and specified fines and fees.  The analysis in this section pertains to the defendant's ability to pay for probation services and takes into account court ordered fines and restitution as required by §1203.1b(b)(3) PC.  The Probation Department will defer to the Court regarding the defendant's ability to pay for other fines and fees as appropriate.

Pursuant to California Constitution article I, §28(b)(13)(C) and §2085.5(j-k), all payments and monies collected from any person who has been ordered to make restitution shall be first applied to pay the amounts ordered as restitution to the victim.

A Defendant's Statement of Assets form (CR-115) was mailed to the defendant at the Santa Barbara County Jail.  The defendant was instructed to complete the form and return it to Probation upon release from custody.  Based on the information currently available utilizing the Monthly Payment General Order adopted October 23, 2008, the defendant's ability to pay is between $225.00 and $318.00 per month toward the overall costs associated with this case, taking into account any amount that the defendant is ordered to pay in fines, assessments, and restitution.  Additionally, the defendant was informed of his right to a hearing for the Court to determine his ability to pay.  The defendant verbally **did not waive** that right.

Once the defendant submits the proper paperwork, an ability to pay hearing will be calendared.

1    <u>**COLLATERAL INFORMATION**</u>:                According to Probation

2    Department chronological entry dated October 30, 2015, Probation

3    Manager Spencer Cross relayed to the District Attorney's Office

4    comments from Anger Management Services (AMS) regarding a statement

5    the defendant made in reference to the defendant harming his

6    "girlfriend and members of the group." As a result, the Probation

7    Department made Doe aware of potential threats to her safety. Also,

8    it was relayed that an employee of AMS was in fear of being present at

9    Domestic Violence Court.

10

11                                       According to Probation

12   Department chronological entries dated March 29, 2017, and July 26,

13   2017, the defendant appeared in court for a domestic violence review.

14   On the first date, he became agitated and stated he did not have the

15   money to pay for the Batterer's Intervention Program (BIP). He

16   continued by asking the Court, "What do you want me to do your Honor,

17   kill myself or somebody else?" On the later date, the defendant

18   became agitated regarding the balance due for the BIP. He stated he

19   had no respect for the "corrupt justice system" or "for the Court."

20   He then asked the Court, "What do you want me to do your Honor, kill

21   everyone and then myself?" It was noted that the defendant always

22   brought his two young daughters to court with him and they were able

23   to observe the defendant's behavior.

24                                       According to Tippecanoe,

25   Indiana Circuit Court Domestic Relation case no. 79C01-0706-DR-000096,

26   the defendant's ex-wife petitioned the Court for dissolution of

27   marriage on June 8, 2007. It is noted that on June 13, 2007, she

28

1  filed for a temporary restraining order against the defendant which

2  was grated.

3                              The undersigned contacted

4  Deputy District Attorney (DDA) Megan Chanda and defense counsel Neil

5  Levinson regarding submitting input for this report.   DDA Chanda

6  indicated she will be filing a sentencing brief.   Mr. Levinson

7  provided the following input:

8      "Despite the guilty verdict by the jury, the complaining witness
       did not testify, preventing the defense from cross-examining her
9      and getting the full story to the jury.  After the verdict, the
       complaining witness, (Jane Doe), pleaded with the court to
10     release the defendant and allow him to continue taking care of
       their children and allowing her to work.  As you probably know,
11     Ms. Uruk is the only one who works in the family and the only one
       financially supporting the family.  The defendant takes care of
12     the kids and has been a present, loving and caring father for his
       children.  A pastor by the name of Sergiy Tarasenko has counseled
13     and been a friend to both the complaining witness and the
       defendant for at least six years and attest to this information
14     about the defendant.  Clearly the relationship between the
       complaining witness and the defendant is extremely troubled and
15     strained, and both parties share the responsibility for many of
       their problems.  It would be a tremendous burden on the
16     complaining witness and their children for the defendant to be
       sentenced to a lengthy prison term."

17 CRIMINOGENIC NEEDS/RISK ASSESSMENT:

18
   Evidence-based practice requires that offenders who are higher risk be
19 supervised and managed at higher levels and offenders who are of lower
   risk be supervised and managed at lower levels. The defendant was
20 evaluated using the Northpointe Correctional Offender Management
   Profiling for Alternative Sanctions (COMPAS).  COMPAS was designed to
21 evaluate an offender's risk of recidivism, and to identify
   criminogenic needs in order to support treatment, programming and case
22 management decisions.  The assessment was normed on both male and
   female offenders, in populations including offenders from community
23 corrections, jail populations, and prison inmates.

24 The defendant was evaluated on July 29, 2019, using the COMPAS Risk of
   Violence and Recidivism (ROVAR) assessment tool.  Results of that
25 assessment indicate he is in the *low* risk probability group for
   violence and the *low* risk probability group for continued criminal
26 activity.  A copy of the COMPAS Risk and Needs Assessment scale is
   attached to this report.

27

28

PA-101                                        - 11 -

According to the ROVAR, the following criminogenic needs and treatment implications were identified:

1.  Criminal Involvement Score: *Low*

2.  History of Noncompliance Score: *Medium*

    This scale focuses on the number of times the offender has failed when he has been placed in a community status. Scores of 8 and above indicate a high risk of rules infractions, or technical violations if placed in the community. These offenders have failed multiple times in the past and have other characteristics which put them at risk of non-compliance. A highly structured supervision and case management plan may be in order. Multiple episodes of violence may suggest the need for more detailed psychological evaluation. Additionally, if the offender is to be released into the community, requirements regarding victim notification may be important. Anger management training and problem-solving skills may be relevant. Programs regarding social cognition to reduce feelings of hostility etc. may also be relevant.

3.  History of Violence Score: *Medium*

    This scale reflects the seriousness and extent of violence in an offender's criminal history. Multiple episodes of violence may suggest the need for more detailed mental health assessment. Additionally, if the offender is to be released into the community, requirements regarding victim notification may be important. Anger management training and problem-solving skills may be relevant. Programs regarding social cognition to reduce feelings of hostility may also be relevant.

4.  Vocational/Educational Score: *Unlikely*

<u>Ontario Domestic Assault Risk Assessment (ODARA)</u>:

**The defendant was evaluated using the ODARA, which was specifically designed to predict future assaults against intimate partners. Results will be used to evaluate the defendant's risk of domestic violence recidivism for the purposes of this report.**

The Probation Officer has completed an initial investigation of the defendant as required by Penal Code §1203.097. As part of that investigation, the ODARA was completed based on information available to the Probation Officer as of July 26, 2019. It should be noted that the ODARA is a single assessment utilized to evaluate whether the defendant is likely to commit further acts of violence and to aid in the development of a treatment plan. The ODARA is an empirically tested and validated domestic violence risk assessment tool that assesses risk of future assaults, as well as the frequency and severity of the assaults. The ODARA score ranks assaulters for risk of repeated domestic violence in one of seven categories cased on a numeric result of 0, 1, 2, 3, 4, 5-6, or 7-13. The score is linked to an actual domestic violence recidivism percentage. For example, a

score of 7 or greater places the assaulter in the highest risk category; 6% of men fell into this category, and 74% of these men met the criteria for domestic violence recidivism. While the original research was completed with men, subsequent research has demonstrated the ODARA's predictive accuracy among men with a correctional record, incarcerated men, male sex offenders, and female offenders.

The ODARA indicated that the defendant scored 7, which based on previous research an offender with this score recidivated at a rate of 74%.

Based on the aforementioned assessment results, it will be recommended the defendant be ordered to enter and complete a 26-week Batterers' Intervention Program.

SENTENCING CONSIDERATIONS:

Probation Eligibility:

The defendant is eligible for a grant of probation.

Probation Suitability (Judicial Council Rule 4.414):

   The following factors appear to support a decision to grant probation:

   1.   The defendant is willing to comply with the terms of probation [Rule 4.414(b)(3)].

   2.   The defendant has the ability to comply with reasonable terms of probation as indicated by the defendant's age, education, health, mental faculties, history of alcohol or other substance abuse, family background and ties, and other relevant factors [Rule 4.414(b)(4)].

   The following factors appear to support a decision to deny probation:

   1.   The nature, seriousness, and circumstances of the crime are more serious as compared to other instances of the same crime [Rule 4.414(a)(1)].

        The victimization at the hands of the defendant lasted for two days and included several acts of violence.

   2.   The defendant's prior record of criminal conduct, including the recency and frequency of prior crimes, indicates a pattern of increasingly serious criminal conduct [Rule 4.414(b)(1)].

   3.   The defendant's prior performance on probation was unsatisfactory and he was on probation when the crime was committed [Rule 4.414(b)(2)].

4.   It is likely that if not imprisoned, the defendant will be a danger to others [Rule 4.414(b)(8)].

The defendant has a history of violence toward his wife. It is believed that if not imprisoned, she may be in danger of continued violence by the defendant.

Conclusions:

After weighing the above factors, the Probation Officer believes the defendant is a marginal candidate for a grant of probation.

SENTENCING COMPUTATIONS:

The Offenses:

Ct. 1:  §136.1(b)(1) PC    Sentencing Range:  16 mos. - 2 - 3 yrs.

Ct. 2:  §273.5(a)/(f) PC    Sentencing Range:  2 - 4 - 5 years

Ct. 3:  §245(a)(4) PC    Sentencing Range:  2 - 3 - 4 years

Ct. 4:  §236 PC    Sentencing Range:  16 mos. - 2 - 3 yrs.

The circumstances in aggravation and mitigation are applicable to all counts and are only listed once, unless otherwise indicated.

Circumstances in Aggravation (Judicial Rule 4.421):

1.   The defendant's prior convictions are of increasing seriousness [Rule 4.421(b)(2)].

2.   The defendant was on probation when the crime was committed [Rule 4.421(b)(4)].

3.   The defendant's prior performance on probation was unsatisfactory [Rule 4.421(b)(5)].

4.   The crime was committed in the presence of a minor who is a relative of or household member of the victim and defendant [Rule 4.421(c)/1170.76 PC].

Circumstances in Mitigation (Judicial Rule 4.423):

None

Conclusions:

The Probation Officer has weighed the significance of the matters in aggravation and mitigation, as well as the salient facts about the crime and the defendant. The upper terms are selected.

Ct. 1:  §136.1(b)(1) PC    Selected Term:  3 years

Ct. 2: §273.5(a)/(f) PC    **Selected Term**:  5 years

Ct. 3: §245(a)(4) PC    **Selected Term**:  4 years

Ct. 4: §236 PC    **Selected Term**:  3 years

**Criteria Affecting Concurrent or Consecutive Sentencing (Judicial Rule 4.425)**:

The following factors appear to support a decision to impose consecutive rather than concurrent sentencing:

1.  The crimes and their objectives were predominantly independent of each other [Rule 4.425(a)(1)].

2.  The crimes involved separate acts of violence or threats of violence [Rule 4.425(a)(2)].

**Principal Term**:

Ct. 2: §273.5(a)/(f) PC    5 years

**Consecutive Terms**:

Ct. 1: §136.1(b)(1) PC*    2 years (full middle term)

Ct. 3: §245(a)(4) PC    1 year (⅓ the middle term)

Ct. 4: §236 PC    8 months (⅓ the middle term)

*Per §1170.15 PC, if a person is convicted of a felony, and of an additional felony that is a violation of §136.1 PC, that was committed against the victim of, or a witness to the first felony, the subordinate term for each consecutive offense shall consist of the full middle term.

**Aggregate Term**:

8 years, 8 months

**Misdemeanor Charge(s)**    **Maximum Punishment**:

Ct. 6: §166(c)(1) PC    1 year
Ct. 7: §243(e)(1) PC    1 year

**State Prison**

[X] Current qualifying felony conviction

**Substance Abuse Treatment Court Eligibility**:

[X] Not eligible for post plea SATC

1    <u>EVALUATION</u>:                                    Cevdet Uruk appears before the

2    Court having been convicted by a jury of six counts relating to

3    violence against his wife.  They include DISSUADING A WITNESS,

4    CORPORAL INJURY TO SPOUSE, ASSAULT WITH FORCE LIKELY TO PRODUCE GREAT

5    BODILY INJURY, FALSE IMPRISONMENT, all felonies, and VIOLATING A

6    PROTECTIVE ORDER, and SPOUSAL BATTERY, both misdemeanors.  According

7    to the Sheriff's report, the defendant physically assaulted his wife

8    over a period of two days reportedly because she lied to him about

9    throwing away the children's lunchtime vegetables.

10                                      This is not the first instance

11   of physical abuse suffered at the hands of the defendant.  In 2014,

12   the defendant grabbed his pregnant wife by the throat, pushed her

13   against a wall, and threatened to kill her because she had eaten some

14   peanuts and hidden the package from the defendant.

15                                      During his interview with the

16   undersigned, the defendant presented as a polite, respectful, soft-

17   spoken, intelligent man who does not fit the profile of his history or

18   what has been documented in the law enforcement reports of his abusive

19   behavior.  However, it is evident that he is a controlling man prone

20   to violent outbursts.  What is disturbing in this case is the fact

21   that the abuse has occurred in the presence of his children.

22                                      The defendant admitted to

23   having an issue with anger; however, he denied that he harmed his

24   wife, or that he did anything to rise to the level of corporal injury.

25   It is troubling that the defendant has previously completed a

26   batterer's treatment program yet has continued to perpetrate violence

27   against his wife and the seriousness of his offenses are increasing.

28

1    Although the defendant seems

2    to pride himself on being disciplined and self-controlled, it is

3    disturbing that he had several outbursts in domestic violence review

4    court in SBSC #1471799 in which he mentioned killing himself and

5    others to the Court.  Additionally, it was noted that the defendant's

6    young daughters were frequently present with the defendant in Court

7    and able to witness the defendant's behavior.

8    The defendant reported

9    suffering from depression for over ten years, yet refuses to take

10    medication.  It is felt that he may benefit from having a mental

11    health evaluation, and therefore it will be recommended that one be

12    completed.

13    The defendant is eligible for

14    a grant of probation and appears to be a marginal candidate for

15    probation supervision.  Due to the defendant's continued violence

16    against his wife, and the potential continued threat for her safety,

17    the undersigned seriously considered recommending that the defendant

18    be sentenced to state prison; however, it is felt that the defendant

19    may benefit from both mental health and domestic violence treatment.

20    However, the defendant should be warned that **any** future acts of

21    violence or violations of probation will result in further

22    incarceration including a state prison sentence.  Therefore, a

23    recommendation for a suspended prison sentence will be made.

24    Hopefully, this will serve as a "wake-up call" to the defendant that

25    his abuse of his wife will not be tolerated and he will face serious

26    consequences should be continue his abusive behavior.

27    At this time, it will be

28    recommended that the defendant be sentenced to the California

PA-101

1   Department of Corrections and Rehabilitation for a period of eight

2   years, and 8 months, with the execution of said sentence suspended,

3   and the defendant be granted probation for a period of five years with

4   standard terms and conditions, including domestic violence and mental

5   health terms.  As a sanction for his behavior, it will be recommended

6   that the defendant serve 364 days in jail.

7   **RECOMMENDATION**:                         It is recommended that the

8   defendant be sentenced to a term of eight years, eight months in the

9   California Department of Corrections and Rehabilitation, that said

10  sentence be suspended, and that the defendant be placed on probation

11  for a period of five years under the attached terms and conditions.

12

13                                  Respectfully submitted,

14                                  Tanja Heitman
                                    Chief Probation Officer
15
    Approved for filing:
16

17  _____     _____
18  Esther Trejo                    Lindsay Whitmeyer
    Supervising Probation Officer   Deputy Probation Officer
19

20  I have read and considered
    the foregoing report of the
21  Probation Officer.

22  _____

23  JUDGE OF THE SUPERIOR COURT

24

25

26

27

28

SANTA BARBARA COUNTY PROBATION DEPARTMENT

## CREDIT FOR TIME-SERVED WORKSHEET

Defendant:  CEVDET URUK                                Court No.: 18CR02248

Offenses(s):  Ct. 1:  §136.1(b)(1) PC; Ct. 2:  §273.5(a) PC; Ct. 3:  §245(a)(4) PC; Ct. 4:  §236 PC; Ct. 6:  §166(c)(1) PC; Ct. 7:  §243(e)(1) PC

|  | DATES SERVED | TOTAL DAYS SERVED | 4019 PC CREDITS | TOTAL CREDIT |
|---|---|---|---|---|
| County Jail/ Work Furlough/ 1203.03 PC (Diag) Electronic Monitoring | 3/9/18 to 3/14/18 6/27/19 to 8/5/19 to to | 6 40 | 6 40 | 12 80 |
| SWAP | to | | None | |
| CRC Inpatient | to | | None | |
| State Hospital | to | | None | |
| Court-Ordered Residential Treatment Facilities | to | | None | |
| TOTAL CREDITS: | | 46 | 46 | 92 |

COMMENTS:

[  ] Offense committed on or after 9/28/10 but prior to 10/1/11
[X] Offense committed on or after 10/1/11
[  ] Serious felony conviction pursuant to §1192.7 PC
        "[click here to insert charge, case #, date]"
[  ] Violent felony conviction pursuant to §667.5 PC
        "[click here to insert charge, case #, date]"
[  ] Registrant pursuant to §290 PC

Verified by  Lindsay Whitmeyer                                7/29/19
                Deputy Probation Officer                        Date

PRO-79 (Rev. 05/2010)

# Risk Assessment

| PERSON | | |
|---|---|---|
| **Name:**<br>CEVDET URUK | **PIN:**<br>2033899 | **Second ID:** |
| **SSN:** | **Race:**<br>Other | **Third ID:** |
| **Status:**<br>Open | **Ethnicity:** | **Fourth ID:** |
| **Date of Birth:**<br>7/13/1969 | **Agency:**<br>Santa Barbara | |
| **Gender:**<br>Male | | |

| ASSESSMENT INFORMATION | | | | |
|---|---|---|---|---|
| **Case Identifier:**<br>2033899-2 | **Scale Set:**<br>SB Co. Risk of Violence and Recidivisim (ROVAR) | **Screener:**<br>Whitmeyer, Lindsay | **Date of Screening:**<br>7/29/2019 | **Screening Location:** |

| ASSESSMENT RISK SCALES | |
|---|---|
| **General Recidivism Risk:** | **Violent Recidivism Risk:** |

## Overall Risk Potential

**Risk**

| | | |
|---|---|---|
| Violent Recidivism Risk | Low | |
| General Recidivism Risk | Low | |
| Decile | 1   2   3   4   5   6   7   8   9   10 | |

## Criminogenic Need Scales

**Criminal Involvement**

| | |
|---|---|
| Criminal Involvement | Low |
| History of Non-Compliance | Medium |
| History of Violence | Medium |

**Social Exclusion**

| | |
|---|---|
| Vocational/Education | Unlikely |

CEVDET URUK (2033899)<br>Northpointe Suite version 8.17.1.10836 ©2019 Northpointe Inc., an equivant company. All rights reserved.

**The Superior Court, State of California**
**For The County of Santa Barbara**
**Criminal Division**
*El Tribunal Superior, estado de California*
*para el Condado De Santa Barbara*
*Division Penal*

The People of the State of California,
*El Pueblo del Estado de California,*

No. 18CR02248

Plaintiff *(Demandante).*

SENTENCING AND PROBATION ORDER
*ORDEN DE SENTENCIAR Y PROBACION*

CEVDET URUK

Defendant *(Acusado),*

the defendant, having been convicted ☐ by plea ☒ by conditional plea ☐ by jury ☐ by Court of the crime(s) of:
*El acusado al haber sido convicto ( ) por declaracion ( ) por acuerdo condicional ( ) por jurado ( ) por el juez, del/de los delito/s de:*

| Ct. 1: §136.1(b)(1) PC (DISSUADING A WITNESS), a felony |
| Ct. 2: §273.5(a)/(f) PC (CORPORAL INJURY TO SPOUSE WITH A PRIOR), a felony |
| Ct. 3: §245(a)(4) PC (ASSAULT BY MEANS OF FORCE LIKELY TO CAUSE GREAT BODILY INJURY), a felony |
| Ct. 4: §236 PC (FALSE IMPRISONMENT), a felony |
| Ct. 6: §166(c)(1) PC (VIOLATION OF A PROTECTIVE ORDER), a misdemeanor |
| Ct. 7: §243(e)(1) PC (SPOUSAL BATTERY), a misdemeanor |

on *(el)* 06/27/19 and appearing in open Court this date *(y presente en Corte pùblica en esta fecha),*

☒ The Court having read and considered the probation report *(La Corte, al haber leido y considerado el informe de probacion).*
☐ The defendant having waived a probation report *(El acusado habiendo renunciado al informe de probacion),*

**THE COURT NOW ORDERS THAT:***(la Corte Ahora Ordena Que:)*

☐ the pronouncement of judgment is suspended and the defendant is granted probation for _3_ years on the below listed terms and conditions: *El pronunciamiento del fallo queda suspendido y al acusado se le otorga probación por __ años con los tèrminos y condiciones que a continuación se mencionan:*

☒ the defendant is committed to: ☒ State Prison ☐ County Jail for _8 years, 8 months_ ; and that the execution of said judgment is suspended and the defendant is granted probation for _5_ years on the following terms and conditions: *El acusado queda confinado a: ( ) Prisión Estatal ( ) Cárcel del Condado por _____; y la ejecución de dicho fallo queda suspendida y al acusado se le otorga probacion por _____ años bajo los siguientes términos y condiciones:*

☒ 1. Serve _364_ days in the Santa Barbara County Jail, with credit for time served of _46_ actual days plus _46_ days good time/work time for a total of _92_ days from _3/9/18_ to _3/14/18_ ; _6/27/19_ to _8/5/19_ to report by _____. *Cumplir de _____ dias en la Cárcel del Condado de Santa Barbara, con crédito por tiempo ya cumplido de _____ días hechos, más_____ por buena conducta y trabajo, por un total de _____ días, desde hasta _____; presentarse antes __.*

☐ 2. Report to Santa Maria Sheriff's Substation/Santa Barbara County Jail to start on or before _____. (Special instructions: Work furlough/work release/electronic monitoring approved. Must apply no later than _____. *Presentarse a la Subestación del Alguacil en Santa Maria/Cárcel del Condado de Santa Bárbara para comenzar en o antes_____.(Instrucciones especiales: lanzamiento de permiso de trabajo/trabajo/monitoreo electrónico aprobado. Debe solicitar antes de _____.*

☐ 3. Pay fines totaling $_____, including penalty assessments, as directed by Probation, in monthly payments of not less than $_____ commencing _60 days after release_ through the Probation Department of the County of Santa Barbara. Fine may be worked off by completing _____ hours of work in the Community Service Work Program. *Pagar multas por un total de $_____, incluyendo recargos en abonos mensuales de no menos de $_____ comenzando _____, y pagadas a través del Departamento de Probación [libertad condicional] del Condado de Santa Barbara. La multa se puede pagar completando __ horas trabajadas con el Programa de Trabajo de Servicios a la Comunidad.*

☐ 4. Pay restitution of $_____ through the Probation Department of the County of Santa Barbara. Pursuant to §1202.4 PC, 10% interest per year will accrue from _____ (date) as well as a 15% administrative fee pursuant to §1203.1(l) PC.) (You have a right to a judicial determination of the amount pursuant to §1202.4(f)(1) PC.) *Pagar la restitución de $_____ a través del Departamento de Libertad Condicional del Condado de Santa Bárbara. En conformidad con la sección 1202.4 PC, un interés anual del 10% de _____ se acumulará de _____ (fecha), así como un cargo administrativo de 15% en conformidad con la sección 1203.1(l) PC.) (Usted tiene el derecho de tener una audiencia sobre la cantidad pertinente al codigo 1202.4(f)(1) PC.).*

☐ 5. Pay restitution through the Probation Department of the County of Santa Barbara in an amount to be determined. Pursuant to §1202.4 PC, 10% interest per year will accrue from _____(date) as well as a 15% administrative fee pursuant to §1203.1(l) PC. (You have a right to a judicial determination of the amount pursuant to §1202.4(f)(1) PC.)

☒ 6. Pay booking fees in the amount of ☒ $ _130.00_ , payable to _____. *Pague la tarifa de règistro en la carcel en la cantidad de [ ] $_____ [ ] a ser pagados a _____."*

☒ 7. Pay the following fines as directed by the Probation Officer. *Pague las siguientes multas como sea ordenado por el Oficial de Probacion:*
☒ $ _500.00_ pursuant to _§1203.097(a)(5) PC_ . *$ 500.00 en conformidad con §1203.097(a)(5) PC.*
☒ $ _200.00_ pursuant to _§1203.097(a)(11)(A) PC_ , (shelter fee). *$ 200.00 en conformidad con §1203.097(a)(11)(A) PC.*

☒ 8. Pay $ _6,300.00_ Restitution Fine pursuant to §1202.4 PC. *Pague $_____ al Restitution Fund de acuerdo a la§1202.4 PC.*

☒ 9. Pay $ _6,300.00_ probation revocation restitution fine pursuant to §1202.44 PC. This fine is suspended unless probation is revoked and full sentence is imposed. *Pague $_____, una multa de restitución de revocación de probación de acuerdo a la §1202.44 PC. Esta multa queda suspendida a menos que probación sea revocada y la sentencia completa sea impuesta.*

CL-338 (Revised 05/2019)

Page 1

☒  10. Report to the Probation Report & Resource Center within 24 hours of release from custody or the next business day, whichever is sooner.

☒  11. Obey all laws and not associate with known criminals. *Obedezca todas las leyes y no se reuna con criminales conocidos.*

☐  12. **Report in person to the probation officer within 72 hours of sentencing. If in custody at time of sentencing, report in person to the probation officer within 72 hours of release from custody.** Report at the times, in the place, and in the manner directed by the Probation Officer.  If you are deported, follow the reporting and payment instructions on the back page of this order.

☒  13. Follow all orders of Probation Officer, including taking any recommended therapies at the defendant's expense. *Cumpla con todas las ordenes del Oficial de Probación, incluyendo tomar cualquier terápia recomendada a costo del acusado.*

☒  14. Maintain residence approved by Probation and keep the P.O. advised of place of residence and employment.

☒  15. Not change place of residence, nor leave the County of Santa Barbara or the State of California without the permission of the P.O.

☒  16. Seek and maintain regular employment ☒ when not a full-time student. *Busque y mantenga  empleo estable cuando no sea un estudiante de tiempo completo.*

☒  17. Maintain a standard of personal appearance that will not impede obtaining employment.  *Mantenga bien suy apariencia personal para que no le impida obtener empleo.*

☒  18. Pursuant to §30305(a)(1) PC and §29800(a)(1) PC not own, possess, or have under custody & control ☒ any firearm or ammunition ☒ any weapon, including firearms, or any ammunition. *En conformidad con §30305(a)(1) PC y§ 29800(a)(l) PC, no sea propietario ni tenga en su posesión ni bajo su custodia o control ☐ ningún arma de fuego o munición ☐ ningún arma, incluyendo armas de fuego o munició.*

☒  19. Submit person & property to search & seizure at any time of day or night by a peace officer or probation officer with or without warrant & with or without cause.

☒  20. Participate in a Domestic Violence specific risk assessment and complete a certified Batterer's Intervention Program and other programming as determined by the risk and needs assessment, as directed by the Probation Officer. You must enroll within 7 days of the date of sentencing or release from custody, if incarcerated at the time of sentencing.  Do not cease program attendance unless Court ordered.

☐  21. Pay the cost of any medical exams/SART exams and/or counseling for the victim, pursuant to §1203.1g and §1203.1h PC. *Pague el costo de cualesquier examenes médicos y/o de cualquier programa de consejos para la victima, en conformidad con las §1203.1g y §1203.1h del PC.*

☒  22. Submit specimens, samples and print impressions pursuant to §296 PC. *Dé muestras e impresiones de las huellas digitales como sea ordenado en conformidad con la §296 del Código Penal.*

☒  23. Attend and complete 20 hours of public service work per §1203.097(a)(8) PC as directed by the Probation Officer. *Asista y complete 20 horas del trabajo de servicio a la comunidad por §1203.097(a)(8) PC como dirigido por el Oficial de Libertad Condicional.*

☒  24. Do not CONTACT  molest, annoy, threaten or harass Natalie Uruk. *No moleste, amenace o acose          /tenga ningún contacto con.*

☒  25. Attend Batterer's Treatment Program Review on 9/4/19 at 8:30 am in Dept. 2 of Santa Barbara Superior Court and attend all subsequent reviews.

☒  26. Pursuant to §1210.7/1210.12 PC, the Probation Department may utilize a Global Positioning System (GPS) program as an enhanced monitoring tool if the defendant is deemed appropriate based on the department's established written guidelines. *Con arreglo a §1210.7/1210.12 PC, el Departamento de Libertad Condicional puede utilizar un programa de Sistema Posiciona Global (GPS) como una vigilancia aumentada si el acusado es creído apropiado basado en las pautas escritas establecidas por el departamento.*

☒  27. You are subject to search and seizure of all personal electronic devices for electronic communication information and must submit to search of all computers, hard drives, flash drives, thumb drives, disks, removable media, computer networks, electronic data storage devices, personal digital assistants, cell phones, smart phones, i-Pads, Notebooks, Chromebooks, electronic gaming consoles, and any other electronic devices and the like ("Computers and Electronic Devices") under your custody or control to which you have sole, shared, partial, or limited access, without a search warrant, at any time of the day or night.  These search terms are to include a waiver of any password or encryption protection.  You must provide the probation officer with all passwords, logins, access codes or other information necessary to access any such Computers and Electronic Devices and to access all social media accounts the defendant may have (such as Facebook, My Space, MocoSpace, Instagram, Snapchat, etc.) when requested by the probation officer.  You shall not possess or utilize any program or application on any Computer or Electronic Device that automatically or through a remote command deletes or scrubs data from that Electronic Device.  If an Electronic Device(s) is/are seized as evidence, probationer may not contact their service provider to remove, alter or destroy data from the Electronic Device.  Failure to provide a password or access to a Personal Electronic Device will be considered a violation of your supervision requirements.

☒  28. Complete programming at the Probation Report and Resource Center as directed by Probation.

☒  29. Comply with the §136.2 PC Protective Order.

☒  30. Participate in mental health treatment and take all prescribed medications. Do not stop medication/treatment without permission of mental health clinician and notification to your probation officer.

---

Done In Open Court On:_____

*Ejecutado en Corte publica el:*

    I have read and fully understand the above terms and conditions and accept them, and I hereby acknowledge receipt of a copy of this Order on Probation and notice of my right to petition for a certificate of rehabilitation and pardon.  I further waive extradition to the State of California from any jurisdiction in or outside the United States where I may be found and agree that I will not contest any effort to return me to the State of California.

    *To he leído y entendido completamente los terminos y condiciones mencionados anteriormente y los acepto, y acuso recibo de una copia de esta orden de probacion y del aviso de mi derecho de pedir un certificado de rehabilitacion y perdón. Además renuncio extradición del Estado de California de cualquier jurisdicción dentro o fuera de los Estados Unidos donde yo me encuentre y convengo en que no litigare contra las medidas que se tomen para regresarme al Estado de California.*

Judge of the Superior Court *Juez de la Corte Superior*

_____

Signature of Probationer *Firma del Acusado en bajo probación*

CL-338 (Revised 05/2019)                                                                                                    Page 2

**Additional Assessments**
*Recargos Adicional*
Defendant *(Acusado)*    CEVDET URUK    Case Number *(Numero del Caso)* 18CR02248

BELOW ASSESSMENTS NUMBERS 1 THROUGH 4 ARE NOT PART OF THE TERMS AND CONDITIONS OF PROBATION BUT ARE ASSESSED PURSUANT TO SECTIONS 987.8 ,1203.1b, 1203.1ab, 1463.07, and 1465.8 OF THE PENAL CODE. NUMBERS 2 THROUGH 4 ARE TO BE COLLECTED THROUGH THE PROBATION DEPARTMENT.    NUMBER 1 IS TO BE COLLECTED THROUGH THE SANTA BARBARA COUNTY SUPERIOR COURT; FAILURE TO PAY SUCH ASSESSMENTS MAY RESULT IN COLLECTION THROUGH CIVIL PROCESS.

1.  Pursuant to Penal Code 987.8, the court finds that the costs of legal assistance provided by the Public Defender or private counsel appointed by the court was $_____. The defendant is ordered to reimburse the County of Santa Barbara the sum of $_____, through the Santa Barbara County Superior Court for all or a portion of the costs of said legal assistance based upon the defendant's ability to pay. The Court may, in its discretion, hold one such additional hearing to determine the defendant's ability to pay for the cost of legal assistance provided for by the County of Santa Barbara within six months of the conclusion of the criminal proceedings.

    *De acuerdo con la sección 987.8 del Código Penal, la Corte halla que los costos de ayuda legal provista por el Defensor Pùblico o por el abogado particular nombrado por la Corte son $_____. Se ordena que el acusado reembolse al Condado de Santa Barbara la suma de $_____, por medio de la División de Ingresos y Fideicomisos del departamento de Auditoria por todos o por parte de los costos de dicha ayuda legal, según la habilidad del acusado para pagar. A discreción de la corte, la corte puede tener una audiencia adicional para determinar la habilidad del acusado de pagar el costo de la ayuda legal provista por el Condado de Santa Barbara, dentro de un plazo que no excederá seis meses desde la conclusión de los procedimientos criminales.*

2.  The defendant is ordered to pay the following as directed by the Probation Officer:
    *El acusado(a) esta ordenado(a) a pagar como sea ordenado por el oficial de probacion:*
    ☒ a.  A fee of $ 90.00 per month for the cost of probation supervision.
        *Una cuota de $ 90.00 por el costo de la supervisión de Probación.*
    ☒ b.  A fee of $1,375.00 for the cost of the probation investigation.
        *Una cuota de $ 1,375.00 por el costo de la investigación de Probación.*
    ☒ c.  A fee of up to $6.00 per day for the cost of continuous Electronic monitoring pursuant to PC 1210.15(a), if placed on GPS.
        *Un honorario de hasta $6.00 por dia para el costo de posicionar global sistema (GPS) conforme a 1210.15(a) del Código Penal, si colocado en GPS.*

3.  The defendant is ordered to
    *El acusado(a) está ordenado(a) a*
    ☒ a.  Pay mandated court security fee pursuant to PC 1465.8 in the amount of $240.00 ($40 for each convicted charge) (not subject to waivers or jail/non-cash credits) ☐ to the clerk of the Court by ____ ☒ as directed by the probation officer. *Pagar Honorario de seguridad encomendado por la Corte de acuerdo con la orden PC 1465.8 por la cantidad ____ ($40 dolares para cada precio de convicion) (no sujeto a renuncias o creditos decarcel/no creditos en efectivos) ☐ a el secretario del tribunal antes de ____ ; ☐ como dirijido por El Oficial De Probación.*
    ☒ b.  Pay mandated criminal conviction assessment pursuant to GC 70373 in the amount of $180.00 ($30 for each convicted charge) (not subject to waivers but eligible for court ordered jail/non cash credits) ☐ to the clerk of the Court by ____ ; ☐ as directed by the probation officer. *Pagar encomendado la evaluacion de conveccion criminal de acelerdo con GC 70373 por la cantidad de ____ ($30 dolares para cada gargo condenado) (no sujeto a renuncias pero elegible po orden de la Corte carcel/no creditos enefectivos) ☐ a el secretario del tribunal antes de ____ ; ☐ como dirijido por El Oficial De Probación.*
    ☐ c.  Pay own recognizance administrative screening fee in the amount of $25.00 (not to exceed $25.00) as directed by the Probation Officer. *Pagar la cuota administrativa de investigar por propio reconocimiento en la cantidad de $25.00 (no exceder $25.00) como sea ordenado por el Oficial de Probación.*
    ☐ d.  Pay the cost of emergency response as directed by agencies incurring the expense.
        *Pagar el costo de respuesta a emergencias como sea indicado por la agencia que contrae el gasto.*

4.  It is further ordered that the defendant be assessed regarding his/her financial ability to pay probation fees
    ☐ on ____    ☒ as determined by the Probation Officer.
    *Ademas se ordena que al acusado se le evalue con respecto a su capacidad para pagar estos costos de probación.*
    [ ] a ____    [ ] el ____ cuando lo determine el oficial de Probación.

**Additional Advisements** (Spanish translation on next page)
*Avisos Adicionales (Traducción en Español en la pagina siguiente)*

ABOVE ASSESSMENTS NUMBERS 1 THROUGH 4 ARE NOT PART OF THE TERMS AND CONDITIONS OF PROBATION BUT ARE ASSESSED PURSUANT TO SECTIONS 987.8 AND 1203.1b OF THE PENAL CODE AND ARE TO BE COLLECTED THROUGH THE TREASURER/TAX COLLECTOR OF SANTA BARBARA COUNTY. FAILURE TO PAY SUCH ASSESSMENTS MAY RESULT IN COLLECTION THROUGH CIVIL PROCESS.

ONLY THE COURT HAS THE AUTHORITY TO CHANGE ANY OF THE CONDITIONS CONTAINED IN THIS ORDER.

You may be returned to the Court, or your probation may be revoked in your absence, if the Court shall have reason to believe from the report of the Probation Officer, or otherwise, that you are violating any of the conditions of your probation, or engaging in criminal practices, or become abandoned to improper associates or a vicious life (1203.2 Penal Code), or if you are convicted of any new offense.
Under certain circumstances, you may have conviction set aside and the case dismissed, as set forth in Section 1203.4 of the California Penal Code, which reads as follows:
"Every defendant who has fulfilled the conditions of his probation for the entire period thereof, or who shall have been discharged from probation prior to the termination of the period thereof, shall at any time thereafter be permitted by the Court to withdraw his plea of guilty and enter a plea of not guilty; or if he has been convicted after a plea of not guilty, the Court shall set aside the verdict of guilty; and in either case the Court shall thereupon dismiss the accusations or information against such defendant, who shall thereafter be released from all penalties and disabilities resulting from the offense or crime of which he has been convicted. The probationer shall be informed of his right and privilege in his probation papers and his right, if any, to petition for a certificate of rehabilitation and pardon. The probationer may make such application and change of plea in person or by attorney, or by the probation officer authorized in writing; provided, that in any subsequent prosecution of such defendant for any other offense, such prior conviction may be pleaded and proved and shall have the same effect as if probation had not been granted or the accusation or information dismissed."

"Dismissal of an accusation or information pursuant to this section does not permit a person to own, possess or have in his custody or control any firearm capable of being concealed upon the person or prevent his conviction under Section 12021."

"Any person convicted of a felony the accusatory pleading of which has been dismissed pursuant to Section 1203.4 may file a petition for certificate of rehabilitation and pardon; provided the petitioner has not been incarcerated in any prison jail, detention facility or other penal institution or agency since the dismissal of the accusatory pleading and is not on probation for the commission of any other felony, and petitioner presents satisfactory evidence of three years residence in this state prison to the filing of the petition." (Section 4852.04(c) of the Penal Code)

**Additional Advisements** (Spanish)
*Avisos Adicionales (Español)*

LAS ORDENES DE 1 A 4 ANTES MENCIONADAS NO SON PARTE DE LOS TERMINOS Y CONDICIONES DE PROBACIÓN[LIBERTAD CONDICIONAL] PERO SERAN EVALUADAS CONFORME A LAS SECCIONES 987.8 Y 1203.1b, 1203.1ab, 1463.07, y 1465.8 DEL CODIGO PENAL. SE RECAUDARAN LAS ORDENES 2 A 4 POR MEDIO DEL DEPARTAMENTO DE PROBACION. SE RECAUDARAN LA ORDEN 1 POR MEDIO DEL CORTE SUPERIOR DE SANTA BARBARA FALTA DE PAGO DE TALES RECARGOS PUEDE DAR LUGAR A UNA DEMANDA CIVIL PARA RECAUDAR ESOS FONDOS.

SOLAMENTE LA CORTE TIENE LA AUTORIDAD DE CAMBIAR CUALESQUIERA DE LAS CONDICIONES CONTENIDAS EN ESTA ORDEN.

• Usted puede ser regresado a Corte, o su probación puede ser revocada en su ausencia si la corte tiene motivo para creer, ya sea por el reporte del Oficial de Probación, o por cualquier otra fuente, que usted está violando cualesquiera de las condiciones de su probación, o que usted está involucrado en actividades criminales, o que usted se ha entregado a las malas compañías o a una vida viciosa (1203.2 Codigo Penal) o si usted tuviera un fallo condenatorio por cualquier nueva ofensa.

• Bajo cíertas circunstancias, usted puede pedir que el fallo condenatorio de usted sea desechado y el caso sea anulado, como se ha expuesto en la sección 1203.4 del Código Penal, que dice como sigue:

• "Cada acusado que haya cumplido con las condiciones de su probación por el período total, o que haya sido quitado del programa de probación, podrá, en cualquier momento después, con el permiso de la corte, retirar su declaración de inocente; o si ha sido hallado culpable después de una declaración de no culpable, la corte desechará el verdicto de culpable: y en cualquiera de los dos casos la corte desperdiá, desde ese momento, las acusaciones o la denuncia contra tal acusado, quien después de eso será descargado de todos los castigos e incapacidades que provengan de la ofensa o del delito del cual ha sido hallado culpable. A la persona bajo probación se le informará de este derecho y de este privilegio en los papeles concernientes a su probación, y se le informará de su derecho, si lo tiene, de pedir un certificado de rehabilitación y perdón. La persona bajo probación puede hacer tal solicitud y tal cambio de declaración personalmente o por medio de un abogado o del oficial de Probación que tenga su autorización por escrito; siempre y cuando que en cualquier procedimiento subsiguiente del acusado por cualquier otra ofensa, tal fallo condenatorio anterior podrá ser declarado y comprobabo y tendrá el mismo efecto como si la probación no se hubiera concedido o como si se hubiera anulado la acusación."

• "El descargo de cualquier acusación o denuncia en conformidad con esta sección no le da permiso a la persona de ser dueño, poseer o tener en su custodia o control un arma de fuego que pueda ser escondida en su persona ni puede prevenir un fallo condenatorio contra èl bajo la sección 12021."

• "Toda persona convicta de una felonia y cuya declaracion a la acusacion ha sido quitada de acuerdo a la seccion 1203.4 puede presentar una peticion para un certificado de rehabilitacion y perdon; provisto que el solicitante no haya estado confinado en ninguna prision, carcel, instalacion de detencion, o ninguna otra institucion penal o agencia, desde que se le quito la declaracion acusatoria, y que no este en probacion por la comision de alguna otra felonia, y que el solicitante presenta evidencia satisfactoria de residencia en este estado por tres años antes de registrar su peticion." (seccion 4852.01(c) del Codigo Penal)

---

**Instructions for Reporting Following Deportation:**
*Instrucciones Para Reportarse Después De La Deportación:*

Si usted es deportado, usted debe de reportarse cada mes al oficial de Probaccion y pagar multas y restitución por correo cuando esté en su país de origen. Para reportarse por correo mande su carta al oficial de Probación a la siguiente dirección:

Dirección: Departamento de Probación, Condado de Santa Barbara

| [ ] 2121 So. Centerpointe Parkway<br>Santa Maria, California, USA 93455<br>(Numero de telefono: (805) 739-8500) | [ ] 415 East Cypress Avenue<br>Lompoc, California, USA 93436-6967<br>(Numero de telefono: (805) 737-7800) | [X] 117 East Carrillo Street<br>Santa Barbara, California, USA 93101-2025<br>(Numero de telefono: (805) 882-3700) |
|---|---|---|

Contenido: Su carta debe contener lo siguiente:
1. Su nombre (como aparece en esta orden)
2. El nùmero de su caso.
3. Su fecha de nacimiento
4. Su dirección. Esta dirección debe enseñar donde vive usted. Si usted recibe su correspondencia en otra dirección, también se tiene que incluir esa direccion y se debe marcar "Dirección para el correo."
5. Dónde trabaja. Si usted no trabaja, debe explicar porqué.

Despues de que usted empiece a raportarse, el oficial de Probacion le mandara formas para que las mande cada mes, instrucciones sobre como enviar sus pagos de multas y restitución. Usted dede reportarse cada mes. Si usted no recibe estas formas o no tiene formas para mandar debe de reportarse por carta cada mes. Si usted regresa a los Estados Unidos usted debe ponerse en contacto con se oficial personalmente dentro de 72 horas y seguir las instrucciones de como reportarse mientras este en los Estados Unidos.

Los empleados bilingues del Departamento de Probación estàn a su disposición para ayudarle con su llamada. Si usted tiene alguna pregunta, se le sugiere que llame o escriba a esta oficina.

Sentencing Statement

I am grateful to the Court for ordering to attend a therapy session. As I continued visiting the therapist throughout the last month many things came into the light.

At the time of my call to police it has been a difficult long period for our family involving my very complicated high risk pregnancy, 5 weeks hospital stay, premature birth and afterwards complications and hospitalizations with the newborn amid wild fire and flood evacuations. Due to constant lack of sleep (almost no sleep), I don't remember events clearly. At the time of the police call I was diagnosed with postpartum depression for which my disability leave was extended. English is my second language and having emotions and myself out of control, unintentionally, I have used inappropriate words and made incorrect statements. In Russia, a spouse - man or woman - can call the local police station, so that the police officer assigned to their block talks to another spouse. It is a common practice.

The therapist I've been going to has listed symptoms and my diagnosis in an attached document which are the actual reason for my call. I am prone to disillusion caused by childhood traumas. In close relationships my mind has a strong tendency to involuntarily create critical imaginable situations towards a male partner and causes me to act aggressively. Hormonal changes accompanying pregnancies and recoveries give an empowering boost to instability of my mind. Scary situations from my childhood arise, I get terrified and unable to think clearly or reason. I've been referred to a psychiatrist for medical management of my highly excited and alert mind. Due to nursing I wasn't prescribed medication but instead was referred to an addiction specialist for my sugar dependency that causes a chemical disbalance in my brain.

It's been my lifelong struggle to learn to control images of danger or perceived personal attacked created by my mind even in regular social life, even at work. In many instances I'd be extensively defensive at work back in Russia with my direct manager turning into an aggressive tone, slamming doors. Shocking colleagues who'd tell me that there was nothing bad that my manager did or say to cause such a reaction from my side. That was an ongoing drama for him for several years.

Cevdet is a loving husband and a devoted father. While I go to work he takes care of our 3 little children. They are 6 yo, 4 y.o and 16 m.o. He was making sure we have the best possible resources for our life given the low income we have. He was the one who taught me the healthy lifestyle, taught me how to drive, mentored me in order to find a good job.

Children keep asking when daddy will come back. They started crying in their sleep. While away in jail Cevdet wasn't able to speak to them over the phone as he starts crying at the mere mentioning of kids names. Kids are waiting when daddy is back to organize their birthday parties, take them camping, take them to a pool, read a good night book to them.

Childcare situation is still unresolved. Parents are leaving at the beginning of September. During the past few months it's been difficult for me to focus at work.

I am constantly terrified of what quality of life and challenges myself and kids will face if Cevdet remains in jail. I have constant panic attacks and anxiety. I've been physically and mentally exhausted this month resuming Cevdet's household responsibilities. My health has been worsening. I am scared for Cevdet's life in jail as he's already been bullied in County Jail and had to be transferred to a different room. Cevdet's stay in jail has been financially pressuring as well. Every day in jail is a torture and Cevdet's extensive education is been annuled for the rest of his life. He has suffered sufficiently. Please allow him to return to us.

I kindly ask for your understanding and compassion towards myself and kids. It has been an incredibly difficult time for our family.

Me and the kids all need Cevdet back home as soon as possible.


Thank you very much.


With gratitude,




7/30/2019


Attachment:  Therapist's referral to a physiatrist which lists my symptoms and diagnosis.

From: **Natalie Uruk** natalie.uruk@gmail.com
Subject: Sentencing statement
Date: August 1, 2019 at 11:14 AM
To: ndllaw@cox.net

Hello Mr. Levinson,

Attached please find the sentencing statement I have prepared along with a doctor's note.

Probation office will have it attached to her recommendation.

Kind regards,
Natalie Uruk

805-259-9249

---

The Holman Group

## Coordination of Care Form

### CONSENT FOR RELEASE OF CONFIDENTIAL INFORMATION TO PCP AND/OR OTHER HEALTH CARE PRACTITIONERS

I, _Natalie Uruk_, _5/29/1980_ authorize
_Heidi Lindros, LMFT_, to release health information related to my evaluation
and treatment to: _Dr. Bulton_

---

**Information to be completed by Behavioral Health Provider**

The following treatment is being provided:
X Outpatient Therapy  Frequency _2x/wk_

☒ Individual Psychotherapy
☐ Family Psychotherapy
☐ Group Psychotherapy
☐ Couples Therapy
☐ Other

_____ Medication Management Frequency: _____

Medications and Dosages: _Please assess for medication mgmt_

_____ Intensive Outpatient  Frequency_____

_____ Inpatient Treatment

_____ Partial Hospitalization

_____ Residential Treatment

_Client has above symptoms:_

nightmares
flashbacks
hyper vigilance,
acute generalized anxiety
severe depression w/
fleeting SI—most of lif
Premenstrual Dysphe
Anger/Rage outbursts
insomnia
sugar addiction
days w/ agitation
& (r/o mania)

my diagnosis @
this time is
PTSD
MDD

If you have any questions or would like to discuss this case in greater detail, please call me at:
(949) 973-4190

Heidi Lindros, LMFT  _Heidi Lindros_  LMFT #86053  7/23/19

I understand that the release of this information is to permit my treating physician and other health care practitioners to monitor my health status and to coordinate all the care I may receive. This authorization becomes effective on the date signed and may be revoked by me at any time in writing, except to the extent action has been taken and reliance thereon.
All parties agree to comply with Protected Health Information pursuant to HIPAA regulations contained in 45CFR Parts 160 and 164. This authorization also authorizes the release of information under the California Confidentiality of Medical Information Act of 1980, Section 56 et seq. of the California Code.



07/25/2019



Print Name of Patient

Send completed form to PCP and/or other practitioner and keep original in treatment record.



URUK_Sentenci
ng_Sta...ent.pdf

EXHIBITS

9) Expert Witness Testimony/Declaration (Understanding Paranoia by Kantor)

10) Declaration of Sergiy Tarasenko

11) Declarations of Adnan and Turanca Orali

Expert Witness Testimony/Declaration
of
MARTIN KANTOR,
Author of the Book
UNDERSTANDING PARANOIA[1]

I am a Harvard trained Psychiatrist who has been in full private practice in Boston and New York City, and active in residency training programs at several hospitals, including Massachusetts General and Beth Israel in New York. I have also served as Assistant Clinical Professor of Psychiatry at Mount Sinai Medical School and New Jersey Medical School. I am the author of 20+ books.

Paranoia is a surprisingly common and widespread disorder that takes many forms, benign as well as malignant, covert as well as overt.

Therapists and [medical society at large] think that all paranoid individuals (PARs) are incurable because the patients rarely know that they are paranoid and, if they doknow it, are mostly uninterested in doing anything about it. Of course, some PARs do seem to be unreachable. In particular, some individuals with delusional disorders seem to be impervious to reason.

In the case of the entity paranoid personality disorder, the elements that congeal into the disorder include suspiciousness, hyper-sensitivity, extreme vigilance, simmering anger, and a tendency to blame others for and absolve oneself of almost everything, accompanied by

_____

1) All text is quoted from the book, without any change.
Kantor, Martin. 2008. Understanding Paranoia: A Guide for Professionals, Families, and Sufferers. Westport: Praeger Publishers.

1

grandiose readiness to feel completely blameless in all things, one that in turn leads to feeling unjustly criticized or unfairly persecuted by one or by a group of blameworthy individuals -the usual culprits, ranging from the Jewsto the FBI.

PARs are no more or less evil than persons with any other emotional disorder, or for that matter, persons with a physical disorder. Paranoia is a disorder of the mind, not a flaw of the character.

There are few essential differences between paranoia that is mild and paranoia that is severe, and that the paranoia of paranoid personalitydisorder closely resembles the paranioa of paranoid schzophrenia.

PARs choose to look as normal as possible. They refuse to submit to weakness [preferring instead to] struggle to pull themselves up by their own bootstraps.

PARs are often angry individuals who verbalize their rage by cursing a great deal. As highly suspicious individuals, they often do not speakthe truth, or at least the whole truth.

Many PARs, including those who suffer from a delusional disorder think clearly but incorrectly. However, paranoidschizophrenics think both unclearly and incorrectly.

Often paranoia is associated with an ongoing bad mood. Some PARs have little or no insight into themselves. As such, they have little or no ability to reality test their false beliefs.

PARs often do act on their false beliefs because they are convinced that they are justified in doing so. They show frequent and sometimesserious lapses of self-control where they put others down, destroy property, happily defeat imagined rivals, or harm or maim presumed adversaries.

2

Their bad memory (hypomnesia) is remarkably profound when it comes to remembering anything that interferes with their image of the world as populated by the weak and wicked. Selective remembering what is bad and forgetting, that is, repressing, what is good about a person or an event is in fact more central to the process of delusional formation than the textbooks usually suggest.

Intelligence can be impaired when PARs become too opinioted, too critical, too anxious, or too angry to accurately evaluate and assimilate a situation. That's why it is sometimes hard to distinguish between fanatism and stupidity. Some PARs at least seem to posses above-average intelligence.

Delusion is a false belief based on incorrect inferences about external reality. Delusions are typically allowed to "overwhelm ... other elements of psyche" creating" belief[s] and behaviour that are uncharacteristic and alien. The result can be abnormal and sometimes violent behaviours, which are however "understandable in the light of the delusional beliefs". Paradoxically, it is often the paranoid ideation itself that motivates the patient with the delusional disorder to continue to function well.

Some paranoid individuals have problems at work but not at home. For others, it is just the opposite.

Primary delusions often have a high organic loading such as might occur in patients who as children suffered from fetal alchool syndrome or in patients who seriously damaged their brains by substance abuse during adolescence or later. Secondary delusions are almost certainly the product of emotions such as anxiety or anger and personality problems such as undue suspiciousness or excessive fear of objection, or are re-

3

active to traumatic life events such as bing fired from an important job.

In PARs, the blaming proseoften involves blaming their past, and the people in it, for all their present failures. They point the finger at their poverty, childhood trauma, and sexual abuse as the sole causes of their problems, doing so even though the abuse was slight to nonexistent and even though they themselves contributed mightily to being abused then, the same way they contribute to being abused now.

Projection is classically the defense PARs resort to. It is a complex defense mechanism that is actually made up of other, more primary defense mechanisms, that interact and operate in concert: denial, repression, reaction formation, displacement, reatribution, identification, dissociation and rationalization.

One reason, PARs find it difficult to accept blame is that they tend to become extremely, painfully, guilty, even or especially about small things. Their shame or weakness exacerbates their problems.

The in justices they collect tend to revolve around someone having hurt them physically, or scammed or otherwise used them financially.

PARs tend to be shy, cold, alouf loners. PARs are sadomasochists (as masochistic as sadistic). Feelings of narcissistic entitlement lead them to belive that they are owed, making them very sensitive to deprivation of all sorts.

Not surprisingly, there is an infantile element to their complaints about others, making these complaints rather like childish temper tantrums taking place in an adult.

PARs are too paranoid to admit that they are paranoid.

There is a trend to reclassify almost all schizophrenia as affective disorder, and along with that a movement to reclassify much paranoia as depression.

PARs hate people who put them down, dishoner them. They often feel discomfited by people exercising traditional authority. Much violence is purely paranoid and almost all violence has a paranoid hinge.

Because paranoia can affect, insight, judgement,and behaviour, it can be a

4

determinant of antisocial or criminal behaviour, raising the possibility that a so-called criminal can and should be adjudged not guilty of having committed a crime by reason of insanity, or NGRI.

PARs are generally reluctant to see mental health practioners, particullarly psychiatrists.

Keeping in mind that paranoid patients often traumatize others, and that others retaliate, we have to ask if in some cases and to some extend their so-called traumatization is not the cause but the product of their paranoia.

Not surprisingly, others with a stake in the outcomefind it easy and profitable to buy into their already-made distortions and even convince them -already poised as they are to imagine, or currently imagining, negative things that did not happen - to give false testimony against someone who is infact innocent as charged.

Their tendence to collect traumata makes it difficult to determine if the past traumatic incidents they speak of actually accured or if theirs are false memories that arethe product of a retrospective distotion of the past arising out of a need to fantasize old and create new adversarial situations in order to give themselves an excuse to attack or sue-guilt and consequence free.

In their masochistic mode, these PARs are embroiled in self destructive inter-personal interactions whose main goal appears to be to almost deliberately antagonize people -part of their plan to arrange for others to hurt them and make them suffer, so thatthey cannow say, "Look at what they are doing to me, just like I told you".

Their search for validation puts the persons called on in a difficult position because to agree is impossible, while to disagree makes you an enemy, a co-conspirator.

As a general rule, being adolescent goes hand in hand with being paranoid.

PARs often have had parents who were alcoholics, or who were unreliable for other reasons, and that many paranoiacs-to-be come from broken homes.

5

Some PARs are violent individuals who can even become violent toward their psychiatrists.

To those few who are seen as "on their side", PARs can maintain blind, even inappropriate loyalty.

Setting too few limts on potentially dangerous PARs can possibly lead to their becoming more dangerous.

Families should never threaten to walk out on a PAR.

For many paranoid adults, the expression "the apple doesn't fall far from the tree." applies. Some have become paranoid later in life because they have the same genes that their parents (paranoid) have, and some have become paranoid later in life because their parents have effectively bred them in their own image by providing them with a ready-made model for how to be paranoid and encouraging them to follow their lead.

6

Declaration of Sergiy Tarasenko

I, Sergiy Tarasenko, make this declaration in support of Cevdet Uruk for a new trial or
resentencing or reinvestigation of his case. I am familiar with his case, and I have a first-hand
knowledge of his innocence (as convicted) and his wife's mental issues. I can and will testify
accordingly in court. I am a pastor at Family Baptist Church of Carpinteria (aka First Baptist
Church of Carpinteria). My address is 1432 Santa Fe Ln., Santa Barbara, CA 93109. My cell
phone number is (805)722-8600. My e-mail address is: smtarasenko@yahoo.com.

I have known Cevdet and Natalie Uruk since 2012, as their pastor and marriage counselor. We
have worshiped together and have been friends for a long time. I have counselled them since
the beginning of their marriage in both group and individual settings. We have socialized
together in church, social gatherings, at their house, and at my house as well. After Cevdet's
incarceration, our church was deeply involved in helping Natalie and their three little children (2,
4, and 6 years old) in any way possible, including financially.

Despite of Natalie's allegations of abuse and violence, I have never observed such an abuse or
violence toward his wife. On the contrary, she has been the aggressor herself on many incidents
including the ones brought to law enforcement's attention.

She had called the police 5-6 times and immediately regretted her actions, crying and begging for
help from everyone (DA's office, attorneys, Cevdet, friends, and me) who could bring Cevdet
back home.

I thought her behavior could be explained by her foreign personality and culture shock (I thought
I could understand her better, since being Ukrainian myself, I spoke Russian and could
communicate with Natalie in her native language). I thought I could justify her behavior by
differences in the culture (Russian vs. Turkish), language barrier, religious background, etc.

After Cevdet's conviction it has become obviously clear that she had serious mental issues. She
had personally admitted that in court that she was diagnosed to be delusional. She admitted many
times that she made things up when called the police and claimed domestic violence. She had
never presented any evidence of violence or abuse.

He personality makes her literally "fight" with everyone around her. I witnessed a number of
times as she fought with Cevdet, her dad, mom, neighbor, friends and relatives, social workers,
counselors and helpers from the church. She attacked me with unwarranted accusations many a
time. As far as I know, she has no friends, because she has a very disturbed personality and
distrusts everyone.

She called me many times and telling me that Cevdet was violent and she would call the police.
As a friend, I would immediately come over and witness that nothing was happening. She would
make things up. She admitted that every time I came to help.

On January 18, 2020, she called the Police on her own father who was visiting from Moscow to
help her with the children, Russia, and had him arrested. She begged her mom and dad to come

and stay with children to let Natalie work. She never wanted to stay home. She would always seek an opportunity to go to work (Cevdet, by the way, was a stay home dad, because of this very reason). After her father was released, she didn't let him come back home and left outside alone with no resources and ability to communicate in English. He had nowhere to go and didn't know what to do. Out of despair he called me and I had to come to comfort him and help with his difficult emotional state.

As soon as Natalie found a job, she never wanted to be a home stay mom. Cevdet had to do it. Natalie kept always praising Cevdet for being a perfect and loving dad. I have never witnessed him even raising his voice on his children. He was always caring and responsible. Children were always fed on time, looked neat and clean, and always acted in a decent manner. Natalie never raised any issues of leaving Cevdet with children 24/7. By law, as a pastor, I am obligated to report any risky or even questionable situations where any person is in real danger. I have never been prompted to do that concerning Cevdet and Natalie. Cevdet is no risk to anybody. As the matter of fact, Cevdet is the only person who can help Natalie with her personality and children.

Because of Natalie's personality and current situation with Cevdet, three little children are deprived of a loving father and a primary caregiver, a safe/secure home, extended family (or any family), friends, church, hiking, backpacking, birthdays, camping, playing, family trips, healthy and nutritional diet, good education, social life, and a good future.

I believe that the children are at serious risk staying only with their mom who is very emotionally unstable. Based on my observation, she desperately needs help of Cevdet and serious therapy (maybe even medication). She is often paranoid and suspicious of everyone who happens to be in her life (husband, parents, church friends, social workers, neighbors, pastors, etc.). Cevdet needs to be there with his family.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

Signed at Santa Barbara, California, on May 6, 2020.

Respectfully submitted,

Sergiy Tarasenko

Declaration of Adnan & Turanca C. Orali

We, Adnan & Turanca Orali, make this joint declaration in support of Cevdet Uruk, for his habeas petition or reinvestigation of his case. We are familiar with his case and we have firsthand knowledge of his innocence (as convicted) and his wife's mental instability. We can and we will be testifying in court accordingly. Our address is 4884 Ashton St. Santa Barbara CA 93111. Our phone numbers is 805-967-0611. Our email is adnanorali@yahoo.com & turanca246@yahoo.com

We have known Cevdet Uruk & Natalie Uruk since 2012, as their family friends. We have been very close and we know all their problems very well. We have been trying to help them with their marital and legal issues, as if we help our own children, especially for the sake of their three little children (2,4 and 6 years old).

Despite Natalie's allegations and their troubled relationship, we have not seen or observed serious physical or mental abuse in their relationship.

Their problem can be attributable to Natalie's mental issues, and cultural and language differences (Turkish & Russian)

Natalie has childish and problematic personality. She makes contradictory statements and she is very difficult to understand. She calls the Police and then she begs everybody to help Cevdet.

She has a very aggressive personality. She fights with everybody around (her parents, her sister, Cevdet's family and friends). Actually she has nobody around her. Everybody (family friends) who has been trying to help her, including us, eventually has given up. Because of her aggressive unfriendly hostile behaviors.

We suspect she has very serious mental issues, such as paranoia and schizophrenia.

Cevdet is a loving husband and devoted father. He stays home and takes care of the children and the house. Natalie works full time. Cevdet decided to stay home to make Natalie happy.

She didn't want to stay home. Cevdet is very well educated, smart and respectful to everybody. He is no risk to anyone. He has been doing the best for his family.

He takes the children for walks, hikes, churches, camping, skiing, beaches, playgrounds. He has been providing a safe, secure and healthy home for the children.

Children are at risk due to Natalie's aggression, mental issues, lies, and hygiene problems and care by strangers. She has caused allergies, rashes, infections, and food poisoning on children. Six-year-old got urinary tract infection for the first time in a week after Cevdet's incarceration. Ones we have got food poisoning too, after eating the food she prepared. We had to take our daughter to the emergency.

We declare under penalty of perjury under the laws of the State of California that the information we have provided on this declaration is true and correct.

Respectfully,

On June 8, 2020 in Santa Barbara California.

Adnan Orali

Turanca C. Orali

March 6, 2021
**Character statements for Cevdet Uruk**
Submitted by John W. Peca

RE: Case Number 18CR02248:
People of the State of California vs Cevdet Uruk

By way of introduction, my name is John Peca and I would like to submit a character statement
for Cevdet Uruk. I have been a 30 year resident of Santa Barbara and over those years I have
held various IT technical and management positions at QAD, Mosaic, Santa Barbara Bank and
Trust, Union Bank and the County of Santa Barbara, Social Services. It was through Cevdet's
and my mutual alma mater at the Washington University, St. Louis Missouri, Olin School of
Business, MBA program that I came to know Cevdet. Over these past 10 years we have shared
time at family celebrations as well as frequent local hiking and Sierra backpacking adventures.
On more than one occasion I was able to join him and his family on day hikes in the Santa
Barbara foothills.

Cevdet is authentic, honest and of kind heart. I know he misses his young children terribly. I
also know that he is sorry for the chain of events including his own miss calculations that
resulted in this incarceration. In my personal dealings with Cevdet I found that he was a good
father and very caring toward his three children. To my knowledge he has always had a positive
attitude and outlook as demonstrated by his willingness to be stay-at-home dad in order that
Natalie could pursue her own career ambitions. In my opinion he is a trustworthy, fair and
respectful man, and despite his wife's claims I am not aware of any abuse issues.

With a clear and good conscience, I know that Cevdet is very committed in his pursuits to
return to a normal life as a contributing community citizen. In conversations since his
incarceration, Cevdet has repeatedly expressed his regret for not accepting the earlier plea
bargain and has, on numerous occasions, conveyed his apologies to friends and family alike.

I declare the above statements true under the rules of perjury.

Your considerations are appreciated.

Thank you,


John W. Peca
        Home Address:  610 Rockwood Drive, Santa Barbara, CA 93103
        Home Phone:  805.564.2043
        Mobile Phone:  805.450.2914

EXHIBITS

12) Family Photo


14) Police Report (2014)

15) My Wife's Letter to DA (2015)

16) Aaron Swartz - Wikipedia Page







**SANTA BARBARA PD**

**GENERAL OFFENSE HARDCOPY**

REPORT RELEASE

GO# SB 2014-83919 CLOSED-ARREST-ON VIEW

422-0 422 PC THREATS-TERROR

## Related Text Page(s)

Document: **DICTATED NARRATIVE**
Author: **3598**
Related date/time: **Nov-24-2014  (Mon.)**

14-83919

CSI SUPPLEMENTAL: On 11/22/14, at approximately 0900 hours, I was on patrol, when I was dispatched to 300 Loma Media Road, to assist Officer Chung with a 422 PC-Threats investigation involving domestic violence.

When I arrived, I photographed the exterior and interior portion of the upstairs apartment complex, where the two involved subjects live. I photographed all of the rooms to the two bedroom apartment, including the bathroom and spare bedroom where the violence had taken place. I photographed the victim,                  both in the bathroom and in the spare bedroom. I asked her to show me where she was in those rooms while the violence took place.           reenacted where she was in the room and where on her body she was affected. In the bathroom, she grabbed her neck, showing me how her husband, Ceudet Uruk, grabbed her neck. While we were in the spare bedroom,            showed me how Ceudet grabbed her left arm while pushing her towards the bed and while grabbing her while she was seated on the bed.

Afterward, I took close up photographs of            right and left arm, where she suggested she was grabbed. I also photographed her neck as well. I did not see any visible injuries or marks anywhere on her body.

         informed me that for quite some time, neither she, nor her husband, have spoken to one another about their feelings. She informed me the way they prefer to have contact is through email correspondence. I photographed the last five day strand between          and Ceudet. I attempted to upload the correspondences onto a thumb drive, however, it was not working. Several of the emails allude to Ceudet's desire for control and implementations of his control in the marriage. See photographs of the email correspondences for further.

Officer Chung informed me Ceudet had a packet, in which he had printed out several of          and his correspondences to one another. Officer Chung requested I collect the packet and book it as evidence. I asked            if she knew the whereabouts of this packet and she handed me a manila folder, which contained several pages of email correspondences. Again, reading through some of these email correspondences, it shows the relationship among both          and Ceudet and how Ceudet has much control of        life. I collected the manila folder and placed it in a paper bag as



**SANTA BARBARA PD**

**GENERAL OFFENSE HARDCOPY**
REPORT RELEASE

GO# SB 2014-83919 CLOSED-ARREST-ON
VIEW

422-0 422 PC THREATS-TERROR

evidence. Later, at the Santa Barbara Police Department, I made
photocopies of the email correspondences and attached them to the report.
I also booked them as evidence.

Lastly, while on scene, I photographed Ceudet, who had already been placed
in handcuffs and under arrest. I asked him to step out of the patrol
vehicle and asked him if he had any injury or complaint of pain. Ceudet
informed me he did not. I photographed him and his hands and did not see
any visible injuries, redness, or marks.
I booked my photographs as evidence at the Santa Barbara Police Department.



**SANTA BARBARA PD**

**GENERAL OFFENSE HARDCOPY**
REPORT RELEASE

GO# SB 2014-83919 CLOSED-ARREST-ON VIEW

422-0 422 PC THREATS-TERROR

## Related Text Page(s)

Document: **GENERAL OFFENSE**
Author: **6970**
Subject: **URUK, CEVDET**
Related date/time: **Nov-22-2014 (Sat.) 1159**

Relationship:            and Cevdet Uruk have been married for the past 2.5 years. The two have one daughter in common and            was pregnant with another child at the time of this incident.

On 11/22/14 at approximately 0901 hours, I was working uniform patrol when I was dispatched to 300 Loma Media Rd for a domestic disturbance. CSI Officer Sathre and Officer Battaglia responded to assist.

Upon arrival, I contacted the victim/RP            .            was very nervous and very shaken from the incident that occurred. She told me the following: She stated that there had been a long history of abuse from her husband Cevdet but she had only called the police one other time.

She stated that on 11/16/14, Cevdet had found a bag of peanuts she was hiding in the closet. Cevdet believed that            was allergic to peanuts and other foods so he restricted her diet.            stated that she was not allergic to peanuts and when she gets hungry she liked to eat them. Cevdet became extremely upset at            for hiding the peanuts and began to yell at her. She did not want to fight with him so she walked away. Cevdet then went up to her, grabbed her by the throat and pushed her up against the bathroom wall. Cevdet then told            that if she gets an allergic reaction from the peanuts, that he would kill her. He then let her go and calmed down.

A short while later, Cevdet became upset again and threw a pillow at her. He then took her into the bedroom and began hitting her through the pillow.            yelled for help and their daughter, Elizabeth (1 years old) began crying. Cevdet stopped hitting her and took Elizabeth outside to calm her down.

The following day 11/17/14, they continued to argue and Cevdet told            to leave the residence.            agreed to leave but requested to be able to stay until Saturday 11/22/14 to get her things in order. Cevdet agreed to this request.

On 11/22/14 Cevdet was suppose to take Elizabeth out on a hike while            cleaned up the residence. Cevdet instead wanted to speak to



**SANTA BARBARA PD**

**GENERAL OFFENSE HARDCOPY**
REPORT RELEASE

GO# SB 2014-83919 CLOSED-ARREST-ON VIEW          422-0 422 PC THREATS-TERROR

about their situation.          stated that Cevdet had written her emails saying that she could stay if she followed certain conditions.
          told Cevdet that there was nothing to discuss and that she was going to move out.

Cevdet continued to follow her around attempting to talk to her about their situation.          continued to ignore him and he grabbed her.
was unsure if he grabbed her neck or her arms. She stated she was grabbed and pushed up against the bathroom wall. Cevdet then said "I'm going to kill you if you do this!"          asked Cevdet what "this" meant but he did not specify.

          stated the baby began crying and she was able to get away from Cevdet and take the baby outside where she called the police.

          said that she was afraid of Cevdet and his threats. She also stated that Cevdet owns a firearm but she did not know where it was.
          also did not want Cevdet to get arrested.

I then spoke with Cevdet who told me the following: On 11/16/14 the two of them engaged in a verbal argument because he had found peanuts in closet.

Cevdet stated that          was allergic to peanuts and would get a rash. He then stated that because she was breast feeding Elizabeth and was pregnant, her allergic reaction to the peanuts were harming the children. Cevdet stated that Elizabeth gets Eczema and he attributes them to eating peanuts. He also stated that the doctors were not sure what was causing Elizabeth's eczema.

The two were arguing about the peanuts when Cevdet told          that he would kill her if she hurt the baby. She then told Cevdet to kill her now at which point he threw a pillow at her.

The following day, they continued to argue but agreed that          would leave the residence on Saturday 11/22/14.

On 11/22/14 Cevdet stated that he was attempting to speak with          but she would not speak with him or even look at him. So he grabbed both of
          arm and made her face him in order to speak with her. He also told her again that he would kill her if she hurt the baby.

Cevdet stated that he does own a 9mm Glock pistol that he kept in the



**SANTA BARBARA PD**

**GENERAL OFFENSE HARDCOPY**

REPORT RELEASE

GO# SB 2014-83919 CLOSED-ARREST-ON VIEW

422-0 422 PC THREATS-TERROR

closet. I asked Cevdet if I could take the firearm for safekeeping which he denied. He stated that the firearm had never been shot and he kept it for protection.

requested DVRT respond.

requested an EPO which was granted by Judge Anderle. I served Cevdet with the EPO.

CSI Officer Sathre responded and took photographs of both           and Cevdet. He also took printouts of the emails Cevdet had sent her. Refer to his report for further details.

I arrested Cevdet for 422 PC - Criminal threats and 243(e)(1) PC - Domestic battery. Cevdet was transported to County Jail.

I recommend this report be forwarded to the DA's office for a filing of 422 PC and 243(e)(1) PC against Cevdet Uruk.

5/21/15


Re:  Cevdet Uruk case.


Dear Ms. Layla Arshi,

I would like to clarify the events that took place between myself and my husband back in November 2014. It is not easy for me to admit, but I did exaggerate and overreacted to simple situations between us because of hormonal change in my body due to pregnancy. Now, I am able to recall some events that took place even at work which had demonstrated an unusual behavior of me.

Starting about 2,5 months ago (end of 2nd trimester in my pregnancy), I've started coming back to my senses and now am able to see that whatever discussions took place between myself and my husband back in November 2014 were regular discussions/disagreements, there was nothing violent, threatening or abusive in my husband's behavior. There was no beating, pushing, hitting, grapping arm/throat, or offensive touching. I over exaggerated. He held my arms/hands lovingly to talk. That was it.

His words/comment like "I'll kill you if you do this" was just to explain/emphasize the importance of an issue/request, but were not criminal/dangerous threats.

Cevdet is a reliable, responsible, loving husband and a father who has been working hard to provide for myself and our daughter. I am very sorry that I had to put him through this misery with the jail and the case which was caused by hormone change in my body during 1st trimester of pregnancy.

I apologize for taking your time as well as other officials who got involved with this issue which was caused just by "simple" pregnancy.

I would appreciate for the case to be dropped, all charges, including arrest, be cleared from my husband, Cevdet Uruk.

Please do not hesitate to let me know if you or anybody else would like to meet and discuss matters related to this issue.


Kind regards,


Natalie Uruk

Natalie.Uruk@gmail.com
805-617-0251
300 Loma Media Rd.
Santa Barbara, CA, 93103

# Aaron Swartz

From Wikipedia, the free encyclopedia
Jump to navigation Jump to search
For other people with similar names, see Aaron Swartz (actor) and Aaron Schwartz (disambiguation).

**Aaron Swartz**



Swartz at a meetup in August 2009
Aaron Hillel Swartz[1]

| | |
|---|---|
| **Born** | November 8, 1986 Highland Park, Illinois,[2] U.S. |
| **Died** | January 11, 2013 (aged 26) Brooklyn, New York City, U.S. |
| **Cause of death** | Suicide by hanging |
| **Alma mater** | Stanford University |
| **Occupation** | Software developer, writer, internet activist |
| **Organization** | Creative Commons (development), Reddit (co-founder), Watchdog.net, Open Library, DeadDrop, Progressive Change Campaign Committee, Demand Progress (co-founder), ThoughtWorks, Tor2web |
| **Title** | Fellow, Harvard University Edmond J. Safra Center for Ethics |
| **Awards** | ArsDigita Prize (2000) American Library Association's James Madison Award (posthumously) EFF Pioneer Award 2013 (posthumously) Internet Hall of Fame 2013 (posthumously) |

| Website | aaronsw.com |

**Aaron Hillel Swartz** (November 8, 1986 – January 11, 2013) was an American computer programmer, entrepreneur, writer, political organizer, and Internet hacktivist. He was involved in the development of the web feed format RSS,[3] the Markdown publishing format,[4] the organization Creative Commons,[5] and the website framework web.py,[6] and was a co-founder of the social news site Reddit. He was given the title of co-founder of Reddit by Y Combinator owner Paul Graham after the formation of Not a Bug, Inc. (a merger of Swartz's project Infogami and Redbrick Solutions.[7] a company run by Alexis Ohanian and Steve Huffman).

Swartz's work also focused on civic awareness and activism.[8][9] He helped launch the Progressive Change Campaign Committee in 2009 to learn more about effective online activism. In 2010, he became a research fellow at Harvard University's Safra Research Lab on Institutional Corruption, directed by Lawrence Lessig.[10][11] He founded the online group Demand Progress, known for its campaign against the Stop Online Piracy Act.

In 2011, Swartz was arrested by Massachusetts Institute of Technology (MIT) police on state breaking-and-entering charges, after connecting a computer to the MIT network in an unmarked and unlocked closet, and setting it to download academic journal articles systematically from JSTOR using a guest user account issued to him by MIT.[12][13] Federal prosecutors later charged him with two counts of wire fraud and eleven violations of the Computer Fraud and Abuse Act,[14] carrying a cumulative maximum penalty of $1 million in fines, 35 years in prison, asset forfeiture, restitution, and supervised release.[15]

Swartz declined a plea bargain under which he would have served six months in federal prison. Two days after the prosecution rejected a counter-offer by Swartz, he was found dead in his Brooklyn apartment, where he had hanged himself.[16][17]

In 2013, Swartz was inducted posthumously into the Internet Hall of Fame.[18]

# Contents

- 1 Early life
  - 1.1 Entrepreneurship
- 2 Activism
  - 2.1 PACER
  - 2.2 Progressive Change Campaign Committee
  - 2.3 Demand Progress
  - 2.4 Stopping the Stop Online Piracy Act (SOPA)
  - 2.5 Wikipedia
- 3 *United States v. Aaron Swartz* case
  - 3.1 Response from JSTOR
  - 3.2 Arrest and prosecution

EXHIBIT

17) Reporter's Transcript

```
 1          Mr. Uruk, I consider you to be an innocent
 2   person.  The only reason I talk about settlement is
 3   just so that we know what the bottom line in this
 4   case is so that you can make decisions with full
 5   knowledge of what the offer is, what the
 6   counteroffer is, so that way everybody can go into
 7   this with full knowledge.
 8          And so I consider you to be an innocent
 9   person.  Anything I say about settlement is only in
10   terms of trying to get the sides to evaluate their
11   case and decide, so that everybody knows what we've
12   tried to do to resolve the case.
13          But in your case, according to my
14   calculations, you're charged with seven counts in
15   this case.  That means your exposure is nine years
16   four months, and you're ineligible for local time,
17   so that would be a state prison sentence is the
18   maximum that I could give you if you were convicted
19   of all seven counts, plus another one year for the
20   violation of probation.
21          So potentially you could face ten years and
22   four months in state prison if you were convicted of
23   all charges and I ran them consecutively to each
24   other.  You'll have to talk to your lawyer about
25   what the likelihood of that is.  I understand that
26   there's an offer that doesn't involve prison.  I
27   think that this case has the potential to resolve.
28   I think there's a lot of room between ten years four
```

34

COPYING NOT PERMITTED — GOVERNMENT CODE SECTION 69954(d)

1    months and probation, and I'd ask the parties to

2    think about that, think about the realities of this

3    case, the likelihoods of this case, what may or may

4    not happen if we go to trial, I guess.

5            You know, no one knows what will happen in a

6    trial.  No one knows what a jury will think.  No one

7    knows what evidence will come out, what witnesses

8    will testify.  But in my experience, it's always

9    better for the parties to know what's going to

10   happen rather than not know, right?  It puts both

11   parties in a better position to be able to negotiate

12   and get to a resolution that both sides can accept

13   and live with, rather than letting a jury decide

14   innocence and guilt and a judge decide sentencing,

15   because when I sentence, I look at a variety of

16   factors that may or may not reflect the kinds of

17   things we talked about in settlement.

18           So I'd ask both sides to consider

19   discussing, throwing out some different options.

20   You know, don't give up hope; that you've reached an

21   impasse.  There's usually some way for the parties

22   to work things out.

23           So I'd ask you to keep negotiating in good

24   faith and see if you can come up with a resolution.

25           All right.  Any questions, comments,

26   concerns?  Anything else anyone wants to put on the

27   record?

28           MS. CHANDA:  No, Your Honor.

                                                  35

1    THE COURT:  Okay.  So here is the plan.  So
2  we're going to be finished now in a few minutes.  We are
3  to going come back tomorrow morning, 9:30, to finish up
4  the motions and finish up anything else.
5    We are going to bring the jury in at 10:00,
6  pick the jury all day Wednesday.
7    MR. LEVINSON:  Tomorrow.
8    THE COURT:  All day tomorrow, Wednesday.  I
9  don't think we will get a jury by end of the day, but
10  maybe we'll finish picking the jury Thursday morning and
11  then we will do openings Thursday afternoon.  And then
12  we'll deal with our witness issue Thursday afternoon.
13    We are also just -- I mean, I don't know
14  that there's any room to still negotiate to try to
15  settle this case.  I think -- I think that there is.  I
16  think that these cases are in flux.  No one knows what a
17  jury is going to do.  Everybody's got issues in this
18  case.
19    So, you know, there is some value to trying
20  to negotiate and trying to come up with a resolution
21  that is predictable and I believe that people can live
22  with that.  Both sides can live with.  As you know we
23  are going to be doing a probation violation hearing
24  contemporaneous with this.
25    I don't know how much time he spent -- I
26  think that's a one-month misdemeanor.  It's not a
27  six-month misdemeanor.
28    MS. CHANDA:  Correct.

-60

1          THE COURT:  He went to try acquitted on one

2    counsel convicted on the other.  So that's his probation

3    violation.  The case is still open.  The -- that's --

4    I'm going to make a ruling on that.

5          I think everybody knows what the standard of

6    proof is to that.  It's not the same standard of proof

7    that is required for a jury trial.  So we are going to

8    have -- in other words, we are going to deal with that.

9    And if the Court finds the defendant in violation of

10   probation then the Court is going sentence based on what

11   the Court agrees is appropriate.

12         So you all got to deal with that.  I mean,

13   that seems like something we're going to have to deal

14   with, no matter what, one way or the other.

15         So I think that there's -- I think that in

16   light of that, that there's some room for the parties to

17   negotiate both cases rather than just one case does that

18   make sense.

19         MS. CHANDA:  It does and the People have

20   been open to negotiation I just think we have kind I

21   have hit a brick wall my I understand the Court's

22   position.

23         THE COURT:  In other words, Mr. Uruk, you

24   could be acquitted.  The witness may not testify.  The

25   government may not be able to prove their case and I can

26   still hold you in violation of probation and I can still

27   send you to jail even if you're acquitted, even if your

28   wife doesn't testify" you understand?

COPYING NOT PERMITTED    GOVERNMENT CODE SECTION 69954(d)

1    point it appears to me that if the complaining

2    witness is called, that would qualify as a hostile

3    witness based on what I've heard so far.  I think

4    prior inconsistent statements are admissible.  And I

5    think that any counselor or religious communications

6    are privileged and cannot be -- are not admissible.

7        But I'll give anybody a chance to do a 402

8    hearing before any of those issues come up, if you

9    think it's relevant and important to do that.

10        And then we'll -- tomorrow at some point,

11    when Mr. Levinson is ready, we'll discuss those

12    other topics that are in the supplemental motion.

13        For purposes of today, though, I'll just

14    instruct both sides not to get into any of the

15    issues that are outlined in that supplemental

16    regarding statements that may or may not be excluded

17    in their voir dire.

18        All right?  Before I call the jury over,

19    anyone have anything that you'd like to put on the

20    record?

21        People?

22        MS. CHANDA:  Just as we discussed in

23    chambers, the People's witness who will be an 1109

24    witness is on vacation next week, and I would like

25    to get him on and off the stand by the end of this

26    week.

27        THE COURT:  I'll do everything I can.  And

28    if we have to come in Friday afternoon to do it, if

67

COPYING NOT PERMITTED    GOVERNMENT CODE SECTION 69954(d)

1      THE COURT:  And anything by the defense?

2      First of all, I want to give you an

3  opportunity, Mr. Levinson, you challenged for cause

4  two other jurors, Juror No. 6, Mr. Camardella, and

5  Juror No. 9, Miss Donovan, for cause.  The Court

6  denied your challenge for cause.

7      I agree, I noted them as having some issues,

8  I was concerned about them, but I think, all and

9  all, they ended up answering the questions that they

10  would try to be fair and impartial, and so that's

11  why I didn't excuse them.  If you want to put

12  anything on the record, I'm happy to let you do

13  that.

14      MR. LEVINSON:  I just disagree with the Court.

15  I do not feel that -- I think the law is closer to

16  excusing them for cause when they express the kinds

17  of concerns that were expressed by those jurors and

18  this last juror, Mr. Xxxxxxxx [Juror No. 1].

19      THE COURT:  We haven't examined him yet, so --

20      MR. LEVINSON:  I know.  I'm using him as

21  sort of an example.  The Court certainly could have

22  excused him for cause just now.  He's made it very

23  clear.  If you look at his --

24      THE COURT:  We haven't questioned him yet.

25  We haven't challenged for cause yet.  That's

26  premature to discuss it.

27      MR. LEVINSON:  The Court has already

28  released people for cause based on the very things

74

COPYING NOT PERMITTED — GOVERNMENT CODE SECTION 69954(d)

1    we just examined Mr. Xxxxxxxx [Juror No. 1] on, even

2    though they were not in the first group.

3        THE COURT:  No, but counsel for the People

4    has not had the opportunity to rehabilitate him

5    during questioning, so they get the opportunity to

6    do that, and then I'll make a ruling.

7        MR. LEVINSON:  What I'm saying is there were

8    other people from the general venire, who have not

9    been in the box, they have not been questioned, they

10   came up and they told us about things that they were

11   uncomfortable with, and the Court released them for

12   cause, excused them for cause.

13       Mr. Xxxxxxxx [Juror No. 1] is in the same

14   position.  I don't see how he's any different than

15   any of those other people that you already excused

16   for cause for, I believe, less clear reasons.

17   I mean, look at his family situation.  That's --

18   anyway, I've made my record.  I'll leave it at that.

19   I think he's a clear cause excusal.

20       THE COURT:  All right.  You'll have the

21   opportunity to challenge him for cause after we

22   question him.

23       All right.  Anything else?  Anyone else want

24   to put anything on the record.

25       MS. CHANDA:  No.  Thank you.

26       MR. LEVINSON:  No.

27       THE COURT:  So we'll see you at nine o'clock

28   tomorrow.  We'll deal with the motions and then

                                                    75

1      Q.   So did she state where on her arms the defendant

2   had grabbed her?

3      A.   Just above the elbow right near the shoulder.

4      Q.   And you stated at first she tried to get away; is

5   that right?

6      A.   Yes.

7      Q.   And how did the defendant react when she tried to

8   get away?

9      A.   The more she tried to get away, the more that he

10  squeezed tighter and pushed her against the wall.

11     Q.   And what did she do next?

12     A.   Once she determined that she, one, couldn't, you

13  know, overpower his strength and that it would be best

14  that she be quiet and not put up a fight, that things

15  would just cease.

16     Q.   Did that happen?

17     A.   No.

18     Q.   What happened?

19     A.   She said that while she was pinned against the

20  wall, he hit her two times.  It was unknown if it was an

21  open -- if it was closed fist or open hand.  And then

22  after being hit in the face she had -- due to the

23  strike, she had fallen to the ground, fallen to the

24  floor.

25     Q.   When you spoke with -- when Jane Doe was telling

26  you about this incident, did you notice any injuries

27  that may have been caused by this incident?

28     A.   Yes.  She showed me on her bottom lip.  She had

                                                        ─204

1    like a bruise and kind of lacerated like bloody lip.

2              MS. CHANDA:   Your Honor, I have People's 7

3    and 8.  May I publish?

4              THE COURT:   Yes.

5    Q.  BY MS. CHANDA:   Okay.  This is first People's 7.

6    Can you describe what we see here.

7    A.  This is the Jane Doe's bottom lip which she

8    showed me and it appears to be that it's -- the skin's

9    been irritated.

10              MR. LEVINSON:   Objection.  Lack of

11    foundation.  Photo speaks for itself.

12              THE COURT:   Overruled.

13              THE WITNESS:   Minor bleeding, maybe it's a

14    small two, three-inch cut.

15    Q.  BY MS. CHANDA:   And I am going to show you

16    People's 8, a slightly different angle.  Is this the

17    same injury that we see in People's 7?

18    A.  Yes.

19    Q.  And in your 50 to 70 cases where you've

20    investigated domestic violence -- well, let me ask you

21    this.  How many cases have you investigated or assisted

22    in that included any type of violence, either assault,

23    battery -- not necessarily towards domestic violence

24    specific?

25    A.  More than half.

26    Q.  More than half?

27    A.  More than half have resulted in some type of

28    injury.

205

1  you'll have four forms one for guilty of the main

2  charge, not guilty of the main charge.  One for guilty

3  of the lesser, one for not guilty of the lesser.

4         If you have questions you can ask the

5  bailiff.  But I think it's pretty simple.  I think

6  you're only going to need one form per charge, the first

7  one, guilty for all charges.  And I hope that you will

8  find the defendant not guilty (sic).

9         Thank you.

10        THE COURT:  We'll take ten-minute break and

11 start back at 11:10.  I am not going to read the

12 admonition.  Don't make up your minds.  Don't talk about

13 the case.  Don't use any social media.  We'll see you in

14 ten minutes.  Thank you.  We'll be off the record.

15        (Brief recess.)

16        THE COURT:  All right.  We are back on the

17 record.  All the parties are present.  All the jurors

18 are present.

19        Thank you, again.  And I have been pretty

20 accurate on time today, not too bad.

21        So now, Mr. Levinson, whenever you're ready,

22 you may give your closing argument.

23        MR. LEVINSON:  Thank you, your Honor.

24        Good morning everyone.  The prosecutor told

25 you at the beginning of her closing argument that the

26 story -- you now know the story of Jane Doe.  The story

27 of Jane Doe hasn't remotely been told in this courtroom.

28 And that's because Jane Doe did not testify.  And

1   trial.  Even the jurors are not my peers.  I don't think

2   that my family, my children, and I deserves any of this.

3   I respect the law.  I respect the Court.  But I don't

4   even get traffic tickets.  And even -- you go to the

5   police report on that one.  I always try to tell the

6   truth, whatever the consequences are.

7          But for the sake of those three little

8   children, they are babies, basically, and (Jane Doe) is

9   not a bad person.  She has a good heart.  But there's

10  some problems and I was working on it through

11  counselors, through society.  But I did not subject her

12  to violence or abuse.  It was the opposite.  She was the

13  aggressor most all the time, but she's like a child.

14         I don't know -- like we are here.  We are at

15  this point.  I also make the mistake of irritating the

16  prosecutors with my arrogance.  And I apologize for

17  this.

18         THE COURT:  All right.  Well, Mr. Uruk, I

19  appreciate what you said.  Those are all factors that

20  I'll consider for sentencing.

21         For purposes of whether this is a -- whether

22  the People have proved up this is a prior, what you just

23  said isn't relevant.  It is a prior.  It's established

24  to the satisfaction of the Court that it meets all the

25  requirements.  And, therefore, I do find that the prior

26  conviction for domestic violence is admissible,

27  admitted, and find -- find true the special allegation

28  that there was a prior conviction on June 15th, 2015.

1           I will let you address the Court at the time

2   of sentencing, and all the factors that you talked about

3   I think are relevant things for me to consider for

4   purposes of sentencing.

5           But for purposes of whether this is a

6   conviction document, it is.  And I will find the special

7   allegation true.

8           People, anything that you want to add?

9           MS. CHANDA:  No, your Honor.  Thank you.

10          THE COURT:  Defense, anything you want to

11  add?

12          MR. LEVINSON:  Not with regard to the prior.

13          THE COURT:  Now let's move on to the next

14  issue, and that is the probation case that we were just

15  dealing with.

16          In that case Mr. Uruk was on probation.  The

17  Court heard the evidence presented in the trial.  The

18  probation violation was heard concurrently with the

19  trial.  And I'm ready to make a ruling on whether he's

20  in violation of probation.

21          People, would you like to be heard?

22          MS. CHANDA:  No, your Honor.

23          THE COURT:  Defense, would you like to be

24  heard?

25          MR. LEVINSON:  Submitted.

26          THE COURT:  All right.  Based on the

27  evidence that was presented it's -- beyond a reasonable

28  doubt or which isn't required in a probation violation,

1  at the very beginning whatever happened whether this

2  case ended in a not guilty verdict or a guilty verdicts

3  you were going to be re-victimized again, no matter what

4  happened.

5          And I feel terrible about that, and I wish

6  there was some way that that wouldn't happen to you.

7  And there probably was some ways to have accomplished

8  that throughout this process.  But that wasn't taken

9  advantage of.

10          And -- but you just heard the defendant

11  blame you.  He just sat here and blamed you for this.

12  That's just what happened.  And there's no way that I am

13  going to release him.  There's nothing you can say.

14  There's nothing you can do that I am going to release

15  him pending sentencing.

16          I am -- I am concerned about your safety.  I

17  think there are probably many good aspects about your

18  husband and that's probably why you're so supportive of

19  him because there's some good aspects.  But there's also

20  some dangerous aspect.  He's now been convicted of

21  multiple felonies.  It would be inappropriate for me to

22  release him.

23          I am going to remand him with no bail

24  pending sentencing.  And I am doing that to protect you.

25  Based on what he said just now he's dissociated his

26  conduct from what reality is, what actually happened.

27  And this case did not need to end up the way that it

28  did.

1           SANTA BARBARA, CALIFORNIA; MONDAY, AUGUST 5, 2019

2              DEPARTMENT 12; HON. MICHAEL CARROZZO, JUDGE

3                        AFTERNOON SESSION

4                            --oOo--

5

6           THE COURT:  All right.  Let's go on the

7    felony record.  Calling the matter of Cevdet Uruk.

8    That's 18CR2248 and 1471799.

9           Appearances, please.

10          MR. LEVINSON:  Neil Levinson with Mr. Uruk,

11   who is present.

12          MS. CHANDA:  Megan Chanda for the People.

13          THE COURT:  All right.  And we are on for

14   sentencing.

15          Mr. Levinson, waive formal reading and

16   advisement, no legal cause why sentence should not be

17   pronounced?

18          MR. LEVINSON:  Yes.

19          THE COURT:  All right.

20          I have read and considered the probation

21   report.  I am willing to give both sides an opportunity

22   to provide me any information that they would like to.

23          Mr. Levinson, you indicated that -- well, I

24   won't speak for you.  But you wanted to say something

25   about proceeding to sentencing now.

26          MR. LEVINSON:  Well, as the Court knows I

27   have been out of town for the last three weeks.  I would

28   like an opportunity to make a motion for new trial.

1    Procedurally, that does need to be done prior to

2    sentencing.

3            I do have a document that I received a

4    couple days ago.  And today is my first opportunity to

5    get it to counsel and to the Court.  It's regarding --

6            THE COURT:  I'll look at it.

7            MR. LEVINSON:  It's a medical form regarding

8    Ms. Uruk.

9            THE COURT:  All right.

10           Marty, can you get that for me.

11           MR. LEVINSON:  I provided a copy to Ms.

12   Chanda.

13           MS. CHANDA:  And, your Honor, I am fine with

14   the Court reviewing it.  I would just ask for her

15   privacy that it not be either filed, or if it is, filed

16   under seal.

17           MR. LEVINSON:  It was provided to me by --

18   by Ms. Uruk, your Honor, just so the Court knows the

19   chain of custody.

20           THE COURT:  All right.  We'll have that

21   sealed.

22           All right.  So you're requesting a

23   continuance so that you can file a motion for a new

24   trial.

25           MR. LEVINSON:  Yes, your Honor.

26           THE COURT:  All right.  Your request for

27   continuance is denied.

28           THE COURT:  All right.

1              People, any witnesses that you'd like to

2    call, any statement you'd like to have presented?

3              MS. CHANDA:  Can I just chat with Jane Doe?

4              THE COURT:  Go ahead.

5              We'll do the firearms assessment.  That's

6    been provided to me indicating to me that he does have a

7    firearm.

8              THE CLERK:  That he does?

9              (Pause)

10             THE COURT:  All right.  People, how would

11   you like to proceed?

12             MS. CHANDA:  Jane Doe would like to make a

13   statement, and then the People would like to make a

14   statement following that.

15             THE COURT:  All right.

16             All right.  Ma'am, you don't need to tell me

17   your name.  I know who you are.  But I'd love to hear

18   anything you'd like to say.  Go ahead.

19             JANE DOE:  I would like to say that, first

20   of all, every word in my statement, initial statement

21   that was attached to the probation report is valid.  A

22   few additional notes, that my husband has apologized to

23   me multiple times for the situation in which me and my

24   kids are finding ourselves.  He takes full

25   responsibility as the head of the household.

26             I believe the therapist should permit me to

27   take some at least some responsibility as well.

28             THE COURT:  Ma'am, could you go a little

—384

1   slower, please.  I know you're nervous.  It's all right.

2   Take your time.  We have all day.

3          JANE DOE:  Okay.  Every word in my statement

4   that is attached to the probation report is valid.  My

5   husband has apologized to me for the situation in which

6   me and the kids find ourselves.  He takes full

7   responsibility.  A note from the therapist should permit

8   me to take some responsibility as well.  If I didn't

9   have my parents over, it would be more challenging for

10  me to discover the features about my behavior.  But I

11  have observed exactly the same things that my parents

12  have been exhibiting towards me as I have been

13  exhibiting towards my husband.

14          I was able to make reflections on my

15  behavior and bring things, these things in my meetings

16  with the therapist.  Meetings with her have been very

17  insightful and liberating.  The past month has left me

18  exhausted.

19          My parents are able to do only a fraction of

20  what my husband was able to do.  In the evenings we had

21  a family dinner prepared by him.  He would read Bible

22  stories to kids.  Afterwards, I was able to spend time

23  with the kids teaching them piano, teaching them

24  reading, math, logic.  We would make scientific

25  experiments.  On Saturdays we would go hiking for half a

26  day.

27          Since my husband is gone I wasn't even able

28  to eat at home because of overwhelming amount of work

1    while attending to kids.  We have been -- we even have

2    started working on college strategy for kids.

3            As I mentioned, child care is extremely

4    challenging still.  If I thought that there is at least

5    slight danger of bringing him home, I wouldn't ask for

6    it.  My first and primary instinct is to make sure kids

7    are safe and have best possible care.  And my husband

8    has been able to provide it.

9            Thank you.

10           THE COURT:  Thank you, ma'am.

11           People, any other statements you'd like to

12   have read or given.

13           MS. CHANDA:  No.  Other than the People's

14   position.

15           THE COURT:  All right.  Let me hear from Mr.

16   Levinson.

17           Mr. Levinson, do you have any statements

18   that you'd like the Court to consider?

19           MR. LEVINSON:  No, your Honor.  I don't.

20   But Mr. Uruk would like to address the Court.

21           THE COURT:  All right.  Go ahead.

22           Marty, you can move him to counsel table, if

23   that's easier.

24           BAILIFF ENSIGN:  Wherever you prefer, your

25   Honor.

26           THE DEFENDANT:  Your Honor, I hope I do not

27   give you wrong impression.  I respect the Court.  I

28   respect you.  People.  The jury.  The system.  And the

1    verdicts.  And the woman and my wife.  I admit my

2    mistakes and I take full responsibility.  I'm sorry for

3    what happened.

4            But there's a misunderstanding and there's a

5    mistake.  I believe discrimination is a significant

6    factor in convictions.  It's not the main factor. I'm

7    not a Muslim.  I'm not a representative of Turkish

8    culture.  I'm an American citizen.  I was raised and

9    educated in American institutions and with American

10   values.  I go to church and I raise my children in

11   Christian faith.

12           I love my wife.  But we had some issues.

13   I'm not blaming anyone, including her.  But she has

14   called the police six times in the last six years.

15   There wasn't any visible injury or evidence that shows

16   or supports the allegations which are very serious such

17   as choking, threatening to kill, beating, pushing,

18   hitting, abuse.

19           After each time I meant to separate.  We

20   separated for a while and after each incident, she came,

21   apologized, said that she has taken some therapy, and

22   things are not going to be the same.  And in a couple of

23   weeks she did not remember anything.

24           Her statements are contradictory.  Again,

25   I'm not trying to blame her or anybody and I take full

26   responsibility for my actions.  She does not understand

27   the legal system and the consequences of her actions.

28   She thinks that it is like Russia.  You call the police

—387

1   to talk to family members and nothing will happen.  She

2   thinks that prosecutors are her attorney in her marital

3   disputes against me.

4           She was not healthy when I met her.  She

5   hospitalized, lost her job, and depressed.  I helped her

6   to heal with healthy diet and exercise.  She's a sugar

7   addict.  Again, I'm not blaming.  I am not accusing

8   anyone.  Just to help the justice to understand or

9   explain what has been happening.  She has -- most of her

10  teeth have decayed.  (Unintelligible), and blinking

11  eyes.

12          THE COURT REPORTER:  I'm sorry.  Mr. Uruk, I

13  didn't hear right before the "blinking eyes."

14          THE COURT:  Mr. Uruk, I'm not going to allow

15  you to say anything more about your wife like that.  You

16  you have to move to a different subject.

17          THE DEFENDANT:  Okay.  Your Honor, I'll say

18  one thing.  Even if her allegations are true, she's not

19  the victim.

20          THE COURT:  All right.  Mr. Uruk, you can

21  move on to a different topic.  Anything else you want me

22  to consider?

23          THE DEFENDANT:  Your Honor, just one

24  sentence.  With due respect, just one sentence.  She has

25  a family, beautiful home, beautiful job, and health.

26  Her sister does not have any of these.

27          THE COURT:  All right.  Mr. Uruk, I've heard

28  enough from you.

-388

1          All right, Mr. Levinson.

2          THE DEFENDANT:  May I finish, your Honor?

3          THE COURT:  Mr. Uruk, I'm ordering you not

4    to say anything else.

5          Mr. Levinson, anything else you'd like to

6    discuss?

7          MR. LEVINSON:  I don't have anything else

8    I'd like to present, no.

9          THE COURT:  All right.  Argument.  People.

10          MS. CHANDA:  Thank you, Judge.

11          The People have reviewed probation's

12    recommendation.  The People are in complete disagreement

13    with the recommendation. I think the evidence that was

14    heard by the Court in this case speaks for itself I

15    think the defendant's statement just seconds ago speaks

16    for itself.

17          In the probation report itself the defendant

18    refuses to take responsibility.  I think his statements

19    today are very -- not genuine when he claims he takes

20    responsibility for his conduct.  The People are

21    obviously very concerned for the safety of Jane Doe in

22    this case.  This is the second conviction for domestic

23    violence as the Court is aware.

24          You know, the probation report details the

25    incident to a slight degree that occurred during the

26    probation during the first conviction.  However, it does

27    not go into it in incredible detail.  However, the

28    defendant had multiple issues during the batterers

389

1    treatment program.  And, in fact, there were -- there

2    was a police report filed with regard to a 422 against

3    the treatment providers.  And in lieu of charges there,

4    there was a criminal protective order protecting the

5    provider and the employees and staff of that program.

6              The defendant was also found to be in

7    violation based on the fact that he had a -- possession

8    of .40 caliber ammunition and a hunting knife which was

9    explicitly prohibited.

10              Probation states that while the defendant is

11    a marginal candidate that perhaps he may benefit from

12    some mental health treatment.  My understanding is that

13    part of the last probation he was ordered as a probation

14    violation sentence to have a mental health evaluation

15    done and comply with whatever they were to determine.

16              This is a really sad and unfortunate case,

17    and I think that the Court said it best when the

18    conviction and the verdicts came down and the defendant

19    was remanded and Jane Doe made a statement then, that

20    she's going to lose no matter what in this situation.

21    She's going to be revictimized no matter what.

22              I think -- and I agree with Jane Doe.  It is

23    going to be incredibly difficult for her to adjust to

24    having to deal with everyday life with the children and

25    being a working parent.  And it's going to be really

26    difficult until she's able to adjust to that.

27              The People and the advocate in this case are

28    dedicated to continuing to working with Jane Doe, but

1   her safety and the safety of her children are of the

2   utmost importance.

3           You know, some of the statements that were

4   made in the current case and in the prior situation

5   where she was so accustom to the defendant being abusive

6   that she just didn't call the cops.  And the reason she

7   called this time was because she was so afraid because

8   it had escalated more so than it had before.

9           The fact that she is accustomed to that is

10  incredibly sad to the People and incredibly worrisome

11  for her -- for her safety and the safety of her

12  children.  And not only the physical safety but the

13  mental damage that seeing this type of conduct between

14  your parents can have on children.

15          The People do not believe that the defendant

16  is a qualified candidate for probation.  The People's

17  recommendation would be a seven-year commitment.  I

18  could break that down for the People's recommendation,

19  if the Court cares to hear that.

20          THE COURT:  No.

21          MS. CHANDA:  But I think, again, the

22  evidence in this case and the defendant's statement here

23  it -- I don't think anything else really needs to be

24  said.

25          THE COURT:  Thank you.

26          Mr. Levinson.

27          MR. LEVINSON:  I would ask the Court to

28  follow the recommendation of probation.  I think the

1    statements by Jane Doe, the concerns she's expressed for

2    the children, there's been no evidence to suggest that

3    Mr. Uruk in any way has endangered his children.  He was

4    found not guilty on the charge regarding the child

5    endangerment.

6        So based on those facts, I hope the Court

7    does not diminish -- I think those facts are important.

8    It would be one thing if Jane Doe came in and said, hey,

9    you know, I'm done with this guy, or I don't -- you

10   know, he's a terrible father, or any one of a number of

11   things that she could have said.  She's not saying that.

12   She's saying actually just the opposite.  We'd ask the

13   Court to take that into consideration.

14       And, you know, probation has done a very

15   thorough investigation.  They see him, as although

16   marginal, a candidate for probation.  We'd ask that the

17   Court follow the probationary recommendation.

18       THE COURT:  All right.  Thank you very much.

19   Anything further by either side?

20       People?

21       MS. CHANDA:  No, thank you.

22       THE COURT:  Defense?

23       MR. LEVINSON:  No, your Honor.

24       THE COURT:  All right.  I am not going to

25   follow the recommendation of probation.  I think

26   probation is wrong.  And I'll explain why.  Firstly, the

27   reasons why a grant of probation is not appropriate in

28   this case, probation indicates that the defendant is

1   willing to comply with the terms of probation as a
2   suitability factor.  I disagree with that.  Defendant
3   has shown he's not willing to comply with probation
4   based on his previous term of probation.
5          Probation also believes he has the ability
6   to comply based on a variety of factors.  I disagree
7   with that.  Nothing that the defendant has shown
8   throughout this case or throughout his prior term of
9   probation indicates he has the ability to comply with
10  probation.  There are factors that probation cites which
11  do support denying probation.  That is the nature and
12  seriousness and circumstances, which I agree with.
13  Defendant's prior criminal record for the same conduct
14  for which he was probation for, that he was unsuccessful
15  on his prior term of probation, and then, most
16  importantly, it is likely if not imprisoned the
17  defendant would be a danger to others and would continue
18  on with his behavior.  So I am going to deny probation.
19  I am going to send him to state prison.
20         When I look at this, I look at the rationale
21  for why we sentence and how we sentence.  And I'm guided
22  by the California Rules of Court 4.410.  And the general
23  objectives are protecting society, which sending the
24  defendant to prison promotes.  Protecting society.
25  Punishing the defendant in an appropriate matter, which
26  is appropriate in this case.  Encouraging the defendant
27  to lead a law-abiding life.  And probably the most
28  important, too, are deterring others from criminal

1   conduct by demonstrating the consequences.

2            Our society has given a pass to men who

3   abuse their wives. And that can no longer stand.

4   It's -- in this case we are preventing the defendant

5   from committing new crimes by isolating him. And it's

6   clear to me that the defendant has no respect for his

7   wife, no respect for the law, and will continue to abuse

8   her.

9            In fact the victim in this case as I pointed

10  out before there's nothing -- there's nothing I can do

11  to help her. And I'm sorry for that. I wish there was

12  something I could do for her and her family. But the

13  statements by the defendant after he was convicted show

14  no remorse. He blamed the victim and he demeaned the

15  victim by calling her a child after he was convicted.

16  And then today he continued to further deny

17  responsibility, blame the defendant -- blame the

18  witness -- the victim, rather, and then demean her here

19  openly about -- with nonsense, quite frankly.

20           And I think it proves my belief that the

21  defendant has manipulated and tried to control the

22  victim in this case for years to the point at which

23  she's had a difficulty being able to respond to these

24  sort of accusations and the fact that she's called the

25  police department six times is a testament to the abuse

26  that's gone on for a long period of time.

27           The fact there's no visible injuries is

28  actually quite telling. He did not say there were no

1    injuries.  He said there are no visible injuries.  The

2    defendant manipulated, led a life which he abused his

3    wife and purposely hides the visibility of those from

4    society.

5            He also in his statement tries to claim he

6    knows what the victim in this case thinks and that she

7    doesn't understand the legal system or the consequences.

8    Again, absolutely demeaning and unacceptable to talk to

9    any person like that.

10           So for all those reasons, I am going to deny

11   probation.  When I look to the factors regarding this

12   crime as to what triad to sentence the defendant to, I'm

13   also guided by the California Rules of Court and,

14   specifically, factors relating to the crime.  In this

15   case the crime did involve great violence, the choking

16   of the victim.  The victim was vulnerable.  The

17   defendant threatened the victim in this case.  The

18   manner in which the crime was carried out indicates

19   planning.  His whole manner of dealing with his wife is

20   manipulating and trying to make her in a position where

21   she wouldn't be able to stand up for herself.

22           The defendant took advantage of position of

23   trust by -- the marital trust that the victim in this

24   case has demonstrated.  And, you know, in listening to

25   what the victim said, she's still blaming herself.

26           It's not your fault.  You have done

27   everything you can to be a good person.  You have done

28   everything you can to support your husband.  He is

1   wrong.  He's an abuser.  He's hurt you.  You've done

2   nothing to deserve that.  Nothing.  Everything that I

3   have seen here indicates you are a good person who did

4   nothing wrong, and you need to understand that you need

5   to get on with your life because your husband is going

6   to prison for a long time and you need to start a new

7   life.

8                In regard to the defendant himself, the

9   defendant has engaged in violent conduct.  The defendant

10  has prior convictions for the same thing.  The defendant

11  was on probation while this crime was committed.  And

12  the defendant's prior performance on probation was

13  unsatisfactory.

14               Therefore, he warrants the upper term and

15  full term consecutive.  So, in other words, I am going

16  to give him the maximum sentence I can as allowable by

17  law, which is five years on Count 2, a full mid-term on

18  Count 1, for an additional two years, one-third the

19  mid-term on Count 3 for an additional year.  Another

20  eight months, one-third the mid-term on Count 4, for a

21  total of eight years eight months.

22               I'm also going to run Count 6 and Count 7,

23  one-year misdemeanors full term consecutive for a total

24  of ten years eight months.

25               In addition to that, he's got a probation

26  case with one year outstanding on that.  I am going to

27  sentence him to the full year on that case as well,

28  consecutive.

```
 1              His credits are looks to me like they are 46
 2   plus 46 for 92.
 3              THE CLERK:  I'm sorry.  Which case is that
 4   on?
 5              THE COURT:  It will be on the principal
 6   case.  He's also got fines, $300 pursuant to 1202
 7   point -- 1202 point -- three point four and point four
 8   five.
 9              THE CLERK:  I'm sorry.  That was 300 each?
10              THE COURT:  300 each.
11              THE CLERK:  Thank you.
12              THE COURT:  Register pursuant to -- or give
13   a sample pursuant to Penal Code Section 296.
14              People, any additional items I'm leaving out
15   on the sentence?
16              MS. CHANDA:  No, not on the sentence, Judge.
17   But there is a 136.2 issue that I'd like to address as
18   to whether or not this is a full no contact.  The People
19   would ask the Court's position on that.
20              THE COURT:  On what?
21              MS. CHANDA:  So the 136.2 no contact
22   order --
23              THE COURT:  Yes.
24              MS. CHANDA:  -- if the Court wishes this to
25   be a full no contact.
26              THE COURT:  What's your position?
27              MS. CHANDA:  My position is that it should
28   be a full no contact.  But I do understand if the Court
```

1    would grant permission for telephone calls, but --

2              THE COURT:  Mr. Levinson.

3              MR. LEVINSON:  We'd ask that Mr. Uruk be

4    allowed at the very least to have telephone contact.

5              MS. CHANDA:  And primarily for -- for the

6    pseudo-visitation issue and any sort of child visitation

7    issues that may arise in the near future.

8              THE COURT:  How many years is this

9    protective order in effect, three years?

10             MS. CHANDA:  The maximum is ten years but

11   the standard is a three-year.

12             THE COURT:  Is that what you're asking for?

13             MS. CHANDA:  Yes.

14             THE COURT:  All right.

15             So what I'll -- I'll have no contact with

16   the victim in this case for full three years, although

17   he can have contact with the children.

18             MS. CHANDA:  Understood.

19             THE COURT:  All right.  Anything further by

20   the People?

21             MS. CHANDA:  No, Judge.  Just handing up the

22   forms.

23             THE CLERK:  Counts 6 and 7, those are both

24   misdemeanors.  As far as fines they are done

25   differently.

26             THE COURT:  We'll exonerate all the fines.

27             THE CLERK:  Thank you.

28             THE COURT:  All right.  Mr. Levinson,

1    anything further?

2              MR. LEVINSON:  No, your Honor.

3              THE COURT:  All right.  Thank you.

4              (Proceedings concluded.)

5                      --oOo--

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBITS

18) My Wife's Skype Message

19) My Email to My Wife - Situation

20) Police Report (June 2013)

21) Email Exchange Between Me and my Wife - Last Apology

22) My Wife's Therapist Issues

23) Paranoid Personality Disorder - DSM

**NATALIE SKYPE COMMUNICATION**

She left home saying "I am going to get your money and I am not going to show you the baby"

Next day skype conversation:
[3/24/2013 8:01:49 AM] Natalia Eremeeva: Good morning
[3/24/2013 8:02:31 AM] Natalia Eremeeva: Cev, I love you and I missed you
[3/24/2013 8:02:42 AM] Natalia Eremeeva: Can you forgive me?
[3/24/2013 8:34:11 AM] Natalia Eremeeva: Can I come back?
[3/24/2013 11:55:52 AM] Cevdet Uruk: Are you allright?
[3/24/2013 11:56:09 AM] Natalia Eremeeva: I am and safe
[3/24/2013 11:56:37 AM] Cevdet Uruk: good
[3/24/2013 11:56:46 AM] Cevdet Uruk: you have food
[3/24/2013 11:56:51 AM] Cevdet Uruk: ?
[3/24/2013 11:56:54 AM] Natalia Eremeeva: Yes
[3/24/2013 11:57:05 AM] Cevdet Uruk: good
[3/24/2013 12:16:30 PM] Natalia Eremeeva: Can you forgive me? Can I come back?
[3/24/2013 12:30:38 PM] Natalia Eremeeva: Cev I want to correct things, I want to try to fix
even thou I am scared
[3/24/2013 12:31:27 PM] Natalia Eremeeva: It is easier for me to comeback now and bring
everything back then later
[3/24/2013 12:32:50 PM] Natalia Eremeeva: I have everything, I don't need anything and can
stay away as much as you want
[3/24/2013 12:33:30 PM] Natalia Eremeeva: But after 3 o'clock it will be more difficult for me to
return
[3/24/2013 12:34:31 PM] Natalia Eremeeva: Now it is much easier to turn things around
[3/24/2013 12:54:26 PM] Natalia Eremeeva: Cev, please respond
[3/24/2013 12:54:39 PM] Cevdet Uruk: i will
[3/24/2013 12:54:43 PM] Natalia Eremeeva: Let's work things together with Dottie and terrie
[3/24/2013 12:56:48 PM] Natalia Eremeeva: Dottie can couch me on how to be less emotional
[3/24/2013 1:33:07 PM] Cevdet Uruk: come back
[3/24/2013 1:36:30 PM] Cevdet Uruk: when are you coming back
[3/24/2013 1:36:44 PM] Cevdet Uruk: i need to go for hiking

 Gmail

Cevdet Uruk <cevdet.uruk@gmail.com>

## Situation

Cevdet Uruk <cevdet.uruk@gmail.com>
To: Natalie Uruk <natalie.uruk@gmail.com>

Thu, May 9, 2013 at 1:47 PM

Natalie,

I have tried to explain the importance of love, respect, trust, and intelligence even before we start.

1. Saying that "I am gonna get your money and I am not going to show you the baby"
2. Not knowing/learning the basics of hygiene (including using the same gloves for food and cleaning) and getting infections in your vagina, then using antibiotics and not thinking about the consequences on your and the baby's health.
3. Hitting me three times and then threatening me with domestic violence, police and prison, while I was trying to explain/teach you and I did not hit you.
4. Being emotional and fighting all the time and wasting your and my time and energy and hurting our health with your emotions/fights while we should be using that time and energy to build our life especially for the baby.
5. Being disgraceful to what you have been given/offered after you had almost died in a Moscow apartment (fell on the subway and fired and depressed) and saying that you are not happy here.
6. Choosing to leave in the middle of nowhere instead of taking a photo.
7. Choosing your ego over your life/future and baby.
8. Abusing my love towards you and the baby.
9. Not being able to look into my eyes while talking since you are not sincere or even lying.
10. Not learning. Even taking the simple driver test 3 times. Escaping from all the usuals of life, like a child, such as crying while giving blood sample, escaping from the dentist, crying after failing the driver test and not getting the job, not cleaning the bathtub properly after six months.
11. Saying that "I humiliate you" while I work hard to help you to become healthier, stronger and empowered.
12. Demanding apology and declaring that you are not going to forgive me for your emotions/fault after you had asked forgiveness and promised to control your emotions.

LACKS LOVE, RESPECT, TRUST AND INTELLIGENCE.

I don't think that I owe you anything. I already asked God's forgiveness for the baby. I can provide for her if I am healthy and not wasting my time and energy with your emotions and fights and I am not in prison.

I knew that you had some problems (from the first moment when you did not answer the call because I did not call you right away) and I thought I can manage and you can change. I was so desperate to love somebody. I failed again. I think your teeth, your vagina and your Bible (Cover of the book) are good representation of you.

I choose to live my life to honor myself, my God and hopefully my family with someone else. I don't have too much time. I don't want to see my baby suffering with your emotions, fights, infections and ego. I am going to miss the moments of love, sharing and not being lonely with you. I still think that you are a good heart.

We will talk.



**SANTA BARBARA PD**

**GENERAL OFFENSE HARDCOPY**

REPORT RELEASE

GO# SB 2013-44527 INACTIVE -CLOSED- OTHER     SC-11 SUSP CIRCS, VERBAL DOMESTIC

# Related Text Page(s)

Document: **GENERAL OFFENSE**

Author: **6377**

Related date/time: **Jun-21-2013  (Fri.) 1139**

On 6-21-13, at approximately 0930 hours, I was dispatched to 300 Loma Media Rd for a report of a domestic violence that occurred. Officer Chad Hunt arrived to assist.

Upon arrival I observed a white female, which appeared to be pregnant standing in the driveway of the residence crying. I contacted the female and identified her as Natalie Uruk. Uruk stated that she was in the kitchen attempting to open a jar of yogurt when her husband identified as Cevdet Uruk (Ben) began to yell at her and call her various names such as "you are stupid". Uruk explains that she and Ben began to argue, and Ben (during the argument) grabbed Uruk by the neck with both hands. Uruk stated that she then slapped the left side of Ben's face in attempt to have Ben remove his hands from her neck. Uruk said that Ben did remove his hands, and told her she had to leave the residence.

I did not observe any physical marks, abrasions or scratches that was consistent with a physical confrontation on Uruk. I did note that Uruk and Ben have been married for approximately 1 year and Uruk is 6 months pregnant.

I spoke with Ben at his front door. Ben was calm and cooperative in the investigation. I asked Ben if they are weapons in the house. Ben said that he has a revolver locked up in the house. I then asked Ben to explain to me what happened.

Ben stated that he and Uruk did get into a verbal argument. Ben did confirm that the initial argument was because Uruk was using a knife to pry off a lid to a screw cap yogurt. Ben said that the couple has many issues that causes them to argue. Ben mentions that Uruk often hits him, and the last occurrence happened a couple a weeks ago when Uruk hit him. Ben explains that during the argument, he attempted to calm Uruk down by gently placing his finger tips on her face and talking calmly to her. According to Ben, Uruk did not calm down, and in fact slapped Ben on his left cheek. Ben further explained that Uruk is extremely emotional, and "acts like a child". Ben proclaimed that he would never hit Uruk, and if he did not have a web conference with a client and family arriving today, he would have walked away.

There were no corresponding injuries to Ben from the apparent slap on his face.



**SANTA BARBARA PD**

**GENERAL OFFENSE HARDCOPY**

REPORT RELEASE

| GO# SB 2013-44527 INACTIVE -CLOSED- OTHER | SC-11 SUSP CIRCS, VERBAL DOMESTIC |

Both parties expressed that they did not want to press any charges on each other.

Uruk called a member from her church, and they came and picked her up to assist her with temporary living arrangements.

Uruk declined to speak with DVRT, and she was provided with their information.

There were no independent witnesses to the incident.

The incident was recorded (audio) by my vehicles MAV system. CSI was not conducted due to no physical evidence.

Due to the lack of physical evidence and witnesses, I was unable to identify a primary aggressor. Ben remained at the residence and Uruk left with a member from the church.

I recommend this report for documentation.

 **Gmail**

**Cevdet Uruk <cevdet.uruk@gmail.com>**

## Last Apology
6 messages

**Cevdet Uruk** <cevdet.uruk@gmail.com>
To: Natalie Uruk <natalie.uruk@gmail.com>

Sun, Apr 20, 2014 at 4:26 PM

Natalie,

Last summer, after staying out for a couple months in a place provided by charity, you came home. You also planned to
give birth to the baby at this place. You ate unhealthy food. You did not exercise. Before coming back, you said:

I am sorry.
Forgive me.
I made a mistake.
I took psychological counselling and I can see my mistakes.
I have been acting like this because of my Mom whose father was an alcoholic.
I have learned to act like this from my Mom.
I will not lie or twist facts.
I will be talking like Christ: yes or no. Nothing else.
I will look into your eyes while talking.
I will change.
I will work hard.
I submit to you unconditionally. (You have read the parts in Bible about the submission)

Could you please remember all these and accept, deny or add (if any more)?

**Natalie Uruk** <natalie.uruk@gmail.com>
To: Cevdet Uruk <cevdet.uruk@gmail.com>

Wed, Apr 23, 2014 at 3:26 PM

I remember that we had the talk but I do not remember what we had discussed
[Quoted text hidden]

**Cevdet Uruk** <cevdet.uruk@gmail.com>
To: Natalie Uruk <natalie.uruk@gmail.com>

Wed, Apr 23, 2014 at 3:27 PM

What are you talking about?

[Quoted text hidden]

**Natalie Uruk** <natalie.uruk@gmail.com>
To: Cevdet Uruk <cevdet.uruk@gmail.com>

Wed, Apr 23, 2014 at 3:28 PM

About your email
[Quoted text hidden]

**Cevdet Uruk** <cevdet.uruk@gmail.com>
To: Natalie Uruk <natalie.uruk@gmail.com>

Wed, Apr 23, 2014 at 3:29 PM

Are you lying or do you have a mental problem?

[Quoted text hidden]

**Natalie Uruk** <natalie.uruk@gmail.com>
To: Cevdet Uruk <cevdet.uruk@gmail.com>

Wed, Apr 23, 2014 at 3:30 PM

Stop offensing

[Quoted text hidden]

### Natalie Therapist Issues

1.Natalie says/agrees to something and later she doesn't remember. She denies. It needs to be explored if any brain injury or other mental issues involved or it is a behavior problem related to lying or twisting things to get her way. If the issue is written, she refuses to read it. You think that you resolved an issue (even in writing) then she starts acting like the resolution/nothing has never happened in a couple of days. When you ask if she forgot or she is lying, she takes it as an offense.

2.She keeps fighting with everybody: Husband, Mother, Father, Mother in Law. She does not let things go. She has to say the last word all the time. She wants to hurt people. She calls his father a jerk. She wants to take her husband's money and doesn't want to show the baby. She wants to kick someones' car who upset her.

3.Childish behavior: Continuously running nose. Continuously blinking eyes. No eye contact while talking.

4. She has an external locus of control. She doesn't take responsibility for her actions.

5. She has procrastination problem.

6. She is a good heart and a good wife. She loves her children.

7. Self destructive behavior: lying, eating unhealthy food, low standard of cleanliness/hygiene, incompetence laziness. She hides cookies. She does not clean dishes well. We all get sick. She does not take any responsibility.

8. I believe it is learned behavior/habits from her parents.

9. She is a sugar addict.

10. She fainted at the subway in Moscow and hospitalized. She denies it.

CASE REPORT

# Paranoid Personality Disorder

Amy Vyas, M.D.
Madiha Khan, M.D.

Since the time of Kraepelin, a pervasive and unwarranted mistrust of others has been considered a cardinal feature of paranoid personality disorder. Other features that have been described prominently in the literature as sensitivity to criticism, aggressiveness, rigidity, hypervigilance, and an excessive need for autonomy. We present the case of a patient with most of these classic characteristics that represent key components of the diagnostic criteria for paranoid personality disorder in the DSM-5 (Table 1).

## CASE

"Mr. J" is a 65-year-old Caucasian man with no prior psychiatric history, history of chronic obstructive pulmonary disease, and a benign vocal cord lesion. He was brought to the emergency department by police for concerns of psychosis and delusions. Records stated that the "patient is delusional, in a state of acute psychosis, easily agitated."

Upon initial contact with the emergency department psychiatrist, the patient reported feeling that the staff at the hospital were against him. He reported never having seen a psychiatrist before, although he reported having been on a selective serotonin reuptake inhibitor in the past to help equilibrate his "serotonin levels." He did not fully cooperate with the interview, was guarded and evasive, and often said, "You don't need to know." His mental status examination was notable for disorganized process and paranoid content. During the latter part of the assessment, the patient became loud, intrusive, and agitated. He pounded his cane on the ground and threw it to the floor in a threatening manner.

He requested discharge but would not elaborate on a safe discharge plan nor allow his family to be contacted. He declined voluntary inpatient hospitalization and threatened to sue the emergency department psychiatrist if he were to be involuntarily committed.

The patient was involuntarily admitted to the inpatient unit due to aggressive behavior and risk of harm to others. He remained at the hospital for 15 days. During the initial part of his stay, he was easily agitated, displayed verbal aggression, exhibited paranoia, and refused treatment. He would not engage in conversation with most team members, with the exception of a medical student on the team to whom he reported paranoid ideations about various family members and friends. He was suspicious and mistrustful of the treatment providers and mostly focused his conversations on legal issues. He claimed that he was being held in the hospital illegally and threatened to sue the providers for holding him against his will.

He reported being estranged from most of his family since his wife's death. He stated that his daughters "did not understand him." Very reluctantly, he gave permission for one of his daughters to be contacted. His daughter described him as always being an "eccentric and distrustful person." She described incidents in the past in which he had held beliefs about others "being against" him, resulting in isolation from friends and family. She described him as someone who "often held grudges and for a long time." She reported a chronic pattern of behavioral problems, aggression, strained relationships, and suspicious thinking. She also described his behavior as worsening recently. Additionally, the patient reported increasing use of cannabis and synthetic cannabinoids over the past few years; indeed,

**TABLE 1. DSM-5 Criteria for Paranoid Personality Disorder[a]**

**A. A pervasive distrust and suspiciousness of others such that their motives are interpreted as malevolent, beginning by early adulthood and present in a variety of contexts, as indicated by four (or more) of the following:**

1. Suspects, without sufficient basis, that others are exploiting, harming, or deceiving him or her.
2. Is preoccupied with unjustified doubts about the loyalty or trustworthiness of friends or associates.
3. Is reluctant to confide in others because of unwarranted fear that the information will be used maliciously against him or her.
4. Reads hidden demeaning or threatening meanings into benign remarks or events.
5. Persistently bears grudges (i.e., is unforgiving of insults, injuries, or slights).
6. Perceives attacks on his or her character or reputation that are not apparent to others and is quick to react angrily or to counterattack.
7. Has recurrent suspicions, without justification, regarding fidelity of spouse or sexual partner.

**B. Does not occur exclusively during the course of schizophrenia, a bipolar disorder or a depressive disorder with psychotic features, or another psychotic disorder and is not attributable to the physiological effects of another medical condition.**

[a] If criteria are met prior to the onset of schizophrenia, add "premorbid," i.e., "paranoid personality disorder (premorbid). Reprinted with permission from the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. (Copyright ©2013). American Psychiatric Association. All Rights Reserved.

EXHIBITS

24) My Sentencing Statement

25) Judge's Aggravating Factors

26) Mitigating Factors


28) Washington University Transcript

Dear Judge Carrezza

I hope I didn't give a wrong impression. I respect the courts, you, people, jury, system ... the verdict, women, and my wife.
I admit my mistakes and take responsibility. I am sorry for what happened.

There is a misunderstanding/error.

(if not the main)

Discrimination (race and sex) is a significant factor in conviction.

I am not a Muslim and I am not a representative of Turkish culture.

I am an American citizen. I was raised and educated in American institutions with American values. I attend church and I raise my children in Christian faith. They have American names.

My wife has some mental issues. She is not stable. She has called the police 6 times in 6 years with the similar false allegations ( choking, killing, threatening, beating, tossing, hitting, abuse), without any visible injury evidence. Each time she was the aggressor. Each time I wanted to separate. Each time, later admitted the mistakes, apologized, asked for forgiveness, after taking therapy. Each time she fixed things in a couple of weeks.

2.

Her statements are false and contradictory. She does
not understand the legal system and the consequences
of her actions. She thinks that it is like Russia
where you call the police to talk and nothing
will happen.

She thinks that Prosecutors are her attorney
in her marital disputes against me.

She was not Healthy when I met her. She fainted
at the subway, hospitalized, lost her job and
depressed I helped her to heal with healthy
diet and exercise.

She is a sugar addict. She has all her
teeth are decayed. Continuously running nose and
watery eyes resembles a 10 year old
child I don't know the technical definition
of her condition. But, I was looking for
help through professionals. I suspect paranoia &
schizophrenia. She was diagnised with chemical imbalance in her brain
On the day of the last incident we
went to the therapist together. Despite her
previous agreement to work together she
refused to cooperate. Later after my
arrest, she went to therapist and
admitted everything. I have been ____

3.

She is not a victim. She has a family, a beatiful home in a beatiful place, health, a good job. Her sister does not have any of these.

I am the victim. I left a good life-time employment in Turkey to become an American. I've got an MBA, CFA, CPA to become a CFO. I was a visiting professor in respectable American universities.

I put my wife's happiness first and left my career. I stayed home and take care of the kids.

Children are the biggest victim.

I worked very hard to be like you. There is nothing I can do if you don't like me and respect me as much as I like and respect you.

I admit my mistakes and I am sorry for those. But I did not chose or wanted to harm/hurt my wife. I love my family.

4

I respectfully ask your mercy and I want to go back to my family to raise my children to be like you.

The figure cut by the justice does not hurt but this is not Just and fair.

I was incompetant to understand the legal system. My initial offer was to get one felony and no jail time.

I declare under the rules of perjury.

Thank you,

Courdet "Ben" Clark

(e)   The reasons for selecting one of the three authorized prison terms referred to in
      section 1170(b) must be stated orally on the record.

*(Subd (e) amended effective May 23, 2007; previously amended and relettered
effective January 1, 1991; previously amended effective July 28, 1977, and January
1, 2007.)*

*Rule 4.420 amended effective January 1, 2008; adopted as rule 439 effective July 1, 1977;
previously amended and renumbered as rule 420 effective January 1, 1991; previously
renumbered effective January 1, 2001; previously amended effective July 28, 1977, January 1,
2007, and May 23, 2007.*

### Advisory Committee Comment

The determinate sentencing law authorizes the court to select any of the three possible prison
terms even though neither party has requested a particular term by formal motion or informal
argument. Section 1170(b) vests the court with discretion to impose any of the three authorized
prison terms and requires that the court state on the record the reasons for imposing that term.

It is not clear whether the reasons stated by the judge for selecting a particular term qualify as
"facts" for the purposes of the rule prohibition on dual use of facts. Until the issue is clarified,
judges should avoid the use of reasons that may constitute an impermissible dual use of facts. For
example, the court is not permitted to use a reason to impose a greater term if that reason also is
either (1) the same as an enhancement that will be imposed, or (2) an element of the crime. The
court should not use the same reason to impose a consecutive sentence as to impose an upper
term of imprisonment. (*People v. Avalos* (1984) 37 Cal.3d 216, 233.) It is not improper to use the
same reason to deny probation and to impose the upper term. (*People v. Bowen* (1992) 11
Cal.App.4th 102, 106.)

The rule makes it clear that a fact charged and found as an enhancement may, in the alternative,
be used as a factor in aggravation.

*People v. Riolo* (1983) 33 Cal.3d 223, 227 (and note 5 on 227) held that section 1170.1(a) does
not require the judgment to state the base term (upper, middle, or lower) and enhancements,
computed independently, on counts that are subject to automatic reduction under the one-third
formula of section 1170.1(a).

Even when sentencing is under section 1170.1, however, it is essential to determine the base term
and specific enhancements for each count independently, in order to know which is the principal
term count. The principal term count must be determined before any calculation is made using the
one-third formula for subordinate terms.

In addition, the base term (upper, middle, or lower) for each count must be determined to arrive at
an informed decision whether to make terms consecutive or concurrent; and the base term for
each count must be stated in the judgment when sentences are concurrent or are fully consecutive
(i.e., not subject to the one-third rule of section 1170.1(a)).

### Rule 4.421.  Circumstances in aggravation

59

Relevant criteria enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise.

*Rule 4.409 amended effective January 1, 2007; adopted as rule 409 effective July 1, 1977; previously renumbered effective January 1, 2001.*

**Advisory Committee Comment**

Relevant criteria are those applicable to the facts in the record of the case; not all criteria will be relevant to each case. The judge's duty is similar to the duty to consider the probation officer's report. Section 1203.

In deeming the sentencing judge to have considered relevant criteria, the rule applies the presumption of Evidence Code section 664 that official duty has been regularly performed. See *People v. Moran* (1970) 1 Cal.3d 755 (trial court presumed to have considered referring eligible defendant to California Youth Authority in absence of any showing to the contrary, citing Evidence Code section 664).

### Rule 4.410.  General objectives in sentencing

**(a)   General objectives of sentencing include:**

 (1)   Protecting society;

(2)   Punishing the defendant;

(3)   Encouraging the defendant to lead a law-abiding life in the future and deterring him or her from future offenses;

 (4)   Deterring others from criminal conduct by demonstrating its consequences;

(5)   Preventing the defendant from committing new crimes by isolating him or her for the period of incarceration;

(6)   Securing restitution for the victims of crime; and

(7)   Achieving uniformity in sentencing.

*(Subd (a) amended effective January 1, 2007; previously amended effective July 1, 2003.)*

**(b)**   Because in some instances these objectives may suggest inconsistent dispositions, the sentencing judge must consider which objectives are of primary importance in the particular case. The sentencing judge should be guided by statutory statements of policy, the criteria in these rules, and the facts and circumstances of the case.

46

Circumstances in aggravation include factors relating to the crime and factors relating to the defendant.

**(a)    Factors relating to the crime**

Factors relating to the crime, whether or not charged or chargeable as enhancements include that:



(1)    The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness;

(2)    The defendant was armed with or used a weapon at the time of the commission of the crime;

(3)    The victim was particularly vulnerable;

(4)    The defendant induced others to participate in the commission of the crime or occupied a position of leadership or dominance of other participants in its commission;

(5)    The defendant induced a minor to commit or assist in the commission of the crime;

(6)    The defendant threatened witnesses, unlawfully prevented or dissuaded witnesses from testifying, suborned perjury, or in any other way illegally interfered with the judicial process;

(7)    The defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed;

(8)    The manner in which the crime was carried out indicates planning, sophistication, or professionalism;

(9)    The crime involved an attempted or actual taking or damage of great monetary value;

(10)    The crime involved a large quantity of contraband; and

(11)    The defendant took advantage of a position of trust or confidence to commit the offense.

(12)    The crime constitutes a hate crime under section 422.55 and:

(A)    No hate crime enhancements under section 422.75 are imposed; and

60

  (B) The crime is not subject to sentencing under section 1170.8.

*(Subd (a) amended effective May 23, 2007; previously amended effective January 1, 1991, and January 1, 2007.)*

**(b) Factors relating to the defendant**

  Factors relating to the defendant include that:

  (1) The defendant has engaged in violent conduct that indicates a serious danger to society;

  (2) The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness;

  (3) The defendant has served a prior prison term;

  (4) The defendant was on probation or parole when the crime was committed; and

  (5) The defendant's prior performance on probation or parole was unsatisfactory.

*(Subd (b) amended effective May 23, 2007; previously amended effective January 1, 1991, and January 1, 2007.)*

**(c) Other factors**

  Any other factors statutorily declared to be circumstances in aggravation.

*(Subd (c) amended effective May 23, 2007; adopted effective January 1, 1991; previously amended effective January 1, 2007.)*

*Rule 4.421 amended effective May 23, 2007; adopted as rule 421 effective July 1, 1977; previously renumbered effective January 1, 2001; previously amended effective January 1, 1991, and January 1, 2007.*

### Advisory Committee Comment

Circumstances in aggravation may justify imposition of the upper of three possible prison terms. (Section 1170(b).)

The list of circumstances in aggravation includes some facts that, if charged and found, may be used to enhance the sentence. The rule does not deal with the dual use of the facts; the statutory prohibition against dual use is included, in part, in rule 4.420.

61

Conversely, such facts as infliction of bodily harm, being armed with or using a weapon, and a taking or loss of great value may be circumstances in aggravation even if not meeting the statutory definitions for enhancements.

Facts concerning the defendant's prior record and personal history may be considered. By providing that the defendant's prior record and simultaneous convictions of other offenses may not be used both for enhancement and in aggravation, section 1170(b) indicates that these and other facts extrinsic to the commission of the crime may be considered in aggravation in appropriate cases. This resolves whatever ambiguity may arise from the phrase "circumstances in aggravation . . . of the crime." The phrase "circumstances in aggravation or mitigation of the crime" necessarily alludes to extrinsic facts.

Refusal to consider the personal characteristics of the defendant in imposing sentence would also raise serious constitutional questions. The California Supreme Court has held that sentencing decisions must take into account "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society." *In re Rodriguez* (1975) 14 Cal.3d 639, 654, quoting *In re Lynch* (1972) 8 Cal.3d 410, 425. In *In re Rodriguez* the court released petitioner from further incarceration because "[I]t appears that neither the circumstances of his offense *nor his personal characteristics* establish a danger to society sufficient to justify such a prolonged period of imprisonment." (*Id.* at 655.) (Footnote omitted, emphasis added.) "For the determination of sentences, justice generally requires . . . that there be taken into account the circumstances of the offense together with the character and propensities of the offender." (*Pennsylvania v. Ashe* (1937) 302 U.S. 51, 55, quoted with approval in *Gregg v. Georgia* (1976) 428 U.S. 153, 189.)

The scope of "circumstances in aggravation or mitigation" under section 1170(b) is, therefore, coextensive with the scope of inquiry under the similar phrase in section 1203.

The 1990 amendments to this rule and the comment included the deletion of most section numbers. These changes recognize changing statutory section numbers and the fact that there are numerous additional code sections related to the rule, including numerous statutory enhancements enacted since the rule was originally adopted.

Former subdivision (a)(4), concerning multiple victims, was deleted to avoid confusion; cases in which that possible circumstance in aggravation was relied on were frequently reversed on appeal because there was only a single victim in a particular count.

Old age or youth of the victim may be circumstances in aggravation; see section 1170.85(b). Other statutory circumstances in aggravation are listed, for example, in sections 1170.7, 1170.71, 1170.75, 1170.8, and 1170.85.

### Rule 4.423. Circumstances in mitigation

Circumstances in mitigation include factors relating to the crime and factors relating to the defendant.

**(a)    Factors relating to the crime**

Factors relating to the crime include that:

(1)    The defendant was a passive participant or played a minor role in the crime;

(2)    The victim was an initiator of, willing participant in, or aggressor or provoker of the incident;

(3)    The crime was committed because of an unusual circumstance, such as great provocation, that is unlikely to recur;

(4)    The defendant participated in the crime under circumstances of coercion or duress, or the criminal conduct was partially excusable for some other reason not amounting to a defense;

(5)    The defendant, with no apparent predisposition to do so, was induced by others to participate in the crime;

(6)    The defendant exercised caution to avoid harm to persons or damage to property, or the amounts of money or property taken were deliberately small, or no harm was done or threatened against the victim;

(7)    The defendant believed that he or she had a claim or right to the property taken, or for other reasons mistakenly believed that the conduct was legal;

(8)    The defendant was motivated by a desire to provide necessities for his or her family or self; and

(9)    The defendant suffered from repeated or continuous physical, sexual, or psychological abuse inflicted by the victim of the crime, and the victim of the crime, who inflicted the abuse, was the defendant's spouse, intimate cohabitant, or parent of the defendant's child; and the abuse does not amount to a defense.

*(Subd (a) amended effective May 23, 2007; previously amended effective January 1, 1991, July 1, 1993, and January 1, 2007.)*

**(b)    Factors relating to the defendant**

Factors relating to the defendant include that:

(1)    The defendant has no prior record, or has an insignificant record of criminal conduct, considering the recency and frequency of prior crimes;

(2)    The defendant was suffering from a mental or physical condition that significantly reduced culpability for the crime;

(3)    The defendant voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process;

63

(4)    The defendant is ineligible for probation and but for that ineligibility would have been granted probation;

(5)    The defendant made restitution to the victim; and

(6)    The defendant's prior performance on probation or parole was satisfactory.

*(Subd (b) amended effective May 23, 2007; previously amended effective January 1, 1991, and January 1, 2007.)*

*Rule 4.423 amended effective May 23, 2007; adopted as rule 423 effective July 1, 1977; previously renumbered effective January 1, 2001; previously amended effective January 1, 1991, July 1, 1993, and January 1, 2007.*

### Advisory Committee Comment

See comment to rule 4.421.

This rule applies both to mitigation for purposes of motions under section 1170(b) and to circumstances in mitigation justifying the court in striking the additional punishment provided for an enhancement.

Some listed circumstances can never apply to certain enhancements; for example, "the amounts taken were deliberately small" can never apply to an excessive taking under section 12022.6, and "no harm was done" can never apply to infliction of great bodily injury under section 12022.7. In any case, only the facts present may be considered for their possible effect in mitigation.

See also rule 4.409; only relevant criteria need be considered.

Since only the fact of restitution is considered relevant to mitigation, no reference to the defendant's financial ability is needed. The omission of a comparable factor from rule 4.421 as a circumstance in aggravation is deliberate.

### Rule 4.424.  Consideration of applicability of section 654

Before determining whether to impose either concurrent or consecutive sentences on all counts on which the defendant was convicted, the court must determine whether the proscription in section 654 against multiple punishments for the same act or omission requires a stay of execution of the sentence imposed on some of the counts.

*Rule 4.424 amended effective January 1, 2011; adopted as rule 424 effective January 1, 1991; previously renumbered effective January 1, 2001; previously amended effective January 1, 2007.*

### Rule 4.425.  Criteria affecting concurrent or consecutive sentences

Criteria affecting the decision to impose consecutive rather than concurrent sentences include:

64

Washington University in St.Louis
Office of the University Registrar

Page 2 of 2

Record Of: **Uruk, Cevdet**
Student ID Number: 90407
Social Security No: 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

**Summer Semester 1997**

| | | | | |
|---|---|---|---|---|
| INTERNATNL BUSINESS:A EURO PERSPECIVE | MGT | B63 518 | 3.0 | A |

    Enrolled Units 6.0    Semester GPA 2.00    Cumulative Units 48.0    Cumulative GPA 1.66

**Fall Semester 1997**

| | | | | |
|---|---|---|---|---|
| MANAGERIAL CONTROL SYSTEMS | ACCT | B60 502 | 1.5 | A |
| BUSINESS ANALYSIS USING FINANCIAL STATEMENTS | ACCT | B60 5660 | 3.0 | A |
| FEDERAL INCOME TAXES | ACCT | B60 567 | 3.0 | A |
| MERGERS AND ACQUISITIONS | FIN | B62 523B | 1.5 | A |
| INVESTMENTS PRAXIS | FIN | B62 528 | 3.0 | A |
| MANAGING INVESTMENTS | FIN | B62 543Q | 3.0 | A |
| SPECIAL TOPICS:  FINANCIAL INSTITUTIONS | FIN | B62 549D | 1.5 | A |
| SPECIAL TOPICS:  INVESTMENT BANKING | FIN | B62 549F | 1.5 | A- |

    Enrolled Units 18.0    Semester GPA 1.98    Cumulative Units 66.0    Cumulative GPA 1.76

**Spring Semester 1998**

| | | | | |
|---|---|---|---|---|
| LAW & BUSINESS MANAGEMENT | MGT | B63 511 | 3.0 | A- |
| STRATEGIC MANAGEMENT | MGT | B63 5302 | 2.0 | A |

    Enrolled Units 5.0    Semester GPA 1.82    Cumulative Units 71.0    Cumulative GPA 1.77

    ************************************* END OF TRANSCRIPT *****************************************

This transcript of record is official if it bears the signature of the registrar on a green background with the name of the university in white type across the face of the document. A raised seal is not required.

Susan E. Hosack, University Registrar

**Washington University in St. Louis**
Office of the University Registrar
One Brookings Drive, Campus Box 1143, St. Louis, MO 63130-4899  Telephone: 314-935-5959

**Transcript Nomenclature**

Transcripts issued by Washington University are a complete and comprehensive record of all classes taken unless otherwise indicated. Each page of the transcript begins with the student's name and Washington University student identification number. Transcript entries on the last page end with a line across the page indicating no further entries below this line

The courses in which the student enrolled while at Washington University are listed in chronological order by semester. Each course is listed on a separate line beginning with the course title followed by the academic department abbreviation, course number, credit hours, and grade.

Honors, awards, administrative actions, and transfer credit are listed at the end of the document under "Distinctions, Prizes and Awards" and "Remarks".

**Course Numbering System**

In general course numbers indicate the following academic levels: Courses 100-199 = freshman; 200-299 = sophomore; 300-399 = junior; 400-500 = senior and graduate level; 501 and above primarily for graduate students.

**Unit of Credit**

Most schools at Washington University follow a fifteen-week semester calendar where the value of one unit of credit is equal to one hour of instruction. The minimum full-time load for undergraduates is generally twelve credit hours and nine credit hours for graduate students during the fall and spring semesters. Some graduate programs in Medicine, Law, and Business follow a one-year academic calendar. The Doctor of Medicine program uses clock hours instead of credit hours.

**Degrees Awarded and Programs of Study**

Degrees conferred by Washington University and current programs of study appear on the first page of the transcript. The Degrees Awarded notation lists the date of award, the specific degree(s) awarded and the major field(s) of study.

**Academic and Disciplinary Notations**

Probation: Academic probation occurs when in the judgment of the school and the faculty the student's work is of unsatisfactory quality. A student may also be placed on probation following a ruling of the Judicial Administrator and/or other University judicial bodies for misconduct.

Suspension: A student may be suspended from student status if the student's work is of unsatisfactory quality, or for misconduct, and not permitted to register.

Expulsion: This action constitutes the permanent removal from student status at the University.

**Grading Systems**

Most schools within Washington University follow the grading and point value system indicated in the Standard column below. However, each school may elect to use unique grading options. Similarly, not all schools at the University choose to display GPA information on the transcript. Cumulative GPA and unit totals may not fully describe the status of students enrolled in dual degree programs of study, particularly those involving schools which use different grading scales. Consult the specific school or program at Washington University for additional information.

### Washington University Grading Systems

|  | Grades | Standard Points | Engineering Pts (before FL2010) | Social Work (before FL09) | Social Work (since FL09) | MBA Points (where applicable) (GB before Fall 1998) | MBA Points (GB since Fall 1998) |
|---|---|---|---|---|---|---|---|
| Superior | A+/A | 4.0 | 4.0 | 3.0 | 4.0* | 2.0 | 4.0 |
|  | A- | 3.7 | 4.0 | 2.7 | 3.7 | 1.7 | 3.7 |
|  | B+ | 3.3 | 3.0 | 2.3 | 3.3 | 1.3 | 3.3 |
| Good | B | 3.0 | 3.0 | 2.0 | 3.0 | 1.0 | 3.0 |
|  | B- | 2.7 | 3.0 | 1.7 | 2.7 | 0.7 | 2.7 |
|  | C+ | 2.3 | 2.0 | 1.3 | 2.3 | 0.3 | 2.3 |
| Average | C | 2.0 | 2.0 | 1.0 | 2.0 | 0.0 | 2.0 |
|  | C- | 1.7 | 2.0 | 0.7 | 1.7 |  | 1.7 |
|  | D+ | 1.3 | 1.0 | 0.0 | 0.0 |  |  |
| Passing | D | 1.0 | 1.0 |  | 0.0 |  |  |
|  | D- | 0.7 | 1.0 |  | 0.0 |  |  |
| Failing | F | 0.0 | 0.0 |  | 0.0 |  |  |

**Additional Grading Information:**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| P/P# | Pass | L | Successful Audit | H | Honors | S | Satisfactory | I | Incomplete | R | Course Repeated |
| F/F# | Fail | Z | Unsuccessful Audit | HP | High Pass | IP | In Progress | N | No Grade Reported | W | Withdrawal |
| CR/CR# | Credit (Pass) | | | LP | Low Pass | U | Unsatisfactory | X | No Exam Taken | | |
| NC/NCR/NCR# | No Credit (Fail) | | | NP | No Pass | E | Unusually High Distinction | | | | |

School of Law: Please use the attached explanation of School of Law grading system.

(revised 8/2016)

1264306-040918

**TO TEST FOR AUTHENTICITY**: Translucent icons of a globe MUST appear when held toward a light source. The face of this transcript is printed on green SCRIP-SAFE® paper with the name of the institution appearing in white type over the face of the entire document:

WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON UNIVERSITY • WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON

**ADDITIONAL TESTS**: The institutional name and the word COPY appear on alternate rows as a latent image. When this paper is touched by fresh liquid bleach, an authentic document will stain. A black and white or color copy of this document is not an original and should not be accepted as an official institutional document. This document cannot be released to a third party without the written consent of the student. This is in accordance with the Family Educational Rights and Privacy Act of 1974. If you have any questions about this document, please contact our office at (314) 935-5959. ALTERATION OF THIS DOCUMENT MAY BE A CRIMINAL OFFENSE.

16226-18                                                                    SCRIP-SAFE® Security Products, Inc. Cincinnati, OH

# Washington University in St. Louis

Office of the University Registrar

Page 1 of 2

Record Of: **Uruk, Cevdet**

Student ID Number: 90407

Social Security No: 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

Degrees Awarded:

MASTER OF BUSINESS ADMINISTRATION          MAY 15, 1998

Transcript Issued 02/04/2020 To:

CALIFORNIA CORRECTIONAL INSTITUTION
EDUCATION DEPARTMENT
P.O. BOX 1031
TEHACHAPI, CA  93581

**Summer Semester 1996**

| | | | | |
|---|---|---|---|---|
| ENGLISH FOR INTERNATIONAL STUDENTS | ESL | U15 125 | 8.0 | P# |

Enrolled Units 8.0    Semester GPA 0    Cumulative Units 8.0    Cumulative GPA 0

**Fall Semester 1996**

| | | | | |
|---|---|---|---|---|
| INTRODUCTION TO FINANCIAL ACCOUNTING | ACCT | B60 5001 | 1.5 | A |
| FINANCE I | FIN | B62 5201 | 1.5 | A |
| INTRODUCTION TO MANAGEMENT AND STRATEGY | MGT | B63 5301 | 1.5 | B+ |
| PROFESSIONAL DEVELOPMENT PLANNING | MGT | B63 532 | 0.5 | P |
| MANAGERIAL DECISION MAKING I | MEC | B64 5402 | 1.5 | A- |
| MANAGERIAL DECISION MAKING II | MEC | B64 5403 | 1.5 | B+ |
| MANAGERIAL STATISTICS | MEC | B64 5410 | 2.0 | A |
| MARKETING ANALYSIS | MKT | B65 5501 | 1.5 | B+ |
| ORGANIZATIONAL BEHAVIOR | OB | B66 5601 | 1.5 | B |
| ORGANIZATIONAL DESIGN | OB | B66 5602 | 1.5 | B |
| OPERATIONS POLICY AND STRATEGY | OMM | B67 5701 | 1.5 | A- |

Enrolled Units 16.0    Semester GPA 1.55    Cumulative Units 24.0    Cumulative GPA 1.55

**Spring Semester 1997**

| | | | | |
|---|---|---|---|---|
| STRATEGIC COST ANALYSIS | ACCT | B60 5002 | 1.5 | A- |
| INTRODUCTION TO FINANCIAL ACCOUNTING II | ACCT | B60 501 | 1.5 | A+ |
| MANAGERIAL CONTROL SYSTEMS | ACCT | B60 502 | 1.5 | W |
| FINANCE II | FIN | B62 5202 | 1.5 | A- |
| CASES IN CORPORATE FINANCE | FIN | B62 523 | 1.5 | A |
| OPTIONS AND FUTURES | FIN | B62 524 | 1.5 | B+ |
| DERIVATIVE SECURITIES | FIN | B62 524B | 1.5 | A- |
| FINANCIAL MARKETS | FIN | B62 527 | 1.5 | A |
| MARKETING POLICY | MKT | B65 5502 | 1.5 | B+ |
| OPERATIONS ANALYSIS | OMM | B67 5702 | 1.5 | B |
| MANAGEMENT SCIENCE I | OMM | B67 5703 | 1.5 | A- |
| PRONUNCIATION & ACCENT REDUCTION | ESL | U15 1402 | 2.0 | P |
| AMERICAN IDIOMS AND SLANG | ESL | U15 1403 | 1.0 | P |

Enrolled Units 18.0    Semester GPA 1.64    Cumulative Units 42.0    Cumulative GPA 1.59

**Summer Semester 1997**

| | | | | |
|---|---|---|---|---|
| INTERNATIONAL ECONOMICS & FINANCE | FIN | B62 520 | 3.0 | A |

*MBA Grad*

RECEIVED
2/4/2022
BK 0724

This transcript of record is official if it bears the signature of the registrar on a green background with the name of the university in white type across the face of the document. A raised seal is not required.

Susan E. Hosack, University Registrar

ISSUED IN ACCORDANCE WITH THE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT OF 1974 (BUCKLEY AMENDMENT)



**Washington University in St. Louis**
Office of the University Registrar
One Brookings Drive, Campus Box 1143, St. Louis, MO 63130-4899  Telephone: 314-935-5959

ILB:4dde25ab-0715-4712-bdde-2e2a722f9349

### Transcript Nomenclature
Transcripts issued by Washington University begins with the student's name and indicating no further entries below th...  ...less otherwise indicated. Each page of the transcript ...es on the last page end with a line across the page

The courses in which the student en... beginning with the course title follow...  ...y semester. Each course is listed on a separate line ...rs, and grade.

Honors, awards, administrative actions... and transfer credit are listed at the end of the document under "Distinctions, Prizes and Awards" and "Remarks".

### Course Numbering System
In general course numbers indicate the following academic levels: Courses 100-199 = freshman; 200-299 = sophomore; 300-399 = junior; 400-500 = senior and graduate level; 501 and above primarily for graduate students.

### Unit of Credit
Most schools at Washington University follow a fifteen-week semester calendar where the value of one unit of credit is equal to one hour of instruction.  The minimum full-time load for undergraduates is generally twelve credit hours and nine credit hours for graduate students during the fall and spring semesters.  Some graduate programs in Medicine, Law, and Business follow a one-year academic calendar.  The Doctor of Medicine program uses clock hours instead of credit hours.

### Degrees Awarded and Programs of Study
Degrees conferred by Washington University and current programs of study appear on the first page of the transcript. The Degrees Awarded notation lists the date of award, the specific degree(s) awarded and the major field(s) of study.

### Academic and Disciplinary Notations
Probation: Academic probation occurs when in the judgment of the school and the faculty the student's work is of unsatisfactory quality.  A student may also be placed on probation following a ruling of the Judicial Administrator and/or other University Judicial bodies for misconduct.

Suspension: A student may be suspended from student status if the student's work is of unsatisfactory quality, or for misconduct, and not permitted to register.

Expulsion: This action constitutes the permanent removal from student status at the University.

### Grading Systems
Most schools within Washington University follow the grading and point value system indicated in the Standard column below.  However, each school may elect to use unique grading options. Similarly, not all schools at the University choose to display GPA information on the transcript. Cumulative GPA and unit totals may not fully describe the status of students enrolled in dual degree programs of study, particularly those involving schools which use different grading scales.  Consult the specific school or program at Washington University for additional information.

#### Washington University Grading Systems

| | Grades | Standard Points | Engineering Pts (before FL2010) | Social Work (before FL08) | Social Work (since FL08) | MBA Points (where applicable) (GB before Fall 1998) | MBA Points (GB since Fall 1998) |
|---|---|---|---|---|---|---|---|
| Superior | A+, A | 4.0 | 4.0 | 3.0 | 4.0 | 2.0 | 4.0 |
| | A- | 3.7 | 4.0 | 2.7 | 3.7 | 1.7 | 3.7 |
| | B+ | 3.3 | 3.0 | 2.3 | 3.3 | 1.3 | 3.3 |
| Good | B | 3.0 | 3.0 | 2.0 | 3.0 | 1.0 | 3.0 |
| | B- | 2.7 | 3.0 | 1.7 | 2.7 | 0.7 | 2.7 |
| | C+ | 2.3 | 2.0 | 1.3 | 2.3 | 0.3 | 2.3 |
| Average | C | 2.0 | 2.0 | 1.0 | 2.0 | 0.0 | 2.0 |
| | C- | 1.7 | 2.0 | 0.7 | 1.7 | | 1.7 |
| | D+ | 1.3 | 1.0 | 0.0 | 0.0 | | |
| Passing | D | 1.0 | 1.0 | | 0.0 | | |
| | D- | 0.7 | 1.0 | | 0.0 | | |
| Failing | F | 0.0 | 0.0 | | 0.0 | | |

SCANNED FEB 19 2020   FEB 19 2020

### Additional Grading Information:

| | | | | | |
|---|---|---|---|---|---|
| P/P# | Pass | L | Successful Audit | H | Honors |
| F/F# | Fail | Z | Unsuccessful Audit | HP | High Pass |
| CR/CR# | Credit (Pass) | | | LP | Low Pass |
| NC/NCR/NCR# | No Credit (Fail) | | | NP | No Pass |

| S | Satisfactory | I | Incomplete | R | Course Repeated |
|---|---|---|---|---|---|
| IP | In Progress | N | No Grade Reported | W | Withdrawal |
| U | Unsatisfactory | X | No Exam Taken | | |
| E | Unusually High Distinction | | | | |

School of Law: Please use the attached explanation of School of Law grading system.

(revised 8/2016)                    1264305-040918

TO TEST FOR AUTHENTICITY. Translucent icons of a globe MUST appear when held toward a light source.  The face of this transcript is printed on green SCRIP-SAFE® paper with the name of the institution appearing in white type over the face of the entire document.

WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON UNIVERSITY IN ST. LOUIS • WASHINGTON

ADDITIONAL TESTS. The institutional name and the word COPY appear on alternate rows as a latent image. When this paper is touched by fresh liquid bleach, an authentic document will stain. A black and white or color copy of this document is not an original and should not be accepted as an official institutional document. This document cannot be released to a third party without the written consent of the student. This is in accordance with the Family Educational Rights and Privacy Act of 1974.  If you have any questions about this document, please contact our office at (314) 935-5959.  ALTERATION OF THIS DOCUMENT MAY BE A CRIMINAL OFFENSE!

SCRIP-SAFE® Security Products, Inc. Cincinnati, OH

Exhibits (2)

29) Habeas Corpus Petition Form (Superior Court)
30) Denial Order (Superior Court)
31) Habeas Corpus Petition Form (Court of Appeal)
32) Denial Order (Court of Appeal)
33) CA Supreme Court Review Denial
34) Habeas Corpus Petition (Superior Court 2)
35) Denial Order (Superior Court)
36) Textbook Page on Testimonial Hearsay
37) Reporter's (Trial) Transcript (2)
38) My Letter to the Appellate Attorney
39) Court of Appeal Direct Appeal Ruling
40) Statements to the Police (2014)
41) 911 Call (2018)
42) 911 Call (2014)
43) Habeas Corpus Petition Form (Court of Appeal) 2
44) Denial Order (Court of Appeal) 2
45) Appellant's Opening Brief
46) Petition for Review

HC-001

Name: **Cevdet Uruk**

Address: **CCI**
**D4-15U**
**PO Box 608**
**Tehachapi, CA 93581**

CDC or ID Number: **BK0724**

IN THE SUPERIOR COURT
OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF SANTA BARBARA

*(Court)*

**Cevdet Uruk**

Petitioner

vs.

**J. W. Sullivan, Warden**

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the superior court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the superior court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the superior court, you only need to file the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal in paper form and you are an attorney, file the original and 4 copies of the petition and, if separately bound, 1 set of any supporting documents (unless the court orders otherwise by local rule or in a specific case). If you are filing this petition in the Court of Appeal electronically and you are an attorney, follow the requirements of the local rules of court for electronically filed documents. If you are filing this petition in the Court of Appeal and you are *not* represented by an attorney, file the original and one set of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, an original and 2 copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2007). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 6

Form Approved for Optional Use
Judicial Council of California
HC-001 [Rev. September 1, 2018]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
*www.courts.ca.gov*

HC-001

**This petition concerns:**

[X] A conviction                    [ ] Parole

[X] A sentence                      [ ] Credits

[ ] Jail or prison conditions       [ ] Prison discipline

[ ] Other *(specify):* _____

1. Your name: _____ Cevdet Uruk _____

2. Where are you incarcerated? California Correctional Institution

3. Why are you in custody? [X] Criminal conviction    [ ] Civil commitment

   *Answer items a through i to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").
   Dissuading a Witness, Corporal Injury, Assult by Means of Likely GBI, False Imprisonment (Felonies)
   Domestic Violance Contempt of Court, Battery, Probation Violation (Misdemeanors)

   b. Penal or other code sections: 136.1(b)(1), 273.5(a), 245(a)(4), 236, 166(c)1, 243e1

   c. Name and location of sentencing or committing court:
   Superior Court of the State of California
   County of Santa Barbara
   Santa Barbara

   d. Case number: 18CR02248 + 1471799

   e. Date convicted or committed: 06/27/2019

   f. Date sentenced: _____ 08/05/2019

   g. Length of sentence: _____ 11 years and 8 months

   h. When do you expect to be released? __ 07/28/2023

   i. Were you represented by counsel in the trial court? [X] Yes  [ ] No   *If yes, state the attorney's name and address:*
   Neil Levinson
   1933 Cliff Dr. Santa Barbara, CA 93109

4. What was the LAST plea you entered? *(Check one):*

   [X] Not guilty  [ ] Guilty  [ ] Nolo contendere  [ ] Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   [X] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

HC-001

6.  **GROUNDS FOR RELIEF**
    **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "The trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page 4. For additional grounds, make copies of page 4 and number the additional grounds in order.)*

    See attached

    a.  Supporting facts:
        Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts on which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel, you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is, *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

        See attached

    b.  Supporting cases, rules, or other authority *(optional)*:
        (Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

        See attached

HC-001

7. **Ground 2 or Ground** _____ *(if applicable)*:

_____

_____

_____

_____

_____

_____

_____

a. Supporting facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority:

_____

_____

_____

_____

_____

_____

_____

HC-001

8. Did you appeal from the conviction, sentence, or commitment? [X] Yes  [ ] No    If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Division of Superior Court"):

_Court of Appeal_

b. Result: _Pending_                                            c. Date of decision: _____

d. Case number or citation of opinion, if known: _B299732_

e. Issues raised: (1) Appellant was prejudiced by the exclusion of Jane Doe's inconsistent statements.

(2) The principle term of Appellant's sentence was unlawful because the court relied on an inapplicable penalty scheme.

(3) Appellant's sentence for false imprisonment and battery must be stayed pursuant to Section 654.

f. Were you represented by counsel on appeal? [X] Yes  [ ] No  If yes, state the attorney's name and address, if known:

Robert Hernandez
530 E. Los Angeles Ave. #115-207, Moorpark, CA 93021

9. Did you seek review in the California Supreme Court? [ ] Yes  [ ] No    If yes, give the following information:

a. Result: _____                          b. Date of decision: _____

c. Case number or citation of opinion, if known: _____

d. Issues raised: (1) _____

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

Factual bases for the claims rest on the evidence not on the record.

11. Administrative review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500.) Explain what administrative review you sought or explain why you did not seek such review:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

b. Did you seek the highest level of administrative review available?  [ ] Yes  [ ] No
*Attach documents that show you have exhausted your administrative remedies.*

HC-001

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or
    issue in any court?        ☐ Yes  If yes, continue with number 13.        ☒ No    If no, skip to number 15.

13 a.  (1)  Name of court: _____

   (2)  Nature of proceeding (for example, "habeas corpus petition"): _____

   (3)  Issues raised:  (a) _____

                        (b) _____

   (4)  Result (attach order or explain why unavailable): _____

   (5)  Date of decision: _____

   b.  (1)  Name of court: _____

   (2)  Nature of proceeding: _____

   (3)  Issues raised:  (a) _____

                        (b) _____

   (4)  Result *(attach order or explain why unavailable)*: _____

   (5)  Date of decision: _____

   c.  *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____
_____
_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949)
    34 Cal.2d 300, 304.)

_____
_____
_____

16. Are you presently represented by counsel?   ☐ Yes   ☐ No    If yes, state the attorney's name and address, if known:

_____
_____

17. Do you have any petition, appeal, or other matter pending in any court?   ☒ Yes   ☐ No    If yes, explain:
    Court of Appeal. Direct appeal is pending.
_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____
_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that
the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as
to those matters, I believe them to be true.

Date: __08/20/2020__                        ▶ _____
                                                       (SIGNATURE OF PETITIONER)

**FILED**
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

NOV 1 6 2020

Darrel E. Parker, Executive Officer
BY _____
Todd Hauenstein, Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SANTA BARBARA

| | |
|---|---|
| Cevdet Uruk,<br><br>                        Petitioner,<br><br>vs.<br><br>J.W. Sullivan, Warden, California<br>Correctional Institution,<br><br>                        Respondent. | Case No. 20CR06321<br><br>ORDER DISMISSING PETITION<br>FOR WRIT OF HABEAS CORPUS |

Petitioner Cevdek Uruk filed his petition for writ of habeas corpus on September 9, 2020. For reasons stated below, the court dismisses the petition.

A jury convicted Cevdet Uruk of corporal injury to a spouse (Penal Code § 273.5(a)[1]), dissuading a witness (§ 136.1(b)(1)), assault with force likely to cause great bodily injury (§ 245,(a)(4)), contempt of court (§ 166(c)(1)), battery (§ 243(e)(1)), and false imprisonment (§ 236). The trial court found true an allegation that Uruk had suffered a prior domestic violence conviction (§ 273.5(f)(1)), and sentenced him to 10 years eight months in state

In his petition, petitioner challenges his conviction based on the ineffective assistance of trial and appellate counsel. Petitioner's appeal of the judgment is pending, specifically a petition

---

[1] All statutory references are to the Penal Code.

1

for review in the Supreme Court. A trial court "has jurisdiction to hear a writ of habeas corpus while an appeal of the challenged judgment is pending, so long as the exercise of that jurisdiction does not interfere with the appellate jurisdiction in the pending matter. *People v. Scarbrough*, 240 Cal.App.4th 916, 924 (2015) [internal quotation and citation omitted]. The relief requested would interfere with appellate jurisdiction. Therefore, this court lacks jurisdiction and must be dismissed.

For the foregoing reasons, the court dismisses petitioner Cevdek Uruk's petition for writ of habeas corpus.

Dated: 11/16/20

Hon. Brian Hill
Judge of the Superior Court

2

| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA** | *FOR COURT USE ONLY* |
|---|---|
| STREET ADDRESS: 118 E. Figueroa Street<br>CITY AND ZIP CODE: Santa Barbara CA 93101<br>BRANCH NAME: Figueroa - Criminal | **FILED**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA<br>**11/18/2020**<br>Darrel E. Parker, Executive Officer<br>BY Hauenstein, Todd<br>Deputy Clerk |
| CAPTION:<br><br>**Cevdet Uruk vs J W Sullivan** | |
| **CLERK'S CERTIFICATE OF MAILING** | CASE NUMBER:<br><br>**20CR06321** |

I certify that I am not a party to this cause and that a true copy of the **Order Dismissing Petition for Writ of Habeas Corpus** was mailed first class, postage prepaid, in a sealed envelope addressed as shown, and that the mailing of such and execution of this certificate occurred at (*place*) Santa Barbara, California, on (*date*): 11/16/2020.

Darrel E. Parker, Executive Officer

Dated:    11/16/2020

By  /s/  Todd Hauenstein                          , Deputy

Cevdet Uruk
CCI
D4-15U
P.O. Box 608
Tehachapi, CA 93581

HC-001

Name _Cevdet Uruk_

Address: _CCI_
_D4-15Up_
_PO Box 608_
_Tehachapi, CA 93581_

CDC or ID Number: _BK0724_

## IN THE COURT OF APPEAL
## OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT

*(Court)*

**Cevdet Uruk**

Petitioner

vs.

**B. Cates, (A) Warden**

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the superior court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the superior court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the superior court, you only need to file the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal in paper form and you are an attorney, file the original and 4 copies of the petition and, if separately bound, 1 set of any supporting documents (unless the court orders otherwise by local rule or in a specific case). If you are filing this petition in the Court of Appeal electronically and you are an attorney, follow the requirements of the local rules of court for electronically filed documents. If you are filing this petition in the Court of Appeal and you are *not* represented by an attorney, file the original and one set of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, an original and 2 copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2007). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 6

Form Approved for Optional Use
Judicial Council of California
HC-001 [Rev. September 1, 2019]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.
Cal. Rules of Court, rule 8.380
www.courts.ca.gov

HC-001

This petition concerns:

☑ A conviction                    ☐ Parole

☑ A sentence                      ☐ Credits

☐ Jail or prison conditions       ☐ Prison discipline

☐ Other (specify): _____

1. Your name: _____Cevdet Uruk_____

2. Where are you incarcerated? __California Correctional Institution__

3. Why are you in custody? ☑ Criminal conviction    ☐ Civil commitment

Answer items a through i to the best of your ability.

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").
Dissuading a Witness, Corporal Injury, Assult by Means of likely GBI, False Imprisonment (Felonies) Domestic Violence Contempt of Court, Battery, Probation Violation (Misdemeanor's)

b. Penal or other code sections: 136.1(b)(1), 273.5(a), 245(a)(4), 236, 166(c)(1), 243(e)(1)

c. Name and location of sentencing or committing court:
Superior Court of the State of California
County of Santa Barbara
Santa Barbara

d. Case number: 18CR02248 + 1471799

e. Date convicted or committed: 06.27.2019

f. Date sentenced: 08.05.2019

g. Length of sentence: 11 years and 8 months

h. When do you expect to be released? 07.28.2023

i. Were you represented by counsel in the trial court? ☑ Yes  ☐ No   If yes, state the attorney's name and address:
Neil Levinson
1933 Cliff Dr.
Santa Barbara, CA 93109

4. What was the LAST plea you entered? (Check one):
☑ Not guilty  ☐ Guilty  ☐ Nolo contendere  ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?
☑ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

6    GROUNDS FOR RELIEF                                                                HC-001
Ground 1: State briefly the ground on which you base your claim for relief. For example: "The trial court imposed an illegal enhancement." (If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page 4. For additional grounds, make copies of page 4 and number the additional grounds in order.)

See attached
I repeat the same grounds/facts/cases
I don't have the time and resource(s) to rewrite the
same things. I don't know all the rules. I don't have
access to the library.

a.    Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts on which your conviction is based. If necessary, attach additional pages. CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel, you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See In re Swain (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time (when) or place (where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

See attached
With an emphasis on the Court's admission of the
testimonial Hearsay (911 calls and interrogations/statements
to Police, both in 2014 & 2018 by The complaining, non testifying
witness) as the sole evidence of violence/abuse.
    Both in 2014 & 2018: There was no ongoing emergency,
The statements were about past events; My wife was
outside with the children; I was inside the house working;
(See the Police/witness reports/testimonies and transcripts
on the record)
    In violation of the confrontation clause of the Sixth
Amendment to the US Constitution and Article I, Section
15 of California Constitution for grounds 2 and 4.
        566 U.S.134,182, L.Ed 2d 379 132.S.Ct 1399
    Also See Missouri v. Frye, 2012 and Lafler v.
Cooper, 2012: defense attorneys must fulfill certain
professional standards during the plea bargaining process
by informing defendants of formal plea offers made by
the prosecutor and by accurately providing advice on the
consequences of turning a plea offer.
(Lafler v Cooper, 566 U.S. 156, 182 L. Ed. 2d 398, 132 S.Ct. 1376 (2012)

b.    Supporting cases, rules, or other authority (optional):
(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

See attached
With an emphasis on Crawford v. Washington (2004),
541, US. 36 & Davis v. Washington (2006) 547, US. 813
& Hammon v. Indiana
    (See the attached Criminal Evidence Textbook page on Testimonial
Hearsay)
                                                                        ⟹

Ground 2 or Ground _____ *(if applicable)*

HC-001

a. Supporting facts:

The issues before the court are subject to de novo review, (Frederiks v. Superior Court (2015) 233 Cal. App 4th 209, 223) The court's standard of review is de novo as to those parts of the appeal that raise questions of law and mixed questions of law and fact. "In the constitutional realm... the United States Supreme Court has often held that the role of the appellate courts' in marking out the limits of a standard, through the process of case by case adjudication favors de novo review, even when answering a mixed question primarily involves plunging into a factual record." [citation]" U.S. Bank N.A. v. Vill of Lakeridge, LLC (2018) U.S. [200 L.Ed. 2d 218, 227] The habeas corpus petition does not (did not) interfere with the appeal or review. It had different claims (ineffective assistance of counsel) that were not on the record. Habeas corpus The habeas corpus on the record. Habeas corpus is sometimes used together with a pending appeal when the allegations require evidence outside the regular appellate record (see People v. Pope (1979) 23 C 3d 412, 426) I repeat the same allegations/claims in the original/attached habeas corpus petition. My wife also might be bipolar. She needs to be on medication, she has been hitting/kicking children too.

b. Supporting cases, rules, or other authority:

In Davis (2006) (which contains Hammon v. Indiana): "... [statements] are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

HC-001

8. Did you appeal from the conviction, sentence, or commitment? ☑ Yes ☐ No    If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Division of Superior Court").
Court of Appeal

b. Result: Affirmed with 1 year reduction    c. Date of decision: 9.30.2020

d. Case number or citation of opinion, if known: B299732

e. Issues raised: (1) Appellant was prejudiced by the exclusion of Jane Doe's inconsistent statements.

(2) The principle term of Appellant's sentence was unlawful because the court relied on an inapplicable penalty scheme.

(3) Appellant's sentence for false imprisonment and battery must be stayed pursuant to Section 654.

f. Were you represented by counsel on appeal? ☑ Yes ☐ No    If yes, state the attorney's name and address, if known.
Robert Hernandez
530 E. Los Angeles Ave. # 115-207, Moorpark, CA 93021

9. Did you seek review in the California Supreme Court? ☑ Yes ☐ No    If yes, give the following information:

a. Result: Pending    b. Date of decision:

c. Case number or citation of opinion, if known:

d. Issues raised: (1) Does Section 1202 require the Court to admit contradictory/ recanting, out of court written statements from a non testifying victim?

(2)

(3)

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
Factual bases for the claims rest on the evidence not on the record.

11. Administrative review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal App 3d 500.) Explain what administrative review you sought or explain why you did not seek such review:

b. Did you seek the highest level of administrative review available? ☐ Yes ☐ No
*Attach documents that show you have exhausted your administrative remedies.*

HC-001

12  Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☑ Yes  If yes, continue with number 13.  ☐ No  If no, skip to number 15.

13  a.  (1)  Name of court:  Superior Court of Santa Barbara County

(2)  Nature of proceeding (for example, "habeas corpus petition"):  Habeas Corpus Petition

(3)  Issues raised.  (a)  Ineffective assistances of counsels (on newly discovered evidence, misadvice, vindictive prosecution,
(b)  Judicial/racial bias, disproportionate sentence)

(4)  Result (attach order or explain why unavailable):  Denied (because of lack of jurisdiction due to pending review)

(5)  Date of decision:  11.16.2020

b.  (1)  Name of court: _____

(2)  Nature of proceeding: _____

(3)  Issues raised.  (a) _____

(b) _____

(4)  Result (attach order or explain why unavailable): _____

(5)  Date of decision: _____

c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14  If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15  Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

_____

16  Are you presently represented by counsel?  ☐ Yes  ☐ No  If yes, state the attorney's name and address, if known:

_____

17  Do you have any petition, appeal, or other matter pending in any court?  ☑ Yes  ☐ No  If yes, explain:
California Supreme Court review is pending.
This habeas corpus petition does not interfere with it.

18  If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:  12.15.20

▶  _(signature)_

(SIGNATURE OF PETITIONER)

HC-001 [Rev. September 1, 2018]

PETITION FOR WRIT OF HABEAS CORPUS

Page 6 of 6

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re CEVDET URUK,<br><br>    on Habeas Corpus. | B309441<br>(Super. Ct. Nos. 18CR02248;<br>20CR06321)<br>(Santa Barbara County)<br><br><br>O R D E R |

COURT OF APPEAL – SECOND DIST.
F I L E D
Dec 22, 2020
DANIEL P. POTTER, Clerk
S. Claborn          Deputy Clerk

THE COURT:

        The petition for a writ of habeas corpus filed by Cevdet Uruk on December 18, 2020, is denied without prejudice. (*In re Hillery* (1962) 202 Cal.App.2d 293, 294.)  Petitioner can renew his claims in the Ventura County Superior Court; the remittitur in the direct appeal, *People v. Uruk* 2nd Crim. No. B299732, was issued on December 11, 2020.


_____          _____          _____
GILBERT, P.J.                            PERREN, J.                                TANGEMAN, J.

SUPREME COURT
FILED

DEC  9 2020

Jorge Navarrete Clerk

Deputy

Court of Appeal, Second Appellate District, Division Six - No. B299732

S265386

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

---

THE PEOPLE, Plaintiff and Respondent,

v.

CEVDET URUK, Defendant and Appellant.

---

The petition for review is denied.

CANTIL-SAKAUYE

*Chief Justice*

Name _Cevdet Uruk_

Address _CCI_
_D4-15Up_
_PO Box 608_
_Tehachapi CA 93581_

HC-001

CDC or ID Number: _BKO724_

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF SANTA BARBARA

_(Court)_

_Cevdet Uruk_

Petitioner

vs

_B. Cates, Warden (A)_

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

_(To be supplied by the Clerk of the Court)_

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the superior court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the superior court, you should file it in the county in which you are confined.

- Read the entire form before answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the superior court, you only need to file the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal in paper form and you are an attorney, file the original and 4 copies of the petition and, if separately bound, 1 set of any supporting documents (unless the court orders otherwise by local rule or in a specific case). If you are filing this petition in the Court of Appeal electronically and you are an attorney, follow the requirements of the local rules of court for electronically filed documents. If you are filing this petition in the Court of Appeal and you are not represented by an attorney, file the original and one set of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, an original and 2 copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2007). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 6

Form Approved for Optional Use
Judicial Council of California
HC-001 [Rev. September 1, 2018]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.
Cal. Rules of Court, rule 8.380
www.courts.ca.gov

This petition concerns:

- [✓] A conviction
- [✓] A sentence
- [ ] Jail or prison conditions
- [ ] Other (specify)

- [ ] Parole
- [ ] Credits
- [ ] Prison discipline

HC-001

1. Your name: Cevdet Uruk

2. Where are you incarcerated? California Correctional Institution

3. Why are you in custody? [✓] Criminal conviction   [ ] Civil commitment

Answer items a through i to the best of your ability.

a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

Dissuading a Witness, Corporal Injury, Assult by Means of Likely GBI, False Imprisonment (Felonies) Domestic Violence Contempt of Court, Battery, Probation Violation (Misdemeanors)

b. Penal or other code sections: 136.1(b)(1), 273.5(a), 245(a)(4), 236, 166(c)(1), 243 e.1

c. Name and location of sentencing or committing court:
Superior Court of the State of California
County of Santa Barbara
Santa Barbara

d. Case number: 18CR02248 + 1471799

e. Date convicted or committed: 06.27.2019

f. Date sentenced: 08.05.2019

g. Length of sentence: 11 years 8 months

h. When do you expect to be released? 07.28.2023

i. Were you represented by counsel in the trial court? [✓] Yes   [ ] No   If yes, state the attorney's name and address.
Neil Levinson
1933 Cliff Dr.
Santa Barbara CA 93109

4. What was the LAST plea you entered? (Check one)
[✓] Not guilty   [ ] Guilty   [ ] Nolo contendere   [ ] Other

5. If you pleaded not guilty, what kind of trial did you have?
[✓] Jury   [ ] Judge without a jury   [ ] Submitted on transcript   [ ] Awaiting trial

6. GROUNDS FOR RELIEF HC-001

Ground 1: State briefly the ground on which you base your claim for relief. For example, "The trial court imposed an illegal enhancement." (If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page 4. For additional grounds, make copies of page 4 and number the additional grounds in order.)

See attached
I renew/repeat the same grounds/claims/facts/cases.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts on which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel, you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly what to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

See attached
with an emphasis on the Court's admission of the testimonial hearsay (911 calls and interrogations/statements to the Police both in 2014 and 2018 by the complaining witness who refused to testify) as the sole evidence of violence/abuse.
Both in 2014 & 2018: There was no ongoing emergency; the statements were about past events; my wife was outside with the children; I was inside the house working; She didn't want the arrest or protective order; she recanted (See the Police/witness reports/testimonies and transcripts on the record)
In violation of the confrontation clause of the Sixth Amendment to the US Constitution and Article I, Section 15 of California Constitution for grounds 2 and 4.
Newly discovered evidence shows that my wife was/is delusional/paranoid: She is probably schizophrenic and/or bipolar. She needs to be on medication She has been hitting/kicking children too.
Also notice the counsel's misadvice in declining no jail/prison plea offer and Judge's denial of recommended probation, as vindication and/or discrimination.
⟹

b. Supporting cases, rules, or other authority *(optional)*:
(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

See attached
With an emphasis on Crawford v. Washington (2004) 541 US. 36
& Davis v. Washington (2006) 547 US. 813 &
& Hammon v. Indiana
(See attached Criminal Evidence Textbook page on Testimonial hearsay)
⟹

Ground 2 or Ground _____ (if applicable)                                    HC-001

a   Supporting facts

Defense attorneys must fulfill certain professional
standards during the plea bargaining process by
informing defendants of formal plea offers made by
the prosecutors and by accurately providing advice
on the consequences of turning a plea offer.
(Missauri v. Frye (2012), 566, US 134, 182. L. Ed 2d
132. S. Ct 1399)
(Lafler v. Cooper (2012), 566, US 156, 182. L. Ed 2d
398, 132 S.Ct. 1376)

b   Supporting cases, rules, or other authority:

In Davis (2006) (which contains Hammon v. Indiana):
"... [Statements] are testimonial when the circumstances
objectively indicate that there is no such ongoing emergency,
and that the primary purpose of the interrogation is
to establish or prove past events potentially relevant
to later criminal prosecution."

HC-001

8. Did you appeal from the conviction, sentence, or commitment? ☑ Yes ☐ No   If yes, give the following information:

a. Name of court ("Court of Appeal" or "Appellate Division of Superior Court"):
Court of Appeal

c. Result: Affirmed with 1 year reduction   c. Date of decision: 9.30.2020

d. Case number or citation of opinion, if known: B299732

e. Issues raised: (1) Appellant was prejudiced by the exclusion of Jane Doe's inconsistent statements.
(2) The Principal term of Appellant's sentence was unlawfull, because the court relied on an inapplicable scheme
(3) Appellant's sentence for false imprisonment, and battery must be stayed pursuant to Section 654.

f. Were you represented by counsel on appeal? ☑ Yes ☐ No   If yes, state the attorney's name and address, if known:
Robert Hernandez
530 E. Los Angeles Ave. 1f 115-207, Moorpark, CA 93021

9. Did you seek review in the California Supreme Court? ☑ Yes ☐ No   If yes, give the following information:

a. Result: Denied   b. Date of decision: 12.09.2020

c. Case number or citation of opinion, if known: S265386

d. Issues raised (1) Hearsay evidence is admissable to impeach a declarant whose statements have been received into evidence.
(2)
(3)

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
Factual bases for the claims rest on the evidence not on the record.

11. Administrative review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See In re Muszalski (1975) 52 Cal.App.3d 500.) Explain what administrative review you sought or explain why you did not seek such review.

b. Did you seek the highest level of administrative review available? ☐ Yes ☐ No
Attach documents that show you have exhausted your administrative remedies.

HC-001

12. On an habeas direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☑ Yes (If yes, continue with number 13)  ☐ No (If no, skip to number 15)

13. a. (1) Name of court: Superior Court of Santa Barbara County

(2) Nature of proceeding (for example, "habeas corpus petition"): Habeas Corpus Petition

(3) Issues raised: (a) Ineffective assistance of counsels on (newly
discovered evidence, misadvice, vindictive Prosecution
(b) Judicial/racial bias, disproportionate sentence)

(4) Result (attach order or explain why unavailable): Denied (because of lack of

(5) Date of decision: Jurisdiction due to pending review)
11.16.2020

b. (1) Name of court: Court of Appeal, Second District

(2) Nature of proceeding: Habeas Corpus Petition

(3) Issues raised: (a) Same as above

(b) ____

(4) Result (attach order or explain why unavailable): Denied

(5) Date of decision: 12.22.2020

c. For additional prior petitions, applications, or motions, provide the same information on a separate page

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

16. Are you presently represented by counsel?  ☐ Yes  ☑ No   If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes  ☑ No   If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date 1/8/2021                                    ▶ (SIGNATURE OF PETITIONER)

HC-001 [Rev. September 1, 2013]           PETITION FOR WRIT OF HABEAS CORPUS           Page 6 of 6

FILED
SUPERIOR COURT of CALIFORNIA
COUNTY of SANTA BARBARA

APR 27 2021

Darrel E. Parker, Executive Officer
BY _____
Todd Hauenstein, Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

FOR THE COUNTY OF SANTA BARBARA

CEVDET URUK,

        Petitioner,

    vs.

B. CATES, WARDEN (A)

        Respondent.

Case No.: 21CR00309

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Cevdek Uruk filed his petition for writ of habeas corpus on January 15, 2021. For reasons stated below, the court denies the petition.

A jury convicted Cevdet Uruk of corporal injury to a spouse (Penal Code Section 273.5(a)(1), dissuading a witness (Penal Code Section 136.1(b)(1)), assault with force likely to cause great bodily injury (Penal Code Section 245(a)(4)), contempt of court (Penal Code Section 166(c)(1)), battery (Penal Code Section 243(e)(1), and false imprisonment (Penal Code Section 273.5(f)(1), and Petitioner was sentenced to 10 years, eight months in state prison.

Petitioner filed a Notice of Appeal with the Court of Appeal on August 8, 2019. On appeal, Petitioner challenged the exclusion of impeachment evidence and his sentence.

Petitioner initially filed a petition for writ of habeas corpus on September 8, 2020. On November 16, 2020 the Court dismissed the petition because the appeal was pending at the time. The Court of Appeal filed its opinion on September 30, 2020 and ordered the sentence to be vacated and remanded the case back to the trial court for resentencing. Petitioner then filed a petition for review to the Supreme Court. The Supreme Court denied the petition for review on December 9, 2020. A remittitur issued on December 11, 2020.

Petitioner then filed the current petition for writ of habeas corpus on January 15, 2021. In the petition, Petitioner states the grounds for relief as follows: 1) improper admission of testimonial hearsay, and 2) ineffective assistance of counsel.

First, the court finds that petitioner has failed to file a sufficient record to permit an adequate review of petitioner's claim. The petition must not only state fully and with particularity the facts on which relief is sought but also "include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations." (People v. Duvall (1995) 9 Cal.4th 464, 474). Whenever the consideration of an exhibit, document or transcript is necessary for a complete understanding of the case it must be furnished to the court by the petitioner. (Sherwood v. Superior Court (1979) 24 Cal.3d 183, 187). Accordingly, the court finds that the petitioner has failed to file a complete record of the trial and sentencing transcript necessary to permit an informed review of his claims. (Strickland v. Washington (1984) 466 US 668; Sherwood, supra, 24 Cal.3d at p.186.)

Secondly, issues that were, or could have been, resolved on appeal generally will not be considered on habeas corpus. (In re Waltreus (1965) 52 Cal.2d 218, 225; In re Dixon (1953) 41 Cal.2d 756, 759 ["in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not , raised upon a timely appeal from a judgment or conviction…"]; In re Harris (1993) 5 Cal.3th 813, 829; In re Clark (1993) 5 Cal. 4th 750, 770). Here, petitioner raises claims that could have been raised on appeal and fails to provide any explanation for why they were not raised on appeal. Specifically, Petitioner failed to raise the issue of improper admission of testimonial evidence and ineffective assistance of counsel in his appeal.

1       For the foregoing reasons, the court denies Petitioner Cevdek Uruk's petition for writ of habeas

2   corpus.

3

4

5   Dated:  4 - 27- 21

6

7

8   Hon. Thomas R. Adams
    Judge of the Superior Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-3-

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA BARBARA | *FOR COURT USE ONLY* |
|---|---|
| STREET ADDRESS:  118 E. Figueroa Street<br>CITY AND ZIP CODE:  Santa Barbara CA  93101<br>BRANCH NAME:  Figueroa - Criminal | **FILED**<br>SUPERIOR COURT of CALIFORNIA<br>COUNTY of SANTA BARBARA |
| CAPTION:<br><br>**Cevdet Uruk vs Brian Cates** | **04/30/2021**<br>Darrel E. Parker, Executive Officer<br>BY _Hauenstein, Todd_<br>Deputy Clerk |
| **CLERK'S CERTIFICATE OF MAILING** | CASE NUMBER:<br><br>**21CR00309** |

I certify that I am not a party to this cause and that a true copy of the **Order Denying Petition for Writ of Habeas Corpus** was mailed first class, postage prepaid, in a sealed envelope addressed as shown, and that the mailing of such and execution of this certificate occurred at (*place*) Santa Barbara, California, on (*date*): 04/30/2021.

Darrel E. Parker, Executive Officer

Dated:    04/30/2021

By   /s/  Todd Hauenstein _____ , Deputy

Cevdet Uruk
CCI
D4-15UP
P.O. Box 608
Tehachapi, CA 93581

Other exceptions to the Hearsay Rule are based on the concept of fair play. For example, it would be unfair to exclude the defendant's confession solely because it was not made under oath. It would also be unfair to allow one side to introduce an edited version of an out-of-court statement but deny the opposing side the right to introduce the portions of that statement that were intentionally left out.

Some states allow police officers to testify at the preliminary hearing and/or before the grand jury about conversations with victims and witnesses even though the officers could not give the same testimony at trial due to the Hearsay Rule. The purpose of this procedure is twofold: It makes the process more efficient, and it minimizes the inconvenience for victims and witnesses of taking time off work to testify in court. It does not interfere with the defendant's Sixth Amendment rights because the rule only applies at pre-trial proceedings.

## Testimonial Hearsay

In *Crawford v. Washington* (2004)[3] and *Davis v. Washington* (2006),[3] the Supreme Court ruled that the prosecution can use **testimonial hearsay** at trial only if the person who made the hearsay statement testifies.

In *Davis* (2006) (which contained the Supreme Court's decisions on *Davis v. Washington* and *Hammon v. Indiana*), the Court explained its holdings:

A critical portion of this holding, and the portion central to resolution of the two cases now before us, is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. See 541 U.S. at 51. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause. . . .

. . . Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[4]

Both cases considered by the Supreme Court in *Davis* were domestic violence cases. In the first one, portions of the 911 tape were played for the jurors. The distraught woman could be heard telling the operator

that she had been hit and the assailant was leaving. The Court ruled that this was nontestimonial because the intent was to obtain police assistance during an emergency.

In the second case, police officers responding to a domestic disturbance call found the victim alone on the front porch. She appeared "somewhat frightened" but told the police that "nothing was the matter." The officers separated the parties and talked to them. After hearing the wife's account, the officers asked her to fill out and sign a battery affidavit. Her handwritten affidavit said:

> Broke our Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn't leave the house. Attacked my daughter.[5]

Emphasizing that the emergency no longer existed, the Court ruled that the affidavit was testimonial hearsay and should not have been used at trial because the person who made it did not appear in court.

In the aftermath of the Court's ruling in *Crawford*, advocates for domestic violence victims argued that there should be a different rule when the person who made the hearsay statement did not testify at trial because of fear of the defendant. The Supreme Court refused to make such a rule, but it pointed to a portion of the *Crawford* decision where it said, "One who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation."[6] Although the Court refused to establish rules on what types of wrongdoing qualify for forfeiture, it pointed to Federal Rules of Evidence that state that hearsay can be used in court if "a statement is offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."[7] The government must prove the defendant's wrongdoing by a preponderance of the evidence in order to introduce hearsay under this rule.

Lab reports are hearsay and subject to the confrontation clause. In a series of recent cases (*Melendez-Diaz v. Massachusetts* [2009], *Briscoe v. Virginia* [2010], *Bullcoming v. New Mexico* [2011]),[8] the Supreme Court made it clear that the person who conducted the test must testify in court. DNA analysis was involved in *Williams v. Illinois* (2012).[9] The police sent a DNA sample to a private lab, which prepared a DNA profile. The profile was then matched with one in the state's database. The DNA analyst from the state's lab testified about matching the two profiles but no one from the private lab testified. The Supreme Court held that this procedure did not violate the defendant's rights.

**COPYING NOT PERMITTED. GOVERNMENT CODE SECTION 69954(d)**

1    lay a foundation, I'll reverse my ruling.

2          So I'm going to read you all my tentatives,

3    and then I'm going to give you a chance to make any

4    arguments that you want.

5          So the first is the 9-1-1 call.  The Court's

6    going to admit that tentatively under Evidence Code

7    1240.

8          The second is the defendant's statements.

9    Generally speaking, they're admitted under 1220.  If

10   there's some specific example that should be

11   excluded, but I haven't heard anything specifically

12   that I think should be excluded, so generally

13   they're admitted under 1220.

14         The prior restraining order is admitted,

15   No. 3, under Evidence Code 1530.

16         The prior conviction from 2014 is admitted.

17   I've done a 352 analysis.  And given the totality of

18   circumstances, I believe it's more probative than

19   prejudicial if the defendant were to testify.

20         Number 5 is the prior incidents of domestic

21   violence under 1101(b).  The 2014 incidents will be

22   admitted as both intent, motive and lack of mistake,

23   and it would also be admissible under 1109.  And in

24   both instances, I believe, under the totality of the

25   circumstances, it is more probative than prejudicial.

26         And those are all the requests by the People.

27         The defense, in essence, your motions in

28   limine are basically on the same issues.  A was

                                                    30

COPYING NOT PERMITTED – GOVERNMENT CODE SECTION 69954(d)

1    defendant's statements being inadmissible, so I'm

2    denying your request.  B was the conviction being

3    excluded.  I'm denying your request.

4         And I'm reserving any other issues that were

5    listed in your briefs until the time of trial.

6         So those are my tentatives rulings.

7         People, would you like to be heard on

8    anything that I've discussed?

9         MS. CHANDA:  No, Your Honor.

10         THE COURT:  Defense, would you like to be

11    heard on anything?

12         MR. LEVINSON:  Yes.

13         THE COURT:  All right.  Go ahead.

14         MR. LEVINSON:  For the record, we're

15    objecting to the 9-1-1 call on the grounds that it's

16    not sufficiently in the midst of or during the

17    course of a traumatic event.  We listened to her

18    voice on the call.  It sounds -- it seems pretty

19    calm, cool and collected.  It's made well after any

20    alleged incident occurred, even though, you know,

21    arguably it's -- you know, we're talking about

22    several minutes.

23         So, for the record, I'd make that objection.

24         With regard to my client's statements, again,

25    I don't know what those statements are yet.  So I'd

26    ask the Court to reserve a final ruling on that

27    until we know what those statements are, and the

28    context of those statements, so there would be an

31

COPYING NOT PERMITTED - GOVERNMENT CODE SECTION 69954(d)

1  objection at this point.

2          We would submit on the 136 order.

3          And then we would object with regard to the

4  prior uncharged acts from 2014; that under Evidence

5  Code Section 352, that it's prejudicial.  Its

6  prejudicial impact is substantially greater -- well,

7  let's just say that the probative value is

8  substantially outweighed by its prejudicial effect.

9  That's the argument.

10          Once the jury hears that evidence, they will

11  not be looking at it in the context of intent or

12  motive.  They'll be looking at it in terms of,

13  "Well, gosh, he did it then, and therefore he did it

14  now."  And I know that under 1109, that actually is

15  allowable, but the argument is that its prejudicial

16  effect is far greater than its probative value.

17          THE COURT:  All right.  Thank you.

18          I'm going to stick to my tentative rulings.

19  I'll make those my rulings.  You make good

20  arguments.  I think, though, that the probative

21  value in a prior incident regarding a dissuading is

22  substantial and outweighs any prejudicial effect.  I

23  believe that the defendant's statements are

24  admissible under the code section that was cited.

25  However, if you find some specific cases that you

26  believe it's inadmissible for some other reason,

27  then I'll reconsider my ruling.  But for now, that

28  will be my ruling.

32

1            THE COURT:  All right.  And so from the

2     briefing from the briefing schedule there's an

3     allegation by the People -- the People want to admit

4     that evidence under 1109 as non-charged evidence of --

5     of conduct relating to a domestic violence incident.

6            And, well, People let me -- let me -- is

7     that how you want to summarize it, or do you want to say

8     it differently?

9            MS. CHANDA:  Yeah.  Under 1109 and 1101 (b).

10           THE COURT:  All right.  And that's an

11    incident that occurred outside the United States while

12    the defendant and complaining witness were traveling in

13    what country?

14           MS. CHANDA:  Turkey.

15           THE COURT:  Turkey.

16           All right.  And the defense is arguing, A,

17    that that's inadmissible.  B, it's not relevant.  And,

18    C, that it's -- under 352 should be excluded.

19           MR. LEVINSON:  As stated in our opposition

20    to the People's motion.

21           THE COURT:  All right.  So does either side

22    want -- I've read it and I let you argue it last time.

23    I reserved ruling on it until today.  I am ready to rule

24    on it.

25           People, you want to argue anything further?

26           MS. CHANDA:  No, your Honor, unless --

27           THE COURT:  Defense.

28           MR. LEVINSON:  Submitted unless there's

1   something the Court wants to hear from us.

2           THE COURT:  No, no, no, I think that based

3   on what I heard it is admissible under 1109 as previous

4   domestic violence incident that occurred between those

5   parties, and I think it falls directly on all fours with

6   the legislative intent of 1109.

7           I also think under 1101 it's relevant as to

8   motive, lack of mistake and intent.  And, therefore, it

9   would be admissible under 1101 as well.

10          Under 352 analysis while it is prejudicial,

11  it is more probative than it is prejudicial and I

12  believe that it's relevant and should be admitted.  So

13  the Court will admit that evidence.  And I don't know

14  how the People intend to present it because there's

15  another issue that we'll deal with momentarily.  But I

16  think that it is admissible.

17          So anything else that I owe you from the

18  previous motions in limine?

19          MS. CHANDA:  I don't believe so.

20          THE COURT:  All right.  And then the People

21  then filed a new motion in limine and a New Amended

22  Information.  So --

23          MS. CHANDA:  Your Honor, the Amended

24  Information we discussed last time.  The only addition

25  was to add the prior that was omitted initially.

26          THE COURT:  All right.  Any objection to the

27  First Amended Information?

28          MR. LEVINSON:  No.

                                                            —44

1  will want to see, Judge.  That's the absolute last thing

2  I want to see.  My concern is of coercion.  My concern

3  is of potential forfeiture by wrong doing things, of

4  that nature.

5           THE COURT:  What do you mean forfeiture many

6  depending on the reasoning as the Court indicated for

7  the -- you know and I would prefer not to have this

8  conversation in front of Mrs. Uruk.

9           THE COURT:  Is she here?  Is that her?

10          MR. KAROW:  It is Ms. Uruk.  She's here, so

11  you can order her back, your Honor.

12          MS. CHANDA:  But I think that it would be

13  very important for the Court to inquire thoroughly about

14  what the situation is.

15          THE COURT:  Yeah, I will.  I mean, it's

16  important to me, but -- it's also important you're

17  proceeding anyway, right?

18          MS. CHANDA:  Yes.  I think we have

19  sufficient evidence to proceed without -- without her.

20          THE COURT:  Okay.  So --

21          MR. LEVINSON:  Your Honor.

22          THE COURT:  Go ahead.

23          MR. LEVINSON:  Just for the record, I heard

24  some discussion about possibly putting Ms. Uruk in jail.

25  My understanding is the Court does not have authority to

26  put her in jail.

27          THE COURT:  I can absolutely put her in

28  jail.  But I can --

1          MR. LEVINSON:  Under -- under --

2          THE COURT:  I can order her to answer the

3    question or I'll hold her in contempt.

4          MR. LEVINSON:  You cannot do that.

5          THE COURT:  Yes, I can.

6          MR. LEVINSON:  Under 1219.

7          THE COURT:  Yes, I can.  I can absolutely --

8    I'm not going to, but I can.

9          MR. LEVINSON:  Okay.

10          MR. KAROW:  Doesn't 1219 specifically forbid

11   that?

12          THE COURT:  No.  That's a procedure in how

13   to proceed, but I can absolutely do that.  I'm not going

14   to.  I'm telling you right now I am not going to, but I

15   can.  It also depends, I mean, I can -- I mean --

16          MR. KAROW:  I just read the code section

17   differently.

18          THE COURT:  There's all different kinds of

19   contempt, right?  If -- if I believe she's being

20   dishonest with the Court, if I believe someone is trying

21   to put a ruse to the Court, I can hold everybody in

22   contempt.  I'll put everyone in jail if I think that

23   someone is trying to manipulate the system.  Right?

24   Everybody understand that?

25          If I think that the system is being

26   manipulated here, I will put everybody in jail.  All

27   right.  So that's how I intend on handling it.  I intend

28   to make an inquiry just to make sure I understand what's

1    going on, make sure that I'm satisfied that there's no

2    counseling or that -- maybe there can be counseling

3    that's sufficient to have her make a decision that's the

4    right decision to make.  But I'm not going to put her in

5    jail.  I'm not going to threaten to put her in jail for

6    not testifying in this case.  But there's all kinds of

7    contempt that can happen.  And there's all kinds of

8    things that can put people in jail.  I'm just not going

9    to put her in jail for refusing to testify in this case,

10   but I may still depending on what's going on.

11          Let me make sure everybody's had a chance.

12   So, Ms. Chanda, we're going to start jury selection

13   tomorrow.  I don't know that we'll be finished on

14   Thursday, but you want me to order her back Thursday at,

15   say, 1:30, something like that, or do you have a time

16   specific you want her back?

17          MS. CHANDA:  I would say 1:30 as long as the

18   Court is okay with that.  If for some reason we move

19   quicker and I'm out of witnesses before 12:00.

20          THE COURT:  It's going to take us a full day

21   to pick a jury.  It's going to take openings.  Yeah,

22   we'll order her back Thursday, 1:30, is what you'd like,

23   correct?

24          MS. CHANDA:  Yes.  Yes.

25          THE COURT:  Anything else you want to say on

26   that issue?

27          MS. CHANDA:  No, not on that issue, no.

28          THE COURT:  Mr. Karow, anything else you'd

1          THE DEFENDANT:  Yes your Honor I do but --

2          THE COURT:  You don't need to say anything.

3    You don't need to say anything but everybody needs to

4    know what we are dealing with and if you all come up

5    with a resolution I encourage you to talk and figure

6    out -- figure out a way that we can all move forward

7    from this in a way that we don't have to come to court

8    again is what I'd like the parties to work on.  All

9    right.  Because I don't want to be back here doing

10   another trial or another probation violation hearing.

11   And I don't know that that is something that we can

12   prevent in the future.  I don't know.  Maybe we can't.

13          But it -- it's sort of our responsibility to

14   try to do that.  And if we can't, then we let a jury

15   decide for us.  And then I -- we will deal with it after

16   that.

17          All right.  Anything further by either side?

18          MR. LEVINSON:  No, your Honor.

19          THE COURT:  All right.  So I'm ordering a

20   jury by tomorrow 10:00 o'clock.  You can call for a

21   jury.  Once the jury gets here there's no more dealings.

22   Everybody understands that?

23          MR. LEVINSON:  Yes, your Honor.

24          THE COURT:  Once the jury is impaneled,

25   that's it.

26          MS. CHANDA:  Judge, one question.  When

27   would you like the jury instructions proposed?  I did do

28   a copy this weekend.  I sent it to counsel.  Whichever

1          MR. LEVINSON:  For the most part they are

2   pretty standard instructions.

3          THE COURT:  Some of it is strategic choice

4   on your part.

5          MR. LEVINSON:  Yes.

6          THE COURT:  You'll have to figure out how

7   you want to deal with that.  All right.  Do not give up

8   on trying to settle this case.  It's a case that has --

9   it has -- it's not one that can't settle, I don't think.

10  I mean, I think it's hard to get it to settle.  But when

11  you look at the max and you look at the floor and the

12  ceiling on this case, if you look at it from that

13  perspective, if you look at it from what's the floor and

14  what's the ceiling, it should settle because the risk,

15  there's even risk on both sides to take this to trial.

16         It should if you look at it from that

17  perspective, it should settle.  But that's up to all of

18  you.

19         All right.  We'll see you tomorrow morning

20  at 10:00 o'clock.

21         MS. CHANDA:  Thank you.

22         MR. LEVINSON:  9:30 or 10:00?

23         THE COURT:  9:30 for our motions.  10:00

24  for the jury.  Sorry about that.

25         MR. LEVINSON:  Thank you.

26         (Proceedings adjourned.)

27

28

COPYING NOT PERMITTED - GOVERNMENT CODE SECTION 69954(d)

1                    CROSS-EXAMINATION

2      BY MR. LEVINSON:

3          Q.    Good afternoon, Mr. Miller.

4          A.    Good afternoon.

5          Q.    I'm just going to ask you some questions.

6      I'm not trying to trick you.   I'm just going to ask

7      some questions.

8          A.    Yep.

9          Q.    I appreciate that you're nervous.

10             So you lived next to or in the same

11     condominium complex as Mr. Uruk and Jane Doe for

12     three years; is that right?

13         A.    Approximately.   I can't give the exact date.

14     Well, approximately.

15         Q.    So that would have been two years that you

16     would have lived there near them at the time that

17     this incident took place; is that right?

18         A.    Can you repeat the question?

19         Q.    Sure.   Sure.   So when Jane Doe came to your

20     home and asked to use your cell phone, that was

21     sometime in March of 2018?

22         A.    Okay.

23         Q.    And when she did that, when she came over to

24     use your cell phone at that time, you had been

25     living there near Mr. Uruk and Jane Doe for about

26     two years?

27         A.    I -- I'm assuming, yes, that's the dates,

28     and yes.

COPYING NOT PERMITTED - GOVERNMENT CODE SECTION 69954(d)

1    Q.   Okay.  Do you recall when you first met Jane
2  Doe and Mr. Uruk?
3    A.   I believe it was July of -- my best guess
4  would be two thousand -- oh, gosh.  I -- '16 maybe
5  it was?  I don't know.  What year are we in?
6    Q.   Just as far as you can remember.
7    A.   Yes.  I'm just trying to think dates.  Yeah,
8  I think it was, I want to say, 2016 --
9    Q.   Okay.
10    A.   -- is when.
11    Q.   And you've never been in their home; is that
12  correct?
13    A.   I have.  Yes, I have.
14    Q.   Approximately how many times have you been
15  in their home?
16    A.   A handful, I'm guessing.  Maybe five or six
17  times.
18    Q.   Have you socialized with them?
19    A.   Yes, I have.
20    Q.   You consider Jane Doe to be a friend?
21    A.   I do.
22    Q.   You consider Mr. Uruk to be a friend?
23    A.   I do.
24    Q.   Now, when this incident happened in March of
25  last year, you were aware that Jane Doe was working
26  or had a job; is that right?
27    A.   Yes.  As far as I know, yes.
28    Q.   Well, you would see her leave in the

146

COPYING NOT PERMITTED — GOVERNMENT CODE SECTION 69954(d)

1    morning, correct?

2       A.   Correct.

3       Q.   You'd see her come back late in the day?

4       A.   Yes.

5       Q.   And you were aware that Mr. Uruk was a stay-

6    at-home father?

7       A.   Yes.

8       Q.   You'd see him at the house or you'd see him

9    around taking care of his kids or with his kids all

10   day?

11      A.   Correct.

12      Q.   As far as you know, Mr. Uruk does not have a

13   job?

14      MS. CHANDA:  Objection.  Relevance.

15      THE WITNESS:  As far as I know --

16      THE COURT:  Hold on.

17      THE WITNESS:  Sorry.

18      THE COURT:  Objection is overruled.

19      You can answer.

20      THE WITNESS:  Yes.  State the question

21   again.  Sorry.

22      Q.   BY MR. LEVINSON:  As far as you know, Mr.

23   Uruk -- just from your personal knowledge, Mr. Uruk

24   does not have a job.

25      A.   As far as I know, a stay-at-home father.

26      Q.   So on March 9th, or at least on the date

27   that this incident happened, you show up at the door

28   of Mr. Uruk and Jane Doe, right?  I'm sorry, Jane

COPYING NOT PERMITTED — GOVERNMENT CODE SECTION 69954(d)

1     Doe shows up at your door?

2     A.   Thank you.

3     Q.   Sorry.  Jane Doe's not crying when she --

4 when you open the door and see her, is she?

5     A.   No.

6     Q.   She's not screaming?

7     A.   No.

8     Q.   And she doesn't ask you to call 9-1-1, does

9 she?

10     A.   No.

11     Q.   She doesn't ask you to call the police?

12     A.   Nope.

13     Q.   She doesn't say she's in trouble?

14     A.   No.

15     Q.   She doesn't say she's in danger, does she?

16     A.   No.

17     Q.   She doesn't say she's injured in any way,

18 does she?

19     A.   No.

20     Q.   She doesn't say that her husband just choked

21 her, does he?

22     A.   No.

23     Q.   Does she?  I'm sorry.

24     Doesn't say that Mr. Uruk had just attacked

25 her, does she?

26     A.   No.

27     Q.   She doesn't say that Mr. Uruk threatened her?

28     A.   No.

COPYING NOT PERMITTED #:249 GOVERNMENT CODE SECTION 69954(d)

```
1       Q.   She doesn't say she's scared?

2       A.   No.

3       Q.   All she says to you when you open the door

4   is, "Can I use your phone?"

5       A.   Correct.

6       Q.   You don't ask her who she's calling, do you?

7       A.   No, I don't.

8       Q.   You ask her if she needs help, right?

9       A.   Correct.

10      Q.   And she doesn't give you a verbal response,

11  does she?

12      A.   I don't recall.

13      Q.   She just walks away with your phone?

14      A.   Correct.

15      Q.   About, what, a minute or two later she comes

16  back with your phone?  Is that about right?

17      A.   No.  It was longer than that.

18      Q.   Okay.  Approximately how long?

19      A.   I don't recall, but approximately, my guess

20  would be, about ten minutes.

21      Q.   When she hands your phone back to you, she

22  doesn't say anything about why she used your phone,

23  does she?

24      A.   No.

25      Q.   And then she just walks away?

26      A.   Correct.

27      Q.   Thank you, Mr. Miller.

28      A.   Yep.
```

149

1    A.   Yes, she is.

2         MS. CHANDA:   I'm going to play it forward

3    from 37 seconds.

4         THE COURT:   Can you make it louder?

5         (Whereupon, a video recording, Plaintiff's

6    Exhibit 2, was played for the Court and jury.)

7         THE COURT:   Can you turn the lights back on?

8         All right.   And so -- I didn't make it

9    clear, but the court reporter is relieved from

10   transcribing that, and the transcript will be marked

11   as People's Exhibit --

12        MS. CHANDA:   2-A.

13        THE COURT:   -- 2-A.   Not admitted, but

14   marked as 2-A.

15        You may continue with your examination.

16   Q.   BY MS. CHANDA:   So that video that we just

17   watched, is that an accurate representation of the

18   interview that you had with Jane Doe on -- back in

19   November of 2014?

20   A.   Yes, it is.

21        MS. CHANDA:   I have no further questions, Judge.

22        THE COURT:   All right.   Cross-examination?

23        MR. LEVINSON:   Thank you, Your Honor.   One

24   minute.

25

26                    CROSS-EXAMINATION

27   BY MR. LEVINSON:

28   Q.   Good afternoon, Deputy.   It's Officer,

                                                        161

COPYING NOT PERMITTED -- GOVERNMENT CODE SECTION 69954(d)

1   right?

2       A.   Yes.  Good afternoon.

3       Q.   When you were interviewing Jane Doe on that

4   date in that video, you learned from her that she

5   had a full-time job?

6       A.   I don't recall, actually.

7       Q.   Okay.  Would you like to take a look at the

8   transcript?

9       A.   Yes, please.

10          THE COURT:  Can you turn it to the line and

11  the page?

12          MR. LEVINSON:  Yeah.  I think it's in the

13  other transcript.

14          THE COURT:  All right.  You can stop reading

15  it.

16          MR. LEVINSON:  Yeah.  Sorry.

17          THE COURT:  Go ahead, Mr. Levinson.

18      Q.   BY MR. LEVINSON:  Officer, Jane Doe never

19  told you that Mr. Uruk was ever violent toward the

20  children, did she?

21      A.   No.

22      Q.   And on this particular date, she told you

23  that Mr. Uruk grabbed her by the throat or by the

24  neck; is that right?

25      A.   Yes.

26      Q.   And that he pushed her against the bathroom

27  wall?

28      A.   Yes.

162

COPYING NOT PERMITTED — GOVERNMENT CODE SECTION 69954(d)

1    Q.   That he grabbed her arms?

2    A.   Yes.

3    Q.   When you saw Jane Doe, you were with her for

4    approximately a half hour, hour, something like

5    that?

6    A.   Sure.  Approximately.

7    Q.   Okay.  She showed you -- she showed you her

8    neck --

9    A.   Yes.

10   Q.   -- right?  She showed you the part of her

11   neck that she said Mr. Uruk grabbed, right?

12   A.   Yes.

13   Q.   She showed you the arms, or the arm where

14   she said Mr. Uruk grabbed her?

15   A.   Yes.

16   Q.   And you looked at her closely to see if

17   there were any visible injuries, didn't you?

18   A.   Yes.

19   Q.   You did not see any visible injury to her

20   neck, did you?

21   A.   No visible injury.

22   Q.   You didn't see any visible injury to her

23   arms, did you?

24   A.   No.

25   Q.   You didn't see any visible injury to any

26   part of her body, did you?

27   A.   I did not see any physical injuries to parts

28   of her body that were exposed.

163

COPYING NOT PERMITTED — GOVERNMENT CODE SECTION 69954(d)

1    Q.   All right.  So any part of her body you

2    could see --

3    A.   Yes.

4    Q.   -- there were no -- you couldn't see any

5    injury?

6    A.   No.  No.

7    Q.   In fact, photos -- photos were taken of

8    those parts of her body she claims were grabbed or

9    held by Mr. Uruk?

10    A.   Yes.

11    Q.   All right.  Those were taken by Officer

12    Sather; is that right?

13    A.   Correct.

14    Q.   You've seen those photos, right?

15    A.   It's been a little while, but, yes.

16    MR. LEVINSON:  Your Honor, I'd like to mark

17    a number of photographs.

18    THE COURT:  How many?

19    MR. LEVINSON:  There are seven.

20    MS. CHANDA:  These are the ones taken from

21    2014?

22    MR. LEVINSON:  Uh-huh.

23    MS. CHANDA:  Can we approach quickly?

24    THE COURT:  Sure.

25    (Discussion held off the record at sidebar.)

26    Q.   BY MR. LEVINSON:  When you talked to Ms.

27    Uruk, she wasn't crying?

28    A.   Not that I recall.

164

1    know more about the schedule.  But so far we are on

2    schedule.  All right.  So thank you for your time and

3    patience.

4              And, People, you may call your next witness.

5              MS. CHANDA:  The People call Jane Doe.

6              THE CLERK:  If I can just have you stand up.

7    Raise your right hand.

8              Do you solemnly affirm under penalty of

9    perjury to tell the truth, the whole truth, and nothing

10   but the truth in your testimony before this Court?

11             THE WITNESS:  Yes.

12             THE CLERK:  Thank you.  Please have a seat.

13             THE COURT:  All right.  And we are not going

14   to have you spell your name, obviously, because we are

15   using the pseudonym Jane Doe.

16             All right.  And you may inquire.

17             MS. CHANDA:  Thank you.

18

19                    JANE DOE,

20         called as a witness for and on

21              behalf of the People,

22       having been first duly affirmed

23             testified as follows:

24

25             DIRECT EXAMINATION

26

27   BY MS. CHANDA:

28     Q.  Good morning.

1    A.  Good morning.

2    Q.  Are you okay?

3    A.  Yes.

4    Q.  Has anyone coerced you or asked you not to

5    testify in this case?

6    A.  No.

7    Q.  So are you willing to testify in this case?

8    A.  No.

9    Q.  So just to be clear are you not willing to answer

10   any questions in this case?

11   A.  Can you please repeat the question.

12   Q.  Are you willing to answer questions in this case?

13   A.  No.

14          THE COURT:  All right.  And so the Court is

15   going to order you to testify, and you are going to

16   refuse that order; is that right?

17          THE WITNESS:  Correct, your Honor.

18          THE COURT:  All right.  Thank you.

19          All right.  Mr. Levinson, any questions?

20          MR. LEVINSON:  No, your Honor.

21          THE COURT:  Mr. Karow, anything you want to

22   say?

23          MR. KAROW:  No, your Honor.

24          THE COURT:  All right.  Ma'am, I am going to

25   go ahead and excuse you.  You are free to go.  Thank

26   you.

27          All right.  People, you can call your next

28   witness.

1    you briefly speak with Jane Doe?

2        A.   Yes.

3        Q.   Were you here just in Court when Jane Doe

4    testified?

5        A.   Yes.

6        Q.   Is that the person you spoke to at that location

7    and on that date?

8        A.   Yes.

9        Q.   When you first encountered Jane Doe, can you

10   please describe her demeanor.

11       A.   She was distraught, crying, just visibly upset.

12   Looked -- appeared she'd been crying for some time

13   because her face was just really red, splotchy.  Her

14   skin appeared irritated.

15            MR. LEVINSON:  Objection.  Speculation.

16   Motion to strike.

17            THE COURT:  Overruled.

18       Q.   BY MS. CHANDA:  Did you see any children?

19       A.   Yes.

20       Q.   How many children did you see?

21       A.   Three.

22       Q.   And approximately -- do you know what the ages

23   are?

24       A.   Yes.  I believe it was two months old to four.

25       Q.   So the range between two months and four years

26   old?

27       A.   Range between two and four, yeah.

28       Q.   And was Jane Doe -- where were the children?

1    A.  They were outside just west of the driveway

2  playing outside in the front yard, and Jane Doe was

3  holding the two-month-old.

4    Q.  Did you ask her if she needed any medical help at

5  that point?

6    A.  I did.

7    Q.  And how did she respond?

8    A.  That, no, she did not need any medical help but

9  that she did sustain a bruised and bloody lip.

10    Q.  At that point did you -- did you inquire as to

11  why you had responded to that address?

12    A.  We were already informed why we were on the way

13  there by our dispatch.

14    Q.  And what was that reason?

15    A.  It was pretty short.  They explained to us

16  that -- to respond to this address for a report of a

17  husband who had just hit his wife.

18    Q.  Did you determine whether or not her husband was

19  still on the scene?

20    A.  We determined when we got there he was on scene

21  because she informed me.

22    Q.  Okay.  And where was he located?

23    A.  Inside the house.

24    Q.  Did you go inside the house to contact her

25  husband?

26    A.  We did.

27    Q.  Do you see that person here in court today?

28    A.  I do.

```
 1              THE COURT:  All right.  Cross-examination.

 2

 3                      CROSS-EXAMINATION

 4

 5   BY MR. LEVINSON:

 6       Q.   Good morning, Deputy.

 7       A.   Good morning, sir.

 8       Q.   When you were at the academy during your

 9   training, you were trained how to write reports,

10   correct?

11       A.   Correct.

12       Q.   And you were trained to include all facts in your

13   report that you felt were important to the

14   investigation?

15       A.   Yes.

16       Q.   And the reason for doing that would be that you

17   may have to come in and testify at some later time,

18   right?

19       A.   Yes.

20       Q.   And sometimes cases take a long time before they

21   get to court?

22       A.   Yes.

23       Q.   And you were taught to preserve all evidence that

24   you think is relevant to your investigation?

25       A.   Yes.

26       Q.   You did that in this case?

27       A.   To the best of my knowledge, yes.

28       Q.   When you first made contact with Jane Doe, you
```

1    don't see any visible injuries, do you?

2        A.  No, not until she shows me.

3        Q.  So that's a, no, you don't see any visible

4    injuries when you first see her?

5        A.  No.

6        Q.  She tells you that she was choked the night

7    before by Mr. Uruk, correct?

8        A.  Yes.

9        Q.  With both hands, right?

10       A.  Yes.

11       Q.  When you see Ms. Uruk -- sorry.  When you see

12   Jane Doe you don't see any injury to her neck, do you?

13       A.  Other than just redness.

14       Q.  Well, there's redness all over her body, isn't

15   there?

16       A.  Just what I believe from her being distraught and

17   crying.

18       Q.  You don't see any finger imprint on her neck, do

19   you?

20       A.  No.

21       Q.  You don't see any hand imprint on her neck?

22       A.  No.

23       Q.  You don't see any bruising on her neck?

24       A.  No.

25       Q.  You didn't see any redness on her neck consistent

26   with somebody choking her, do you?

27       A.  No.

28       Q.  Now on the day that you get to the house to

1    investigate this call, Ms. Jane Doe tells you that Mr.
2    Uruk grabs both her arms, right?
3        A.   Yes.
4        Q.   Grabs both her arms tightly enough to prevent her
5    from moving about freely, right?
6        A.   Yes.
7        Q.   She tells you that Mr. Uruk holds her arms for
8    about a minute?
9        A.   Approximately.
10       Q.   Right?
11            She tells you she tries to get away, right?
12       A.   Yes.
13       Q.   And then his grip tightens on her arms; isn't
14   that what she tells you?
15       A.   Yes.
16       Q.   When you see Jane Doe, you do not see any visible
17   injury to her arms, do you?
18       A.   No.
19       Q.   You do not see any finger imprints on her arms?
20       A.   No.
21       Q.   You don't see any hand -- what would be
22   considered handprints or anything like that on her arms?
23       A.   No.
24       Q.   You don't see any visible bruising to either arm?
25       A.   No.
26       Q.   Then Jane Doe says that Mr. Uruk hits her two
27   times in the face, right?
28       A.   Yes.

1    Q.  You do not see any visible injury to her face, do

2  you?

3    A.  No.

4    Q.  You don't see any swelling of her lower lip, do

5  you?

6    A.  Not initially.

7    Q.  Well, you don't see any type of injury on the

8  outside of her lip, do you?

9    A.  No.

10    Q.  You do not see any swelling on the outside of her

11  lip, do you?

12    A.  No.

13    Q.  You do not see any bruising on the outside of the

14  lip?

15    A.  No.

16    Q.  She tells you when you're talking to her that she

17  does not need medical attention, correct?

18    A.  Correct.

19    Q.  You explain to her that she can have an Emergency

20  Protective Order issued, don't you?

21    A.  Yes.

22    Q.  And she declines to have an Emergency Protective

23  Order, doesn't she?

24    A.  She does.

25    Q.  You were telling us a little earlier about

26  looking at Mr. Uruk when you were out there at the scene

27  to see if he has any injuries.

28        Do you remember that --

1    A.  Yes.

2    Q.  -- a few minutes ago?

3        And you look at his hands, right?  You look at

4    the palms, yes?

5    A.  Yes.

6    Q.  You look at the back of his hands, right?

7    A.  Yes.

8    Q.  No injuries on his hands at all, right?

9    A.  Correct.

10   Q.  No redness on his hands?

11   A.  No.

12   Q.  Nothing on his knuckles that would be consistent

13   with a punch or a slap?

14   A.  No.

15   Q.  And had you seen anything like that you would

16   have noted it in your report?

17   A.  Absolutely.

18   Q.  When this incident takes place, the one that --

19   where Jane Doe says that she was hit by Mr. Uruk and

20   held by the arms, the children are downstairs at the

21   time this incident takes place, right?

22   A.  Yes.

23   Q.  And Mr. Uruk and Jane Doe are upstairs?

24        THE COURT:  You have to answer out loud.

25        THE WITNESS:  Yes.

26   Q.  BY MR. LEVINSON:  Now at some point Jane Doe sees

27   Mr. Uruk leave the room they are in where this incident

28   allegedly takes place, right?

1   A.   Yes.

2   Q.   Jane Doe doesn't see what Mr. Uruk is doing after

3   he leaves, right?

4   A.   No, she did not see him.

5   Q.   She thinks he goes into the bedroom, something

6   like that?

7   A.   She told me he immediately ran to the bedroom.

8   Q.   She doesn't actually see Mr. Uruk take her phone?

9   A.   No.

10  Q.   And at no time during this entire incident does

11  Jane Doe ever see Mr. Uruk in possession of her phone,

12  correct?

13  A.   Correct.

14  Q.   Jane Doe never says anything to Mr. Uruk about

15  calling the police, does she?

16  A.   She told me that she wanted to call the police.

17  Q.   But that's not my question.  My question is she

18  never says anything to Mr. Uruk about wanting to call

19  the police, does she?

20  A.   No.

21  Q.   She never says anything to Mr. Uruk that she is

22  going to call the police, does she?

23  A.   No.

24  Q.   She never says anything to Mr. Uruk that she's

25  going to call 9-1-1?

26  A.   On my last statement she did tell me she told him

27  she wanted to call the police but that he told her to

28  take care of the kids.

-214

1      Q.  Well, that's an important fact you would have

2    noted in your report, isn't it?

3      A.  Yes.  If I may look at my report.

4      Q.  If it would refresh your memory --

5      A.  Yes.

6      Q.  -- absolutely.

7      A.  Thank you.

8         (Pause)

9         THE WITNESS:  I'm ready.

10        She asked for her cell phone back, not

11   necessarily to call 9-1-1.

12     Q.  BY MR. LEVINSON:  Okay.  So at no time does she

13   ever indicate to Mr. Uruk that she's going to call the

14   police or 9-1-1, does she?

15     A.  No.

16     Q.  You told us a little earlier that you had

17   recovered the phone from some sort of basket or box on

18   top of the refrigerator, right?

19     A.  Yes.

20     Q.  And as we saw in the photo the phone is on top of

21   some other items, correct?

22     A.  Yes.

23     Q.  It's the first thing you see when you look in the

24   basket?

25     A.  Yes.

26     Q.  You didn't take that phone and preserve it for

27   evidence, did you?

28     A.  No.

1    Q.   You didn't look in that phone to or ask Jane Doe

2    to look in the phone, did you?

3    A.   No.

4    Q.   You don't consider that there might be text

5    messages or photographs or other information that might

6    be relevant to your investigation, did you?

7    A.   No.

8    Q.   You didn't consider that there might be

9    evidence there that might have actually exonerated Mr.

10   Uruk?

11              MS. CHANDA:  Objection.  Relevance.  352.

12              THE COURT:  Objection sustained.  It's

13   argumentative.

14   Q.   BY MR. LEVINSON:  At some point during the

15   investigation you had an opportunity to look inside the

16   entire house, right?

17   A.   Yes.

18   Q.   Jane Doe showed you where the incident that she

19   described to you happened?

20   A.   Yes.

21   Q.   You didn't do an examination of those areas, did

22   you?

23   A.   What type of examination?

24   Q.   Did you test for -- you didn't test for any blood

25   on the ground, did you?

26   A.   No.

27   Q.   You didn't look for any blood on the ground, did

28   you?

1    A.   I didn't see any that was visible.

2    Q.   You did not do a specific examination of the area

3    where this supposedly took place to look for blood, did

4    you?

5    A.   No.

6    Q.   And if any blood had been discovered, you would

7    have put that in your report?

8    A.   Yes.

9    Q.   You didn't see any type of cloth or tissue that

10   had blood on it that -- in the possession of Jane Doe,

11   did you?

12   A.   No, I didn't.

13   Q.   You did not see anything that had any blood on it

14   anywhere in the house, did you?

15   A.   Not other than her lip.  That's it.

16   Q.   It wasn't actively blooding when you saw her, was

17   it?

18   A.   No.

19          MR. LEVINSON:  Thank you, Officer.  I have

20   no further questions.

21          THE COURT:  Any redirect?

22          MS. CHANDA:  Yes.  Thank you.

23

24              REDIRECT EXAMINATION

25

26   BY MS. CHANDA:

27   Q.   With regard to the -- with Jane Doe's neck and

28   specifically regarding the choking or strangulation that

1          THE COURT:  Yes.  They can either stay in or

2     stay out.  Just don't go back and forth.

3          All right.

4          (Jurors leave the courtroom.)

5          THE COURT:  All right.

6          So your next witness -- we are back on the

7     record.  We are outside the presence of the jury.

8          Your next witness is?

9          MS. CHANDA:  Detective Harrison.  However,

10    before I do that, I am going to introduce the protective

11    order and then also play the 9-1-1 calls, get that out

12    of the way.  Call Detective Harrison.  And then that

13    will be it.

14         THE COURT:  Okay.  And you had an objection

15    to Detective Harrison.  Let's just do that now.  What's

16    your objection?

17         MR. LEVINSON:  Objection is under 1107,

18    since there isn't going to be any live testimony,

19    there's no relevance to this witness's testifying as an

20    expert.  She doesn't -- she doesn't have any --

21         THE COURT:  What if it explains why -- what

22    if it possibly gives an explanation as to why she's not

23    testifying?

24         MR. LEVINSON:  And that's the second part of

25    the objection is that it is -- its probative value, I

26    believe, is substantially outweighed by the prejudicial

27    effect because essentially what that witness is going to

28    be allowed to do is plant in the jury's mind the only --

1  that would be the only reason that this witness didn't

2  testify.

3          THE COURT:  Right.  But you get to

4  cross-examine her and reveal that that is not the only

5  reason the witness is not testifying, right?

6          MR. LEVINSON:  Well --

7          THE COURT:  All right.

8          MR. LEVINSON:  Once they start talking about

9  domestic violence victims and cycle of violence and all

10 of that, it will be patently clear that -- what their

11 conclusion is.

12          But, anyway, that's the objection.

13          THE COURT:  Okay.  But your objection is not

14 that she's not qualified as an expert.  You're objection

15 is the scope of her testimony is too prejudicial and not

16 probative.

17          MR. LEVINSON:  Correct.

18          THE COURT:  Right?

19          All right.  So I'm going to overrule that

20 objection.  I'm going to allow her to testify.  I would

21 say that, you know, the more concise the testimony, the

22 more concise the questions are, the better.  And I will

23 leave it to you to object.  If you think we are going

24 too far afield or that it is too speculative or not part

25 of the expert testimony, then you can make an objection

26 as we go through.

27          So I would just say be concise and get to

28 the points of the hypotheticals or however you're going

1

12/18/2019

Dear Mr. Hernandez,

I wanted to emphesize a couple of issues regarding
my appeal.

1. Ineffective Assistance of the Counsel
My first plea offer was 1 Felony (Dissuading a witness)
and no jail/prison time. There is an email from Mr.
Levinson regarding the offer. While I was waiting for
a response, I found myself at the preliminary hearing.
I was willing to take the offer, since I was scared.
The DA changed. I was waiting for a settlement.
Mr. Levinson told me that there is an offer of 1 yr
jail and 1 felony, but it is not good. Just before
the trial, I asked for settlement. They offered
180 days and 1 Felony, on ankle monitoring.
While discussing the offer, Mr. Levinson told me that
lets go try. He said there is no supporting evidence
for the charges. I specifically asked him if the
Judge can give me a lengthy sentence. He said no.
I was misled. He said I might end up with a
probation violation.

2.

I wanted to testify. He strongly opposed. I could have helped myself.

I wanted our Pastor to testify. Mr. Levinson didn't want. He could have helped me.

My wife's mental issues, aggression, false statements and my innocence could have been introduced through my or our Pastor's testimony. There were supporting documents/emails. He didn't investigate my wife's mental health.
I wanted my wife to be called to introduce her written statements, after the Judge denied them without her testimony. The Judge told us that we can call her to introduce the written statements. Mr. Levinson opposed.

Even after the convictions he told me that maybe I get 3-4 yrs. He told me that I have a very favorable report for probation.

Our Pastor wanted to come to sentencing to help. But Mr. Levinson told me that he would postpone the sentencing. The Judge denied.

3

He didn't tell me that we have 5% chance of winning the trial, generally.

I asked him specifically if he is paid extra for the trial. He said no? Later I learned that he was paid every month as long as the litigation. He had a strong incentive not to settle the case. I still don't know his compensation plan.

He didn't respond to my emails and calls. He didn't tell me that they can punish me for going to trial. He told me that my wife had a red spot on her arm in one of the photos. There was no such photo.

## 2. No Supporting Evidence for the Charges

I was basically arrested for simple battery (misdemeanor). My charges were increased to felonies by the DA.

There was no bloody lip. There was no blood. The little mark inside my wife's mouth was likely caused by the implant/cover of her teeth.

There was no other evidence of Corporal Injury or Assault with great bodily injury.

4

The Judge did not allow 2014 Photos to be shown to the Jury. There was no sign of any violence.

In 2014, I was arrested for holding my wife's hands/arms to protect myself. I was offered an infraction. I declined.
I don't fit the profile described by the Law enforcement. I am highly educated (MBA, CFA, CPA), without any other criminal background. I am a loving husband and devoted father.

3 My Wife's Hearsay Statements
Whole 2014 statements, even the parts excluded in 2014 trial, were allowed to come to trial in 2019. They were regarding long term abuse and violence. They were long. My wife refused to testify in 2014 trial as well. She took the 5th.

She didn't remember if I hold/grabbed her arms or neck. Mr. Levinson told the Jury that she didn't remember if I hold her neck or throaht, despite my in advance reminder.

2018 statements were fully allowed. The alleged choking incident took place the day before the 911 call.

5

## 4. Prejudice

Mr. Levinson told the Jury that I am Turkish. But he didn't told them that I am an American.

One of the Jurors told the court that he has been to Turkey and definitely the standarts of threating a woman there are dithrent.

When I talked about race and sex discrimination, the Judge said he would consider those during the sentencing. Then he gave me the maximum term with harsh words and face.

The Foreperson told the court before the trial that if the DA didn't dismiss the charges, I must be guilty.

There were more than 20 people from the DAs office coming to the trial. I wanted this to be on the record. Mr. Levinson opposed.

In 2014 trial, one of the senior DAs came and shouted "this is a criminal trial" in front of the Jury, during recess, after my wife refused to testify.

6

I made stupid mistakes while expressing my
confidence in the system, and American people, such as
saying that "your justice is not significantly
different from the movie Midnight Express". Later
I apologized.

5. The Jury Mistake
Mr. Levinson told me that Jury made a mistake too.
I don't know what it is. You need to talk to him.

6. My Wife's Written Statements
The Judge didn't allow my wife's written statements
come to the trial. Mr. Levinson told me that the
Judge made a mistake. The record was made
clearly with the supporting authority and I
should have a pretty good chance on the appeal.
With the written statements, the result would
have been completely different, he said.

7

7. My Incompatance
The Judge told me that, even if my wife does
not testify, he could find me guilty on the
probation violation (misdemeanor) (2014). It
must be on the record. I understood this as
if she didn't testify they cannot find me guilty
on felony charges. As an immigrant, I was
incompetent.


8. Expert Witness
She didn't know anything about the case. It was
prejudicial.

9. Unjust Sentence
You know better. Probation recommended 5 yrs probation. The
DA asked for 7 yrs. The Judge gave the maximum
term (12.3) yrs.

Thank you for your representation. My deepest gratitudes.

Kind regards,
Cevdet Uluk

8

P.S.

In 2014, when I was arrested, they had our email
communication with my wife. There was a Bible
verse "wifes submit to your husbands". When
they found out about it, after I retuned the plea
offer, they gave me a female prosecutor with
Iranian descent, a female public defender
with Iranian descent, a female Judge who has
been fighting with ex-husband over child
support.

Prosecutors came up with false statements such as
"There was a witness from child protection
services". There was no witness.

Then came the false allegation of having a
fire arm as probation violation. I didn't have
a fire arm. It was already confiscated by the
Police. I made the Prosecution very angry during
the appeal process. I explained the rationale
behind 2nd Amendment. I called the
probation report "corruption of obese government
officals". I quoted a Wall Street Journal
Article saying that "woman failed humanity"
I said "when there is nothing, if 3-4 prosecutors are

9

coming to court to influence the court, this is corruption."

I appealed all the way to the Supreme Court unsuccessfully.

I wouldn't do such things in Turkey or another place. I trusted America and American Justice and People. more than anything It was all with good intentions.
It was my stupidness. I have been apologizing and asking/begging for mercy since my conviction.

I had been submitting to my wife since the beginning. I stay home and take care of the children.

My wife told me that "I'll get your money and I will not show you the baby" in 2014.

In 2019, she said "I'll send you to Prison and you'll die there" after she slapped me.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re CEVDET URUK,<br><br>   on Habeas Corpus. | B312326<br>(Super. Ct. Nos. 18CR02248;<br>21CR00309)<br>(Santa Barbara County)<br><br><br>O R D E R<br><br>**COURT OF APPEAL – SECOND DIST.**<br><br>F I L E D<br><br>May 20, 2021<br><br>DANIEL P. POTTER, Clerk<br><br>awinters          **Deputy Clerk** |

THE COURT:

   In reviewing the petition for a writ of habeas corpus filed by
Cevdet Uruk on March 13, 2021, we have taken judicial notice of the
appellate court record in *People v. Cedvet Uruk*, Crim. Case No. B299732.
(Evid. Code, §§ 452, subd. (d), 459.)

   The petition for a writ of habeas corpus is denied.  (*People v.
Duvall* (1995) 9 Cal.4th 464, 474-475; *Strickland v. Washington* (1984) 466
U.S. 668, 693-694; *In re Waltreus* (1965) 62 Cal.2d 218, 225.)


_____        _____        _____
GILBERT, P.J.                              PERREN, J.                              TANGEMAN, J.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions
not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion
has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

THE PEOPLE,

　　Plaintiff and Respondent,

v.

CEVDET URUK,

　　Defendant and Appellant.

2d Crim. No. B299732
(Super. Ct. No. 18CR02248)
(Santa Barbara County)

COURT OF APPEAL – SECOND DIST.
FILED
Sep 30, 2020
DANIEL P. POTTER, Clerk
S. Clabom    Deputy Clerk

　　　　A jury convicted Cevdet Uruk of corporal injury to a
spouse (Penal Code,[1] § 273.5, subd. (a)), dissuading a witness
(§ 136.1, subd. (b)(1)), assault with force likely to cause great
bodily injury (§ 245, subd. (a)(4)), contempt of court (§ 166, subd.
(c)(1)), battery (§ 243, subd. (e)(1)), and false imprisonment
(§ 236).  The trial court found true an allegation that Uruk had
suffered a prior domestic violence conviction (§ 273.5, subd.
(f)(1)), and sentenced him to 10 years eight months in state

---

[1] Undesignated statutory references are to the Penal Code.

prison. Uruk contends: (1) the judgment should be reversed because the court erroneously excluded impeachment evidence, (2) the sentence on his corporal injury to a spouse conviction should be reduced, and (3) the sentences on his battery and false imprisonment convictions should be stayed.[2] We reduce Uruk's sentence by one year, and otherwise affirm.

## FACTUAL AND PROCEDURAL HISTORY

On the evening of March 8, 2018, Uruk choked his wife during an argument. He then pinned her against the kitchen counter. She did not call 911 because she thought the incident would "blow over" and Uruk would forget about it.

The next morning, Uruk was still angry about the events of the previous evening. He grabbed his wife by both arms and pinned her against the wall. She struggled to get away. He struck her in the face twice, causing her to fall to the floor.

While his wife was on the floor, Uruk went to the bedroom and took her phone. He refused her request to return it. A sheriff's deputy later found the phone on top of the refrigerator.

Uruk's wife called 911 from a neighbor's house. She told the operator that Uruk had just hit her, and that he tried to choke her the previous evening. She said that he had "lost control completely" and threatened to kill her.

A sheriff's deputy responded to the 911 call and saw that Uruk's wife had a bruised and lacerated lip. She told the deputy that Uruk had grabbed her by the arms, pinned her

---

[2] In a supplemental brief, Uruk raises several additional arguments in support of his contention that the judgment should be reversed. Because he does not support these arguments with citations to the record or legal authority, we do not consider them. (*In re Champion* (2014) 58 Cal.4th 965, 985-986.)

against the wall, and struck her in the face. When the deputy
spoke with Uruk, he did not observe any injuries. Uruk did not
complain of any injury, and did not claim that his wife had
attacked him.

Uruk was arrested. He later posted bail and
returned home to his wife and children, where he remained
throughout trial.

Prosecutors called Uruk's wife as a trial witness.
After she was sworn in, she refused to answer prosecutors'
questions except to say that no one had told her not to testify.
The trial court then gave Uruk the opportunity to question his
wife, but he declined. The court thereafter admitted into
evidence a recording of her 911 call, and permitted the sheriff's
deputy who interviewed her to testify.

Uruk sought to impeach this evidence with a July
2018 letter his wife purportedly wrote to the district attorney and
a May 2019 e-mail she purportedly wrote to his attorney to pass
along to the district attorney. In the letter, Uruk's wife
"apologized . . . for the troubles [she] might have caused." She
said she "acted childishly without knowing/understanding the
consequences of [her] actions." She did not "remember [the
March 2018] events clearly," but believed she "used inappropriate
words and made misleading/false/exaggerated statements" when
describing them. She said that there was no violence in her
home, that her outbursts were due to fatigue, and that she had
been the aggressor. She asked the district attorney to drop the
charges against her husband.

In the e-mail, Uruk's wife reiterated that she had
"trouble recalling [the] exact events" of March 2018, and "still
[didn't] understand how things work[ed]." She again claimed

that she overreacted, that there was no violence or threat of violence in her home, and that she "might" have been the aggressor.

The trial court denied Uruk's request to admit the impeachment evidence. The letter was deemed unreliable and unduly prejudicial pursuant to Evidence Code section 352. The e-mail was "even less relevant [and] less reliable than the letter" because it was submitted for "litigation purposes" in lieu of actual testimony. It was also unduly prejudicial.

After the jury convicted Uruk of the charges against him, the trial court found true an allegation that he suffered a prior domestic violence conviction for committing battery on a spouse. The court rejected a recommendation for probation, concluding that Uruk instead deserved a "full-term consecutive" sentence, "the maximum sentence . . . allowable by law." It sentenced him to 10 years eight months in state prison: five years on the corporal injury to a spouse conviction; two years for dissuading a witness; one year each on the assault, contempt, and battery convictions; and eight months on the false imprisonment.

## DISCUSSION

### Exclusion of impeachment evidence

Uruk contends the trial court prejudicially erred when it admitted the recording of his wife's 911 call and her subsequent statements to the sheriff's deputy but excluded the letter and e-mail. We disagree.

Evidence Code section 1202 permits the admission of "[e]vidence of a statement . . . by a declarant that is inconsistent with a statement by such declarant . . . for the purpose of attacking the [declarant's] credibility." This provision "creates 'a

4

uniform rule permitting a hearsay declarant to be impeached by inconsistent statements in all cases, whether or not the declarant has been given an opportunity to explain or deny the inconsistency.' [Citation.]" (*People v. Corella* (2004) 122 Cal.App.4th 461, 470 (*Corella*).) Its purpose is to "assure fairness to the party against whom hearsay evidence is admitted without an opportunity for cross-examination." (*Ibid.*)

But the impeachment evidence Uruk proffered at trial—the letter and e-mail from his wife—were in writing. And "[a]uthentication of a writing is required before it may be received in evidence." (Evid. Code, § 1401, subd. (a).) Uruk had the opportunity to question his wife about the authenticity of the letter and e-mail at trial, but did not do so. Nor did he present any other evidence of the authenticity of the two writings. The trial court thus did not err when it declined to receive them into evidence. (Evid. Code, § 403, subd. (a)(3) [proponent of writing has burden of showing its the authenticity]; see *People v. Brown* (2004) 33 Cal.4th 892, 901 [when deciding challenge to admission or exclusion of evidence, appellate court examines result, not trial court's rationale].)

We would not find error even if Uruk had authenticated the letter and email. A trial court has broad discretion to exclude impeachment evidence if its probative value "is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice." (Evid. Code, § 352; see *People v. Hamilton* (2009) 45 Cal.4th 863, 929.) When analyzing whether to exclude evidence as unduly prejudicial, a court "need not expressly weigh prejudice against probative value, or even expressly state it has done so." (*People v. Williams* (1997) 16 Cal.4th 153, 214.) "All that is required is

5

that the record demonstrate the . . . court understood and fulfilled its responsibilities under Evidence Code section 352." (*Ibid.*)

The record demonstrates that happened here. The letter and e-mail were only marginally probative. In both writings Uruk's wife said that she did not remember all of the details of the March 2018 events. She also never explicitly contradicted her statements—made in both the 911 call and the subsequent statements to the sheriff's deputy—that Uruk had hit her in the mouth.

Admission of the writings would have presented a potential for prejudice. Uruk was living at home with his wife throughout trial, which permitted him to pressure her to recant the statements she had made to the 911 operator and sheriff's deputy. Uruk had also previously battered his wife, which undermined her statements that there has been no violence in their household. Balancing this potential prejudice against the marginal probative value of the writings, we cannot say "'that the court exercised its discretion in an arbitrary, capricious[,] or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

This case is unlike *Corella, supra,* 122 Cal.App.4th 461, on which Uruk relies. In that case, "[t]he record show[ed] that the trial court did not exclude the [impeachment] evidence under [Evidence Code] section 352" but rather "because it had been stricken from the preliminary hearing." (*Id.* at p. 471.) We thus had no occasion to consider whether the evidence was unduly prejudicial. "It is axiomatic that cases are not authority

6

for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th
1250, 1268, fn. 10.)

*Corporal injury to a spouse sentence*

Uruk next contends, and the Attorney General
concedes, the sentence on his corporal injury to a spouse
conviction must be reduced to four years because the trial court
relied on an inapplicable alternative penalty scheme. We agree.

When a person is convicted of corporal injury to a
spouse, and has, within the previous seven years, been convicted
of a violation of section 243, subdivision (d), the person can be
sentenced to two, four, or five years in state prison. (§ 273.5,
subd. (f)(1).) If the person's prior conviction was for a violation of
section 243, subdivision (e), however, the person can be sentenced
to two, three, or four years in prison. (§ 273.5, subd. (f)(2).) Here,
the trial court sentenced Uruk to five years in prison for his
corporal injury on a spouse conviction pursuant to section 273.5,
subdivision (f)(1). But it should have sentenced him pursuant to
subdivision (f)(2) of that section because his prior conviction was
for a violation of section 243, subdivision (e). Accordingly, the
sentence on Uruk's corporal injury on a spouse conviction must
be reduced to four years.

*Battery and false imprisonment sentences*

Lastly, Uruk contends the sentences on his battery
and false imprisonment convictions should be stayed pursuant to
section 654 because they occurred during a course of conduct
indivisible from his corporal injury to a spouse conviction. We
disagree.

"An act . . . that is punishable in different ways by
different provisions of law shall be punished under the provision
that provides for the longest potential term of imprisonment, but

7

in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) This prevents a defendant from being punished for multiple offenses that are committed during "a course of conduct deemed to be indivisible in time." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.) """"Whether a course of criminal conduct is divisible[,] and therefore gives rise to more than one act within the meaning of section 654[,] depends on the intent and objective of the actor."""" (*People v. Jackson* (2016) 1 Cal.5th 269, 354 (*Jackson*).)  If all of the offenses were "merely incidental to" a single objective, or were all "the means of accomplishing or facilitating" that objective, the defendant "may be found to have harbored a single intent and . . . may be punished only once." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)  But if the defendant "harbored 'multiple criminal objectives[]' [that] were independent of and not merely incidental to each other, [they] may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*Ibid.*)

"Intent and objective are factual questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense." (*Jackson, supra,* 1 Cal.5th at p. 354.)  We will uphold the court's determination that Uruk had separate intents and objectives when committing corporal injury to his wife, battery, and false imprisonment if supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730.)  In applying this standard, we accept all rational inferences the court may have drawn from the evidence, irrespective of whether we would have drawn those

same inferences ourselves.  (*People v. Solomon* (2010) 49 Cal.4th
792, 811-812.)

     The three offenses at issue all occurred on the
morning of March 9, 2018.  Uruk battered his wife by grabbing
her arms.  He falsely imprisoned her when he pinned her against
the wall.  And he inflicted corporal injury when he punched her
in the mouth and caused her to fall to the floor.

     Substantial evidence supports the trial court's
determination that Uruk harbored separate intents and
objectives when he committed each of these offenses.  It is
rational to infer that he battered his wife because he was still
angry about the events of March 8.  It is rational to infer that he
falsely imprisoned her to prevent her from fleeing or resisting his
abuse.  And it is rational to infer that he inflicted corporal injury
on her to neutralize her so he could go into the bedroom, take her
phone, and prevent her from calling the police.  It was thus
permissible to punish each offense separately.  (See, e.g., *People
v. Nubla* (1999) 74 Cal.App.4th 719, 730-731 [multiple
punishment permitted for separate acts of domestic violence].)

     Multiple punishments are not barred where, as here,
"the defendant had a chance to reflect between offenses and each
offense created a new risk of harm."  (*People v. Felix* (2001) 92
Cal.App.4th 905, 915.)  "[T]he purpose of section 654 is to ensure
that the defendant's punishment is commensurate with [their]
culpability."  (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1256.)
Permitting multiple punishments for an increasingly egregious
course of conduct—like Uruk's on the morning of March 9—is
accordingly proper.  (*Ibid.*)

## DISPOSITION

Uruk's sentence is vacated, and the matter is remanded to the trial court with directions to resentence him to total term of nine years eight months in state prison, a term that includes four years on the corporal injury on a spouse conviction. (See § 273.5, subd. (f)(2).)  The clerk of the court shall prepare an amended abstract of judgment, and forward a copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


TANGEMAN, J.

We concur:


GILBERT, P. J.


PERREN, J.

10

Michael J. Carrozzo, Judge

Superior Court County of Santa Barbara

———————————————

Robert L. Hernandez, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Wyatt E. Bloomfield and Douglas L. Wilson, Deputy Attorneys General, for Plaintiff and Respondent.

EXHIBIT NO. 2a
Case No. 19CR02248
☐ Court      ☐ Pltf.
☑ People    ☐ Petr.
I.D. 6/21/19
Evid.
DARRELE BAKER
By
501 Rev

1
2
3
4
5
6
7                              **PEOPLE V. URUK**
8
9
10
11   **KEY:**
12   **CHUNG:**        **Ofc. Chung**
13   **DOE:**          **Jane Doe**
14
15                              [START OF INTERVIEW]
16
17   CHUNG:         Uh, what happened?
18
19   DOE:           Um, this started last Sunday when he, um, he beat me for - he found some
20                  peanuts that I was hiding. I had some peanuts - doesn't allow me to eat lots of
21                  food. I'm on a very strict diet because he thinks it's, uh, allergies but I don't. I
22                  went to the doctor's off- well, because of that he got so mad at me that he
23                  yelled and he tossed me and he beated me. So th- I was screaming for help. So
24                  my landlady she also came. Um...
25
26   CHUNG:         Did the police come?
27
28   DOE:           No, I didn't call the police.
29
30   CHUNG:         You didn't call the police? How come?
31
32   DOE:           Um, I'm just kinda used to that behavior. Um, I've been trying to keep the
33                  marriage and stuff, been trying to leave – it's a long story. I would come back
34                  all the time. Um, but he did this in front of the baby and she got so scared. She
35                  cried. He grabbed her. He went out to the landlady and, um, she saw how -
36                  how angry he was. So he told me next day that I have to leave and, um, on
37                  Monday. Now I (unintelligible) I work full-time (unintelligible). Okay, can I -
38                  can I stay 'til Saturday? Then I have time - I have time off. I'll move. I'll find
39                  a place where to stay. (Unintelligible) would prefer immediately. We
40                  negotiated - okay. And today - this morning, uh, he was supposed to be here
41                  on a hike, so that I have time to clean the place and move in. And instead of
42                  that he gets even more aggressive and hostile. He's - he like grabbed me just
43                  pulled me to - from room to room to the bathroom threatening to kill me.
44
45   CHUNG:         What...

301

46

47    ((Crosstalk))

48

49    CHUNG:        ...did he say exactly?

50

51    DOE:          "I will kill you if you do - if you do this."

52

53    CHUNG:        Do what?

54

55    DOE:          I did ask him several times. "What do you mean by this? What do you mean
56                  by this?" He didn't explain.

57

58    CHUNG:        What this meant?

59

60    DOE:          Yes.

61

62    CHUNG:        He keeps saying, "I - I will kill you if you do this."

63

64    DOE:          Yes.

65

66    CHUNG:        But he doesn't explain what this is?

67

68    DOE:          He didn't. And he (unintelligible) he told me that, um, it could be anything
69                  from being the wrong food to leaving, uh, leaving him. Uh, and just usually
70                  tells me that if I do something...

71

72    CHUNG:        Mm-hm [affirmative].

73

74    DOE:          ...or not do something what he wants there will be consequences.

75

76    CHUNG:        What did he mean by consequences?

77

78    DOE:          I've asked him many times he's never (unintelligible). That's our neighbor.
79                  Hi.

80

81    CHUNG:        Hi.

82

83    NEIGHBOR:     Everything okay?

84

85    CHUNG:        Everything's okay right now.

86

87    DOE:          Yeah, we're good. We're Good. Thank you. Uhm, usually that means not only
88                  yelling but beating.

89

90    CHUNG:        Beating.

302

| | | |
|---|---|---|
| 91 | | |
| 92 | DOE: | Yes. |
| 93 | | |
| 94 | CHUNG: | So let me get the whole story straight. So, last Sunday you guys got into an |
| 95 | | argument. |
| 96 | | |
| 97 | OFFICER 2: | Sir, can you please come downstairs? |
| 98 | | |
| 99 | DOE: | That's my husband. |
| 100 | | |
| 101 | OFFICER 2: | Can you please come downstairs? |
| 102 | | |
| 103 | DOE: | I think he expected me to call the police. |
| 104 | | |
| 105 | OFFICER 2: | He's coming down. |
| 106 | | |
| 107 | CHUNG: | Okay. |
| 108 | | |
| 109 | OFFICER 2: | Want to stand by with me (Unintelligible) |
| 110 | | |
| 111 | CHUNG: | Just. I'll be right back. Just stay right here. |
| 112 | | |
| 113 | OFFICER 2: | Hi. We're just going to talk to you for a little bit. Uh, do we're just going to |
| 114 | | talk to you for a little bit. Uh, do you have any weapons on your or anything? |
| 115 | | |
| 116 | URUK: | Not on me but I have a (Unintelligible) |
| 117 | | |
| 118 | OFFICER 2: | You have nothing on your right now? (Unintelligible) Make sure then I'll feel |
| 119 | | more comfortable standing by and talking with ya. I'm sure that will make |
| 120 | | you feel more comfortable too to know that I know you don't have any |
| 121 | | weapons on you, right? Is this your wallet? |
| 122 | | |
| 123 | URUK: | Yeah |
| 124 | | |
| 125 | OFFICER 2: | How long have you lived here in this house? |
| 126 | | |
| 127 | URUK: | (Unintelligible) Years (Unintelligible) |
| 128 | | |
| 129 | OFFICER 2: | Okay. I just got to make sure |
| 130 | | |
| 131 | URUK: | I'm a. I am an educated person |
| 132 | | |
| 133 | OFFICER 2: | Great. |
| 134 | | |
| 135 | URUK: | Ok. I can control myself if you like to talk to me let's go upstairs. |

| 136 | OFFICER 2: | Yeah. I'm going to stay within eyesight of my partner, but I'll talk with you |
| 137 | | |
| 138 | URUK: | You can come together |
| 139 | | |
| 140 | OFFICER 2 | No. No. No. We'll do so in just a |
| 141 | | |
| 142 | CHUNG: | We're just going to talk right here |
| 143 | | |
| 144 | OFFICER 2 | He's going to stand by and talk to the other party ok. So let me get your |
| 145 | | information first... |
| 146 | | |
| 147 | CHUNG: | Okay on Sunday you guys got into an argument and he hit you. |
| 148 | | |
| 149 | DOE: | He just found this... |
| 150 | | |
| 151 | CHUNG: | Peanuts. |
| 152 | | |
| 153 | DOE: | Peanuts. He came to me and said what is this, I said one guess. I had some |
| 154 | | peanuts. I was hungry. He put me on a very strict diet. I can only eat rice, |
| 155 | | vegetables, meat, fish. |
| 156 | | |
| 157 | CHUNG: | Where did he hit you? |
| 158 | | |
| 159 | DOE: | Um, first time he came started to yelling at me, yelled and yelled. I just |
| 160 | | walked away. I don't react to his yelling anymore. |
| 161 | | |
| 162 | CHUNG: | Mm-hm [affirmative]. |
| 163 | | |
| 164 | DOE: | I stayed calm (unintelligible) used to. Then in a couple minutes he rushed to |
| 165 | | me again. He, um, grabbed me by the throat, pushed me to the bathroom and |
| 166 | | he said, "If you - if I see, um, allergy on your face -- my skin - my skin does |
| 167 | | break to certain food, but this is not allergy and it (unintelligible) to multiple |
| 168 | | things. |
| 169 | | |
| 170 | CHUNG: | Uh-huh [affirmative]. |
| 171 | | |
| 172 | DOE: | Uh, like sun, green, whatever. He said, "If I see once again I'll kill you." |
| 173 | | |
| 174 | CHUNG: | "If I see you..." |
| 175 | | |
| 176 | DOE: | "If I see this, um..." |
| 177 | | |
| 178 | CHUNG: | Allergy. |
| 179 | | |
| 180 | DOE: | ..."allergy again" -- or whatever condition was it like an allergy. I went to the |

| | | |
|---|---|---|
| 181 | | doctor. It's not an allergy - this skin condition -- "then I will kill you." Um, |
| 182 | | I'm... |
| 183 | | |
| 184 | ((Crosstalk)) | |
| 185 | | |
| 186 | CHUNG: | This is in English or is in... |
| 187 | | |
| 188 | DOE: | English. |
| 189 | | |
| 190 | CHUNG: | It's... |
| 191 | | |
| 192 | DOE:: | It's all English - yes. Um, I'm also used to the threats and him grabbing my |
| 193 | | throat. That is co- quite common so I stay calm. I... |
| 194 | | |
| 195 | CHUNG: | Did he grab you with his right hand or left hand? |
| 196 | | |
| 197 | DOE: | Uh, it can be also both. I don't remember. |
| 198 | | |
| 199 | CHUNG: | Okay. And he threw you into the bathroom? |
| 200 | | |
| 201 | DOE: | No, he... |
| 202 | | |
| 203 | CHUNG: | Did you fall? |
| 204 | | |
| 205 | DOE: | No, he pushed me to the... |
| 206 | | |
| 207 | CHUNG: | Oh, pushed you into the bathroom? |
| 208 | | |
| 209 | DOE: | ...bathroom and against the wall. |
| 210 | | |
| 211 | CHUNG: | Against the wall. |
| 212 | | |
| 213 | DOE: | Against the wall. That's usually what he does. Against the wall. He shouted |
| 214 | | all this to me. Baby was there but since I was staying calm and kind of |
| 215 | | ignorant then, um, she wasn't that scared. Then what happened again maybe |
| 216 | | in five minutes or something he started talking to me like why am I doing |
| 217 | | this? Why do I keep eating forbidden foods? And I said, "Well, 'cause" - |
| 218 | | because I get the allergy he says then baby gets her meat allergy. 'Cause she |
| 219 | | has this red spot and it connects with little red. But this is just his assumptions. |
| 220 | | |
| 221 | CHUNG: | So did he let go? Let go of your... |
| 222 | | |
| 223 | DOE: | Of the throat? Yeah, he the- he threw this threat. Since I was silent in response |
| 224 | | he let me go. But then after like he - he went away and then five minutes we |
| 225 | | have this conversation and I tell him, "Well, I went to doctor and I don't have |

| 226 | | any allergies. And I'm hungry on this diet." He, um, he burst - he jumping me |
| 227 | | and it (unintelligible) from the couch, had a pillow and he, uh, I can't |
| 228 | | remember how he caught me. He grabbed me, um, he hit me through the |
| 229 | | pillow. |
| 230 | | |
| 231 | CHUNG: | So he put the pillow and hit - hit the pillow and it hit you? |
| 232 | | |
| 233 | DOE: | Through the pillow. He - he... |
| 234 | | |
| 235 | CHUNG: | Through the pillow? |
| 236 | | |
| 237 | DOE: | ...was hitting me through the pillow. He pushed me to the bedroom and he - he |
| 238 | | was just shouting something like, "Stop killing us, stop killing us, stop doing |
| 239 | | this to us." And he kept on hitting me through the pillow or... |
| 240 | | |
| 241 | CHUNG: | On your head? |
| 242 | | |
| 243 | DOE: | Uh, some were face, neck, back. |
| 244 | | |
| 245 | CHUNG: | So he put the pillow... |
| 246 | | |
| 247 | DOE: | He was just... |
| 248 | | |
| 249 | CHUNG: | He put the pillow on you and he was hitting you? |
| 250 | | |
| 251 | DOE: | I think it was through the pillow, but it was still painful so I'm not sure if it |
| 252 | | was direct or just through the pillow. But I know he have to had it - to had it, |
| 253 | | um, and I started screaming because he was like really insane. I used to like |
| 254 | | that he hits me like or he grabs my throat or he tosses me everything like hit |
| 255 | | me, slap on the face that I fell on the floor. Single cases I'm used to but this |
| 256 | | was like repeatedly so I got scared. I screamed out and I (unintelligible) |
| 257 | | shouted for help and the landlady she - the landlady she went upstairs 'cause I |
| 258 | | tried to walk upstairs, heard my screaming and she saw my husband walking |
| 259 | | out with the babe because he was hitting me in front of Elizabeth, but she |
| 260 | | came in and she got so scared she cried and he let go of me. With the |
| 261 | | screaming and we were... |
| 262 | | |
| 263 | CHUNG: | Wait. So - so he's hitting you with the pillow through the pillow, landlady |
| 264 | | comes in. |
| 265 | | |
| 266 | DOE: | I - I shout. |
| 267 | | |
| 268 | CHUNG: | You shout and then... |
| 269 | | |
| 270 | | |

---

| | | |
|---|---|---|
| 316 | | me and to convince to stay. At some point he dragged me by my arm. |
| 317 | | |
| 318 | CHUNG: | (Unintelligible)? |
| 319 | | |
| 320 | DOE: | Yeah. Pushed me into the bedroom and said I just remember (unintelligible) |
| 321 | | re-negotiation conversation but it's like he wants me to stay, uh, but he's seen |
| 322 | | (unintelligible) and he wants me to stay. He doesn't want me to go so he |
| 323 | | continued this conversation over and over again. And then eventually he |
| 324 | | tosses me into the bedroom - bathroom and said... |
| 325 | | |
| 326 | CHUNG: | Bathroom? |
| 327 | | |
| 328 | DOE: | Bathroom. Pushed me against the wall saying, "If you do this I'll kill you." |
| 329 | | |
| 330 | CHUNG: | Like by your arms or your throat or how did he... |
| 331 | | |
| 332 | DOE: | Throat. |
| 333 | | |
| 334 | CHUNG: | He grabbed you by the throat today? |
| 335 | | |
| 336 | DOE: | They say and now I don't remember what he did. Was it throat or was it hand? |
| 337 | | Um, but he said, "I'm gonna kill you." |
| 338 | | |
| 339 | CHUNG: | "If you do this?" |
| 340 | | |
| 341 | DOE: | Yeah, "Do this." And I ask, "What is this? What is this?" And he doesn't |
| 342 | | explain. Um, and then he started again and baby started crying while we were |
| 343 | | there so I tried to calm her down, um, (unintelligible). |
| 344 | | |
| 345 | CHUNG: | So baby's crying. You try to calm her down. |
| 346 | | |
| 347 | DOE: | Uh, he went out. He said, "It's okay, don't cry. We're fine." So I went into the |
| 348 | | - the room and he wanted to read an email. He tried to explain to me all his |
| 349 | | facts. "Look at this, look at that. Is that okay? Is that okay?" And I cannot |
| 350 | | disagree with him - have to agree because otherwise he's gonna get really |
| 351 | | mad. So when I and he was aggressive. He forced me to look into his eyes. |
| 352 | | But when he's aggressive I don't want to look at him. Um, he wasn't - he |
| 353 | | forced me to look into his eyes with an aggressive voice and a threat in his |
| 354 | | voice. And eventually I tried to calm the baby down and eventually when I get |
| 355 | | a chance I just escape because it gets scarier and scarier. So I'm gonna end. |
| 356 | | |
| 357 | CHUNG: | So there was a moment... |
| 358 | | |
| 359 | ((Crosstalk)) | |
| 360 | | |

| 361 | DOE: | That he... |
|---|---|---|
| 362 | | |
| 363 | CHUNG: | So... |
| 364 | | |
| 365 | DOE: | Yeah, there was a moment that, um... |
| 366 | | |
| 367 | CHUNG: | You could leave (unintelligible)? |
| 368 | | |
| 369 | DOE: | ...I could escape yes. I - I think baby started crying hard in my arms and I just |
| 370 | | rushed outside and he shouted to me, "Don't leave, don't leave." But I just |
| 371 | | grabbed her and I ran downstairs. Because I open this apartment below earlier |
| 372 | | 'cause when they give me the key I was going to move with her and he knew |
| 373 | | I'm going to move to her that's the place in town. |
| 374 | | |
| 375 | CHUNG: | You're gonna move downstairs? |
| 376 | | |
| 377 | DOE: | Yeah. |
| 378 | | |
| 379 | CHUNG: | That doesn't sound like a good idea. |
| 380 | | |
| 381 | DOE: | I thought it would be gradual for the baby because Daddy would still babysit |
| 382 | | and he loves her. He takes good care of her. I was afraid (unintelligible) for |
| 383 | | her and for me because I take things gradual. Oh, (unintelligible). Thank you. |
| 384 | | |
| 385 | CHUNG: | So what - what is it that you want for me to do for you today? |
| 386 | | |
| 387 | DOE: | That if you could convince him not to prevent me from leaving with Elizabeth |
| 388 | | so he doesn't try to s- to make (unintelligible) to stay. I take it - I - I prepare |
| 389 | | the place, I take her things and I just move and I leave. I just... |
| 390 | | |
| 391 | CHUNG: | Do you... |
| 392 | | |
| 393 | DOE: | ...want to leave. |
| 394 | | |
| 395 | CHUNG: | Do you feel scared because he said he's gonna kill you? |
| 396 | | |
| 397 | DOE: | I've heard his threats before and (unintelligible) is scary. |
| 398 | | |
| 399 | CHUNG: | Mm-hm [affirmative]. |
| 400 | | |
| 401 | DOE: | And then I get used to it. Um... |
| 402 | | |
| 403 | CHUNG: | Are you scared today? |
| 404 | | |
| 405 | DOE: | I think... |

406
407  CHUNG:        Were you scared today?
408
409  DOE:          I was scared.
410
411  CHUNG:        Do you feel like...
412
413  DOE:          I was scared.
414
415  CHUNG:        ...he might do it?
416
417  DOE:          Um...
418
419  CHUNG:        Do you think it's possible he might do it?
420
421  DOE:          He gets really mad. Um, I don't know if he's capable. Things have been
422                escalating gradually. He's been hitting me more and more. Um, I don't know
423                how far he really can go. If it's just threat.
424

PEOPLE V. URUK
2018 911 Call
Page 1

EXHIBIT NO. 14a
Case No. 18CR02248
☐ Court          ☐ Pltf.
☒ People        ☐ Petr.
I.D. 6/25/19
Evid.
DARRELL PARKER
By _____          501 Rev

1
2
3
4
5
6
7                          **PEOPLE V. DOE**
8                        **911 Call March 2018**
9
10    **KEY:**
11
12    **DISPATCH:**        **Dispatch**
13    **DOE:**             **Jane Doe**
14
15                              [START OF INTERVIEW]
16
17    DISPATCH:        911, what's the address of your emergency?
18
19    DOE:            Uh, 1021.
20
21    DISPATCH:        Excuse me?
22
23    DOE:            (Unintelligible).
24
25    DISPATCH:        Hello?
26
27    DOE:            Hello 1021 (unintelligible).
28
29    DISPATCH:        1021 what's going on there?
30
31    DOE:            Um, my husband, he just hit me.
32
33    DISPATCH:        Okay. Where is he at now?
34
35    DOE:            He's inside the house.
36
37    DISPATCH:        Okay. He just hit you?
38
39    DOE:            Yes it's been like since yesterday - yesterday he tried to choke me. He
40                    threatened badly. Um, he threatened. Um, today he continues on. He's been
41                    pushing me around the house. And he's been aggressive. And now he hit me
42                    again. Um, (unintelligible).
43
44    DISPATCH:        Any weapons?
45

| | | |
|---|---|---|
| 46 | DOE: | (Unintelligible) bleeding. Huh? |
| 47 | | |
| 48 | DISPATCH: | Any... |
| 49 | | |
| 50 | DOE: | No. |
| 51 | | |
| 52 | DISPATCH: | ...weapons? |
| 53 | | |
| 54 | DOE: | No weapons. No. |
| 55 | | |
| 56 | DISPATCH: | All right and is that a little baby? |
| 57 | | |
| 58 | DOE: | Next to me, yes. I'm holding a baby. |
| 59 | | |
| 60 | DISPATCH: | Okay. And where are you at now? |
| 61 | | |
| 62 | DOE: | Outside the house. |
| 63 | | |
| 64 | DISPATCH: | Okay. Does he know you're calling law enforcement? |
| 65 | | |
| 66 | DOE: | Yes, I think he knows. |
| 67 | | |
| 68 | DISPATCH: | How do you think he'll react? |
| 69 | | |
| 70 | DOE: | Um, I - I don't know it's unpredictable. He's been threatening me with - and |
| 71 | | he even - he cannot hold himself and his like - he's been threatening to kill me |
| 72 | | for a while. |
| 73 | | |
| 74 | DISPATCH: | Okay. |
| 75 | | |
| 76 | DOE: | And yesterday there was an argument and he just lost control completely. Is |
| 77 | | possible to - but, um, deputies come a little, um... |
| 78 | | |
| 79 | DISPATCH: | We're on our way... |
| 80 | | |
| 81 | DOE: | ...like... |
| 82 | | |
| 83 | DISPATCH: | ...right now. |
| 84 | | |
| 85 | DOE: | ...like, um, n- not so discreet? |
| 86 | | |
| 87 | DISPATCH: | I'm sorry? |
| 88 | | |
| 89 | DOE: | Um, I don't want any- is it possible that when officers come, they come like |
| 90 | | not so, um, open I would say but, uh, I don't want the neighbors to... |

PEOPLE V. URUK
2018 911 Call
Page 3

| | | |
|---|---|---|
| 91 | | |
| 92 | DISPATCH: | Um, they don't... |
| 93 | | |
| 94 | DOE: | ...um... |
| 95 | | |
| 96 | DISPATCH: | ...normally park in front of the house. But they... |
| 97 | | |
| 98 | DOE: | Okay. |
| 99 | | |
| 100 | DISPATCH: | ...will have to go into the house. I'm not sure. How do you spell, um, it's Y-U- |
| 101 | | R-U-K and how do you spell the - your husband's first name? |
| 102 | | |
| 103 | DOE: | Um, Ben, B-E-N. |
| 104 | | |
| 105 | DISPATCH: | Okay. |
| 106 | | |
| 107 | DOE: | The last name U-R-U-K. |
| 108 | | |
| 109 | DISPATCH: | Okay. Does anyone else live in the house? |
| 110 | | |
| 111 | DOE: | Uh, the - well it's one house and it has two condos. So... |
| 112 | | |
| 113 | DISPATCH: | Okay. |
| 114 | | |
| 115 | DOE: | ...it's, uh, one condo me and my, um, my husband and our kids. |
| 116 | | |
| 117 | DISPATCH: | Okay wa- is it - what condo number is it? |
| 118 | | |
| 119 | DOE: | 1021. |
| 120 | | |
| 121 | DISPATCH: | 1021, okay there's not like A or B? |
| 122 | | |
| 123 | DOE: | No. |
| 124 | | |
| 125 | DISPATCH: | Okay. Is he under the influence of any drugs or alcohol? |
| 126 | | |
| 127 | DOE: | No. |
| 128 | | |
| 129 | DISPATCH: | No? Any weapons in the home at all? |
| 130 | | |
| 131 | DOE: | No. |
| 132 | | |
| 133 | DISPATCH: | Okay. We're on the way. I'll stay on the phone with you 'till we get there or |
| 134 | | did you want me to get off or? |
| 135 | | |

| 136 | DOE: | I'm sorry, what? |
| 137 | | |
| 138 | DISPATCH: | I can stay on the phone with you 'till we get there. |
| 139 | | |
| 140 | DOE: | Um, no I can get off and then we will just stay outside. |
| 141 | | |
| 142 | DISPATCH: | Okay. I'll let 'em know that you're out front. Okay? |
| 143 | | |
| 144 | DOE: | Okay thank you. |
| 145 | | |
| 146 | DISPATCH: | Thank you. |
| 147 | | |
| 148 | DOE: | Bye. |

PEOPLE V. URUK
911 Call November 2014
Page 1

EXHIBIT NO. 15a
Case No. 18CR02248
☐ Court        ☐ Pltf.
☑ People       ☐ Petr.
I.D. 6/25/19
Evid.
DARREL E. PARKER
By _____

1
2
3
4
5
6
7                           **PEOPLE V. URUK**
8                        **911 Call November 2014**
9
10   **KEY:**
11
12   **DISPATCH:**     **Dispatch**
13   **DOE:**          **Jane Doe**
14
15                          [START OF INTERVIEW]
16
17   DISPATCH:       911?
18
19   DOE:            I'm trying to leave my husband, but he has threatened to kill me if I do so.
20
21   DISPATCH:       Okay.
22
23   DOE:            I just escaped from him to a neighbor's place with my baby and, uh, we
24                   agreed that I have to -- he wanted to kick me out on Monday, but I negotiated
25                   to stay until Saturday then I leave, but now he's, uh, not letting me go.
26
27   DISPATCH:       Okay. Are you at 300 Loma Media?
28
29   DOE:            Yes, 300 Loma Media.
30
31   DISPATCH:       962-7361? Is that the correct phone number?
32
33   DOE:            Oh you - yeah that's probably my, uh, neighbor's, yes, because she lives
34                   downstairs, that's where I escaped. He's in the apartment upstairs.
35
36   DISPATCH:       He's in the apartment upstairs?
37
38   DOE:            Right.
39
40   DISPATCH:       And you're in the downstairs?
41
42   DOE:            Yes. I'm in the downstairs.
43
44   DISPATCH:       Is there a unit number or it's just upstairs/downstairs?
45

315

| 46 | DOE: | I think somehow - yeah, it's upstairs. Instead of up. |
| 47 | | |
| 48 | DISPATCH: | Okay. You want to stay on the phone with me until officers get there? |
| 49 | | |
| 50 | DOE: | Um, yeah that's fine. Or I can just look for them when they come. |
| 51 | | |
| 52 | DISPATCH: | Okay. Are there any weapons in the house? In his house? |
| 53 | | |
| 54 | DOE: | He has a gun. |
| 55 | | |
| 56 | DISPATCH: | He has a gun? What kind of gun does he have? |
| 57 | | |
| 58 | DOE: | I don't know. A small handgun. |
| 59 | | |
| 60 | DISPATCH: | Does he usually carry it? |
| 61 | | |
| 62 | DOE: | I'm sorry? Oh, no he doesn't carry. |
| 63 | | |
| 64 | DISPATCH: | Okay. Where does he keep it? |
| 65 | | |
| 66 | DOE: | Um, somewhere inside, but I don't know where exactly. |
| 67 | | |
| 68 | DISPATCH: | What's his name? |
| 69 | | |
| 70 | DOE: | His name is, official Cevdet, C-E, uh, I'm sorry, V-E-T. |
| 71 | | |
| 72 | DISPATCH: | C-E-V-E-T? |
| 73 | | |
| 74 | DOE: | Cevet, yes. |
| 75 | | |
| 76 | DISPATCH: | What's his last name? |
| 77 | | |
| 78 | DOE: | U-R-U-K. |
| 79 | | |
| 80 | DISPATCH: | Okay. Hold on just a minute. |
| 81 | | |
| 82 | DOE: | Thank you. |
| 83 | | |
| 84 | DISPATCH: | Does he know you just left? |
| 85 | | |
| 86 | DOE: | Yes, I just escaped. |
| 87 | | |
| 88 | DISPATCH: | Okay. |
| 89 | | |
| 90 | DOE: | I had a chance to run away. |

| | | |
|---|---|---|
| 91 | | |
| 92 | DISPATCH: | Okay. Does he know where you are? |
| 93 | | |
| 94 | DOE: | Uh, I don't know. |
| 95 | | |
| 96 | DISPATCH: | Okay. Hold on. Did he show you the gun today? |
| 97 | | |
| 98 | DOE: | No. |
| 99 | | |
| 100 | DISPATCH: | No. Okay. |
| 101 | | |
| 102 | DOE: | He was just threatening to kill me if he saw me around. Um. |
| 103 | | |
| 104 | DISPATCH: | Okay. Hold on just a minute. I have to talk to the officer. |
| 105 | | |
| 106 | DISPATCH: | And he doesn't know where you went, right? As far as you know? |
| 107 | | |
| 108 | DOE: | Um, he may not know, but I think he assumes that I went to some of the |
| 109 | | neighbors to call. |
| 110 | | |
| 111 | DISPATCH: | Okay. Has he hit you in the past? |
| 112 | | |
| 113 | DOE: | Yes. He did. |
| 114 | | |
| 115 | DISPATCH: | Okay. |
| 116 | | |
| 117 | DOE: | Um, he hit me last time really in just insane on Sunday. And after that he |
| 118 | | claimed that I have to leave with the baby, but I asked him to stay until |
| 119 | | weekend so I can find a place and I have a full time job so I couldn't move |
| 120 | | right away. |
| 121 | | |
| 122 | DISPATCH: | Mm-hm [affirmative]. |
| 123 | | |
| 124 | DOE: | But he's hitting me quite regularly. |
| 125 | | |
| 126 | DISPATCH: | Do you have a place to stay today? |
| 127 | | |
| 128 | DOE: | Yes. I was initially going to move downstairs to my, um, neighbor here. I'll be |
| 129 | | staying with her. |
| 130 | | |
| 131 | DISPATCH: | Okay. How old is your baby? |
| 132 | | |
| 133 | DOE: | She's 14 months. |
| 134 | | |
| 135 | DISPATCH: | Oh, okay. What kind of car does your husband drive? |

317

| | | |
|---|---|---|
| 136 | | |
| 137 | DOE: | He drives a Jeep. |
| 138 | | |
| 139 | DISPATCH: | What color is it? |
| 140 | | |
| 141 | DOE: | It's, um, I think it's a gold color. God. Crazy. And he's the one who insisted |
| 142 | | that I leave this time but now that I actually leave... |
| 143 | | |
| 144 | DISPATCH: | Uh huh? |
| 145 | | |
| 146 | DOE: | ...he - he didn't want to let me go. And he threatened and he tried to like tell |
| 147 | | me all kinds of things that I'm wrong. |
| 148 | | |
| 149 | DISPATCH: | Okay. |
| 150 | | |
| 151 | DOE: | He's been threatening - threatening to kill me for like about a year already. |
| 152 | | |
| 153 | DISPATCH: | Okay. |
| 154 | | |
| 155 | DOE: | For various reasons. |
| 156 | | |
| 157 | DISPATCH: | Do you have family in California? |
| 158 | | |
| 159 | DOE: | No, I don't. Um, I'm an immigrant. |
| 160 | | |
| 161 | DISPATCH: | Okay. |
| 162 | | |
| 163 | DOE: | Um. |
| 164 | | |
| 165 | DISPATCH: | Where - where's your family? |
| 166 | | |
| 167 | DOE: | They're back in Russia. |
| 168 | | |
| 169 | DISPATCH: | Russia, okay. |
| 170 | | |
| 171 | DOE: | (Unintelligible) back in Turkey. |
| 172 | | |
| 173 | DISPATCH: | I see how this is, um, it's a big decision for you right now, isn't it? |
| 174 | | |
| 175 | DOE: | It is, but I tried to leave him all the - like many times and I returned every |
| 176 | | time. Um, but I hope it's like the final. |
| 177 | | |
| 178 | DISPATCH: | Okay. Well, the officers will get there and they'll try to help you find some |
| 179 | | better options, okay? |
| 180 | | |

318'

| 181 | DOE: | I just need to like I don't know I need to get inside, I need to like continue my |
| 182 | | vocation and get my stuff that's my stuff and that's kind of help I need. |
| 183 | | |
| 184 | DISPATCH: | Do you have any other friends besides your downstairs neighbor? |
| 185 | | |
| 186 | DOE: | Um, I do. |
| 187 | | |
| 188 | DISPATCH: | Okay. I'm just wondering, um, you could -- because that's so close to where |
| 189 | | he is if you continue to stay there, because that might be a little too close to |
| 190 | | him. |
| 191 | | |
| 192 | DOE: | Uh, I didn't expect it to be that hard because, um, well this is more convenient |
| 193 | | because like a great deal of separation because I won't be able to take all |
| 194 | | things right away and it's going to be less hard for the baby if her dad is |
| 195 | | around and he would be watching her. |
| 196 | | |
| 197 | DISPATCH: | Oh, okay. I see. |
| 198 | | |
| 199 | DOE: | He loves her. Will officer should be able to, I don't know, um, like calm him |
| 200 | | down or anything so I can continue just leaving? Just pack, leave. |
| 201 | | |
| 202 | DISPATCH: | Yes, yes. Yes, they will. |
| 203 | | |
| 204 | DOE: | (Unintelligible). |
| 205 | | |
| 206 | DISPATCH: | We have one officer on Las Alteras so he's almost there. |
| 207 | | |
| 208 | DOE: | Okay. Thank goodness. Yup. Yup. Yup. Yup. (Unintelligible). |
| 209 | | |
| 210 | DISPATCH: | And I just want to double check, you said you're downstairs, he's upstairs, |
| 211 | | right? |
| 212 | | |
| 213 | DOE: | Right. |
| 214 | | |
| 215 | DISPATCH: | Okay. |
| 216 | | |
| 217 | DOE: | (Unintelligible) front of the baby and she gets scared every time, but it doesn't |
| 218 | | matter to him. When he's mad he's just insane. He doesn't realize anything. |
| 219 | | |
| 220 | DISPATCH: | Yeah, I'm sure that's very frightening for the baby. And for you. |
| 221 | | |
| 222 | DOE: | Yes, it is. |
| 223 | | |
| 224 | DISPATCH: | How long have you lived in the United States? |
| 225 | | |

319

| 226 | DOE: | Um, about two and a half years. |
| 227 | | |
| 228 | DISPATCH: | Oh, you speak very well. |
| 229 | | |
| 230 | DOE: | Thank you. |
| 231 | | |
| 232 | DISPATCH: | He's downstairs for land line. |
| 233 | | |
| 234 | DOE: | Oh, I see the officer's car. |
| 235 | | |
| 236 | DISPATCH: | You do? Okay. Just wait until he comes up to your door, okay? |
| 237 | | |
| 238 | DOE: | Yeah. I'm sorry, what? |
| 239 | | |
| 240 | DISPATCH: | Roger (unintelligible). Just wait until he comes up to your door. |
| 241 | | |
| 242 | DOE: | Okay. Okay. Thank you. |
| 243 | | |
| 244 | DISPATCH: | Affirmative. Okay. The officers want to know if you'll step outside. |
| 245 | | |
| 246 | DOE: | Yeah. |
| 247 | | |
| 248 | DISPATCH: | Okay. We can hang up then, okay? |
| 249 | | |
| 250 | DOE: | Yes. Thank you so much. |
| 251 | | |
| 252 | DISPATCH: | Okay. You're welcome. Bye. |
| 253 | | |
| 254 | DOE: | Bye-bye. |

Name: Cevdet Uruk

Address: CCI

D4-70up

PO Box 608

Tehachapi CA 93581

HC-001

CDC or ID Number: BK0724

IN THE COURT OF APPEAL
OF THE STATE OF CALIFORNIA
SECOND APPELLATE DISTRICT

*(Court)*

Cevdet Uruk

Petitioner

vs.

B. Cates, (A) Warden

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. _____

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the superior court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the superior court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition is a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the superior court, you only need to file the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal in paper form and you are an attorney, file the original and 4 copies of the petition and, if separately bound, 1 set of any supporting documents (unless the court orders otherwise by local rule or in a specific case). If you are filing this petition in the Court of Appeal electronically and you are an attorney, follow the requirements of the local rules of court for electronically filed documents. If you are filing this petition in the Court of Appeal and you are *not* represented by an attorney, file the original and one set of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and 10 copies of the petition and, if separately bound, an original and 2 copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court (as amended effective January 1, 2007). Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 6

Form Approved for Optional Use
Judicial Council of California
HC-001 [Rev. September 1, 2018]

PETITION FOR WRIT OF HABEAS CORPUS

Penal Code, § 1473 et seq.
Cal. Rules of Court, rule 8.380
www.courts.ca.gov

This petition concerns:

[✓] A conviction

[✓] A sentence

[ ] Jail or prison conditions

[ ] Other *(specify)*

[ ] Parole

[ ] Credits

[ ] Prison discipline

HC-001

1  Your name  **Cevdet Uruk**

2  Where are you incarcerated?  **California Correctional Institution**

3  Why are you in custody?  [✓] Criminal conviction    [ ] Civil commitment

*Answer items a through i to the best of your ability.*

a  State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

**Dissuading a Witness, Corporal Injury, Assult by Means of likely GBI, False Imprisonment (Felonies) Domestic Violence Contempt of Court, Battery, Probation Violation (Misdemeanors)**

b  Penal or other code sections:  **136.1(b)(1), 273.5(a), 245(a)(4), 236, 166(c)(1), 243.e.1**

c  Name and location of sentencing or committing court:

**Superior Court of the State of California County of Santa Barbara Santa Barbara**

d  Case number:  **18CR02248 + 1471799**

e  Date convicted or committed:  **06.27.2019**

f  Date sentenced:  **08.05.2019**

g  Length of sentence:  **11 years 8 months**

h  When do you expect to be released?  **07.28.2023**

i  Were you represented by counsel in the trial court?  [✓] Yes  [ ] No  If yes, state the attorney's name and address

**Neil Levinson 1923 Cliff Dr. Santa Barbara CA 93109**

4  What was the LAST plea you entered? *(Check one)*

[✓] Not guilty  [ ] Guilty  [ ] Nolo contendere  [ ] Other:

5  If you pleaded not guilty, what kind of trial did you have?

[✓] Jury  [ ] Judge without a jury  [ ] Submitted on transcript  [ ] Awaiting trial

6  GROUNDS FOR RELIEF                                                                    HC-001

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "The trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page 4. For additional grounds, make copies of page 4 and number the additional grounds in order.)*

_See  attached_

a.  Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts on which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel, you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where).* *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

_See  attached_

b.  Supporting cases, rules, or other authority *(optional)*:

(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)

_See attached._

HC-001

Did you appeal from the conviction, sentence, or commitment? ☑ Yes ☐ No _If yes, give the following information:_

a. Name of court ("Court of Appeal" or "Appellate Division of Superior Court")

Court of Appeal

c. Result Affirmed with 1 year reduction   c. Date of decision 9.30.2020

d. Case number or citation of opinion, if known: B299732

e. Issues raised: (1) Appellant was prejudiced by the exclusion of Jane Doe's inconsistent statements.

(2) The principal term of Appellant's sentence was unlawful, because the court relied on an inapplicable scheme

(3) Appellant's sentence for false imprisonment, and battery must be stayed pursuant to section 654.

f. Were you represented by counsel on appeal? ☑ Yes ☐ No _If yes, state the attorney's name and address, if known_

Robert Hernandez
530 E. Los Angeles Ave. #115-201, Moorpark, CA 93021

g. Did you seek review in the California Supreme Court? ☑ Yes ☐ No _If yes, give the following information_

a. Result Denied    b. Date of decision 12.09.2020

c. Case number or citation of opinion, if known: S265386

d. Issues raised (1) Hearsay evidence is admissable to impeach a declarant whose statements have been received into evidence.

(2) _____

(3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal

Factual bases for the claims rest on the evidence, not on the record.

11. Administrative review:

a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See _In re Muszalski_ (1975) 52 Cal.App.3d 500.) Explain what administrative review you sought or explain why you did not seek such review

b. Did you seek the highest level of administrative review available? ☐ Yes ☐ No
_Attach documents that show you have exhausted your administrative remedies._

HC-001 [Rev. September 1, 2018]                    PETITION FOR WRIT OF HABEAS CORPUS                    Page 5 of 5

HC-001

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?  ☑ Yes  If yes, continue with number 13.  ☐ No  If no, skip to number 15.

13. a. (1) Name of court: Superior Court of Santa Barbara County

(2) Nature of proceeding (for example "habeas corpus petition"): Habeas Corpus Petition X 2

(3) Issues raised: (a) Ineffective assistance of counsels on (newly discovered evidence, misadvice, vindictive Prosecution
(b) Judicial/racial bias, disproportionate sentence)

(4) Result (attach order or explain why unavailable): Denied (because of lack of jurisdiction due to pending review)

(5) Date of decision: 11.16.2020 + 4.21.2021

b. (1) Name of court: Court of Appeal, Second District

(2) Nature of proceeding: Habeas Corpus Petition

(3) Issues raised: (a) Same as above

(b) _____

(4) Result (attach order or explain why unavailable): Denied

(5) Date of decision: 12.22.2020

c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)

16. Are you presently represented by counsel?  ☐ Yes  ☑ No  If yes, state the attorney's name and address, if known.

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes  ☑ No  If yes, explain.

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 5/10/2021

▶ _____
(SIGNATURE OF PETITIONER)

HC-001 [Rev. September 1, 2019]

PETITION FOR WRIT OF HABEAS CORPUS

Page 5 of 6

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re CEVDET URUK,<br><br>on Habeas Corpus. | B312326<br>(Super. Ct. Nos. 18CR02248;<br>21CR00309)<br>(Santa Barbara County) |

O R D E R

**COURT OF APPEAL – SECOND DIST.**

F I L E D

May 20, 2021

DANIEL P. POTTER, Clerk

awinters        **Deputy Clerk**

THE COURT:

In reviewing the petition for a writ of habeas corpus filed by Cevdet Uruk on March 13, 2021, we have taken judicial notice of the appellate court record in *People v. Cedvet Uruk*, Crim. Case No. B299732. (Evid. Code, §§ 452, subd. (d), 459.)

The petition for a writ of habeas corpus is denied. (*People v. Duvall* (1995) 9 Cal.4th 464, 474-475; *Strickland v. Washington* (1984) 466 U.S. 668, 693-694; *In re Waltreus* (1965) 62 Cal.2d 218, 225.)

GILBERT, P.J.                PERREN, J.                TANGEMAN, J.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT, DIVISION SIX

THE PEOPLE OF THE STATE OF
CALIFORNIA, Plaintiff and Respondent,

v.

CEVDET URUK, Defendant and Appellant.

Court of Appeal No.
B299732

Superior Court No.
18CR02248

**APPEAL FROM THE SUPERIOR COURT OF
CALIFORNIA, COUNTY OF SANTA BARBARA
Hon. Michael Carrozzo, Judge**

## APPELLANT'S OPENING BRIEF

Robert L. Hernandez (SBN 271889)
530 E. Los Angeles Ave., #115-207
Moorpark, CA 93021
Telephone: (805) 402-5948
Email: hernandez.robert@gmail.com
Attorney for Appellant, CEVDET URUK

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ 4

INTRODUCTION .............................................................................. 5

STATEMENT OF APPEALABILITY ............................................. 6

STATEMENT OF THE CASE ......................................................... 6

STATEMENT OF FACTS ................................................................ 8

    A.    The Events of March 8, 2018........................................... 8

    B.    The Events of March 9, 2018........................................... 9

ARGUMENT .................................................................................... 10

I.    The Court Improperly Excluded Out-of-Court Statements Made by Jane Doe Offered to Impeach Other of Her Out-of-Court Statements................................................................. 10

    A.    Background Facts. ........................................................... 10

    B.    Standard of Review.......................................................... 11

    C.    Hearsay Evidence Is Admissible to Impeach a Declarant Whose Statements Have Been Received in Evidence... 12

    D.    Jane Doe's Inconsistent Hearsay Statements Should Have Been Admitted for the Purpose of Impeachment. 13

    E.    Appellant Was Prejudiced by the Exclusion of Jane Doe's Inconsistent Statements. ...................................... 16

II.    The Principal Term of Appellant's Sentence Was Unlawful Because the Court Relied on an Inapplicable Alternative Penalty Scheme.................................................................... 18

    A.    Standard of Review.......................................................... 18

    B.    The Alternative Penalty Scheme Set Out at Section 273.5, Subdivision (f)(1) Was Inapplicable to Appellant. ........................................................................................ 18

III.    The Trial Court Erred By Sentencing Appellant to Multiple Prison Terms that Should Have Been Stayed Pursuant to Section 654. ..................................................................... 20

A.    Standard of Review..................................................... 20

B.    Appellant's Sentence for False Imprisonment and
       Battery Must Be Stayed Pursuant to Section 654........ 20

CONCLUSION.................................................................... 22

CERTIFICATE OF WORD COUNT ............................................. 23

PROOF OF SERVICE .................................................................. 24

# TABLE OF AUTHORITIES

## CASES

*Am-Cal Inv. Co. v. Sharlyn Estates, Inc.* (1967)
  255 Cal.App.2d 526 .......................................................................... 13
*Chapman v. California* (1967) 386 U.S. 18 ................................. 16
*Neal v. State of California* (1960) 55 Cal.2d 11 ............................. 20
*People v. Corella* (2004) 122 Cal.App.4th 461 ...................... passim
*People v. Corpening* (2016) 2 Cal.5th 307 ...................................... 20
*People v. Harvey* (1984) 151 Cal.App.3d 660 ................................ 12
*People v. Hill* (2004) 119 Cal.App.4th 85 ...................................... 18
*People v. Superior Court* (*Alvarez*) (1997) 4 Ca1.4th 968 ............ 12
*People v. Watson* (1956) 46 Cal.2d 818 ......................................... 16
*Westside Community for Independent Living v. Obledo* (1983)
  33 Cal.3d 348 ................................................................................. 12

## STATUTES

**Evidence Code**
  1202 ................................................................................. 12, 14
**Penal Code**
  136.1 ................................................................................... 6, 7
  166 ............................................................................................ 6
  236 ................................................................................. 6, 7, 21
  237 .......................................................................................... 21
  243 ............................................................................. 6, 19, 21
  245 ....................................................................................... 6, 7
  273.5 ....................................................................... 6, 7, 18, 19
  273a .......................................................................................... 6
  1237 .......................................................................................... 6

## OTHER AUTHORITIES

CALCRIM No. 841 ......................................................................... 21
CALCRIM No 1240 ....................................................................... 21

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT, DIVISION SIX

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff and Respondent,<br><br>v.<br><br>CEVDET URUK, Defendant and Appellant. | Court of Appeal No. B299732<br><br>Superior Court No. 18CR02248 |

**APPEAL FROM THE SUPERIOR COURT OF
CALIFORNIA, COUNTY OF SANTA BARBARA
Hon. Michael Carrozzo, Judge**

**APPELLANT'S OPENING BRIEF**

## INTRODUCTION

Appellant was convicted of four felonies and two misdemeanors stemming from two separate incidents of domestic violence. By this appeal, appellant challenges the trial court's decision to exclude impeachment evidence appellant sought to have admitted, and to correct appellant's sentence, which includes a miscalculated principal term and sentences for two convictions that should have been stayed pursuant to Penal Code section 654.

5

## STATEMENT OF APPEALABILITY

This appeal is from a final judgment of conviction and is authorized by Penal Code section 1237.[1]

## STATEMENT OF THE CASE

On June 18, 2019, appellant was charged by amended information with seven counts: 1) dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)); 2) corporal injury to a spouse (§ 273.5, subd. (a)); 3) assault by means of force likely to cause great bodily injury (§ 245, subd. (a)(4)); 4) false imprisonment (§ 236); 5) cruelty to a child (§ 273a, subd. (b)); 6) violation of a domestic violence protective order (a misdemeanor) (§ 166, subd. (c)(1); and 7) battery (§ 243(e)(1). (1 CT 11-114.) With respect to count two, it was specially alleged that within the past seven years, appellant had been convicted of a prior domestic violence offense within the meaning of section 273.5, subdivision (f)(1).[2] (1 CT 113.)

On June 27, 2018, a jury convicted appellant on all counts but count five, cruelty to a child. (1 CT 180-189; 2 RT 359-

---

[1] All subsequent statutory references are to the Penal Code unless otherwise noted.

[2] As discussed in Section II of this brief, *infra*, the special allegation was improperly alleged, and resulted in the court miscalculating the principal term of appellant's sentence.

361.) The court found the prior alleged in the special allegation to
have been proven true. (1 CT 181; 2 RT 369.)

Appellant was sentenced on August 5, 2020. The
court rejected the probation department's recommendation of
probation (2 RT 392), instead electing to "give [appellant] the
maximum sentence [...] allowable by law." (2 RT 396.) For the
felony convictions, appellant was sentenced to eight years and
eight months in state prison, as follows:

- Count Two (§ 273.5, subd. (a)) (the principal term):
  maximum term five years;[3]
- Count One (§ 136.1, subd. (b)(1)): full middle term
  two years, to run consecutively;
- Count Three (§ 245, subd. (a)(4)): one-third middle
  term one year, to run consecutively; and
- Count Four (§ 236): one-third middle term 8 months,
  to run consecutively.

(1 CT 299; 2 RT 396.)

In addition to the felony counts, the court sentenced
appellant to one year each for the misdemeanors in counts six
and seven, to run consecutively. The court also determined that
appellant had violated the terms of his previous probation, and
sentenced him to one year in county jail for that. (2 RT 396.) The

---

[3] Again, as discussed in Section II, *infra*, the principal term was
miscalculated.

7

final total term, including state prison and county jail time, was
11 years and 8 months.

Appellant was given credit for 92 days (46 actual
days plus 46 for good time/work time). (1 CT 300; 2 RT 397.) The
court imposed various fines and fees (1 CT 300) and issued a
protective order for a term of three years, which prohibited
contact between appellant and his wife, but allowed appellant to
have contact with his children. (2 RT 398.)

Appellant filed a notice of appeal on August 7, 2019.
(1 CT 295.)

## STATEMENT OF FACTS

This case involves two separate incidents that
occurred on March 8 and 9, 2018. The primary narrative facts
presented at trial consisted almost exclusively of out-of-court
statements made by appellant's wife, Jane Doe, who did not
testify at trial.[4]

### A.    The Events of March 8, 2018.

On March 8, 2018, appellant and his wife had an
argument about whether their children had eaten their food that
day. (2 RT 200.) During the course of the argument, appellant
learned that his wife had lied to him about what the children had

---

[4] Jane Doe was called to the stand as a prosecution witness. The
only thing she said at trial was that she was not willing to
answer any questions and that she had not been coerced or
asked not to testify. (2 RT 186.)

8

eaten. (2 RT 200.) Appellant then began choking his wife by
grabbing her with both hands around her neck. (2 RT 201-202.)
Appellant also pinned his wife against the kitchen counter,
bending her backwards. (2 RT 201-202.) Jane Doe did not call 911
that day because she thought the incident would blow over and
appellant would forget about it. (2 RT 202.) No other physical
violence occurred for the remainder of the night. (2 RT 203.)

**B.      The Events of March 9, 2018.**

The next morning, appellant was following his wife
around the house, still angry from the previous day. (2 RT 203.)
While they were upstairs in a hallway near their bedroom,
appellant grabbed his wife by both arms and pinned her against
the wall. (2 RT 203.) At first, she tried to get away, but
eventually decided it would be best not to put up a fight or say
anything. (2 RT 203.) While he had her pinned, appellant struck
his wife twice in the face, causing her to fall to the floor. (2 RT
204.)

After that, appellant went to the bedroom, where
Jane Doe's phone was stored. (2 RT 206.) She did not actually see
appellant take her phone (2 RT 214), but when she later went
into the bedroom to look for the phone, it was not there. (2 RT
219.) When Jane Doe asked for appellant to return the phone to
her, he told her not to worry about it and just take care of the
children. (2 RT 207.) Ultimately, the phone was found by the
police in the kitchen in a basket on top of the refrigerator. (2 RT
208.)

At some point, Jane Doe was able to go to a

9

neighbor's house to borrow a phone, which she used to call 911. (1 RT 142-143.) The police officer who responded to the 911 call observed that Jane Doe had a bruised and lacerated lip. (2 RT 205.)

## ARGUMENT

I.    THE COURT IMPROPERLY EXCLUDED OUT-OF-
      COURT STATEMENTS MADE BY JANE DOE OFFERED
      TO IMPEACH OTHER OF HER OUT-OF-COURT
      STATEMENTS.

### A.    Background Facts.

Jane Doe refused to testify in this case. (1 RT 115-118; 2 RT 186.) However, the court allowed the prosecution to present evidence of her out-court-court statements in the form of the 911 call she made and the testimony of the police officer who interviewed Jane Doe at her home after the 911 call. After admitting these out of court statements into evidence, the court excluded other out-of-court statements of Jane Doe offered by appellant to impeach her previous statements.

First, the court admitted the statements Jane Doe made during the 911 call in March 2018. (2 CT 311; 2 RT 263-264.) In this call, Jane Doe described the incidents that led to the charges in the instant case. She stated that appellant had hit her, and that on the previous day, he tried to choke her. (2 CT 311.) She also told the 911 dispatcher that appellant had threatened to kill her. (2 CT 312.)

Next, during live testimony, Deputy Muñoz of the Santa Barbara County Sheriff's Department recounted

10

statements made to him by Jane Doe when he responded to the March 2018, 911 call. Deputy Muñoz testified that Jane Doe told him appellant had grabbed her by the arms, pinned her to the wall, and then struck her in the face. (2 RT 203-204.) Jane Doe then said that appellant took her phone and refused to give it back when she asked for it. (2 RT 206-207.)

Appellant sought to introduce, as impeachment evidence, other out-of-court statements made by Jane Doe in a letter and an email. The letter, dated September 28, 2018, was from Jane Doe to the District Attorney. (1 CT 158.) In the letter, Jane Doe indicated that because English is her second language, and because she was emotionally out of control at the time, she had "used inappropriate words" and made misleading, false, and exaggerated statements about the incidents she reported. (2 CT 158.) She stated further that there was no violence in her home, that her outbursts were due to her tired state, and that she was the aggressor in this case. (1 CT 158.)

In an email dated May 2, 2019, Jane Doe again stated that she had overreacted to things, there was no violence in her home, there had been no real threat of violence, and she might have been the aggressor in the incident. (1 CT 157.)

The court denied appellant's request to admit the statements in the letter and the email for impeachment purposes. (2 RT 179.)

**B.    Standard of Review.**

Whether evidence was improperly excluded under section 1202 of the Evidence Code is reviewed for abuse of

discretion. (See, e.g., *People v. Corella* (2004) 122 Cal.App.4th 461, 470 [applying the abuse of discretion standard to challenge brought under section 1202].)

"[T]rial court discretion is not unlimited. The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown." (*Westside Community for Independent Living v. Obledo* (1983) 33 Cal.3d 348, 355 [internal quotations omitted].) Although an appellate court's deference to the decision below is high under the abuse of discretion standard, it is not absolute. All exercises of discretion must be guided by legal principles and policies, not arbitrariness or caprice. (*People v. Superior Court* (*Alvarez*) (1997) 4 Cal.4th 968, 977.) Reviewing courts "should not rubberstamp a decision of the trial court when the totality of the circumstances indicates the court's discretion has been abused." (*People v. Harvey* (1984) 151 Cal.App.3d 660,667.)

### C.   Hearsay Evidence Is Admissible to Impeach a Declarant Whose Statements Have Been Received in Evidence.

Evidence Code section 1202 provides that:

> Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct.

12

The statute goes on to state that "[a]ny other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

Although it is often the case that the declarant to be impeached is a witness who testified at trial, that is not always so; a hearsay declarant may also be impeached. (*Am-Cal Inv. Co. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 542.) "The purpose of allowing extrajudicial inconsistent statements is to be fair to the party against whom the hearsay was received inasmuch as he was denied the opportunity of cross-examination; thus, such party should at least be allowed to impeach the declarant by admitting the declarant's own statements which are inconsistent with the declaration received in evidence." (*Ibid*.) More succinctly, the "purpose of section 1202 is to assure fairness to the party against whom hearsay evidence is admitted without an opportunity for cross-examination." (*People v. Corella* (2004) 122 Cal.App.4th 461, 470.)

**D.    Jane Doe's Inconsistent Hearsay Statements Should Have Been Admitted for the Purpose of Impeachment.**

*People v. Corella* (2004) 122 Cal.App.4th 461, presents circumstances strikingly similar to the instant case. In *Corella*, defendant's wife called 911 to report that defendant had hit her. (*Id.*, at p. 464.) She repeated the accusation to the police officer who responded to the 911 call. (*Ibid*.) However, when the wife testified at defendant's preliminary hearing, she made

13

statements that contradicted the statements she made during the 911 call and to the police officer who interviewed her after the call. (*Ibid.*) Specifically, during the preliminary hearing, the wife testified that she had not been not hit by defendant, but instead had fallen and hit her hear while playing with her son. (*Id.*, at p. 469.) She also testified that she made false statements to the police out of fear that her husband was going to leave her. (*Ibid.*) However, the next day, when her preliminary hearing testimony was set to continue, the wife invoked her right against self-incrimination and refused to testify further. (*Ibid.*) The court then struck her previous testimony. (*Ibid.*)

At trial, neither the prosecution nor the defense called the wife as a witness. (*Corella*, supra, 122 Cal.App.4th at 469.) Instead, the prosecution relied on the wife's hearsay statements contained in the 911 call and in the police officer's testimony. (*Id.*, at pp. 469-70.) Defendant sought to introduce the wife's inconsistent statements from the transcript of the preliminary hearing under Evidence Code section 1202, but the trial court refused to admit the statements into evidence. (*Id.*, at p. 470.) On appeal, the court held that the wife's prior statements should have been admitted for the purpose of impeachment. (*Id.*, at p. 471.) In reaching its conclusion, the court noted that the applicability of section 1202 is not limited only to those cases in which the declarant is unavailable. (*Ibid.*) The court also noted that whether or not the proffered hearsay statements were trustworthy did not factor into its analysis: "Unlike some exceptions to the hearsay rule, section 1202 does not require the

14

trial court to consider trustworthiness as a condition of admissibility." (*Id.*, at p. 472.)

Here, as in *Corella*, the statements made by Jane Doe in the letter and the email were inconsistent with what she said during the 911 call and what she told the police. During the 911 call and in her conversation with the police, she said that appellant had, among other things, hit her, choked her, and threatened to kill her. By contrast, in the subsequent letter and email, she said that she had been the aggressor, that she had made false and misleading statements due to her fraught emotional state, that appellant had not made any real threats against her, and that there had been no violence in her home. All of these statements were relevant to whether appellant had done the things he was charged with, and they were inconsistent with Jane Doe's other hearsay statements that were admitted into evidence. They should have been admitted into evidence by the court.

In denying appellant's request to admit these statements, the trial court indicated that appellant was free to call Jane Doe as a witness instead if he wanted to. (2 RT 256.) This flies in the face of *Corella*, in which the wife also refused to testify, and in which the court said witness unavailability is not a requirement of Evidence Code section 1202. (*Corella*, supra, 122 Cal.App.4th at 471.) In addition, calling Jane Doe to testify would have been a futile act, as she had already stated her unwillingness to testify. (2 RT 45-51,186.)

The trial court here also questioned the reliability of
the letter and email offered by appellant. (2 RT 256.) Again, the
court in *Corella* made it clear that the trustworthiness of the
proffered hearsay is not factored into a section 1202 analysis.
(*Id.*, at p 472.) Just as in *Corella*, these later statements should
have been admitted for impeachment purposes. The trial court
here abused its discretion by refusing to be bound by *Corella* and
by excluding Jane Doe's inconsistent hearsay statements.

### E.    Appellant Was Prejudiced by the Exclusion of Jane Doe's Inconsistent Statements.

"An error by the trial court in ruling on the admission
of evidence is generally considered under the *Watson* standard of
prejudice, but completely excluding evidence of a defendant's
defense theoretically could rise to a constitutional level and
require application of the *Chapman* standard." (*People v. Corella*
(2004) 122 Cal.App.4th 461, 472.) Under the Chapman standard,
appellant's conviction must be reversed unless the state can
prove that the erroneous exclusion of Jane Doe's statements was
harmless beyond a reasonable doubt. (*Chapman v. California*
(1967) 386 U.S. 18, 24.) Under the *Watson* standard, reversal is
required if there is a reasonable probability that appellant would
have had a more favorable outcome but for the error. (*People v.
Watson* (1956) 46 Cal.2d 818, 836.) As in *Corella, supra*, here, the
facts demonstrate prejudice under either standard.

The evidence against appellant that established what
actually happened between him and his wife, Jane Doe, consisted
almost exclusively of her hearsay statements made to the 911

16

operator and to the police. There were no other witnesses that
offered first-hand testimony about what happened inside
appellant's home. The physical evidence of what happened, as
testified to by the responding police officer, could also have
allowed the jury to make in inference that Jane Doe was lying
about what happened or perhaps exaggerating. The officer
noticed that Jane Doe had a bruised and lacerated lip only after
she pointed it out to him. (2 RT 205.) Before then, the officer had
not noticed any other injuries on Jane Doe's body. (2 RT 210.) For
example, the officer saw no imprints on her neck, and no bruising
consistent with choking. (2 RT 210.) There were no visible signs
of bruising on Jane Doe's arms, nor were there outward signs of
injuries to her face. (2 RT 211-212.)

          Appellant was not allowed to introduce evidence that
Jane Doe later said she lied to the police and there had been no
violence in her home. The jury, as the trier of fact, should have
heard both sets of statements and made its own determination
about Jane Doe's credibility. However, the jury's role was
usurped by the trial court, which took it upon itself to determine
that Jane Doe's later statements were not reliable and not
relevant. If there was significant evidence from another source
that appellant did what he was accused of doing, the error might
not be prejudicial. But in this case, Jane Doe's uncontested
statements and her unchallenged credibility were everything.
Allowing the jury to consider her inconsistent statements could
have made all the difference. Therefore, this error was not
harmless beyond a reasonable doubt; and there is a reasonable

probability that appellant would have had a better outcome but
for the error. For these reasons, appellant's convictions must be
reversed.

II.    THE PRINCIPAL TERM OF APPELLANT'S SENTENCE
       WAS UNLAWFUL BECAUSE THE COURT RELIED ON
       AN INAPPLICABLE ALTERNATIVE PENALTY SCHEME.

   A.    Standard of Review.

         Whether the court imposed an illegal sentence is
reviewed independently because there is no discretion to sentence
illegally. (*People v. Hill* (2004) 119 Cal.App.4th 85, 89).

   B.    The Alternative Penalty Scheme Set Out at
         Section 273.5, Subdivision (f)(1) Was
         Inapplicable to Appellant.

         In count two, appellant was charged with corporal
injury to his spouse, in violation of section 273.5, subdivision (a).
(CT 112.) There was also a special allegation of a prior conviction
within the meaning of section 273.5, subdivision (f)(1). (CT 112.)
As discussed below, the charging document was wrong because
subdivision (f)(1) is inapplicable in this case. Further, the court
erred by sentencing appellant pursuant to that incorrect
subdivision.

         Under section 273.5, the standard sentencing triad is
two, three, or four years for a felony conviction. (§ 273.5,
subd. (a).) However, subdivision (f)(1) is an alternate penalty
scheme that specifies that the triad shall be two, four, or five
years when, within the last seven years, the defendant has had a

18

previous conviction under section 243, subd. (a) or (d).[5] In this
case, appellant had a prior conviction under section 243,
subdivision (e), not subdivisions (a) or (d). (2 CT 113, 258.)
Therefore, the alternate triad specified in section 273.5,
subdivision (f)(1) was not applicable to appellant, despite what
the charging document incorrectly stated. Instead, appellant's
conviction should have triggered the application of section 243,
subdivision (f)(2), which applies when, within the previous seven
years, a defendant has had a previous conviction under section
243, subdivision (e). The applicable triad under subdivision (f)(2)
is two three, or four years. That is the triad that should have
been used to sentence appellant.

        Here, however, after having found appellant's prior
conviction to have been proven true, the court applied the triad
from subdivision (f)(1), and imposed the maximum term of five
years as appellant's principal term. That was error. The
maximum term that the court could have imposed on appellant,
even accounting for his prior conviction under section 243,
subdivision (e), was four years. Accordingly, this case must be
remanded to the trial court for resentencing without reliance on
the section 273.5, subdivision (f)(1) alternate penalty scheme.

---

[5] There are other Penal Code sections that trigger the section
273.5, subdivision (f)(1) alternate penalty scheme, but they are
not relevant to this case.

19

III.    THE TRIAL COURT ERRED BY SENTENCING
APPELLANT TO MULTIPLE PRISON TERMS THAT
SHOULD HAVE BEEN STAYED PURSUANT TO
SECTION 654.

A.    Standard of Review.

Whether section 654 applies to the undisputed facts
in this case is a question of law this court reviews de novo.
(*People v. Corpening* (2016) 2 Cal.5th 307, 312.)

B.    Appellant's Sentence for False Imprisonment
and Battery Must Be Stayed Pursuant to
Section 654.

Section 654, subdivision (a), provides that "[a]n act or
omission that is punishable in different ways by different
provisions of law shall be punished under the provision that
provides for the longest potential term of imprisonment, but in no
case shall the act or omission be punished under more than one
provision." "Whether a course of criminal conduct is divisible and
therefore gives rise to more than one act within the meaning of
section 654 depends on the intent and objective of the actor."
(*Neal v. State of California* (1960) 55 Cal.2d 11, 19.) "If all of the
offenses were incident to one objective, the defendant may be
punished for any one of such offenses but not for more than one."
(*Ibid.*)

Appellant was convicted of inflicting corporal injury
on his spouse in violation of section 273.5, subdivision (a), and
sentenced to five years for it. (1 CT 299.) The elements of the
crime are: 1) the defendant willfully and unlawfully inflicted a
physical injury on his spouse; and 2) the injury resulted in a

20

traumatic condition. (§273.5, subds. (a) and (b)(1).) The evidence
presented was that appellant grabbed his wife by the arms and
then struck her in the face, resulting in his wife sustaining a
bruised and lacerated lip. (2 RT 203.) These two acts, which
occurred in immediate succession, were not committed by
appellant with two distinct objectives, but were instead one
continuous act. Appellant was mad at his wife, so he grabbed her
by the arms and hit her.

Appellant was also convicted of battery of his spouse
in violation of section 243, subdivision (e)(1). The elements of this
crime are: 1) the defendant willfully and unlawfully touched a
person in a harmful or offensive manner; and 2) that person was
his wife. (§243, subdivision (e)(1); CALCRIM No. 841.) Again,
appellant was convicted of this crime because he grabbed his wife
by the arms and then struck her. The only difference between
this crime and section 273.5 is that no injury is required to be
convicted under section 243. Because both convictions resulted
from the same conduct, appellant may only be sentenced for one
of them.

Similarly, appellant was convicted of felony false
imprisonment in violation of section 236. (1 CT 299.) The
elements of this crime are: 1) the defendant intentionally
restrained or confined a person by violence; and 2) the defendant
made the other person stay or go somewhere against the person's
will. (§§236 and 237, subd. (a); CALCRIM No 1240.) The basis of
this conviction was that appellant grabbed his wife by the arms.
However, as discussed above, appellant grabbed his wife by the

arms as part of his battery of her. He was just angry and grabbed her. Under these circumstances, appellant did not have two distinct objectives: to batter his wife and also to restrict her movement. His actions formed one single objective to batter his wife. Pursuant to section 654, appellant may not be punished for both crimes.

Because the same conduct underlies all three of appellants convictions, he can only be sentenced under the provision that results in the longest potential prison term. In this case, that would be section 273.5. The sentences for convictions under sections 243 and 236 must be stayed.

## CONCLUSION

Because the trial court improperly excluded the impeachment evidence appellant sought to introduce, resulting in prejudice to his defense, all of his convictions must be reversed. If the convictions are nor reversed, the case should be remanded for re-sentencing, with instructions to the trial court to impose the proper principal term and, pursuant to section 654, stay appellant's sentences for false imprisonment and battery.

Dated: January 31, 2020                    Respectfully submitted,

*Robert L. Hernandez*

Robert L. Hernandez
State Bar No. 271889
Attorney Appellant

# IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff and Respondent, | No. _____ |
| v. | 2d Crim. B299732 |
| CEVDET URUK, Defendant and Appellant. | Santa Barbara County Sup. Ct. No. 18CR02248 |

## PETITION FOR REVIEW

Robert L. Hernandez (SBN 271889)
530 E. Los Angeles Ave., #115-207
Moorpark, CA 93021
Telephone: (805) 390-1222
Email: robert@calcrimappeals.com
Attorney for Petitioner

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. 3

QUESTION PRESENTED FOR REVIEW ...................................... 5

NECESSITY FOR REVIEW................................................................ 5

STATEMENT OF THE CASE AND FACTS.................................. 5

ARGUMENT ..................................................................................... 6

  I.  Hearsay Evidence Is Admissible to Impeach a Declarant
     Whose Statements Have Been Received into Evidence........6

  A. Evidence Code Section 1202 Allows for the Admission of
     Hearsay Evidence to Impeach a Non-Testifying Declarant.
     ................................................................................................. 6

  B. The Inconsistent Hearsay Statements of Petitioner's Wife,
     Whose Previous Out-of-Court Statements Were Offered as
     Evidence Against Petitioner, Should Have Been Admitted
     for Impeachment. ................................................................ 7

CONCLUSION.............................................................................. 11

CERTIFICATION OF WORD COUNT ......................................... 12

EXHIBIT A..................................................................................... 13

PROOF OF SERVICE ................................................................... 14

## TABLE OF AUTHORITIES

### CASES

*Am-Cal Inv. Co. v. Sharlyn Estates, Inc.* (1967)
255 Cal.App.2d 526 ........................................................................ 7

*People v. Corella* (2004) 122 Cal.App.4th 461 .................. 7, 8, 9, 10

### STATUTES

Evidence Code
1202.............................................................................. 5, 6, 8, 10

### CALIFORNIA RULES OF COURT

Rule 8.500........................................................................... 4

# IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff and Respondent,<br><br>v.<br><br>CEVDET URUK, Defendant and Appellant. | No. _____<br><br>2d Crim. B299732<br><br>Santa Barbara County<br>Sup. Ct. No. 18CR02248 |

## PETITION FOR REVIEW

TO THE HONORBLE TANI CANTIL-SAKAUYE,
CHIEF JUSTICE, AND THE HONORABLE
ASSOCIATE JUSTICES OF THE SUPREME
COURT OF THE STATE OF CALIFORNIA

Pursuant to rule 8.500 (a)(1) of the California Rules of Court, petitioner, Cevdet Uruk, respectfully requests this Court review the unpublished decision of the Court of Appeal, Second Appellate District, Division Six, which affirmed his conviction. A copy of the Court of Appeal's opinion, filed September 30, 2020, is attached as Exhibit A. Review is sought pursuant to California Rules of Court rule 8.500 (b)(1), to settle an important question of law.

4

## QUESTION PRESENTED FOR REVIEW

1.    In a domestic violence case, when out-of-court statements of a non-testifying victim are offered through the testimony of a police officer and through an audio recording of a 911 call made by the victim, does Evidence Code section 1202 require the court to admit into evidence—for the purpose of impeachment—subsequent writings made by the non-testifying victim that contradict or undermine the out-of-court statements that were previously admitted?

## NECESSITY FOR REVIEW

In cases of domestic violence, it often happens that the victim does not testify at trial and previous out-of-court statements of the victim are introduced into evidence via police officers add 911 recordings. It sometimes also happens that the victim will make subsequent statements, either contradicting or recanting the previous out-of-court statements, or otherwise undermining the victim's credibility. Because the out-court-statements of the victim are often the most compelling evidence offered against a defendant in a domestic violence case, Evidence Code section 1202 should be construed liberally to allow subsequent statements of the victim to be introduced as impeachment.

## STATEMENT OF THE CASE AND FACTS

For purposes of this petition for review only, petitioner adopts the factual and procedural background of the case provided at pages 1-4 of the attached slip opinion of the

5

Court of Appeal. In short, petitioner was convicted of dissuading
a witness from reporting a crime, corporal injury to a spouse,
assault by means of force likely to cause great bodily injury, false
imprisonment, violation of a domestic violence protective order,
and battery. (1 CT 111-114.) Petitioner was sentenced to a prison
term of 10 years and eight months. (CT 299; RT 396.)

Petitioner appealed his convictions and also
challenged the duration of the sentence imposed. The Court of
Appeal affirmed the convictions, but vacated the sentence and
remanded the case to the court of appeal with an order to
resentence petitioner to a term of nine years and eight months.
(Exhibit A, Slip Opinion, p. 10.) Petitioner did not seek rehearing
in the Court of Appeal.

## ARGUMENT

I.    HEARSAY EVIDENCE IS ADMISSIBLE TO IMPEACH A
      DECLARANT WHOSE STATEMENTS HAVE BEEN RECEIVED
      INTO EVIDENCE.

      A.    Evidence Code Section 1202 Allows for the
            Admission of Hearsay Evidence to Impeach a
            Non-Testifying Declarant.

      Evidence Code section 1202 provides that:

            Evidence of a statement or other
            conduct by a declarant that is
            inconsistent with a statement by such
            declarant received in evidence as
            hearsay evidence is not inadmissible
            for the purpose of attacking the
            credibility of the declarant though he is
            not given and has not had an

6

> opportunity to explain or to deny such
> inconsistent statement or other
> conduct.

The statute goes on to state that "[a]ny other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

Although it is often the case that the declarant to be impeached is a witness who testified at trial, that is not always so; a hearsay declarant may also be impeached. (*Am-Cal Inv. Co. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 542.) "The purpose of allowing extrajudicial inconsistent statements is to be fair to the party against whom the hearsay was received inasmuch as he was denied the opportunity of cross-examination; thus, such party should at least be allowed to impeach the declarant by admitting the declarant's own statements which are inconsistent with the declaration received in evidence." (*Ibid*.) More succinctly, the "purpose of section 1202 is to assure fairness to the party against whom hearsay evidence is admitted without an opportunity for cross-examination." (*People v. Corella* (2004) 122 Cal.App.4th 461, 470.)

**B.    The Inconsistent Hearsay Statements of Petitioner's Wife, Whose Previous Out-of-Court Statements Were Offered as Evidence Against Petitioner, Should Have Been Admitted for Impeachment.**

*People v. Corella* (2004) 122 Cal.App.4th 461, presents circumstances strikingly similar to the instant case. In

7

*Corella*, defendant's wife called 911 to report that defendant had hit her. (*Id.*, at p. 464.) She repeated the accusation to the police officer who responded to the 911 call. (*Ibid.*) However, when the wife testified at defendant's preliminary hearing, she made statements that contradicted the statements she made during the 911 call and to the police officer who interviewed her after the call. (*Ibid.*) Specifically, during the preliminary hearing, the wife testified that she had not been not hit by defendant, but instead had fallen and hit her hear while playing with her son. (*Id.*, at p. 469.) She also testified that she made false statements to the police out of fear that her husband was going to leave her. (*Ibid.*) However, the next day, when her preliminary hearing testimony was set to continue, the wife invoked her right against self-incrimination and refused to testify further. (*Ibid.*) The court then struck her previous testimony. (*Ibid.*)

At trial, neither the prosecution nor the defense called the wife as a witness. (*Corella*, supra, 122 Cal.App.4th at 469.) Instead, the prosecution relied on the wife's hearsay statements contained in the 911 call and in the police officer's testimony. (*Id.*, at pp. 469-70.) Defendant sought to introduce the wife's inconsistent statements from the transcript of the preliminary hearing under Evidence Code section 1202, but the trial court refused to admit the statements into evidence. (*Id.*, at p. 470.) On appeal, the court held that the wife's prior statements should have been admitted for the purpose of impeachment. (*Id.*, at p. 471.) In reaching its conclusion, the court noted that the applicability of section 1202 is not limited only to those cases in

8

which the declarant is unavailable. (*Ibid*.) The court also noted that whether or not the proffered hearsay statements were trustworthy did not factor into its analysis: "Unlike some exceptions to the hearsay rule, section 1202 does not require the trial court to consider trustworthiness as a condition of admissibility." (*Id.*, at p. 472.)

Here, petitioner's wife (Jane Doe) refused to testify at trial. (RT 186.) Instead, statements she made regarding the events leading to petitioner's arrest were introduced through police testimony and through an audio recording of the 911 call she made. Subsequent to petitioner's arrest, Jane Doe wrote a letter and an email that were inconsistent with what she said during the 911 call and with what she told the police. For example, during the 911 call and in her conversation with the police, she said that petitioner had, among other things, hit her, choked her, and threatened to kill her. (CT 311-312.) By contrast, in the subsequent letter and email, she said that she had been the aggressor, that she had made false and misleading statements due to her fraught emotional state, that petitioner had not made any real threats against her, and that there had been no violence in her home. (CT 157-158.) All of these statements were relevant to whether petitioner had done the things he was charged with, and they were inconsistent with Jane Doe's previous hearsay statements that were admitted into evidence. They should have been admitted into evidence by the court.

In denying petitioner's request to admit these statements, the trial court indicated that petitioner was free to call Jane Doe as a witness instead if he wanted to. (2 RT 256.) This flies in the face of *Corella*, in which the wife also refused to testify, and in which the court said witness unavailability is not a requirement of Evidence Code section 1202. (*Corella*, supra, 122 Cal.App.4th at 471.) In addition, calling Jane Doe to testify would have been a futile act, as she had already stated her unwillingness to testify. (2 RT 45-51,186.)

The trial court here also questioned the reliability of the letter and email offered by petitioner. (2 RT 256.) Again, the court in *Corella* made it clear that the trustworthiness of the proffered hearsay is not factored into a section 1202 analysis. (*Id.*, at p 472.) Just as in *Corella*, these later statements should have been admitted for impeachment purposes. The trial court here abused its discretion by refusing to be bound by *Corella* and by excluding Jane Doe's inconsistent hearsay statements.

## CONCLUSION

In a domestic violence case, the most damaging evidence against a defendant is often introduced through the out-of-court statements of the victim, who often does not testify. When there are also subsequent hearsay statements made by the victim which tend to undermine or contradict the previous out-of-court statements, Evidence Code section 1202 requires that those hearsay statements be admissible for impeachment.

Dated: November 4, 2020                    Respectfully submitted,


*Robert L. Hernandez*
Robert L. Hernandez
State Bar No. 271889
Attorney Petitioner

11

## CERTIFICATION OF WORD COUNT

I, Robert L. Hernandez, hereby certify in accordance with California Rules of Court, rule 8.504(d)(1), that this petition contains 1,506 words as calculated by Microsoft Word, the software in which it was written.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated: November 4, 2020

*Robert L. Hernandez*

Robert L. Hernandez
State Bar No. 271889

Exhibit List (3)

47) My letters to my appellate counsel
48) My appellate counsel's response
49) My Supplemental Brief
50) My request for the Police Reports & response
51) My letter to my trial counsel
52) My letter to the Superior Court
53) My letter to the DA's Office
54) The DA's Office's Response.

1/24/2020

Dear Mr. Hernandez,

Attached are the 2 versions of a Postscript to my Supplemental Brief. I am not sure about the long version. It is upto you. I see that you are not in support of filing a supplemantal brief. Without knowing the whole story, it is not easy to understand the case. Even my family and Attorneys didn't believe me until they saw everything themselves. Also, there are some issues that need to be argued, such as prejudice and the fact that I don't fit the profile described by the law enforcement. You know the best. Unless it hurts me, I want to file it. No decent person/Judge would give such a verdict and sentence if they knew the whole story.

I also want to remind you the following issues:

1. Jury mistake; Could you find the Jury mistake? It must be probably in the Jury instructions. Mr. Levinson told me that the Jury made a mistake and it could be an important one.

2

2. Misdemeanor case/charges:
How are you arguing/appealing?

3. No supporting evidence for the charges;
How are you arguing/appealing?

4. 911 & Police Statements (2014, 2018)
Most of the 2014 statements were excluded in
2015 trial. The whole statement came to 2019
trial.

5. Expert Witness:
How are you going to argue/appeal?

6. My wife's Sentencing Statement;
is an in court statement. Is it arguable/appealable?

7. Prejudice/Discrimination
How are you going to argue/appeal?

8. Constitutional Rights such as confrontation and
equal protection: Are they arguable/appealable?

Thank you so much,
With gratitude,
Cevdet Unik

3/11/2020
Dear Mr. Hernandez,
Thank you very much for your work and help
with my appeal and habeas. I am very grateful.

I am sending you my draft writ of habeas corpus
prepared with limited knowledge/skills/experience/resources
language. I appreciate if you can send it back to me
along with this letter, once you get your copies. I don't
have access to photocopy.

I hope to be able to have access to the library/additional
books/resources/jailhouse lawyers in the following weeks,
if the lockdown is lifted. I'll share them with you.
I don't know the rules of evidence and the Courts/
pleadings. I know the facts, though.

I'll ask our Pastor to send you his and our family
friend's declarations. I am sure that they'll agree to
modify them as you wish. I'll also ask him to
send you evidences (emails, SMS, etc).

You should be able to get other discovery documents
from Mr. Levinson. (police reports, photos, interview
transcripts etc)

2

Unfortunately, I don't have any of the email communication with Mr. Levinson, especially the one about the plea offer. I hope you'll be able to get all the emails from him. I don't know if we need them before filing or there would be a separate discovery.

Our strongest grounds are ineffective assistance of counsel (misadvice about "potential sentence) and newly discovered evidences (Paranora & recent Police call)

The most difficult part is the "barred by procedural default." I don't know the appeal grounds. Also, grounds need to be federalized at the state level, if I am not mistaken I remember from my experience on the first habeas for 2014 incident. As an example if the Crawford/confrontation clause is not raised and federalized at the direct appeal it is barred by procedural default on the habeas. The only way is to bring it as ineffective assistance of counsel.

3

It is not easy to be conciece and provide
enough supporting facts. That's why I
provided a summary and then went to the
details.

I don't know exaity what needs to be
proven for each ground and prejudice.

I appreciate it you don't file anything
before we aggree on the final version
My understanding is we have one shot
and courts routinely deny it.

I don't know if it would be possible to
goto another Judge. Judge Carrazzo wasn't
nice to me.

We need citations for the grounds.

I might be adding my conditions of
confinement as well. They sent me to
Level 2, from Level 1. I was assulted in
Level 2, It is not safe for me. It is in
the appeal (administrative).

4

my wife's statement at the sentencing is attached to the probation report. It is the newly discovered evidence. You don't mention anything about it in your appeal brief. I don't know if it is something that can be brought to direct appeal as well.

Einstein quotation is from a NYT article "The Dark Side of Einstein", it I am not mistaken, at the end. Google should produce. I don't know if it is a good idea to present it or if it is presentable as an evidence.

You mention child cruelty in your brief. My charge was child endangerment. I don't know if they are the same. The first sounds scarier.

Is there a way to look for average actual terms given for my charges? It could be another ground for habeas.

5

Also, judge was telling me that "you cannot talk about your wife like that" as a reason for sentencing. Could that be sentence based on Judge's finding instead of Jury's. That's another ground

Is there a ground for judicial misconduct or abuse of power? Other than judicial bias.

Mr. Levinson told me that Jury made mistake. I don't know what it is but it can be important.
Also, did the Jury instructions had the lessor crime instruction? That's another ground.

Can the appeal court increase my sentence? I am scared of the system and the people.

Thank you so much for everything

Gratefully yours,

Cevdet Uruk

P.S.

My jail time is consequtive. You mentioned something about being concurrent. Would it be possible to look at it phase? Thank you!

6. 3. 20                                                                    1

Dear Mr. Hernandez,

I am confused. You told me that you'll file, the
reply without delay/extension. It's been at least 6 weeks
since you received AG's response. I am not sure
if you have done anything on it. I understand
that the courts are closed. But, you can file
and that would eliminate additional delay in
further proceedings. (oral arguments & and
decision). You also told me to send the habeas
material asap/immediately. I did 2 months ago.
In the meantime I couldn't reach you on
the phone. You told me that you'll contact me
with the Prison's video system. I have
been waiting. I have sent you a couple of
letters asking for the original habeas material
back. You haven't responded. You haven't
responded to Sergiy's email either.
I have been patiently waiting. I didn't
want to bother you especially thinking that
you were working on the reply and I should
be getting something any time.

2

Finally, I was able to reach you after my friends call and text. Then I realize that you haven't done anything on the reply, haven't read my letters and draft habeas and changed your mind about helping me with the habeas

I hope I haven't done/said/write anything that upset you. I have been grateful for your help. I need your help.

I cannot reach you again. I appreciate if you can look at the issues I brought to your attention with my letters and draft habeas. They'll help you with the reply and oral arguments, regardless of your help with the habeas. I also appreciate it you can send me back the original habeas (as we discussed yesterday) and my letters back, after you get your copies. Only the ones in the last two months should be enough. I don't have access to photocopy.

3

Main issues I brought to your attention in my
letters included:

1) My wife's statements regarding her mental and
physical state (including the letter, emails, sms)
(Evidence Code: 1250). She is manic/paranoiac.

2) Competance and substance of the expert
witness testimony on intimate partner battering.
(Criminal Code 1473.5)

3) Police Officer's training (1231.3)

4) Punching allegation?

5) Sentencing upper term instead of middle term

6) Consecutive misdemeanor sentences after prison?

The details and other issues are in my letters
you have.

Also, Sergiy's declaration should help you.

4

Thank you very much for your help.

Gratefully yours,
Cevdet
Cevdet Uruk

6.7.20

Dear Mr. Hernandez,
I received the Fee Waiver from the Court. Unfortunately,
I cannot send you a copy. But you or the Court
should be able to access it in the Docket.
I appreciate your help in getting the transcripts
for the Jury selection.

I assume you mailed the draft habeas back.

Thank you,

Kind regards,

*Cevdet Uruk*
Cevdet Uruk

True Copy

Hernandez

6.9.20

I talked to him after trying twice every day for the last week. He said that he mailed the draft habeas to me 20 mins ago. Last week, he said he'll be mailing immediately. I also learned that he has been paid for the habeas work. I specifically asked if he'll get paid even if he doesn't file a habeas. He said he'll be paid for the work he is doing.

He also said he'll be filing the reply brief by the 19th of June and no new issues can be brought. He said he'll argue mischaracterization (punch).

6.10.20

I called him. He didn't answer.

6.17.20

Mr. Hernandez,
Is it possible to get a copy of the followings
please?
  1) Reporter's transcripts
  2) Clerk's File

If the CAP does not cover the cost, my
friend will send you a check.

I need them immediately.

When is the oral arguments?

Would you be able to get the transcripts
for the jury selection?

Thank you,

Sincerely,

Cevdet

Cevdet Uruk

True copy,

10.7.20

Mr. Hernandez

, Section 1202 states that inconsistent statements
of hearsay declarent "is not inadmissable".
Other "evidence" "is admissable". My
understanding is that it doesn't give any discretion
to the judge under 352, if it is inconsistent.
It is a mandate. Judge has the
discretion on any other impeaching evidence.
So the appealate courts statement saying
that 1202 "permits" is not correct, if the
evidence is inconsistent. Then the issue
becomes, whether the letter and email
are inconsistent. They are inconsistent. I
don't know how to argue these at the
rehearing or review.

It should be possible to find some
cases, if you look at annotated evidence
code (by West Publishing). I don't
have it

Letter and email are probative and
relevant( CA Constitution Sec 28$^{(f)(2)}$ Right to
Truth in Evidence)

, The confrontation clause violation 6th Amd.
should have been argued. Crawford
and Davis

  Crawford  v.  Washington  (2004)
  Davis  v  Washington  (2006)
  The  911 and statments were
testimonial hearsay. There was no
ongoing emergency.

The letter and email was authenticated by an investigator. (It is on the record)

- My characterization:
- I (tried to) choked her.
- Deputy did not see the bruise and/or lacerated lip.

The alleged offenses were a single act that happened in less than 1 minute. The court infers with the same intent and objective (wrong conclusion) (to stop my wife's attack)

The other sentencing issues should have been discussed. (such as, denial of continuance, denial of making a statement, and consecutive & upper term for the same unsubstantiated aggravation factor, complete ignorance of mitigating factors,

Wende brief. The court should have looked at the whole record on its own.

# ROBERT L. HERNANDEZ
## ATTORNEY AT LAW
530 E. Los Angeles Ave., #115-207 • Moorpark, CA • 93021
(805) 390 1222 • robert@calcrimappeals.com

October 19, 2020

Cevdet Uruk BK0724
California Correctional Institution
P.O. Box 608
Tehachapi, CA 93581

Re:  ***People v. Uruk***
     **2nd Dist. Court of Appeal Case No. B299732**
     **Santa Barbara Sup. Ct. No. 18CR02248**

Dear Mr. Uruk:

I have received and read your letter of October 7, 2020, and write now in response.

First, I want to let you know that in briefing your case, I considered very carefully the potential issues I thought could be raised on appeal. In the end, I chose, in consultation with CAP-LA, to raise three issues: the Evidence Code section 1202 issue you refer to in your letter, a sentencing error in which the court applied the wrong statute in selecting the base term of your sentence, and a Penal Code section 654 claim (arguing that you could not be sentenced twice for the same conduct.) In addition, at your request, I sent a letter to the court asking that the court receive and file your own supplemental brief, which the court did. In the end, the court only gave you a one year sentence reduction, and affirmed your case in all other respects.

I chose to raise those issues because I believed they were the ones that had merit. I also considered other issues, but I did not think there was any basis to raise them on appeal. I will tell you also, Mr. Uruk, that I understand how important this case is to you, and how you must feel hard-done by your sentence.

In your letter, you refer to the 1202 evidence issue. I agree with you that the result the court of appeal reached is frustrating, and it is not what I was hoping for. However, Evidence Code section 352 is applicable and the trial court was within its discretion to consider 352 when ruling on the evidence that you sought to admit. I do not believe there is a legal error that would make rehearing appropriate.

Regarding authentication of the letter, from my review of the record in this case, I recall that your attorney indicated to the court that the investigator could

Cevdet Uruk
October 19, 2020
Page 2

authenticate the letter if necessary. However, the investigator was never called as a witness to authenticate it. Ultimately, whether that happened or not was not essential to the court's reasoning in this case anyway, because the court held that the trial court properly excluded the evidence on 352 grounds.

Regarding the 654 issue, I agree with you that the facts arguably indicate that the alleged conduct was one continuous event and you did not for two separate intents. The court simply does not agree that is the case, and as a legal matter, I do not believe they erred in holding that. It was a difficult argument, and I thought it was kind of a long shot, but the court did not agree. Again, I do not believe there is any basis for rehearing on that issue.

You also mention Crawford and confrontation clause issues. In case like yours, where the evidence offered by the alleged victim comes in the form of a 911 call, I always evaluate whether there is a potential confrontation clause problem. I did not believe I could credibly argue that the 911 call was non-testimonial, and I did not raise the issue. Even were I inclined to change my mind on that issue, it cannot now be raised in a petition for rehearing when it was not raised in the briefing.

For these reasons, I do not believe a petition for rehearing is appropriate.

Sincerely,

*Robert L. Hernandez*

Robert L. Hernandez

IN THE

COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION: 6


The People v. Uruk

Cevdet Uruk

B299732

Santa Barbara No 18CR02248



DEFENDANT'S SUPPLEMENTAL BRIEF

1

I, Cevdet Uruk, respectfully submit this supplemental brief in support of my appeal.

## FACTS

My wife and I have been married for 7 years with 3 little children (2, 4, 6 yrs). She is the primary bread winner as a Software Analyst with a Masters in Mechanical Engineering. I am the primary caregiver to the children with an MBA from Washington University, and CFA, and CPA designations.

She was not healthy physically and mentally when I met her. She fainted and hospitalized at the subway. She has lost her job. She was depressed. I helped her to heal with healthy diet and exercise. It took almost a year for her to conceive due to her poor health.

## 1st Call

In February 2013, when she was pregnant for our first baby, she told me that: " I am gonna get your money and I am not gonna show you the baby ", over an argument why she failed the driver's license test twice. She already had a driver's license from Russia. I asked

2

for the debit & the credit cards, and the wedding bands. I told her that: "we will get a divorce". She called the domestic violence hotline and told them that: " my life is in danger".

She left home. Next day, she called me and a friend, Dotty, to apologize and to come home. There is a skype message from her asking for forgiveness. It is among the discovery documents. Later, I noticed that she lied to me and gave me the old cards, took some cash from the bank and bought a ticket to Russia by using the new credit card. She stayed in a hotel at LAX and changed her mind next morning.

## 2nd Call

In March 2013, she became aggressive/violent over an argument when she was using the house cleaning gloves to clean fish. She threw the fish at me and she hit me a couple of times. I asked her to go to our friend Dotty. She told me that: "I'll send you to jail". I emailed her and asked for a divorce. It is among the discovery documents. A year later, I learned that she went to the Police to report. I wasn't

3

contacted by the Police. The Police report is among
the discovery documents. She was alleging that I slapped
her with the fish and she was admitting that she hit me.

### 3rd Call

In June 2013, she became aggressive and she slapped me
when I yelled at her while she was using a can opener
to open a yogurt jar with a twisting lid. I locked her out
and I asked her to go for a walk to calm down. I was
cooking for expected guests from overseas and I had
a phone interview. She didn't calm down. I asked her
to go to the people from the Church (Montecito Covenant).
She called the Police to come home. I told the officer
that: "you wouldn't want to come to a violent place".
He agreed. We were seperated for a couple of weeks/
months. We took some counselling from our marriage
counsellor, Pastor Sergiy Tarasenko. (from Carpinteria
Baptist Church). I asked her to write down her
complaints and I responded in writing. She told me
that; "I don't want to see you anymore". We had
no communication next day. The following day she
came home and told me that: "I am sorry... can you
forgive me?... I took some threapy and I was told

4

that I am like that because of my alcholic father."
Later, she didn't remember anything. The email
for this communication is in the discovery file. The
Police report stating that there was no evidence of
violence and I was very calm is in the discovery file
too.

### 4th Call (2014 Incident)

In November 2014, over an argument for peanuts she
was hiding and lying about it, she became aggressive.
She was getting allergies/rushes from peanuts and since
she was nursing, the baby was getting the same rushes.
Previously, she admitted the cause-effect relationship
and now she was denying. I wanted to seperate.
There is an email among the discovery documents.
She went to our landlord and cried. Our landlord's
name is Doris Eastman. A week later she called the
Police and told them that: " There has been a long
abuse going on, I want to leave my husband and
he is threatening to kill me, he tossed me from
room to room, he hit me, grabbed me by the neck
or arm ... I don't remember ... "

She was pregnant with our 2nd baby, at that time.

5

She didn't want the arrest, she didn't want the
protective order. She wanted Police to talk to me.
There was no evidence of any violence. I was
arrested for battery (misdemeanor) for holding her
hands/arms and criminal threat (felony) for saying
that: "I'll kill you if you hurt the baby." Initially,
the prosecution dropped the criminal threat charge
and offered an infraction.

Later, they found out an email exchange between us
quoting a Bible verse "Wives, submit to your husbands".
They gave me a female public defender with
Iranian/Armenian descent (Ms Kareemian), a
prosecutor with Iranian descent (Ms. Arshi), a
female Judge who has been fighting with her
ex-husband over child support. They brought the
criminal threat charge back as misdemeanor, by alleging
that there was a witness from the Child Welfare
Services. There was no witness.

My wife made written and verbal statements to the
DA saying that: "There was no violence, no threat...
I made incorrect statements emotionally, due to

6

hormonal changes. In Russia, we call the Police so that they talk to the husband. Not a big deal. Cevdet is a loving husband and a devoted father. He helped me to gain my health, get a job and family ...,

She took the 5th Amendment on the trial and refused to testify. One senior DA was shouting: "this is a criminal trial" in front of the jury during the recess. I was subjected to the harsh looks and comments from Judge Dandona. I wanted to testify, but my council opposed.

I learned that I was convicted of battery and acquitted of criminal threat at the delivery/operation room in the hospital. I was put into 3 yr probation.

### Probation

In 2015, I was charged with probation violation, for not being able complete the batterer's threatment program and possessing a fire arm, after I explained the rationale behind 2nd Amendment.

I responded to the probation report stating that

7

"this is corruption". My fire arm had already been confiscated by the Police.

Probation came for a house search. They found a knife and a box of ammunition that I didn't know where they were. They belonged to my wife and I had previously disclosed to the probation officer, while waiting/asking the court the approval of the transfer of the fire arm to my wife. I wasn't allowed to record the conversation with the probation officer. I was sentenced to 2 months in jail. ... The officer lied in the court.

I appealed unsuccessfully, by quoting a Wall Street Journal Article that said "Women failed humanity."

I also made some mistakes in expressing my confidence in America, system, justice and people by saying that: "this is not significantly different from the movie Midnight Express and Jesus's & Aaron Schwartz's prosecutions." Later, I apologized for the

8

misunderstandings I have caused and for my arrogance.

## 5th Call (2018 Incident)

In November 2017, my wife went to early labor at week 31 while she was pregnant with our 3rd baby. She was hospitalized for 5 weeks amid wildfire evacuations and mudslides. Our son was born in January 2018 at week 36. In February, he was hospitalized due to respiratory infection. It was a very stressful time for our family. I had to fight with the doctors and my wife to keep the baby at the womb as long as possible. They wanted to take the baby out at week 35. Later, I learned that their motivation was primarily financial. At week 35, the baby goes to NICU, a very expensive stay, without parents consent. At week 36, they need parents' consent. I had Medical and all costs were covered with no out of pocket expense, including the NICU stay. I was so worried for the prematurity risk and infection risk at the NICU. Our son made it without any need for NICU stay. My wife was threatening me with calling the Police on the Phone.

9

On March 9, 2018, I took my wife to a long postponed Therapy. She had taken some Threapy 6-7 months earlier with another Threapist. Unfortunately, I couldn't attend, since I had to watch the kids. She was refusing to work together, despite her previous aggreement. She was saying that she didn't need any therapy; I was very disappointed. I told her that this could be our last chance, Please, lets work together."

The previous night, we had an argument over her behaviour to teach children to lie. I had offered children a treat if they finished their vegitables. I left the table for a while and when I came back my wife told me that they finished the vegitables. I opened the trash and the vegitables were there. My wife threw them away and lied.

We came home from the Therapist. The baby was in the carrier. I had work to do. She was aggressively fighting with me. I was trying to tell her that teaching them to lie would be the worst thing she could do to us. She attacked me and called the Police

10

to say that: "my husband hit me, he tried to choke
me last night ". I was basically arrested for
simple battery (misdemeanor).

The Police report mentions about a bloody lip.
There was no blood. There was no bloody lip.
There was a small/light mark inside her mouth
likely caused by her implant/cover to her front teeth
cavities.

She didn't want the protective order. She was
telling the Police that: "it was enough.. he has seen
you.. he is scared.. She went to the DA to help
me / get me out. The DA increased my charges to
Corporal Injury (Felony), Assult with Likely GBI
(Felony), Dissuading a Witness, (Felony), False
Imprisonment (Felony), Child Endangerment (Misdemeanor),
Protective Order Violation (Misdemeanor). My wife
was telling them that: "don't tie this to 2014, this is
different ". She was crying & begging to the Judge, DA and
my counsel to get me home back. Emails are
in the discovery documents.

My plea after was 1 felony (Dissuading a witness) and no
Jail/prison time.

11

She send me an SMS saying that:" I am so sorry,
please fight for us. You have always been right.
I went to the therapist. I have been fighting with
you because of the things in my head. I'll do
the best of everything for you, I beg you." The

She also made another written statement to the DA
similar to the 2015 one. The statement and the sms
are among the discovery documents. She was admitting
that she was the aggressor.
As soon as I was able to go home, she
forgot everything and started threatening me with
the Police again. For example, when I asked her
to get up in the morning, she replied:"Do you
want me to call the Police". Once, she almost
called the Police, while we were on vacation in
Tahoe, unless I hang up the phone and not talk to
my Sister.

## 6th Call

In February 2019, she was pregnant briefly and acting
extremely aggressive. In March 2019, I wanted to
seperate. She slapped me and told me that "I'll
send you to Prison and you'll die there".

12

Our baby had some rashes. I took him to 2-3 doctors. I asked my wife if she was eating/taking anything unusual. She said: "No". Later, I learned that she was lying again. She was taking painkillers. They were the cause of the rashes, most likely. I don't know what else she was lying about.

Also, I learned that she went to the DA in March and told them that: "My husband beaten me in Turkey. I had bruises all over. He locked me in... Also, he left us with a bear and ran away in King's Canyon." There was no digital recording of this interview. I don't know the whole content. We had visited Turkey for about a month, 6 months earlier, in October 2018. We were traveling all the time in public in different cities/places, including a public resort vacation. There are/were photos all the time. We were with family and friends, most of the time.

The bear incident had happened 2 years earlier in 2017. I didn't run away. We ran away together. I was carrying my little daughter on my shoulder.

13

Later, she made another statement similar to
the previous ones saying that there was no violence.

The prosecution attempted to bring those murders
as uncharged events.

During the trial in June 2019, she refused to
testify. I wanted her to testify. Judge Carrozzo
allowed her full 2014 and 2018 statements to come
to trial. He denied her written statements to come
to trial. I wanted to testify but my counsel
(Mr. Levinson) opposed strongly.

I wanted our Pastor to testify. My counsel opposed.
He could have attested to my wife's mental issues
lies and my innocence. His declaration is in the
discovery file. There were other witnesses as well.
(Adnan & Turanca Orali).

After the convictions she made another written
statement saying that:" I was diagnosed with
chemical imbalance in my brain due to my sugar
addiction and I was prone to delusions due to

14

a childhood trauma... I don't remember the events and I need my husband back home. The statement and the therapist note is attached to the Probation Report.

The Judge denied our request to postpone sentencing for a new trial. He also denied recommendation from the probation for 5 years probation. The DA asked for 7 yrs prison and the Judge gave the maximum 12.3 yrs with harsh words and looks.

My wife has no communication with her parents and sisters. She fights with everybody around. Since, I loved her, I took it as a childish act. I was looking for help through friends, churches, counsellors and professionals though. She is a sugar addict with cavities on her all teeth. She has continously running nose and blinking eyes. She cries while giving blood sample. She runs away from the dentist. She cried saying that anesthesia didn't work, during an operation.
My 4 year old daughter is telling me that:" You are a monster Daddy!... get out of this house... this is not your house... we'll send you to jail and drink juice."

## ANALYSES                                    15

1. There was no supporting evidence for the charges.

I was basically arrested for simple battery. My charges were increased to felony by the DA.

There was no bloody lip. There was no blood. The little mark inside my wife's mouth was likely caused by the implant/cover to her front teeth cavities.

There was no other pysical evidence of corporal injury or assult with likely GBI.

In 2014, I was arrested for holding my wife's hands to protect myself. My plea after was an infraction. The Judge didn't allow 2014 photos to be shown to the Jury. There was no sign of any violence.

I was convicted with the hearsay, out of court and false statements made by an admitted liar with mental issues. My wife admitted and diagnosed

16

with chemical imbalance in her brain due to sugar addiction and delisions due to a childhood trauma. I suspect more serious mental issues such as probable paranoia and possible schizophrenia.

As the probation report states, I don't fit the profile described by the law enforcement. I am highly educated (with MBA, CFA, CPA). I don't drink. I don't do drugs. I am a loving husband and devoted father. I am calm and respectful to everybody. I have a very healthy life style. I served the University of Memphis & Purdue University as a visiting Professor. I worked for the Turkish SEC and FedEx as a Sr. Financial Analyst. I lived my life with the highest possible ethical standards.

My wife has been the aggressor. She didn't call the Police when I slapped her lightly to stop her aggression. She called the Police 6 times, when I wanted to seperate from her.

The expert witness knew nothing about the case. Her testimony was prejudiced.

17

2 My wife's 911 call & statements to Police are testimonial.

Full 2014 statements, even the parts excluded in 2015 trial, were allowed to come to trial in 2019. They were regarding long term abuse and violence. They were long. There was not an ongoing emergency. She refused to testify in 2015 as well. She took the 5th.

Full 2018 statements were allowed as well. There was not an ongoing emergency at the time of the call. The alleged choking incident took place the day before the 911 call.

Those statements were false and were not subject to cross examination. They were made by an admitted liar with mental issues.

The written statements were completely contradictory to 911 call & statements to the Police. The Judge didn't allow written statements to come to the trial. Those statements were saying that " There was no violence or abuse ... I was the aggressor. I made incorrect statements ... my husband is a loving husband and a devoted father. "

18

My counsel told me that the Judge made a mistake
by not allowing those statements, the record was
made clearly with the supporting authority. With the
written statements, the result would have been
completely different, he said. He also said that the
Jury made a mistake too. I don't know what
it is.

3. The counsel was ineffective in assistance.

My first plea offer was 1 felony (Dissuading a
witness) and no jail/prison time. There is an
email from the counsel regarding the offer.
While I was waiting for a response, I found
myself at the preliminary hearing. I was willing
to take the offer, since I was scared of the
charges. The DA was changed. I was waiting
for a settlement. The counsel told me that there
is an offer of 1 year jail and 1 felony, but
it is not good. Just before the trial, I asked
for a settlement. They offered 180 days on ankle
monitoring and 1 felony. While discussing the offer,
my counsel, Mr. Levinson, told me that let's go try,

19

He said there is no supporting evidence for the charges. I specifically asked him if the Judge can give me a lengthy sentence. He said "no." I was misled. He said I might end up with a probation violation.

I wanted to testify. He strongly opposed. I could have helped myself.

I wanted our Pastor to testify. My counsel opposed. He could have helped me.

My wife's mental issues, aggression and false statements and my innocence could have been introduced through my or our Pastor's testimony. There were supporting documents/emails. He didn't investigate my wife's mental health.

I wanted my wife to be called to introduce her written statements, after the Judge denied them without her testimony. The Judge told us that we can call her to introduce the written statements. My counsel opposed.

20

Even after the convictions, he told me that maybe
I get 3-4 yrs. He told me that I have a very
favorable report from probation.

Our Pastor and marriage counselor wanted to
come to sentencing to help. But Mr. Laurison
told me that he would postpone the sentencing.
The Judge denied.

He didn't tell me that we have 5% chance of
winning the trial, in general.

I asked him specifically if he is paid extra for
the trial. He said "no". Later, I learned that
he was paid monthly as long as the litigation.
He had a strong incentive not to settle the
case. I still don't know his compensation plan.
He is state paid.
He didn't respond to my emails and calls properly.
He didn't tell me that they can punish me
for going to trial. He told me that my wife
had a red spot on her arm in one of the
photos. There was no such photo.

21

My wife told the Police that she didn't remember if I held her by the neck or arm. Mr. Levinson told the Jury that she didn't remember if I held her by the neck or throat, despite my in advance reminder.

He didn't tell me anything about Cuiz Waiver, 5150 List, and appeal bail.

The Judge told me that even if my wife does not testify, he could find me guilty on the probation violation (misdemeanor) (2014). It must be on the record I understood this as if she doesn't testify they cannot find me guilty on felony charges. As an immigrant, I was incompetant.

22

4 <u>I was prejudiced/discriminated against.</u>

My Counsel told the Jury that I am Turkish. But he didn't tell them that I am an American.

One of the Jurors told the court that he had been to Turkey and definitely the standards of threating a woman there are different.

When I talked about the race and sex discrimination, the Judge told me that he would consider these during the sentencing. Then he gave me the maximum term with harsh words and faces.

The foreperson told the court that if the DA didn't dismiss the charges, I must be guilty.

There were around 20 people from the DA's office coming to the trial. I wanted this to be on the record. Mr. Levinson opposed.

The Prosecutor, Ms. Chanda told the court at the closing arguments, "I hope you find the defendant <u>not</u> guilty of all charges."!

23

It wasn't a coincident to be represented by a female public defender with Iranian descent, prosecuted by a female prosecutor with Iranian descent, after quoting a Bible verse "wives, submit to your husbands.", in 2015. I respect women & I submitted to my wife.

5. The maximum sentence is unjust, unusual and cruel.

My wife was not a victim. There was no victim. Now, there are at least 5 victims. My wife had the health, family, America, a beautiful home in a beautiful place and a good job. She hadn't had any of these before I met her. Her sister does not have any of these. My wife took away all these plus my freedom from me. I am the victim. Children are the biggest victim. They are deprived off their father and primary caregiver. They'll be more likely to be poor.

I failed my children. I have a lot of pain. I worry about the survival of my family. My wife and I don't have any family or friends who can help us in the U.S.

24

I am no risk to anyone. I love my family and America. My wife has to work and take care of the children by herself. She makes 4.5K a month and pays 2.5K a month for daycare.

It is inhumane to deprive 3 little children off their father and primary care giver, (with wrongful convictions) and anjust (lengthy sentences)

6. My constitutional rights have been violated.

My 1st, 2nd, 5th, 6th, 8th and 14th Amendment rights have all been violated.

I changed my name, nationality and religion trusting to the laws, faiths and people of America.

I left my family, friends, a life time employment and a good life in Turkey to become an American. I worked very hard to be like you.

I've got an MBA, CFA, CPA to become a CFO.

25

Your people made me a felon and destroyed my
life and my family, and their lives too.


## CONCLUSION

If my wrongful convictions and unjust sentences are
not the results of prejudice/discrimination, and
abuse of power/corruption, then they must be the
result of using my constitutional right to trial. The
only difference between the plea offer of no
jail/prison and the maximum term (12.3 yrs)
is/was trial.


I don't deny my mistakes while I was trying to
protect my family against my wife's childish
aggression. I take full responsibility for my actions.
I apologize for creating the whole problem
from the beginning and not being able to
manage it. I couldn't walk away from
my children. But we never had anything like
Jerry Springer Show or Mell Gibbson's
battery. There are cultural and language difference
issues as well. I am sorry for what happened and
I don't blame anybody.

26

Even the Jurors were not my peers. I respect them and the system. But something went seriously wrong.

I respectfully ask/beg the Court to show some, compassion, justice and mercy by reversing the wrongful convictions or at least reducing and/or postponing the unjust sentence for the sake of 3 little children.

With respect & gratitude,


I declare under the rules of perjury. January 7, 2020

Cevdet Uruk

POSTSCRIPT                                27

I just learned from our Pastor that my wife called
the Police again over an argument with her father on
January 18, 2020 and had him arrested. I don't know
the details. Her father was visiting from Russia to
help her.

My wife pushed my Mother in Turkey and threw an
onion bag at her when my Mother was helping
us with the new born in the US, as well.


I declare under the rules of perjury. January 24, 2020.
Respectfully.

Ceelilly

Cevdet Uruk

6.11.20
Santa Barbara County Sheriff
4434 Calle Real
Santa Barbara CA. 93160

Dear Sheriff,

I am respectfully requesting a copy of the (deputy)
reports for the following incidents:

1) A call from my wife, Natalie Uruk, on March 9, 2018
regarding a domestic disturbance (alleged) involving me.

2) A call from my wife, Natali Uruk, on or around
January 18, 2020 regarding a domestic disturbance
involving her father, Ildar Eremeev

3) Any call from my wife regarding any incident
involving anybody. Her cell phone is 805.259.
Her/
Our address is 1021 Cieneguitas Rd, Santa Barbara CA,
93110.

I am incarcerated and preparing to file a habeas corpus
petition.
Thank you very much for your help.
Kind regards,


Cevdet Uruk

CCI
D4, 8up
PO Box 608
Tehachapi CA 93581

# Office of the Sheriff

## SANTA BARBARA COUNTY

**BILL BROWN**
Sheriff-Coroner

**SOL LINVER**
Undersheriff

P. O. Box 6427 · 4434 Calle Real · Santa Barbara, California 93160
Phone (805) 681-4100 · Fax (805) 681-4322
www.sbsheriff.org

June 19, 2020

**STATIONS**

**Buellton**
140 W. Highway 246
Buellton, CA 93427
Phone (805) 686-8150

**Carpinteria**
5775 Carpinteria Avenue
Carpinteria, CA 93013
Phone (805) 684-4561

**Isla Vista**
6504 Trigo Road
Isla Vista, CA 93117
Phone (805) 681-4179

**Lompoc**
3500 Harris Grade Road
Lompoc, CA 93436
Phone (805) 737-7737

**New Cuyama**
70 Newsome Street
New Cuyama, CA 93254
Phone (661) 766-2310

**Santa Maria**
812-A W. Foster Road
Santa Maria, CA 93455
Phone (805) 934-6150

**Solvang**
1745 Mission Drive
Solvang, CA 93463
Phone (805) 686-5000

**Sheriff – Coroner Office**
66 S. San Antonio Road
Santa Barbara, CA 93110
Phone (805) 681-4146

**Main Jail**
4436 Calle Real
Santa Barbara, CA 93110
Phone (805) 681-4260

**COURT SERVICES
CIVIL OFFICES**

**Santa Barbara Division**
1105 Santa Barbara Street
P O Box 690
Santa Barbara, CA 93102
Phone (805) 568-2900

**Santa Maria Division**
312 E. Cook Street, "O"
Santa Maria, CA 93456
Phone (805) 346-7430

California Correctional Institution
Cevdet Uruk CDC # BK0724
Facility D Building 4 Bed 15 UP
PO Box 608
Tehachapi, CA   93581

Enclosed is a copy of your request.
Since you are not listed as a victim, we are unable to release the report.

You can review our Guidelines on report release at the Santa Barbara County
Sheriff website.  www.sbsheriff.org

Respectfully,

J.Castillo/AOP Senior
Santa Barbara County Sheriff
Records/Warrants

ENC

Neil Levinson
1933 Cliff Dr.
Santa Barbara CA 93109

4/26/2020

Re: Client File
    Case # 18CR02248

Dear Mr. Levinson,

I hope all is well. I need a complete copy of my client file for the habeas corpus petition. This includes all discovery material, pretrial motions, responses, orders, communications/emails with me, DAs, my wife, other attorneys/investigators, etc.

Hopefully, you'll act according to the federal law and not impede my rights, by providing me a copy (printout) of my client file within 14 days of this letter via a certified mail. Otherwise, I'll file a motion to compel with the court.

Also, you told me, after the convictions, that the jury made a mistake too. I appreciate if you can explain/clearify the mistake.

$\Longrightarrow$

6.7.20

Re: Case # 18CR02248

Dear Clerk,

I am respectfully requesting

1) Reporter's Transcripts for all the proceedings
   (all hearings, Jury Selection, trial, sentencing etc)

2) Clerk's File/Report for all the documents
(motions, minute orders, briefs, orders, Judgements etc)

I am preparing for a habeas petition.

Thank you very much for your help.

Kind regards

Cevdit Uruk